Exhibit E

CERTIFIED COPY                                             1

1

2  UNITED STATES DISTRICT COURT

   SOUTHERN DISTRICT OF NEW YORK

3  ------------------------------------x

4  VIOLA PLUMMER,

5              Plaintiff,        Civil Action No.

6        -against-              07 CV 6154(WHP)

7  CHRISTINE QUINN,

8  Speaker of the City Council,

9              Defendant.

10 ------------------------------------x

11              August 14, 2007

                1:24 p.m.

12

13

14

15           DEPOSITION of CHARLES MEARA, taken

16 by the Plaintiff, pursuant to Notice, at the law

17 offices of the Corporation Counsel, 100 Church

18 Street, New York, New York before Karen Perlman,

19 a Shorthand Reporter and Notary Public within and

20 for the State of New York.

21

22

23         GREENHOUSE REPORTING, INC.

         363 Seventh Avenue - 20th Floor

24        New York, New York    10001

              (212) 279-5108

25

2

1

2  A P P E A R A N C E S :

3  LAW OFFICES OF ROGER S. WAREHAM, ESQ.

4  Attorneys for the Plaintiff

5       394 Putnam Avenue

6       Brooklyn, New York  11216

7

8  NEW YORK CITY LAW DEPARTMENT

9  OFFICE OF THE CORPORATION COUNSEL

10  Attorneys for Defendant

11       100 Church Street

12       New York, New York  10007

13  BY:    PAUL MARKS, ESQ.

14           -and-

15  NEW YORK CITY COUNCIL

16  OFFICE OF THE GENERAL COUNSEL

17  Attorneys for Defendant

18       250 Broadway

19       New York, New York  10007

20  BY:    ALVIN L. BRAGG, JR., ESQ.

21

22

23  ALSO PRESENT:

24  Viola Plummer

25

3

1

2                    STIPULATIONS

3            IT IS HEREBY STIPULATED AND AGREED

4    by and between the attorneys for the respective

5    parties hereto, that all objections, except as to

6    form, shall be reserved to the time of trial.

7            IT IS FURTHER STIPULATED AND AGREED

8    that the sealing and filing of the within

9    deposition are hereby waived.

10            IT IS FURTHER STIPULATED AND AGREED

11    that the within deposition may be subscribed and

12    sworn to by the witness being examined before a

13    Notary Public other than the Notary Public before

14    whom this deposition was begun.

15

16

17

18

19

20

21

22

23

24

25

4

```
 1                      C. Meara
 2   C H A R L E S   M E A R A, stating a business
 3               address of City Hall, New York, New
 4               York, having been first duly sworn
 5               by the Notary Public, was examined
 6               and testified under oath as follows:
 7
 8   EXAMINATION
 9   BY MR. WAREHAM:
10        Q.    Good afternoon Mr. Meara?
11        A.    Good afternoon.  How are you?
12        Q.    Fine, and you?
13        A.    Good.
14        Q.    My name is Roger Wareham, and I
15   represent Ms. Plummer in this action.  I just
16   want to ask you a couple of preliminary
17   questions.  Have you ever been deposed before?
18        A.    No.
19        Q.    As you can tell you're already
20   testifying under oath.  If I ask you any
21   questions that you don't understand either in
22   terms of its form or its content, you should just
23   ask me and I'll try to rephrase it and make it
24   understandable.
25               You have to answer verbally, orally,
```

5

                              C. Meara
1

2    she can't record a shake of the head or that, so

3    you have to say yes, I understand or something?

4          A.    Yes, I understand.

5          Q.    Have you taken any medications or

6    anything that may impair your ability to answer

7    clearly and understand what is going on today?

8          A.    No.

9          Q.    If you need to take a break or

10   anything like that, just let us know, we'll do

11   that.

12         A.    Okay.

13         Q.    What is your position on the

14   Council?

15         A.    I'm the Chief of Staff to the

16   Speaker of the City Council.

17         Q.    And how long have you been in that

18   position?

19         A.    About three years.

20         Q.    And were you Chief of Staff for the

21   previous Speaker as well?

22         A.    For about a year and a half.

23         Q.    And that was Gifford Miller?

24         A.    Yes.

25         Q.    And what did you do prior to working

6

1                    C. Meara

2  as Chief of Staff for the Speakers?

3       A.    I worked at the Port Authority of

4  New York and New Jersey.

5       Q.    And what did you do there?

6       A.    I did their intergovernmental work

7  for New York.

8       Q.    How long did you do that?

9       A.    I was there 19 years.

10      Q.    And what is the highest level of

11 education that you attained?

12      A.    I have a college degree.

13      Q.    In what?

14      A.    Political science and history.

15      Q.    From where?

16      A.    Maris College in Poughkeepsie.

17      Q.    And what is the total amount of time

18 that you've been working at the Council?

19      A.    Three years and about two months.

20      Q.    What are your responsibilities as

21 Chief of Staff?

22      A.    I have overall responsibility for

23 the supervision of the staff, which includes

24 legislative, it includes administrative services,

25 member services, and I work with members.

7

C. Meara

1

2    Q.    Does that also entail personnel

3  responsibilities?

4    A.    I have oversight of personnel

5  responsibilities.

6    Q.    And oversight means what?  What is

7  your definition of oversight?

8    A.    Well, we have an administrative

9  services division and they, through someone else,

10 will ultimately report to me.

11   Q.    So everything comes through you,

12 before it gets to the Speaker, generally?

13       MR. MARKS:  Objection, Objection to

14   form.

15       You can answer.

16   A.    Yes.

17   Q.    Is there a flow chart, an

18 administrative chart for the City Council that

19 you're aware of?

20   A.    Yeah, I've seen a flow chart.

21   Q.    And everything sort of goes through

22 you and then from you to the Speaker?

23   A.    Ultimately, yes.

24   Q.    Do you have any particular

25 responsibilities at stated meetings of the

8

1                              C. Meara

2     Council?

3            A.     I usually stand near the Speaker and

4     try to ensure that everything goes right.

5            Q.     In your position as Chief of Staff

6     to the Speaker, do you also advise the Speaker on

7     different issues that come up?

8            A.     Yes.

9            Q.     On the procedure that is involved

10    with co-naming of streets or renaming of

11    streets --

12                  MR. WAREHAM:    Withdrawn.

13           Q.     You're familiar with the procedure

14    that is involved with co-naming of streets?

15           A.     Yes.

16           Q.     And would it be fair to say that

17    that involves the submission of names by Council

18    people in a package that then gets at some point

19    approved by the full Council or voted on by the

20    full Council?

21           A.     Yes.

22           Q.     When the package is first submitted,

23    does it regularly go to the Parks and Recreations

24    Committee?

25           A.     Yes.

9

1                              C. Meara

2         Q.    And then the Parks and Recreations

3    Committee sends it back to the full Council

4    assuming it approves it?

5         A.    Yes.

6         Q.    Prior to the removal of the name

7    of -- are you aware that the name of Sonny Carson

8    was removed from the package by the Parks and

9    Recreation Committee in I believe April of 2007?

10        A.    Yes.

11        Q.    Prior to that removal are you aware,

12   had that ever happened before, where the Parks

13   and Recreation Committee removed a name from a

14   package that had been submitted?

15        A.    Not that I'm aware of.

16        Q.    To your knowledge, was the Speaker

17   involved in discussions with members of the Parks

18   and Recreations Committee about the removal of

19   Sonny Carson's name from that package?

20        A.    To my knowledge, no.

21        Q.    Were you aware that prior to the

22   meeting in the Parks and Recreation Committee,

23   the Speaker had indicated that she had a problem

24   with Sonny Carson's name being included in that

25   package?

10

C. Meara

1

2      A.    Yes.

3      Q.    And that she had indicated that she

4  was going to have that name removed from the

5  package?

6      A.    I think she indicated that she did

7  not support including that name in the package.

8      Q.    But your understanding -- you're

9  saying she did not also further indicate that she

10  was going to intervene to have the name removed

11  from the package?

12      A.    I -- I think she made her position

13  on the name in the package clear.

14      Q.    Prior to the meeting of the Parks

15  and Recreations Committee, do you know if she

16  spoke with any of the members of that committee

17  concerning their vote on the Sonny Carson issue?

18      A.    I don't -- I don't know that she

19  did.

20      Q.    Did you contact anyone, any members

21  of the Parks and Recreation Committee prior to

22  that concerning the Speaker's concerns?

23      A.    I contacted members of the Parks and

24  Recreation Committee to determine what their

25  position was on the issue.

11

1                          C. Meara

2        Q.    So you were just taking a pole?

3        A.    Yes.

4        Q.    Did you indicate to them that the

5   Speaker did not support Sonny Carson's name being

6   included in that package?

7        A.    Yes.

8        Q.    Did you speak to Council Member Tish

9   James, Leticia James about that?

10       A.    Yes.

11       Q.    And did you indicate to her that

12  there would be -- How many times prior to that

13  meeting did you speak to her about that?

14       A.    I believe once.

15       Q.    And what about Council Member

16  Gallagher?

17       A.    Yes, I spoke to him.

18       Q.    How many times did you speak to him?

19       A.    I believe once.

20       Q.    Did you speak to any of the members

21  more than once?

22       A.    I believe I spoke to the

23  chairperson, Helen Foster more than once.

24       Q.    And did she indicate whether she

25  supported the Speaker's position?

12

1                            C. Meara

2          A.      Yes.   She indicated.

3          Q.      And what did she indicate?

4          A.      That she did not support the

5    Speaker's position.

6          Q.      Is that the basis of you speaking to

7    her more than once about it?

8          A.      That was part of the basis, the

9    other basis was that she, as the chair, I worked

10   with her to make sure she understood, you know,

11   how it would work as, you know, committee, that

12   there would be a motion that would be introduced

13   and et cetera.

14         Q.      Did you indicate to her that there

15   might be a penalty if she opposed the view of the

16   Speaker on this issue?

17         A.      Never.

18         Q.      Did you indicate to Council Member

19   James that there might be a perquisite if she

20   supported the position of the Speaker?

21         A.      No.

22         Q.      Did you remind Council Member James

23   that the Speaker has great influence over the use

24   of discretionary funds?

25         A.      No.

13

C. Meara

1

2    Q.    At stated meetings generally, who's

3  responsible for maintaining order at stated

4  meetings, if you know?

5    A.    I would say the Public Advocate.

6    Q.    And that is as per the City Council

7  rules?

8    A.    Yes, working with the Speaker's

9  office.

10    Q.    And you stated that at the stated

11  meetings you were usually near the Speaker?

12    A.    Umm-hmm.

13    Q.    And are there times when the Speaker

14  will ask you to give instructions to the Public

15  Advocate in terms of maintaining security at the

16  meeting?

17    A.    Yes.

18    Q.    Prior to the stated meeting of May

19  30, 2007, was there a meeting of members of the

20  Council in preparation for that stated meeting?

21          MR. MARKS:   Objection to form.

22          You can answer.

23    A.    Members of the Council?

24    Q.    Was there a meeting with the Public

25  Advocate and the Speaker around any concerns of

14

                           C. Meara

1

2  that upcoming stated meeting on May 30th?

3         A.    There was a meeting with the Public

4  Advocate, I can't tell you whether the Speaker

5  was part of that meeting.

6         Q.    And do you remember what day that

7  was, was that the same day?

8         A.    Probably the same day.

9         Q.    Do you remember who else was

10  present?

11         A.    Probably just staff of the Speaker's

12  office.

13         Q.    And that would be who?  Do you

14  remember specifically who was there?

15         A.    No, I don't even know that I was

16  there, to be honest with you.

17         Q.    You've been at so many that you

18  can't sort of --

19         A.    Yes, and from time to time we meet

20  with the Public Advocate prior to a stated

21  session, so it wasn't an unusual thing.

22         Q.    So you're saying that that meeting

23  was not necessarily out of the norm in terms of

24  meetings that are held prior to stated meetings?

25         A.    Well, we don't do it at every stated

15

C. Meara

1

2 meeting, but, you know, it wasn't -- it wasn't --

3 we do it from time to time.

4        Q.    To your knowledge, did the Speaker

5 have any particular concerns before the stated

6 meeting of May 30th around security?

7        A.    Yes.

8        Q.    And what were those?  What were

9 those concerns?

10        A.    We -- we knew that the matter that

11 was going to be before the Council was

12 controversial and there were a lot of emotions

13 around the issue, and so I think that they would

14 basically be the concerns of the Speaker.

15        Q.    And you said you just don't remember

16 whether or not you were at that meeting?

17        A.    With the Public Advocate?

18        Q.    Yes.

19        A.    I don't.  Ordinarily I wouldn't be,

20 but I just don't know.

21        Q.    And if I told you that -- are you

22 familiar with Wayne Kawadler?

23        A.    Yes.

24        Q.    Who is he?

25        A.    He is a senior advisor to the

16

1                          C. Meara

2    Speaker.

3          Q.    And if I told you that he had

4    testified that he remembered you being at that

5    meeting on May 30, 2007, would that --

6          A.    With the Public Advocate?

7          Q.    With the Public Advocate.

8          A.    I didn't say that I wasn't at the

9    meeting, I just don't remember if I was.

10          Q.    Do you remember who called the

11    meeting?

12          A.    No, I don't.

13          Q.    Were any extraordinary security

14    measures taken for that meeting --

15              MR. MARKS:   Objection to form.

16          Q.    -- that you're aware of?

17              MR. MARKS:   You can answer.

18          A.    Well, I -- I know that we worked

19    with the NYPD, which has overall supervision of

20    the building, so I don't know what they did in

21    terms of extraordinary, you know, matters, but I

22    think that there was -- I mean there was a lot of

23    people there and, you know, more than usual

24    so....

25          Q.    Does the NYPD usually have in the

17

1                        C. Meara

2    meetings that you've attended over the years,

3    does the NYPD usually have a visible presence in

4    the chambers in the gallery and the balcony?

5          A.    Usually no, sometimes yes.

6          Q.    And on that day did it have a

7    visible presence?

8          A.    I believe they did.

9          Q.    Do you happen to remember how many

10   uniforms?

11         A.    No, I wouldn't know that.

12         Q.    When the Public Advocate is

13   presiding over the meeting, does the Speaker also

14   have authority to clear the room?

15         A.    I -- I don't know.

16         Q.    But the Public Advocate clearly

17   does, as far as you know?

18         A.    I think the Public Advocate would

19   act on behalf of the speaker if the Speaker

20   wanted the room cleared.

21         Q.    And on May 30th, to your

22   recollection, was the room cleared that day?

23         A.    It was not cleared.

24         Q.    Were you there for the entire stated

25   meeting on May 30, 2007?

18

1                           C. Meara

2          A.     Yes.

3          Q.     Did you observe Mrs. Plummer at the

4    meeting that day?

5          A.     Yes.

6          Q.     Do you remember where she was

7    seated?

8          A.     Yes.

9          Q.     Where was that?

10         A.     If -- if you're standing facing the

11   front of the chamber, she was on the left hand

12   side where there is a row of like two seats --

13   two seats two by two, I don't know if she was in

14   the first or second row, but she was near the

15   front near where Councilman Barron sits.

16         Q.     You're aware that Mrs. Plummer -- of

17   course you're aware.

18               And do you remember sending a letter

19   to Ms. Plummer dated June 28, 2007 where you're

20   referring to disruptive actions at the Council

21   stated meeting of May 30, 2007?

22         A.     Yes, I do.

23         Q.     And did you witness this disruptive

24   conduct?

25         A.     Yes, I did.

19

1                    C. Meara

2        Q.    Can you please describe what the

3   disruptive conduct consisted of?

4        A.    During the course of the meeting, as

5   the matter of the Sonny Carson street renaming

6   was being discussed, she disrupted the meeting by

7   yelling a number of times, both during remarks of

8   members and during the votes by particular

9   members.

10       Q.    And when you say a number of times,

11  how many?  One?  Two?  Three?  Four?  10?  15?

12  19?

13       A.    I would say 10 or 15, roughly.

14       Q.    What was she yelling?  What did she

15  say?

16       A.    I heard her yell specifically

17  "Liar", I heard her yell specifically, "Shut up".

18       Q.    Anything else?

19       A.    That is what I recall.

20       Q.    What steps if any did --

21            MR. WAREHAM:  Withdrawn.

22       Q.    Was anyone else in the room engaged

23  in quote/unquote disruptive conduct?

24       A.    There were some people in the

25  balcony who were disruptive, but no one else on

20

1                             C. Meara

2    the -- what I call the floor of the Council.

3         Q.    What steps, if any, did the

4    presiding officer take in the face of Ms.

5    Plummer's disruptive conduct?

6              MR. MARKS:  Objection to form, but

7         you can answer.

8         A.    A number of times she tried to use

9    the gavel to quiet the disruption, and she did

10   that repeatedly, actually.

11        Q.    Did she say anything when she was

12   using the gavel?

13        A.    She kept asking for quiet.

14        Q.    Did she specifically address

15   Mrs. Plummer in terms of a request for quiet?

16        A.    I think she at least once directed

17   her -- her remarks to the area that Mrs. Plummer

18   was in.

19        Q.    She specified whoever was making

20   noise to my right, please be quiet?

21        A.    I don't know if she was that

22   specific.

23        Q.    When you say --

24        A.    It was clear, it was only disruption

25   coming from one place on the floor of the

21

C. Meara

1

2  Council, and at least once she was directing

3  herself to them.

4       Q.    When you say directing herself, what

5  did she do in the case that she was directing

6  herself to that area?

7       A.    There was only one person at the

8  time yelling, and she directed her comments to

9  the person yelling to be quiet.

10      Q.    Do you remember specifically what

11  she said?

12      A.    No, I don't remember specifically

13  what she said.

14      Q.    Did she order the Sergeant of Arms

15  to remove Ms. Plummer or whoever that person was

16  causing the disruption?

17      A.    No.

18      Q.    What did Speaker Quinn do while this

19  disruptive conduct was occurring?

20           MR. MARKS:   Objection to form but

21      you can answer.

22      A.    She asked me at one point to have

23  the Public Advocate, you know, quiet down the

24  crowd.

25      Q.    Quiet down the crowd or quiet down

22

1                          C. Meara

2    Mrs. Plummer?

3         A.    I don't know that her comments were

4    directed specifically to Mrs. Plummer, but they

5    were -- she was the only one on the floor making

6    comments.

7         Q.    But she asked that you quiet down

8    the crowd?

9         A.    Making noise on the floor, yeah.

10        Q.    And when she said that to you, what

11   did you do?

12        A.    At one point, and I don't know if it

13   was directly at this time, I asked the director

14   of security to see what was going on.

15        Q.    And who is that?

16        A.    Carl D'Alba.

17        Q.    What did he do?

18        A.    I know he went over there, I don't

19   know what he did.

20        Q.    He went over where?

21        A.    To the area where Ms. Plummer was.

22        Q.    You saw him do that?

23        A.    I saw him go over, yes, I don't know

24   specifically what he said.

25        Q.    Did you see him talking to

23

1                         C. Meara
2    Mrs. Plummer?
3         A.    I saw him in the general area, I
4    didn't see him speak specifically to
5    Mrs. Plummer, but I asked him to go over there
6    and, you know, he went over there.
7         Q.    Who else was in that general area at
8    that time?
9         A.    Well, there are a number of
10   Councilmen who sit right there, and I don't know
11   who else was sitting with Ms. Plummer.
12        Q.    Was she sitting by herself?
13        A.    I don't recall.
14        Q.    Did Ms. Plummer's quote/unquote
15   disruptive actions prevent the vote, the vote on
16   Councilman Vann's amendment to include Sonny
17   Carson's name in the co-naming package?
18        A.    No, it went forward.
19        Q.    Did it disrupt the subsequent vote
20   on the entire co-naming package?
21        A.    No, that went forward.
22        Q.    Did the Council complete the
23   scheduled agenda for that day?
24        A.    Yes, it did.
25        Q.    To your recollection, was anyone

24

1                         C. Meara

2    removed from the Council that day for disruptive

3    behavior?

4         A.    No.

5         Q.    And the disruptive behavior you're

6    attributing to Ms. Plummer were words that she

7    shouted out?

8         A.    Yes.

9         Q.    During your tenure as Chief of

10   Staff, have there been any other meetings of the

11   stated meetings of the Council where there has

12   been disruptive conduct?

13        A.    No.

14        Q.    So this is the first meeting where

15   there was disruptive -- -

16        A.    The first stated meeting.

17        Q.    Were you at the stated meeting, the

18   meeting prior to May 30, 2007?

19        A.    I'm sure.

20        Q.    Was there any disruption in the

21   discussion around the, I think, the Taxi and

22   Limousine Commission?

23        A.    I -- I don't know if that was the

24   meeting prior to, but when that meeting occurred,

25   if you're talking about the petty cab issue?

25

1                        C. Meara

2          Q.     Yes.

3          A.     Yes, there was disruption in the

4    gallery that day.

5          Q.     So when you say there hasn't been

6    any disruption in the stated meeting, you're

7    distinguishing between the balcony --

8          A.     Yes, sir.

9          Q.     -- and the gallery.

10              MR. MARKS:  No, no. You said the

11         balcony and the gallery.

12         A.     The balcony and the floor, I call it

13   the floor of the stated -- of the Council.

14         Q.     Right.

15         A.     Right.

16         Q.     The Public Advocate calls it the

17   gallery.

18              MR. WAREHAM:  Remember?

19              MR. MARKS:  I think just for -- so

20         the record is clear.

21              MR. WAREHAM:  The floor.

22              MR. MARKS:  I want to make it clear.

23              The floor, okay.

24         Q.     Have there been disruptions at

25   committee meetings that you're aware of?

26

C. Meara

1

2    A.    There have been disruptions at

3    committee meetings that have been brought to my

4    attention, I was not personally at them.

5    Q.    Have those disruptions involved

6    staff members of individual Council members that

7    you're aware?

8    A.    That was brought to my attention,

9    yes.

10    Q.    And do you remember, can you tell me

11    what that was, what the disruption was and whose

12    staff member was involved?

13    A.    It was brought to my attention by a

14    number of members that Councilman Barron's staff

15    person Ms. Plummer was disruptive at a number of

16    committee meetings.

17    Q.    Can you specify when?  Date?

18    A.    No.

19    Q.    Time?  How many?

20    A.    One was brought to my attention was

21    the civil rights committee meeting, and one that

22    was brought to my attention was the public safety

23    committee.

24    Q.    Those were separate meetings?

25    A.    I don't know if that was separate or

27

```
 1                        C. Meara
 2   the same meeting.
 3         Q.    And what were you told was the
 4   nature of the disruption by Mrs. Plummer?
 5         A.    That during the course of the
 6   meeting she, at various times, yelled out certain
 7   things, I don't know specifically what.
 8         Q.    And who was chairing that meeting?
 9         A.    I believe Councilman Seabrook was
10   chairing, and Councilman Vallone was chairing.
11         Q.    And what, if any, steps did they
12   take to address the disruption caused by Ms.
13   Plummer?
14         A.    I believe that as chairs they tried
15   to use their gavel to bring quiet to the meeting.
16         Q.    And you say "Tried", does that mean
17   that they did not succeed?
18         A.    I wasn't there, I don't know that it
19   succeeded.
20         Q.    At committee meetings, is there a
21   Sergeant At Arms present?
22         A.    Yes.
23         Q.    Do you know whether they had the
24   Sergeant of Arms escort Ms. Plummer out of the
25   meeting?
```

28

1              C. Meara

2         A.    I don't believe they did.

3         Q.    That was the prerogative the chair

4    in face of a disruption if they thought it was

5    interfering with the work of their committee?

6         A.    Correct.

7         Q.    Aside from this meeting of the civil

8    rights and public safety commission was there any

9    other committee meetings that to your knowledge

10   Ms. Plummer was accused of disruptive conduct?

11        A.    Not to my knowledge.

12        Q.    And did it come to your attention at

13   some point that Mrs. Plummer had made a remark

14   concerning the assassination of Councilman

15   Comrie's ass?

16        A.    Yes.

17        Q.    And when did that come to your

18   attention?

19        A.    Some time after the stated meeting

20   was completed.

21        Q.    And where were you when it came to

22   your attention?

23        A.    I was in the Speaker's office.

24        Q.    And who brought it to your

25   attention?

29

1                       C. Meara

2        A.    I can't remember.

3        Q.    And what were you told was the

4   remark, as you understood it to be?

5        A.    I was told that at a press

6   conference, the -- that Ms. Plummer said that she

7   -- she voiced that she wanted the assassination

8   of Councilman Comrie's ass.

9        Q.    Sorry.  What did you interpret that

10  remark to mean?

11            MR. MARKS:   Objection to form, but

12        you can answer.

13       A.    Well, we took it very seriously.

14       Q.    And by taking it very seriously,

15  what did that mean?

16       A.    Well, I asked the -- well, what it

17  means we were very concerned about it.  We -- I

18  asked for the -- to see if we can get a copy of

19  what she said.  I called Councilman Comrie

20  immediately and asked him to come to the office,

21  and I called Lieutenant Brennan, who is the head

22  of the City Hall security for the NYPD.

23       Q.    And what happened after that?

24       A.    Councilman Comrie came to the office

25  and Lieutenant Brennan came to the office, and we

30

1                          C. Meara

2    discussed the matter.

3              And Councilman Comrie said at that

4    time that he took the matter very seriously.

5              I asked Lieutenant Brennan for his

6    opinion, he took it seriously.  I asked

7    Lieutenant Brennan to have some security for

8    Councilman Comrie, since he was having an event

9    that night, and he agreed to do that.

10       Q.    Did Councilman Comrie indicate that

11   he felt physically threatened by Viola Plummer?

12       A.    We said to him, "Do you take this

13   seriously?"  He said, "I take it very seriously".

14       Q.    And that was the nature of the

15   question to him in terms of whether --

16       A.    Right.

17       Q.    -- he really thought Viola Plummer

18   was going to assassinate him?

19              MR. MARKS:  Objection to form.

20              You can answer.

21       A.    I think that the concern was broader

22   than Viola Plummer.  I think that the concern was

23   that it was a very emotional day, there were very

24   high passions, and no one really knew who Viola

25   was saying it to.  So it wasn't simply a question

31

1                          C. Meara

2   of whether Viola was going to do something, it

3   was a question of who might hear the word

4   assassinate attached to Councilman Comrie, and I

5   think -- so the concern was broader than just

6   Viola Plummer.

7           Q.    So the concern was that it might be

8   a hidden directive?

9                 MR. MARKS:   Objection to form.

10          A.    Yes.  Or someone might take it as a

11  hidden directive.

12          Q.    Did you approach Ms. Plummer or

13  Councilman Barron to ask her about her remark?

14          A.    No.

15          Q.    Did anyone consider approaching Ms.

16  Plummer or Councilman Barron to ask them

17  personally about the remark she made and what she

18  meant by it.

19          A.    I don't know what others may have

20  considered.

21          Q.    Did the Speaker consider doing that?

22          A.    I don't know what the Speaker

23  considered doing.

24          Q.    Did you advise the Speaker that, you

25  know, maybe we should talk to Councilman Barron

32

1                          C. Meara

2   and Ms. Plummer about these remarks?

3          A.    No, I did not advise the Speaker to

4   do that.

5          Q.    Do you know if anyone did?

6          A.    I don't know.

7          Q.    Why not?

8                MR. MARKS:  You mean why didn't he?

9          Q.    Why didn't you approach Councilman

10  Barron or the Speaker, Councilman Barron or Ms.

11  Plummer about the remark?

12         A.    Well, I wouldn't have approached

13  Councilman Barron, since they weren't his

14  remarks, if I --

15         Q.    Why didn't you approach Ms. Plummer?

16         A.    Because she explained the remarks

17  later in the -- in the press conference and I

18  just thought that the use of the word

19  "Assassinate" in City Hall given what -- given

20  the history there was so inflammatory that there

21  was -- there was no explanation.

22                And again, it wasn't only what Viola

23  may have meant by the remarks, it was what

24  someone may have taken from those remarks, and

25  she was never in a position to explain that to me

33

C. Meara

1

2  in a satisfactory way.

3      Q.    But you said she explained it later

4  in the press conference?

5      A.    She said --

6      Q.    What was her explanation?

7      A.    She talked about it being a

8  political assassination.

9      Q.    Did you have the same response when

10 Councilman Vallone talked about stringing up Con

11 Ed from a light post?

12     A.    I don't know that he said that.

13     Q.    You're not familiar at the point

14 where they had the blackout in Queens, Councilman

15 Vallone said that Con Ed should be strung from a

16 lamp post?

17     A.    I know that they had a blackout in

18 Queens, I don't know that Council Vallone said

19 that, I'm not saying he didn't say that, I'm just

20 saying I don't know that he said that.

21     Q.    So you're saying there was no

22 explanation that would have been acceptable to

23 you once the word "Assassinate" was issued on the

24 property of City Hall?

25     A.    Correct.

34

1                        C. Meara

2        Q.    So that is a taboo word in City

3    Hall, character assassination cannot --

4    assassination cannot be used in any context

5    without there being a security response?

6                MR. MARKS:  Objection to form.

7                You can answer.

8        A.    Character assassination is one

9    thing, that is not what she said.

10       Q.    But you focused on the word

11   "Assassination"?

12       A.    Correct.

13       Q.    And she explained political

14   assassination, and in the same press conference,

15   quote/unquote press conference, I'm not conceding

16   it was a press conference --

17       A.    Right.

18       Q.    -- explained that she meant it was a

19   political assassination of his political career,

20   but your position was that genie is out of the

21   box and therefore it required a security

22   response?

23       A.    I think it --

24                MR. MARKS:  Objection to form.

25                You can answer.

35

1                          C. Meara

2          A.      -- it required a serious response

3     which included security.

4          Q.      So basically the word she uttered

5     required that response?

6          A.      Yes.

7          Q.      And how long was security supplied

8     to Council Member Comrie, if you're aware?

9          A.      I believe it was supplied for that

10    evening.

11         Q.      Did Council Member Comrie file a

12    complaint with the police department?

13         A.      I'm not aware that he did.

14         Q.      Was he advised to, if you know?

15         A.      There was a discussion as to whether

16    he should, I don't know whether he was advised to

17    or not.

18         Q.      What was your view, do you think

19    that he should have filed a complaint with the

20    police department?

21                 MR. MARKS:  Objection to form.

22                 THE WITNESS:  I can answer?

23                 MR. MARKS:  You can answer.

24         A.      I -- I didn't really have an opinion

25    one way or the other.

36

1                         C. Meara

2          Q.    Do you know what the Speaker's

3    position was --

4          A.    No.

5          Q.    -- around filing the complaint?

6          A.    I don't know.

7          Q.    At the point in time, aside from the

8    security measures that were taken that evening --

9               MR. WAREHAM:  Withdrawn.

10         Q.    What steps did the Speaker take on

11   that evening in terms of Mrs. Plummer's

12   assassination comment, if any?

13         A.    Well, one was the security, which

14   we've already talked about, and the second was we

15   asked the office -- I believe it was that night,

16   we asked the Office of the General Counsel to see

17   what options would be available to us.

18         Q.    Options in terms of?

19         A.    A discipline.

20         Q.    Did that include firing at that

21   point, or just discipline?

22         A.    We -- I don't think we specified

23   specifically, we just wanted to know what the

24   options were.

25         Q.    And was the Speaker concerned that

37

C. Meara

1    she did not have authority to discipline Ms.

2    Plummer because she was the employee of an

3    individual Council Member?

4

5          A.    She didn't --

6               MR. MARKS:  Objection to form.

7               You can answer.

8          A.    She didn't know if she had the

9    authority, and that is what she asked the General

10   Counsel's office to research.

11         Q.    Did she think she had the authority?

12   Prior to getting an opinion from the General

13   Counsel, did she think she had the authority to

14   discipline Ms. Plummer?

15              MR. MARKS:  Objection.

16         A.    Yes.

17         Q.    Did she think she had the authority

18   to fire Ms. Plummer?

19         A.    We didn't know.

20         Q.    What was her view, I'm talking about

21   immediately after, what was her view of the

22   source of her authority to discipline

23   Mrs. Plummer?

24              MR. MARKS:  Objection to form.

25              You can answer.

38

1                    C. Meara

2        A.    Well, we had on other occasions

3   dealt with staff of members in a number of ways

4   which indicated to us that we had the authority

5   to discipline a member of the staff of a member.

6        Q.    Had the Speaker actually disciplined

7   a staff member of an individual Council Member

8   prior to this action taken against Mrs. Plummer?

9        A.    Yes.

10       Q.    And when was that and who was that?

11       A.    The -- I don't remember the exact

12  dates, but one was a member of Councilman

13  McMahon's staff and one was a member of

14  Councilman Rivera's staff.

15            We had also as a matter of policy

16  enacted a requirement that members and their

17  staff do training for various -- in various

18  areas, and had disciplined staff if they didn't

19  do the training.

20       Q.    The time with Council Member Vann's

21  staff --

22       A.    Not Vann, McMahon.

23       Q.    McMahon?

24       A.    Not Vann.

25       Q.    I'm sorry, McMahon?

39

1                     C. Meara

2          A.    Yes.

3          Q.    What was the nature of the incident

4     and what ws the nature of the discipline that was

5     enacted?

6          A.    There was a -- a complaint filed

7     with the Department of Investigations about the

8     Councilman and his staff use of staff in his

9     district office.  And D -- DOI's investigation

10    showed that they had inappropriately used on one

11    occasion staff in the district office, and they

12    did not discipline Councilman McMahon, but we

13    disciplined the member of the staff and required

14    that he participate in certain training.

15         Q.    Did Councilman McMahon have to sign

16    off on that discipline?

17         A.    No, I believe we told him.

18         Q.    And he agreed to it?

19         A.    Yes.

20         Q.    And if he had not agreed to it,

21    would you have been able to enact that

22    discipline?

23         A.    I believe so.

24         Q.    And the authority for that would

25    have been?

40

1                         C. Meara

2        A.     The Speaker's office.

3        Q.     And in this particular case, the

4   discipline was seen as a remedy after the

5   completion of an investigation by the Department

6   of Investigation?

7        A.     Right.

8        Q.     And did that investigation entail

9   interviews with the staff member involved?

10       A.     I don't know.

11       Q.     Was there any hearing involved in

12  that investigation?

13       A.     I don't believe so.

14       Q.     Did it involve discussion with the

15  Council Member McMahon himself?

16       A.     Only as it pertained to his

17  involvement.

18       Q.     And that the discipline involved was

19  taking a training course?

20       A.     Right.

21       Q.     It didn't involve suspension --

22       A.     No.

23       Q.     -- or termination?

24       A.     Correct.

25       Q.     And if the staff member had not

41

```
 1                    C. Meara

 2   agreed to take the training course, what was the

 3   or else?

 4        A.    We never had to give an or else.

 5        Q.    But Councilman McMahon never

 6   challenged that?

 7             MR. MARKS:  McMahon.

 8        Q.    McMahon.

 9             MR. WAREHAM:  I said McMahon.

10             MR. MARKS:  Sorry.

11             MR. WAREHAM:  I got it this time.

12             THE WITNESS:  He did.

13        Q.    Did the staff member involved have

14   to sign any agreement acknowledging that he or

15   she had committed an impropriety and agreeing to

16   the training?

17        A.    I don't know, to be -- I don't know.

18   Not that I know of, but I don't know for sure.

19        Q.    And how long was the training course

20   that this staff member had to take in terms of

21   hours?

22        A.    I don't know.

23        Q.    And what was the incident involving

24   Council -- which Rivera, Joel?

25        A.    Joel Rivera.
```

42

C. Meara

1

2    Q.    What the incident involving his

3  staff member?

4    A.    There was a -- I believe it was a

5  DOI investigation of a staff member, and I don't

6  remember the specifics to be honest with you, but

7  we imposed a discipline on him to take a training

8  as well, and Councilman Rivera at first resisted

9  it but didn't think it was appropriate, but then

10 we -- we insisted and as I understand it the

11 staff member did the training.

12    Q.    The same question, did that member

13 have to sign anything?

14    A.    Not that I'm -- I don't know for

15 sure, but not that I know of.

16    Q.    And was there an or else, if they

17 didn't agree to it they would face termination,

18 suspension or termination?

19    A.    No, we never got to that point.

20    Q.    So it in effect involved a voluntary

21 compliance with the request?

22    A.    Yes.

23    Q.    And if Council Member Rivera had

24 continued to resist, what steps would you have

25 taken to enforce that discipline?

43

1                        C. Meara

2          A.    I never got to that point.

3          Q.    And once again the authority for

4    that came from?

5          A.    The Speaker's office.

6          Q.    So those are the two instances that

7    you're aware of where in the past the Speaker has

8    imposed some form of discipline on an individual

9    Council members staff?

10                  MR. MARKS:  Object to the form.

11                  You can answer.

12          Q.    Are those the only two instances

13    that you're aware of?

14          A.    I don't know that we ever imposed

15    any discipline as a result of not completing the

16    training sessions that I referred to earlier, but

17    that would be the only other instance.

18          Q.    Are you aware of any instances where

19    the Speaker suspended the staff of an individual

20    Council Member?

21          A.    No.

22          Q.    Are you aware of any instances where

23    the Speaker terminated the employment of a staff

24    of an individual Council Member?

25          A.    No.

44

1                          C. Meara

2          Q.    Were you at the stated meetings of

3    June 14th and 27th of 2007?

4          A.    I'm sure.

5          Q.    Do you remember whether Mrs. Plummer

6    was there?

7          A.    I don't.

8          Q.    Were there any disruptions at that

9    meeting?

10         A.    No.

11         Q.    Those meetings, that you're aware

12   of?

13         A.    No.

14         Q.    Are you a familiar with the New York

15   City Council policy against harassment and

16   discrimination?

17         A.    Yes.

18         Q.    Do you know whether the Speaker

19   brought a complaint against Ms. Plummer pursuant

20   to that policy?

21         A.    I don't believe this was a matter

22   regarding discrimination or harassment.

23         Q.    So does that mean she did not?

24         A.    It means she did not.

25         Q.    Do you know whether Council Member

45

C. Meara

1                                              

2  Comrie brought a complaint around harassment of

3  Mrs. Plummer pursuant to that policy?

4      A.    I -- I'm not aware of that.

5      Q.    Are you aware that the Speaker

6  expressed concern in the early part of June

7  around taking action against Ms. Plummer as she

8  worked for quote, an independent Council member?

9          MR. MARKS:  Objection to form, but

10      you can answer.

11      A.    That was why we asked the General

12  Counsel's office to research what the options

13  were that would be available to us.

14      Q.    Because Mrs. Plummer was working for

15  Council Member Barron, not the central staff?

16      A.    Correct.

17      Q.    And at what point in time did the

18  Speaker arrive at a firm conclusion that she had

19  the authority to suspend and/or terminate

20  Mrs. Plummer?

21          MR. MARKS:  Objection to form, but

22      you can answer.

23      A.    I don't recall the exact date, but

24  it was when the General Counsel's office had

25  completed their research.

46

C. Meara

1

2        Q.     And what is your understanding of

3   the basis for the Speaker's authority to

4   terminate the staff member of an individual

5   Council Member?

6        A.     Well, I'm not a lawyer, but my

7   understanding is that as the head of Council, the

8   Speaker of the Council, she's the head of the

9   agency, and as head of the agency she has that

10  authority.

11       Q.     And are you familiar with the

12  provisions of the Charter, the New York City

13  Charter that concerned the City Council?

14       A.     I've never read them.

15       Q.     Let me show you what has been marked

16  as Plaintiff's Exhibit 1, this is the one from

17  the Gotbaum deposition.

18              THE WITNESS:  This is the what,

19       excuse me?

20       Q.     This is the one we did with Gotbaum,

21  and I want to draw your attention to section 21?

22              MR. MARKS:  I just want to make it

23       clear --

24              MR. WAREHAM:  This is the full one.

25              MR. MARKS:  Right, but I just want

47

C. Meara

1

2    to make it clear for the record and, you

3    know, I don't want to be accused of making

4    speaks objections, so actually before I say

5    what I'm going to say, I'm wondering if it

6    would be better --

7            MR. WAREHAM:  -- if he stepped out

8    of the room.

9            MR. MARKS:  -- if he stepped out of

10   the room.

11           MR. WAREHAM:  Why don't we do that.

12           (Whereupon the witness leaves the

13   conference room.)

14           MR. MARKS:  Off the record.

15           (Discussion held off the record.)

16           (Whereupon the witness enters the

17   conference room.)

18   Q.    Let me just show you Plaintiff's

19   Exhibit 1, which is excerpts from the New York

20   City Charter, the chapters that specifically

21   address the Council.  And I just want to draw

22   your attention to section 21, just read through

23   that to yourself.

24   A.    Okay.

25   Q.    And --

48

1                          C. Meara

2       A.    You're not going to ask me to repeat

3  it back, are you?

4       Q.    No. If you could just read the first

5  sentence of section 21?

6       A.    "The Council, there shall be a

7  Council which shall be the legislative body of

8  the City."

9       Q.    Now, you said that your

10 understanding is that the Speaker derives her

11 authority to discipline or terminate the

12 employment of individual staff members of

13 individual Council members through her position

14 as head of the agency?

15             You have to speak.

16      A.    Yes.

17      Q.    And your understanding is that the

18 City Council of New York is an agency of the City

19 of New York?

20      A.    Correct.

21      Q.    And how did you arrive at that

22 understanding?

23      A.    Well, as I mentioned before, we

24 asked the General Counsel's office to research

25 what options were available to us and that was

49

1                          C. Meara

2    what they said.

3              MR. MARKS:  Object to the extent

4         it's -- you shouldn't testify about any

5         attorney-client privileged matter what the

6         General Counsel's office of the Council

7         said to you or anybody else.

8              THE WITNESS:  Okay.

9         Q.    And that authority allows her, gives

10   her control over, nominally gives her control

11   over the staff of every City Council member?

12             MR. MARKS:  Objection to form.

13             You can answer.

14        A.    Yes.

15        Q.    And is it your understanding that

16   when members of the City Council elect one of

17   their fellow members as Speaker, that they are

18   giving that person control over the suspension

19   and firing of their individual staff?

20        A.    I don't know what members thought

21   when they elected the Speaker.

22        Q.    Were you present during the election

23   of Speaker Quinn as the Speaker?

24        A.    Yes.

25        Q.    Was there, to your recollection, was

50

1                                C. Meara

2    there any discussion of the responsibilities of

3    the Speaker during that election?

4              A.    By election I mean that I was

5    present when the Council members voted for the

6    Speaker.

7              Q.    Prior to the election, were there

8    any discussions concerning what the task of the

9    Speaker or the responsibilities of the Speaker

10   are?

11             A.    I wasn't involved in any of those.

12             Q.    When a Council member wants to hire

13   someone for their staff, does the Speaker have

14   the approval of that hire?

15             A.    I know that the paperwork goes

16   through the administrative services division but

17   we generally don't approve of hires for Council

18   member.

19             Q.    Does the Speaker disapprove of

20   hires?

21             A.    Not that I'm aware of.

22             Q.    Does the Speaker sign off on any of

23   the paperwork necessary for a person to be hired?

24             A.    The Speaker personally?

25             Q.    Yes.

51

<center>C. Meara</center>

1

2     A.     Not that I'm aware of.

3     Q.     Anyone from the Speaker's office?

4     A.     I don't know what administrative

5  services people sign.

6     Q.     At some point in June did the

7  Speaker instruct you to write a letter to Ms.

8  Plummer informing her of her suspension?

9     A.     Yes.

10     Q.     And did you write that letter?

11     A.     Yes.

12     Q.     Who had input in terms of the

13  content of that letter?

14     A.     The General Counsel's office, I

15  don't know that anyone else did.

16     MR. WAREHAM:  You had put that in as

17     defendants, so I guess I have to put it in

18     separately?

19     MR. MARKS:  Off the record.

20     (Discussion held off the record.)

21     Q.     Let me show you what was marked as

22  Defendant's B which is --

23     A.     Do you want this back?

24     Q.     You can put it right there.

25     Does that look familiar to you?

52

1                          C. Meara

2   What do you recognize that to be?

3          A.    I recognize it to be a letter that I

4   sent to Ms. Plummer.

5          Q.    And you said input was made from the

6   General Counsel's office and the Speaker in terms

7   of the content of the letter?

8          A.    Yes.

9          Q.    And that letter is dated?

10         A.    June 28, 2007.

11         Q.    And it was at that point in time

12  that by June 28th --

13              MR. WAREHAM:  Withdrawn.

14              MR. MARKS:  Sorry to interrupt.

15              Off the record.

16              (Discussion held off the record.)

17         Q.    And after the this legal action was

18  brought, was there a subsequent letter that you

19  sent to Ms. Plummer dated July 5th?

20         A.    Yes.

21         Q.    And the content of that letter was

22  composed by whom?

23              MR. MARKS:  Objection to form.

24              You can answer.

25         A.    The General Counsel's office.

53

1                      C. Meara

2          Q.    And then you signed off on it?

3          A.    Yes.

4          Q.    And you were doing this at the

5     behest of the Speaker?

6          A.    Yes.

7          Q.    In the name of the Speaker?

8          A.    Yes.

9          Q.    And the Speaker had full knowledge

10    of the content of both letters?

11         A.    I don't know that she actually saw

12    the letter, but she had knowledge generally of

13    the content, yes.

14         Q.    And she approved you signing it?

15         A.    Yes.

16         Q.    You had to check with her before you

17    signed it?

18         A.    Yes.

19         Q.    And if she had said do not sign it,

20    you would not have signed it?

21         A.    Correct.

22               MR. WAREHAM:  Off the record.

23               (Discussion held off the record.)

24         Q.    Following the May 30th stated

25    meeting, did the Speaker have a meeting to assess

54

1                          C. Meara

2    the disruption caused by Ms. Plummer's outburst

3    and threats?

4          A.    I -- I don't know that we had a

5    specific meeting to assess the outburst and

6    threats.

7          Q.    Do you remember having a meeting

8    with Wayne Kawadler and other senior staff

9    members concerning the response to Ms. Plummer?

10         A.    Yes.

11         Q.    Do you remember when that was?

12         A.    There was a series of meetings in

13   the immediate aftermath, so I can't tell you

14   which meeting occurred on which date.

15         Q.    Did you attend all of those

16   meetings?

17         A.    I -- I would assume that I did, yes,

18   but I'm not sure.

19         Q.    Can you, to the best of your

20   recollection, detail, if you don't remember the

21   exact dates, when the meetings were, who attended

22   the separate meetings, those different meetings?

23         A.    There were meetings in the days that

24   followed, some were attended by the General

25   Counsel's office, some were attended by

55

1                        C. Meara

2    administrative staff.

3            Q.    And what was discussed at those

4    meetings?

5                    MR. MARKS:  I am going to object to

6            the extent that it calls for him to state

7            what occurred at the meetings that were

8            attended by the General Counsel's office

9            that would be protected by the

10           attorney-client privilege.

11                   But if you can answer the questions

12           about other meetings that were not attended

13           by the General Counsel's office, that is

14           fine.

15           A.    I don't specifically recall if there

16   were meetings at the General Counsel's office, I

17   didn't participate in them so I just don't know

18   the answer to that.  But in a general way we

19   discussed options that were available that the

20   General Counsel's office had been asked to

21   research.

22           Q.    And would it be fair to say that

23   your view of the principal obstacle being whether

24   or not the Speaker had the authority over the

25   individual staff member of an individual counsel

56

1                        C. Meara

2    member?

3              MR. MARKS:    Object to the form of

4         the question.

5              You can answer.

6         A.    I don't know that we viewed it as an

7    obstacle, we viewed it as a question.

8         Q.    It was viewed as a question because

9    it wasn't clearly set out anyplace?

10        A.    It wasn't clearly set out in

11   anyplace in either way.

12        Q.    And it was a question because it had

13   never happened before?

14        A.    Correct.

15        Q.    And the focus of the discussion was

16   around Ms. Plummer's statements around Council

17   member Comrie?

18        A.    And the conduct at the stated

19   meeting.

20        Q.    Are you saying that they were looked

21   at as co-equal, equally?

22        A.    I'm not saying either one, you asked

23   a question and I'm just trying to be -- both

24   element were part of the discussions, I don't

25   know whether one was more than the other.

57

1                           C. Meara

2          Q.     And was a concern of the Speaker

3     from the beginning with both the conduct inside

4     and the statement of Council Member Comrie?

5                 MR. MARKS:   About?

6          Q.     About --

7          A.     Yes.

8          Q.     -- Mrs. Plummer's conduct?

9          A.     Yes.

10         Q.     And are you saying that Ms.

11    Plummer's conduct inside of City Hall was the

12    basis upon which she was terminated?

13                MR. MARKS:   I just want to -- do you

14         mean --

15         Q.     The stated meeting on May 30th?

16                MR. MARKS:   The stated meeting of

17         May 30, 2007?

18         Q.     The stated meeting of May 30, 2007?

19                MR. WAREHAM:   Thank you.

20         A.     I didn't say that.

21         Q.     I'm asking you.

22         A.     I think it's a combination.

23         Q.     If it's a combination does one have

24    predominance over the other in your view?

25         A.     Not really.

58

1                              C. Meara

2          Q.    I'll ask you a hypothetical, had Ms.

3    Plummer not made the remarks concerning Council

4    Member Comrie, do you think that she would have

5    faced termination for her conduct inside of City

6    Hall on May 30, 2007?

7                    MR. MARKS:  I will object, because

8              it really does call for a speculation

9              rather than him to answer.  The question is

10             what would be the basis for her suspension

11             and termination and he testified to it,

12             he's not here to speculate.

13         Q.    I'll try to be a little bit more

14   concrete.  Would you say that more weight was

15   attributed to Ms. Plummer's statement in terms

16   of --

17                    MR. WAREHAM:  Withdrawn.

18         Q.    On a scale, if we look at Ms.

19   Plummer's conduct inside the City Council on May

20   30, 2007 and the statement outside, which was

21   statements as well, outside the City Council in

22   2007, which do you think had more weight in terms

23   of decision to discipline her?

24                    MR. MARKS:  Objection to form, but

25             you can answer.

59

                          C. Meara

1

2        A.    Again, I would say both, but in the

3   immediate aftermath we were particularly

4   concerned about the assassination comment.

5        Q.    Would you say that that one carried

6   more weight?

7        A.    In the beginning it was a more

8   immediate concern.

9        Q.    And that concern was demonstrated by

10  the assignment of the security detail to Council

11  Member Comrie?

12            MR. MARKS:    Objection to form.

13            You can answer.

14       A.    Yes.

15       Q.    And the concern around Ms. Plummer's

16  conduct in the City Council on May 30, 2007 was

17  demonstrated by what?

18       A.    I don't understand.

19       Q.    If Ms. Plummer's conduct inside City

20  Hall was as serious as that alleged by the --

21  caused by the remarks, what steps were taken

22  inside City Hall that day to address her conduct?

23       A.    Well, I -- we asked the General

24  Counsel's office to begin exploring what options

25  were available to us.

60

C. Meara

1

2      Q.    Maybe my question isn't clear.  What

3  steps were taken inside the City Council that day

4  at the time that the disruptive comment happened

5  to address that?

6      A.    Well, once the meeting was over we

7  went downstairs and were talking about the

8  Council meeting, and at that time the

9  assassination comment was brought to our

10  attention, so the focus quickly shifted from the

11  disruption in the chamber to the assassination

12  comment.

13      Q.    But during the meeting itself, no

14  steps were taken to address that?

15      A.    Well, as I said much earlier, once

16  the -- I mean the meeting proceeded.

17      Q.    Right.  The meeting proceeded and

18  the work was completed?

19      A.    Yes.

20      Q.    And Ms. Plummer attended two

21  subsequent stated meetings where nothing

22  happened --

23      A.    I believe I said I don't know

24  whether she did.

25      Q.    Do you remember getting an e-mail

61

C. Meara

1

2    from Carl D'Alba on July 2nd as to how we should

3    handle Ms. Plummer in the future?

4          A.    No, I don't.

5                MR. WAREHAM:   This will be

6          Plaintiffs' Exhibit 12, it is Bates marked

7          D 0842.

8                (Plaintiff's Exhibit 12, document

9          bearing Bates number D 0842, marked for

10         identification.)

11         Q.    Would you look at that, please?

12         A.    Okay.

13         Q.    Do you remember having looked at

14   that, do you remember that message now?

15         A.    Not really.

16         Q.    Do you know, based on that message,

17   do you remember any meeting occurring on how you

18   attended to handle Ms. Plummer?

19         A.    I don't remember specifically, but

20   assume we had a meeting.

21         Q.    Do you know what the decision was

22   around that, this is on July 2nd?

23         A.    I don't remember specifically what

24   the result of any discussion that I had with Carl

25   was.

62

C. Meara

1

2    Q.    Was there any policy that was

3  developed prior to Ms. Plummer's termination as

4  to how she was going to be handled by security?

5    A.    Not specific to Ms. Plummer that I

6  recall.

7         MR. WAREHAM:  I'm almost finished,

8     let's take a five minute break.

9         (Time noted:  2:39 p.m.)

10        (A brief recess is taken.)

11        (Time noted:  2:44 p.m.)

12        MR. WAREHAM:  I have no further

13    questions.

14        MR. MARKS:  I have no questions.

15        (Time noted:  2:44 p.m.)

16

17

18

19

20

21

22

23

24

25

63

1                    C. Meara

2           I, the witness herein, having read

3       the foregoing testimony, do hereby certify

4       it to be a true and correct transcript,

5       subject to the corrections, if any, shown

6       on the attached page.

7

8

9

10

11                    _____

12                    CHARLES MEARA

13

14

15   Subscribed and sworn to

16   before me this _____ day

17   of _____ 2007.

18

19

20

21   _____

22

23

24

25

64

```
 1                      L. Comrie

 2                    CERTIFICATE

 3    STATE OF NEW YORK )

 4                       :

 5    COUNTY OF NEW YORK)

 6         I, KAREN PERLMAN, a Shorthand Reporter and

 7    Notary Public within and for the State of New

 8    York, do hereby certify:

 9         That CHARLES MEARA, the witness whose

10    deposition is hereinbefore set forth, was duly

11    sworn by me and that such deposition is a true

12    record of the testimony given by such witness.

13         I further certify that I am not related to

14    any of the parties to this action by blood or

15    marriage, and that I am in no way interested in

16    the outcome of this matter.

17         IN WITNESS WHEREOF, I have hereunto set my

18    hand this 20th day of August, 2007.

19

20

21

22

23    _____

24              KAREN PERLMAN

25
```

65

1                           C. Meara

2                            INDEX

3   WITNESS                EXAMINATION BY          PAGE

4   CHARLES MEARA      MR. WAREHAM                    4

5

6                          EXHIBITS

7   PLAINTIFF'S      EXHIBIT                 PAGE LINE

8   12      Document bearing................  61    8

         Bates number D 0842

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## A

ability 5:6
able 39:21
acceptable 33:22
accused 28:10 47:3
acknowledging
    41:14
act 17:19
action 1:5 4:15 38:8
    45:7 52:17 64:14
actions 18:20 23:15
address 4:3 20:14
    27:12 47:21 59:22
    60:5,14
administrative 6:24
    7:8,18 50:16 51:4
    55:2
advise 8:6 31:24
    32:3
advised 35:14,16
advisor 15:25
Advocate 13:5,15
    13:25 14:4,20
    15:17 16:6,7
    17:12,16,18 21:23
    25:16
aftermath 54:13
    59:3
afternoon 4:10,11
agency 46:9,9 48:14
    48:18
agenda 23:23
agree 42:17
agreed 3:3,7,10 30:9
    39:18,20 41:2
agreeing 41:15
agreement 41:14
alleged 59:20
allows 49:9
ALVIN 2:20
amendment 23:16
amount 6:17
and/or 45:19
answer 4:25 5:6
    7:15 13:22 16:17
    20:7 21:21 29:12
    30:20 34:7,25
    35:22,23 37:7,25
    43:11 45:10,22
    49:13 52:24 55:11
    55:18 56:5 58:9
    58:25 59:13
anybody 49:7
anyplace 56:9,11
approach 31:12
    32:9,15
approached 32:12
approaching 31:15
appropriate 42:9
approval 50:14
approve 50:17

approved 8:19
    53:14
approves 9:4
April 9:9
area 20:17 21:6
    22:21 23:3,7
areas 38:18
Arms 21:14 27:21
    27:24
arrive 45:18 48:21
aside 28:7 36:7
asked 21:22 22:7,13
    23:5 29:16,18,20
    30:5,6 36:15,16
    37:9 45:11 48:24
    55:20 56:22 59:23
asking 20:13 57:21
ass 28:15 29:8
assassinate 30:18
    31:4 32:19 33:23
assassination 28:14
    29:7 33:8 34:3,4,8
    34:11,14,19 36:12
    59:4 60:9,11
assess 53:25 54:5
assignment 59:10
assume 54:17 61:20
assuming 9:4
attached 31:4 63:6
attained 6:11
attend 54:15
attended 17:2 54:21
    54:24,25 55:8,12
    60:20 61:18
attention 26:4,8,13
    26:20,22 28:12,18
    28:22,25 46:21
    47:22 60:10
attorneys 2:4,10,17
    3:4
attorney-client 49:5
    55:10
attributed 58:15
attributing 24:6
August 1:11 64:18
authority 6:3 17:14
    37:2,9,11,13,17
    37:22 38:4 39:24
    43:3 45:19 46:3
    46:10 48:11 49:9
    55:24
available 36:17
    45:13 48:25 55:19
    59:25
Avenue 1:23 2:5
aware 7:19 9:7,11
    9:15,21 16:16
    18:16,17 25:25
    26:7 35:8,13 43:7
    43:13,18,22 44:11
    45:4,5 50:21 51:2

## B

B 51:22
back 9:3 48:3 51:23
balcony 17:4 19:25
    25:7,11,12
Barron 18:15 31:13
    31:16,25 32:10,10
    32:13 45:15
Barron's 26:14
based 61:16
basically 15:14 35:4
basis 12:6,8,9 46:3
    57:12 58:10
Bates 61:6,9 65:8
bearing 61:9 65:8
beginning 57:3 59:7
begun 3:14
behalf 17:19
behavior 24:3,5
behest 53:5
believe 9:9 11:14,19
    11:22 17:8 27:9
    27:14 28:2 35:9
    36:15 39:17,23
    40:13 42:4 44:21
    60:23
best 54:19
better 47:6
bit 58:13
blackout 33:14,17
blood 64:14
body 48:7
box 34:21
BRAGG 2:20
break 5:9 62:8
Brennan 29:21,25
    30:5,7
brief 62:10
bring 27:15
broader 30:21 31:5
Broadway 2:18
Brooklyn 2:6
brought 26:3,8,13
    26:20,22 28:24
    44:19 45:2 52:18
    60:9
building 16:20
business 4:2

## C

C 2:2 4:1,2 5:1 6:1
    7:1 8:1 9:1 10:1
    11:1 12:1 13:1
    14:1 15:1 16:1
    17:1 18:1 19:1
    20:1 21:1 22:1
    23:1 24:1 25:1
    26:1 27:1 28:1
    29:1 30:1 31:1
    32:1 33:1 34:1
    35:1 36:1 37:1

38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 65:1
cab 24:25
call 20:2 25:12 58:8
called 16:10 29:19
    29:21
calls 25:16 55:6
career 34:19
Carl 22:16 61:2,24
carried 59:5
Carson 9:7 10:17
    19:5
Carson's 9:19,24
    11:5 23:17
case 21:5 40:3
caused 27:12 54:2
    59:21
causing 21:16
central 45:15
certain 27:6 39:14
CERTIFICATE
    64:2
certify 63:3 64:8,13
cetera 12:13
chair 12:9 28:3
chairing 27:8,10,10
chairperson 11:23
chairs 27:14
challenged 41:6
chamber 18:11
    60:11
chambers 17:4
chapters 47:20
character 34:3,8
CHARLES 1:15
    63:12 64:9 65:4
chart 7:17,18,20
Charter 46:12,13
    47:20
check 53:16
Chief 5:15,20 6:2,21
    8:5 24:9
CHRISTINE 1:7
Church 1:17 2:11
City 1:8 2:8,15 4:3
    5:16 7:18 13:6
    29:22 32:19 33:24
    34:2 44:15 46:12
    46:13 47:20 48:8
    48:18,18 49:11,16
    57:11 58:5,19,21
    59:16,19,22 60:3
civil 1:5 26:21 28:7
clear 10:13 17:14

20:24 25:20,22
    46:23 47:2 60:2
cleared 17:20,22,23
clearly 5:7 17:16
    56:9,10
college 6:12,16
combination 57:22
    57:23
come 8:7 28:12,17
    29:20
comes 7:11
coming 20:25
comment 36:12
    59:4 60:4,9,12
comments 21:8 22:3
    22:6
commission 24:22
    28:8
committed 41:15
committee 8:24 9:3
    9:9,13,18,22
    10:15,16,21,24
    12:11 25:25 26:3
    26:16,21,23 27:20
    28:5,9
complaint 35:12,19
    36:5 39:6 44:19
    45:2
complete 23:22
completed 28:20
    45:25 60:18
completing 43:15
completion 40:5
compliance 42:21
composed 52:22
Comrie 29:19,24
    30:3,8,10 31:4
    35:8,11 45:2
    56:17 57:4 58:4
    59:11 64:1
Comrie's 28:15 29:8
Con 33:10,15
conceding 34:15
concern 30:21,22
    31:5,7 45:6 57:2
    59:8,9,15
concerned 29:17
    36:25 46:13 59:4
concerning 10:17
    10:22 28:14 50:8
    54:9 58:3
concerns 10:22
    13:25 15:5,9,14
conclusion 45:18
concrete 58:14
conduct 18:24 19:3
    19:23 20:5 21:19
    24:12 28:10 56:18
    57:3,8,11 58:5,19
    59:16,19,22
conference 29:6

32:17 33:4 34:14
34:15,16 47:13,17
consider 31:15,21
considered 31:20,23
consisted 19:3
contact 10:20
contacted 10:23
content 4:22 51:13
52:7,21 53:10,13
context 34:4
continued 42:24
control 49:10,10,18
controversial 15:12
copy 29:18
Corporation 1:17
2:9
correct 28:6 33:25
34:12 40:24 45:16
48:20 53:21 56:14
63:4
corrections 63:5
Council 1:8 2:15
5:14,16 6:18 7:18
8:2,17,19,20 9:3
11:8,15 12:18,22
13:6,20,23 15:11
18:20 20:2 21:2
23:22 24:2,11
25:13 26:6 33:18
35:8,11 37:4 38:7
38:20 40:15 41:24
42:23 43:9,20,24
44:15,25 45:8,15
46:5,7,8,13 47:21
48:6,7,13,18 49:6
49:11,16 50:5,12
50:17 56:16 57:4
58:3,19,21 59:10
59:16 60:3,8
Councilman 18:15
23:16 26:14 27:9
27:10 28:14 29:8
29:19,24 30:3,8
30:10 31:4,13,16
31:25 32:9,10,13
33:10,14 38:12,14
39:8,12,15 41:5
42:8
Councilmen 23:10
counsel 1:17 2:9,16
36:16 37:13 55:25
Counsel's 37:10
45:12,24 48:24
49:6 51:14 52:6
52:25 54:25 55:8
55:13,16,20 59:24
COUNTY 64:5
couple 4:16
course 18:17 19:4
27:5 40:19 41:2
41:19

COURT 1:2
co-equal 56:21
co-naming 8:10,14
23:17,20
crowd 21:24,25 22:8
CV 1:6

_____ D _____

D 39:9 61:7,9 65:8
date 26:17 45:23
54:14
dated 18:19 52:9,19
dates 38:12 54:21
day 14:6,7,8 17:6,22
18:4 23:23 24:2
25:4 30:23 59:22
60:3 63:16 64:18
days 54:23
dealt 38:3
decision 58:23
61:21
Defendant 1:9 2:10
2:17
defendants 51:17
Defendant's 51:22
definition 7:7
degree 6:12
demonstrated 59:9
59:17
department 2:8
35:12,20 39:7
40:5
deposed 4:17
deposition 1:15 3:9
3:11,14 46:17
64:10,11
derives 48:10
describe 19:2
detail 54:20 59:10
determine 10:24
developed 62:3
different 8:7 54:22
directed 20:16 21:8
22:4
directing 21:2,4,5
directive 31:8,11
directly 22:13
director 22:13
disapprove 50:19
discipline 36:19,21
37:2,14,22 38:5
39:4,12,16,22
40:4,18 42:7,25
43:8,15 48:11
58:23
disciplined 38:6,18
39:13
discretionary 12:24
discrimination
44:16,22
discussed 19:6 30:2

55:3,19
discussion 24:21
35:15 40:14 47:15
50:2 51:20 52:16
53:23 56:15 61:24
discussions 9:17
50:8 56:24
disrupt 23:19
disrupted 19:6
disruption 20:9,24
21:16 24:20 25:3
25:6 26:11 27:4
27:12 28:4 54:2
60:11
disruptions 25:24
26:2,5 44:8
disruptive 18:20,23
19:3,23,25 20:5
21:19 23:15 24:2
24:5,12,15 26:15
28:10 60:4
distinguishing 25:7
district 1:2,2 39:9
39:11
division 7:9 50:16
document 61:8 65:8
DOI 42:5
doing 31:21,23 53:4
DOI's 39:9
downstairs 60:7
draw 46:21 47:21
duly 4:4 64:10
D'Alba 22:16 61:2

_____ E _____

E 2:2,2 4:2,2
earlier 43:16 60:15
early 45:6
Ed 33:11,15
education 6:11
effect 42:20
either 4:21 56:11,22
elect 49:16
elected 49:21
election 49:22 50:3
50:4,7
element 56:24
emotional 30:23
emotions 15:12
employee 37:3
employment 43:23
48:12
enact 39:21
enacted 38:16 39:5
enforce 42:25
engaged 19:22
ensure 8:4
entail 7:2 40:8
enters 47:15
entire 17:24 23:20
equally 56:21

escort 27:24
ESQ 2:3,13,20
et 12:13
evening 35:10 36:8
36:11
event 30:8
exact 38:11 45:23
54:21
EXAMINATION
4:8 65:3
examined 3:12 4:5
excerpts 47:19
excuse 46:19
Exhibit 46:16 47:19
61:6,8 65:7
EXHIBITS 65:6
explain 32:25
explained 32:16
33:3 34:13,18
explanation 32:21
33:6,22
exploring 59:24
expressed 45:6
extent 49:3 55:6
extraordinary
16:13,21
e-mail 60:25

_____ F _____

face 20:4 28:4 42:17
faced 58:5
facing 18:10
fair 8:16 55:22
familiar 8:13 15:22
33:13 44:14 46:11
51:25
far 17:17
fellow 49:17
felt 30:11
file 35:11
filed 35:19 39:6
filing 3:8 36:5
fine 4:12 55:14
finished 62:7
fire 37:18
firing 36:20 49:19
firm 45:18
first 4:4 8:22 18:14
24:14,16 42:8
48:4
five 62:8
floor 1:23 20:2,25
22:5,9 25:12,13
25:21,23
flow 7:17,20
focus 56:15 60:10
focused 34:10
followed 54:24
Following 53:24
follows 4:6
foregoing 63:3

form 3:6 4:22 7:14
13:21 16:15 20:6
21:20 29:11 30:19
31:9 34:6,24
35:21 37:6,24
43:8,10 45:9,21
49:12 52:23 56:3
58:24 59:12
forth 64:10
forward 23:18,21
Foster 11:23
Four 19:11
front 18:11,15
full 8:19,20 9:3
46:24 53:9
funds 12:24
further 3:7,10 10:9
62:12 64:13
future 61:3

_____ G _____

Gallagher 11:16
gallery 17:4 25:4,9
25:11,17
gavel 20:9,12 27:15
general 2:16 23:3,7
36:16 37:9,12
45:11,24 48:24
49:6 51:14 52:6
52:25 54:24 55:8
55:13,16,18,20
59:23
generally 7:12 13:2
50:17 53:12
genie 34:20
getting 37:12 60:25
Gifford 5:23
give 13:14 41:4
given 32:19,19
64:12
gives 49:9,10
giving 49:18
go 8:23 22:23 23:5
goes 7:21 8:4 50:15
going 5:7 10:4,10
15:11 22:14 30:18
31:2 47:5 48:2
55:5 62:4
Good 4:10,11,13
Gotbaum 46:17,20
great 12:23
GREENHOUSE
1:23
guess 51:17

_____ H _____

H 4:2
half 5:22
Hall 4:3 29:22 32:19
33:24 34:3 57:11
58:6 59:20,22

3

hand 18:11 64:18
handle 61:3,18
handled 62:4
happen 17:9
happened 9:12
    29:23 56:13 60:4
    60:22
harassment 44:15
    44:22 45:2
head 5:2 29:21 46:7
    46:8,9 48:14
hear 31:3
heard 19:16,17
hearing 40:11
held 14:24 47:15
    51:20 52:16 53:23
Helen 11:23
hereinbefore 64:10
hereto 3:5
hereunto 64:17
hidden 31:8,11
high 30:24
highest 6:10
hire 50:12,14
hired 50:23
hires 50:17,20
history 6:14 32:20
honest 14:16 42:6
hours 41:21
hypothetical 58:2

I
identification 61:10
immediate 54:13
    59:3,8
immediately 29:20
    37:21
impair 5:6
imposed 42:7 43:8
    43:14
impropriety 41:15
inappropriately
    39:10
incident 39:3 41:23
    42:2
include 23:16 36:20
included 9:24 11:6
    35:3
includes 6:23,24
including 10:7
independent 45:8
INDEX 65:2
indicate 10:9 11:4
    11:11,24 12:3,14
    12:18 30:10
indicated 9:23 10:3
    10:6 12:2 38:4
individual 26:6 37:4
    38:7 43:8,19,24
    46:4 48:12,13
    49:19 55:25,25

inflammatory 32:20
influence 12:23
informing 51:8
input 51:12 52:5
inside 57:3,11 58:5
    58:19 59:19,22
    60:3
insisted 42:10
instance 43:17
instances 43:6,12,18
    43:22
instruct 51:7
instructions 13:14
interested 64:15
interfering 28:5
intergovernmental
    6:6
interpret 29:9
interrupt 52:14
intervene 10:10
interviews 40:9
introduced 12:12
investigation 39:9
    40:5,6,8,12 42:5
Investigations 39:7
involve 40:14,21
involved 8:9,14 9:17
    26:5,12 40:9,11
    40:18 41:13 42:20
    50:11
involvement 40:17
involves 8:17
involving 41:23
    42:2
issue 10:17,25 12:16
    15:13 24:25
issued 33:23
issues 8:7

J
James 11:9,9 12:19
    12:22
Jersey 6:4
Joel 41:24,25
JR 2:20
July 52:19 61:2,22
June 18:19 44:3
    45:6 51:6 52:10
    52:12

K
Karen 1:18 64:6,24
Kawadler 15:22
    54:8
kept 20:13
knew 15:10 30:24
know 5:10 10:15,18
    12:10,11 13:4
    14:15 15:2,20
    16:18,20,21,23
    17:11,15,17 18:13

20:21 21:23 22:3
    22:12,18,19,23
    23:6,10 24:23
    26:25 27:7,18,23
    31:19,22,25 32:5
    32:6 33:12,17,18
    33:20 35:14,16
    36:2,6,23 37:8,19
    40:10 41:17,17,18
    41:18,22 42:14,15
    43:14 44:18,25
    47:3 49:20 50:15
    51:4,15 53:11
    54:4 55:17 56:6
    56:25 60:23 61:16
    61:21
knowledge 9:16,20
    15:4 28:9,11 53:9
    53:12

L
L 2:20 4:2 64:1
lamp 33:16
law 1:16 2:3,8
lawyer 46:6
leaves 47:12
left 18:11
legal 52:17
legislative 6:24 48:7
Leticia 11:9
letter 18:18 51:7,10
    51:13 52:3,7,9,18
    52:21 53:12
letters 53:10
let's 62:8
level 6:10
Liar 19:17
Lieutenant 29:21,25
    30:5,7
light 33:11
Limousine 24:22
LINE 65:7
little 58:13
long 5:17 6:8 35:7
    41:19
look 51:25 58:18
    61:11
looked 56:20 61:13
lot 15:12 16:22

M
M 4:2
maintaining 13:3,15
making 20:19 22:5
    22:9 47:3
Maris 6:16
marked 46:15 51:21
    61:6,9
MARKS 2:13 7:13
    13:21 16:15,17
    20:6 21:20 25:10

25:19,22 29:11
    30:19 31:9 32:8
    34:6,24 35:21,23
    37:6,15,24 41:7
    41:10 43:10 45:9
    45:21 46:22,25
    47:9,14 49:3,12
    51:19 52:14,23
    55:5 56:3 57:5,13
    57:16 58:7,24
    59:12 62:14
marriage 64:15
matter 15:10 19:5
    30:2,4 38:15
    44:21 49:5 64:16
matters 16:21
McMahon 38:22,23
    38:25 39:12,15
    40:15 41:5,7,8,9
McMahon's 38:13
mean 16:22 27:16
    29:10,15 32:8
    44:23 50:4 57:14
    60:16
means 7:6 29:17
    44:24
meant 31:18 32:23
    34:18
Meara 1:15 4:1,10
    5:1 6:1 7:1 8:1 9:1
    10:1 11:1 12:1
    13:1 14:1 15:1
    16:1 17:1 18:1
    19:1 20:1 21:1
    22:1 23:1 24:1
    25:1 26:1 27:1
    28:1 29:1 30:1
    31:1 32:1 33:1
    34:1 35:1 36:1
    37:1 38:1 39:1
    40:1 41:1 42:1
    43:1 44:1 45:1
    46:1 47:1 48:1
    49:1 50:1 51:1
    52:1 53:1 54:1
    55:1 56:1 57:1
    58:1 59:1 60:1
    61:1 62:1 63:1,12
    64:9 65:1,4
measures 16:14
    36:8
medications 5:5
meet 14:19
meeting 9:22 10:14
    11:13 13:16,18,19
    13:20,24 14:2,3,5
    14:22 15:2,6,16
    16:5,9,11,14
    17:13,25 18:4,21
    19:4,6 24:14,16
    24:17,18,24,24

25:6 26:21 27:2,6
    27:8,15,25 28:7
    28:19 44:9 53:25
    53:25 54:5,7,14
    56:19 57:15,16,18
    60:6,8,13,16,17
    61:17,20
meetings 7:25 13:2
    13:4,11 14:24,24
    17:2 24:10,11
    25:25 26:3,16,24
    27:20 28:9 44:2
    44:11 54:12,16,21
    54:22,22,23 55:4
    55:7,12,16 60:21
member 6:25 11:8
    11:15 12:18,22
    26:12 35:8,11
    37:4 38:5,5,7,7,12
    38:13,20 39:13
    40:9,15,25 41:13
    41:20 42:3,5,11
    42:12,23 43:20,24
    44:25 45:8,15
    46:4,5 49:11
    50:12,18 55:25
    56:2,17 57:4 58:4
    59:11
members 6:25 9:17
    10:16,20,23 11:20
    13:19,23 19:8,9
    26:6,6,14 38:3,16
    43:9 48:12,13
    49:16,17,20 50:5
    54:9
mentioned 48:23
message 61:14,16
Miller 5:23
minute 62:8
months 6:19
motion 12:12

N
N 2:2
name 4:14 9:6,7,13
    9:19,24 10:4,7,10
    10:13 11:5 23:17
    53:7
names 8:17
nature 27:4 30:14
    39:3,4
near 8:3 13:11
    18:14,15
necessarily 14:23
necessary 50:23
need 5:9
never 12:17 32:25
    41:4,5 42:19 43:2
    46:14 56:13
New 1:2,18,18,20,24
    1:24 2:6,8,12,12

2:15,19,19 4:3,3
6:4,4,7 44:14
46:12 47:19 48:18
48:19 64:3,5,7
night 30:9 36:15
noise 20:20 22:9
nominally 49:10
norm 14:23
Notary 1:19 3:13,13
4:5 64:7
noted 62:9,11,15
Notice 1:16
number 19:7,10
20:8 23:9 26:14
26:15 38:3 61:9
65:8
NYPD 16:19,25
17:3 29:22

**O**

oath 4:6,20
object 43:10 49:3
55:5 56:3 58:7
Objection 7:13,13
13:21 16:15 20:6
21:20 29:11 30:19
31:9 34:6,24
35:21 37:6,15,24
45:9,21 49:12
52:23 58:24 59:12
objections 3:5 47:4
observe 18:3
obstacle 55:23 56:7
occasion 39:11
occasions 38:2
occurred 24:24
54:14 55:7
occurring 21:19
61:17
office 2:9,16 13:9
14:12 28:23 29:20
29:24,25 36:15,16
37:10 39:9,11
40:2 43:5 45:12
45:24 48:24 49:6
51:3,14 52:6,25
54:25 55:8,13,16
55:20 59:24
officer 20:4
offices 1:17 2:3
okay 5:12 25:23
47:24 49:8 61:12
once 11:14,19,21,23
12:7 20:16 21:2
33:23 43:3 60:6
60:15
opinion 30:6 35:24
37:12
opposed 12:15
options 36:17,18,24
45:12 48:25 55:19

59:24
orally 4:25
order 13:3 21:14
Ordinarily 15:19
outburst 54:2,5
outcome 64:16
outside 58:20,21
overall 6:22 16:19
oversight 7:4,6,7

**P**

P 2:2,2
package 8:18,22 9:8
9:14,19,25 10:5,7
10:11,13 11:6
23:17,20
page 63:6 65:3,7
paperwork 50:15
50:23
Parks 8:23 9:2,8,12
9:17,22 10:14,21
10:23
part 12:8 14:5 45:6
56:24
participate 39:14
55:17
particular 7:24 15:5
19:8 40:3
particularly 59:3
parties 3:5 64:14
passions 30:24
PAUL 2:13
penalty 12:15
people 8:18 16:23
19:24 51:5
Perlman 1:18 64:6
64:24
perquisite 12:19
person 21:7,9,15
26:15 49:18 50:23
personally 26:4
31:17 50:24
personnel 7:2,4
pertained 40:16
petty 24:25
physically 30:11
place 20:25
Plaintiff 1:5,16 2:4
Plaintiffs 61:6
Plaintiff's 46:16
47:18 61:8 65:7
please 19:2 20:20
61:11
Plummer 1:4 2:24
4:15 18:3,16,19
20:15,17 21:15
22:2,4,21 23:2,5
23:11 24:6 26:15
27:4,13,24 28:10
28:13 29:6 30:11
30:17,22 31:6,12

31:16 32:2,11,15
37:3,14,18,23
38:8 44:5,19 45:3
45:7,14,20 51:8
52:4,19 54:9 58:3
60:20 61:3,18
62:5
Plummer's 20:5
23:14 36:11 54:2
56:16 57:8,11
58:15,19 59:15,19
62:3
point 8:18 21:22
22:12 28:13 33:13
36:7,21 42:19
43:2 45:17 51:6
52:11
pole 11:2
police 35:12,20
policy 38:15 44:15
44:20 45:3 62:2
political 6:14 33:8
34:13,19,19
Port 6:3
position 5:13,18 8:5
10:12,25 11:25
12:5,20 32:25
34:20 36:3 48:13
post 33:11,16
Poughkeepsie 6:16
predominance
57:24
preliminary 4:16
preparation 13:20
prerogative 28:3
presence 17:3,7
present 2:23 14:10
27:21 49:22 50:5
presiding 17:13
20:4
press 29:5 32:17
33:4 34:14,15,16
prevent 23:15
previous 5:21
principal 55:23
prior 5:25 9:6,11,21
10:14,21 11:12
13:18 14:20,24
24:18,24 37:12
38:8 50:7 62:3
privilege 50:9
privileged 49:5
Probably 14:8,11
problem 9:23
procedure 8:9,13
proceeded 60:16,17
property 33:24
protected 55:9
provisions 46:12
public 1:19 3:13,13
4:5 13:5,14,24

14:3,20 15:17
16:6,7 17:12,16
17:18 21:23 25:16
26:22 28:8 64:7
pursuant 1:16 44:19
45:3
put 51:16,17,24
Putnam 2:5
p.m 1:11 62:9,11,15

**Q**

Queens 33:14,18
question 30:15,25
31:3 42:12 56:4,7
56:8,12,23 58:9
60:2
questions 4:17,21
55:11 62:13,14
quickly 60:10
quiet 20:9,13,15,20
21:9,23,25,25
22:7 27:15
Quinn 1:7 21:18
49:23
quote 45:8
quote/unquote
19:23 23:14 34:15

**R**

R 2:2 4:2,2
read 46:14 47:22
48:4 63:2
really 30:17,24
35:24 57:25 58:8
61:15
recall 19:19 23:13
45:23 55:15 62:6
recess 62:10
recognize 52:2,3
recollection 17:22
23:25 49:25 54:20
record 5:2 25:20
47:2,14,15 51:19
51:20 52:15,16
53:22,23 64:12
Recreation 9:9,13
9:22 10:21,24
Recreations 8:23
9:2,18 10:15
referred 43:16
referring 18:20
regarding 44:22
regularly 8:23
related 64:13
remark 28:13 29:4
29:10 31:13,17
32:11
remarks 19:7 20:17
32:2,14,16,23,24
58:3 59:21
remedy 40:4

remember 14:6,9,14
15:15 16:9,10
17:9 18:6,18
21:10,12 25:18
26:10 29:2 38:11
42:6 44:5 54:7,11
54:20 60:25 61:13
61:14,17,19,23
remembered 16:4
remind 12:22
removal 9:6,11,18
remove 21:15
renaming 8:10 19:5
repeat 48:2
repeatedly 20:10
rephrase 4:23
report 7:10
Reporter 1:19 64:6
REPORTING 1:23
represent 4:15
request 20:15 42:21
required 34:21 35:2
35:5 39:13
requirement 38:16
45:12,25 48:24
55:21
reserved 3:6
resist 42:24
resisted 42:8
respective 3:4
response 33:9 34:5
34:22 35:2,5 54:9
responsibilities 6:20
7:3,5,25 50:2,9
responsibility 6:22
responsible 13:3
result 43:15 61:24
right 8:4 20:20
23:10 25:14,15
30:16 34:17 40:7
40:20 46:25 51:24
60:17
rights 26:21 28:8
Rivera 41:24,25
42:8,23
Rivera's 38:14
Roger 2:3 4:14
room 17:14,20,22
19:22 47:8,10,13
47:17
roughly 19:13
row 18:12,14
rules 13:7

**S**

S 2:2,3 4:2
safety 26:22 28:8
satisfactory 33:2

saw 22:22,23 23:3
  53:11
saying 10:9 14:22
  30:25 33:19,20,21
  56:20,22 57:10
scale 58:18
scheduled 23:23
science 6:14
Seabrook 27:9
sealing 3:8
seated 18:7
seats 18:12,13
second 18:14 36:14
section 46:21 47:22
  48:5
security 13:15 15:6
  16:13 22:14 29:22
  30:7 34:5,21 35:3
  35:7 36:8,13
  59:10 62:4
see 22:14,25 23:4
  29:18 36:16
seen 7:20 40:4
sending 18:18
sends 9:3
senior 15:25 54:8
sent 52:4,19
sentence 48:5
separate 26:24,25
  54:22
separately 51:18
Sergeant 21:14
  27:21,24
series 54:12
serious 35:2 59:20
seriously 29:13,14
  30:4,6,13,13
services 6:24,25 7:9
  50:16 51:5
session 14:21
sessions 43:16
set 56:9,10 64:10,17
Seventh 1:23
shake 5:2
shifted 60:10
Shorthand 1:19
  64:6
shouted 24:7
show 46:15 47:18
  51:21
showed 39:10
shown 63:5
Shut 19:17
side 18:12
sign 39:15 41:14
  42:13 50:22 51:5
  53:19
signed 53:2,17,20
signing 53:14
simply 30:25
sir 25:8

sit 23:10
sits 18:15
sitting 23:11,12
Sonny 9:7,19,24
  10:17 11:5 19:5
  23:16
sorry 29:9 38:25
  41:10 52:14
sort 7:21 14:18
source 37:22
SOUTHERN 1:2
speak 11:8,13,18,20
  23:4 48:15
speaker 1:8 5:16,21
  7:12,22 8:3,6,6
  9:16,23 11:5
  12:16,20,23 13:11
  13:13,25 14:4
  15:4,14 16:2
  17:13,19,19 21:18
  31:21,22,24 32:3
  32:10 36:10,25
  38:6 43:7,19,23
  44:18 45:5,18
  46:8 48:10 49:17
  49:21,23,23 50:3
  50:6,9,9,13,19,22
  50:24 51:7 52:6
  53:5,7,9,25 55:24
  57:2
Speakers 6:2
Speaker's 10:22
  11:25 12:5 13:18
  14:11 28:23 36:2
  40:2 43:5 46:3
  51:3
speaking 12:6
speaks 47:4
specific 20:22 54:5
  62:5
specifically 14:14
  19:16,17 20:14
  21:10,12 22:4,24
  23:4 27:7 36:23
  47:20 55:15 61:19
  61:23
specifics 42:6
specified 20:19
  36:22
specify 26:17
speculate 58:12
speculation 58:8
spoke 10:16 11:17
  11:22
staff 5:15,20 6:2,21
  6:23 8:5 14:11
  24:10 26:6,12,14
  38:3,5,7,13,14,17
  38:18,21 39:8,8
  39:11,13 40:9,25
  41:13,20 42:3,5

42:11 43:9,19,23
  45:15 46:4 48:12
  49:11,19 50:13
  54:8 55:2,25
stand 8:3
standing 18:10
state 1:20 55:6 64:3
  64:7
stated 7:25 13:2,3
  13:10,10,18,20
  14:2,20,24,25
  15:5 17:24 18:21
  24:11,16,17 25:6
  25:13 28:19 44:2
  53:24 56:18 57:15
  57:16,18 60:21
statement 57:4
  58:15,20
statements 56:16
  58:21
STATES 1:2
stating 4:2
stepped 47:7,9
steps 19:20 20:3
  27:11 36:10 42:24
  59:21 60:3,14
STIPULATED 3:3
  3:7,10
STIPULATIONS
  3:2
street 1:18 2:11 19:5
streets 8:10,11,14
stringing 33:10
strung 33:15
subject 63:5
submission 3:2
submitted 8:22 9:14
subscribed 3:11
  63:15
subsequent 23:19
  52:18 60:21
succeed 27:17
succeeded 27:19
supervision 6:23
  16:19
supplied 35:7,9
support 10:7 11:5
  12:4
supported 11:25
  12:20
sure 12:10 24:19
  41:18 42:15 44:4
  54:18
suspend 45:19
suspended 43:19
suspension 40:21
  42:18 49:18 51:8
  58:10
sworn 3:12 4:4
  63:15 64:11

T

taboo 34:2
take 5:9 20:4 27:12
  30:12,13 31:10
  36:10 41:2,20
  42:7 62:8
taken 1:15 5:5 16:14
  32:24 36:8 38:8
  42:25 59:21 60:3
  60:14 62:10
talk 31:25
talked 33:7,10 36:14
talking 22:25 24:25
  37:20 60:7
task 50:8
Taxi 24:21
tell 4:19 14:4 26:10
  54:13
tenure 24:9
terminate 45:19
  46:4 48:11
terminated 43:23
  57:12
termination 40:23
  42:17,18 58:5,11
  62:3
terms 4:22 13:15
  14:23 16:21 20:15
  30:15 36:11,18
  41:20 51:12 52:6
  58:15,22
testified 4:6 16:4
  58:11
testify 49:4
testifying 4:20
testimony 63:3
  64:12
Thank 57:19
thing 14:21 34:9
things 27:7
think 10:6,12 15:13
  16:22 17:18 20:16
  24:21 25:19 30:21
  30:22 31:5 34:23
  35:18 36:22 37:11
  37:13,17 42:9
  57:22 58:4,22
thought 28:4 30:17
  32:18 49:20
threatened 30:11
threats 54:3,6
three 5:19 6:19
  19:11
time 3:6 6:17 14:19
  14:19 15:3,3 21:8
  22:13 23:8 26:19
  28:19 30:4 36:7
  38:20 41:11 45:17
  52:11 60:4,8 62:9
  62:11,15
times 11:12,18

13:13 19:7,10
  20:8 27:6
Tish 11:8
today 5:7
told 15:21 16:3 27:3
  29:3,5 39:17
total 6:17
training 38:17,19
  39:14 40:19 41:2
  41:16,19 42:7,11
  43:16
transcript 63:4
trial 3:6
tried 20:8 27:14,16
true 63:4 64:11
try 4:23 8:4 58:13
trying 56:23
two 6:19 18:12,13
  18:13,13 19:11
  43:6,12 60:20

U

ultimately 7:10,23
Umm-hmm 13:12
understand 4:21 5:3
  5:4,7 42:10 59:18
understandable
  4:24
understanding 10:8
  46:2,7 48:10,17
  48:22 49:15
understood 12:10
  29:4
uniforms 17:10
UNITED 1:2
unusual 14:21
upcoming 14:2
use 12:23 20:8 27:15
  32:18 39:8
usual 16:23
usually 8:3 13:11
  16:25 17:3,5
uttered 35:4

V

Vallone 27:10 33:10
  33:15,18
Vann 38:22,24
Vann's 23:16 38:20
various 27:6 38:17
  38:17
verbally 4:25
view 12:15 35:18
  37:20,21 55:23
  57:24
viewed 56:6,7,8
Viola 1:4 2:24 30:11
  30:17,22,24 31:2
  31:6 32:22
visible 17:3,7
voiced 29:7

**voluntary** 42:20
**vote** 10:17 23:15,15 23:19
**voted** 8:19 50:5
**votes** 19:8

**W**

**waived** 3:9
**want** 4:16 25:22 46:21,22,25 47:3 47:21 51:23 57:13
**wanted** 17:20 29:7 36:23
**wants** 50:12
**Wareham** 2:3 4:9 4:14 8:12 19:21 25:18,21 36:9 41:9,11 46:24 47:7,11 51:16 52:13 53:22 57:19 58:17 61:5 62:7 62:12 65:4
**wasn't** 14:21 15:2,2 16:8 27:18 30:25 32:22 50:11 56:9 56:10
**way** 33:2 35:25 55:18 56:11 64:15
**Wayne** 15:22 54:8
**ways** 38:3
**weight** 58:14,22 59:6
**went** 22:18,20 23:6 23:18,21 60:7
**weren't** 32:13
**we'll** 5:10
**we've** 36:14
**WHEREOF** 64:17
**Withdrawn** 8:12 19:21 36:9 52:13 58:17
**witness** 3:12 18:23 35:22 41:12 46:18 47:12,16 49:8 63:2 64:9,12,17 65:3
**wondering** 47:5
**word** 31:3 32:18 33:23 34:2,10 35:4
**words** 24:6
**work** 6:6,25 12:11 28:5 60:18
**worked** 6:3 12:9 16:18 45:8
**working** 5:25 6:18 13:8 45:14
**wouldn't** 15:19 17:11 32:12
**write** 51:7,10
**ws** 39:4

**X**

**x** 1:3,10

**Y**

**yeah** 7:20 22:9
**year** 5:22
**years** 5:19 6:9,19 17:2
**yell** 19:16,17
**yelled** 27:6
**yelling** 19:7,14 21:8 21:9
**York** 1:2,18,18,20 1:24,24 2:6,8,12 2:12,15,19,19 4:3 4:4 6:4,7 44:14 46:12 47:19 48:18 48:19 64:3,5,8

**0**

**07** 1:6
**0842** 61:7,9 65:8

**1**

**1** 46:16 47:19
**1:24** 1:11
**10** 19:11,13
**100** 1:17 2:11
**10001** 1:24
**10007** 2:12,19
**11216** 2:6
**12** 61:6,8 65:8
**14** 1:11
**14th** 44:3
**15** 19:11,13
**19** 6:9 19:12

**2**

**2nd** 61:2,22
**2:39** 62:9
**2:44** 62:11,15
**20th** 1:23 64:18
**2007** 1:11 9:9 13:19 16:5 17:25 18:19 18:21 24:18 44:3 52:10 57:17,18 58:6,20,22 59:16 63:17 64:18
**21** 46:21 47:22 48:5
**212** 1:24
**250** 2:18
**27th** 44:3
**279-5108** 1:24
**28** 18:19 52:10
**28th** 52:12

**3**

**30** 13:19 16:5 17:25 18:21 24:18 57:17 57:18 58:6,20 59:16
**30th** 14:2 15:6 17:21 53:24 57:15
**363** 1:23
**394** 2:5

**4**

**4** 65:4

**5**

**5th** 52:19

**6**

**61** 65:8
**6154(WHP)** 1:6

**8**

**8** 65:8



**Greenhouse Reporting, Inc.**
TOTAL LITIGATION SUPPORT UNDER ONE ROOF
Phone: 212.279.5100     Fax: 212.279.5431

ERRATA SHEET FOR THE TESTIMONY OF: _____

IN THE MATTER OF: _____

DATE TAKEN: _____


<u>PAGE/LINE</u>     <u>CORRECTION</u>                    <u>REASON</u>

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____


                          _____
                          (Signature of Witness)


Subscribed and sworn to

Before me this _____ day

of _____, 2007


*Additional space for corrections provided on the other side of this sheet*