# Exhibit F

Page 1

[1]

[2] UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

[3]

[4] VIOLA PLUMMER,

[5]        Plaintiff,    Civil Action No.

[6]    -against-    07 CV 6154(WHP)

[7] CHRISTINE QUINN,

[8] Speaker of the City Council,

[9]        Defendant.

[10]

[11]    August 16, 2007

10:26 a.m.

[12]

[13]

[14]    Deposition of CHRISTINE C. QUINN,

[15] taken pursuant to Notice, held at the

[16] Offices of the Corporation Counsel, 100

[17] Church Street, New York, New York, before

[18] Vicky Galitsis, a Certified Shorthand

[19] Reporter and Notary Public of the State of

[20] New York.

[21]

[22]

[23]

[24]    GREENHOUSE REPORTING, INC.

363 Seventh Avenue - 20th Floor

New York, New York 10001

[25]    (212) 279-5108

Page 2

[1]

[2] APPEARANCES:

[3] ROGER S. WAREHAM, ESQ.

[4] Attorney for the Plaintiff

[5]    394 Putnam Avenue

[6]    Brooklyn, New York 11216

[7]

[8] NEW YORK CITY LAW DEPARTMENT

[9] OFFICE OF THE CORPORATION COUNSEL

[10] Attorneys for the Defendant

[11]    100 Church Street

[12]    New York, New York 10007

[13] BY:  JAMES LEMONEDES, ESQ.

[14]    PAUL MARKS, ESQ.,

[15]        of Counsel

[16]

[17] NEW YORK CITY COUNCIL

[18] OFFICE OF THE GENERAL COUNSEL

[19]    250 Broadway, 15th Floor

[20]    New York, New York 10007

[21] BY:  ALVIN BRAGG, JR., ESQ.,

[22]        of Counsel

[23]

[24] ALSO PRESENT:

[25]    Viola Plummer

Page 3

[1]

[2]    IT IS HEREBY STIPULATED AND AGREED,

[3] by and between the attorneys for the

[4] respective parties hereto, that all

[5] objections, except as to form, shall be

[6] reserved to the time of trial.

[7]    IT IS FURTHER STIPULATED AND AGREED

[8] that the sealing and filing of the within

[9] deposition are hereby waived.

[10]    IT IS FURTHER STIPULATED AND AGREED

[11] that the within deposition may be

[12] subscribed and sworn to by the witness

[13] being examined before a Notary Public

[14] other than the Notary Public before whom

[15] this deposition was begun.

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 4

**C.C. Quinn**

[1]

[2] CHRISTINE C. Q UINN,

[3] having been first duly sworn by a

[4] Notary Public of the State of New

[5] York, was examined and testified

[6] further as follows:

[7]    **EXAMINATION BY MR. WAREHAM:**

[8]    **Q:** Good morning. My name is Roger

[9] Wareham and I represent Viola Plummer in this

[10] action.

[11]    There are a few preliminary

[12] questions that I just need to ask you.

[13]    **A:** Okay.

[14]    **Q:** Have you ever been deposed

[15] before?

[16]    **A:** Yes.

[17]    **Q:** As you already know, you are

[18] under oath.

[19]    **A:** Yes.

[20]    **Q:** Any questions I ask you, if you

[21] don't understand them in terms of form or

[22] content, just ask me to rephrase it or repeat

[23] it. Your questions have to be answered orally

[24] because —

[25]    **A:** Yes.

Page 5

**C.C. Quinn**

[1]
[2]  **Q:** Okay. Have you taken any
[3] medications or drugs today that would effect
[4] your ability to answer or understand my
[5] questions and answer clearly?
[6]  **A:** No.
[7]  **Q:** Have you reviewed any documents
[8] in preparation for this?
[9]  **A:** Yes.
[10]  **Q:** Which documents were they?
[11]  **A:** The transcript of the Stated
[12] Meeting and the interrogatories.
[13]  **Q:** Anything else?
[14]  **A:** No.
[15]  **Q:** What is your title in the City
[16] Council?
[17]  **A:** Speaker.
[18]  **Q:** You are the Councilmember from
[19] which district?
[20]  **A:** Third.
[21]  **Q:** When were you elected?
[22]  **A:** February 5, 1999.
[23]  **Q:** Are you term limited?
[24]  **A:** Yes.
[25]  **Q:** When you ran for Speaker, was

Page 6

**C.C. Quinn**

[1]
[2] there anyone also running for that position?
[3]  **A:** Yes.
[4]  **Q:** Who was that?
[5]  **A:** There were numerous people who
[6] were running.
[7]  **Q:** How many people, if you remember?
[8]  **A:** I believe there were six people
[9] in total including myself — I'm sorry, there
[10] were seven people including myself.
[11]  **Q:** Do you remember which ones?
[12]  **A:** Myself, Melinda Katz, Leroy
[13] Comrie, David Weprin, Joel Rivera,
[14] Bill de Blasio and Lewis Fidler.
[15]  **Q:** Did you have the support of the
[16] democratic party from Queens for your
[17] selection as Speaker?
[18]  **MR. LEMONEDES:** Objection to
[19] form. You can answer if you can.
[20]  **A:** At what point? Could you be more
[21] specific?
[22]  **Q:** How many votes did you get to be
[23] selected as Speaker?
[24]  **MR. LEMONEDES:** Objection to
[25] form.

Page 7

**C.C. Quinn**

[1]
[2]  **A:** I think I got 49 votes but I'm —
[3] it was in the high 40s, I think it was 49.
[4]  **Q:** Did Councilmember Comrie support
[5] your selection of Speaker?
[6]  **MR. LEMONEDES:** Again, objection.
[7] You can answer.
[8]  **A:** At what point, sir, because it
[9] was a multi —
[10]  **Q:** Let me go back for a second. Can
[11] you describe what is the procedure that
[12] someone goes through, the procedure to select
[13] a Speaker in the City Council?
[14]  **A:** Well, the charter meeting, the
[15] date of which is stipulated by the charter,
[16] there is a vote. And if you get a majority
[17] vote of your colleagues then you're the
[18] Speaker.
[19]  **Q:** And the majority vote means you
[20] have to have?
[21]  **A:** 26.
[22]  **Q:** And prior to that vote are there
[23] steps that are taken to secure support?
[24]  **A:** Pardon me?
[25]  **Q:** What steps did you take prior to

Page 8

**C.C. Quinn**

[1]
[2] the vote to secure support for your candidacy?
[3]  **A:** You have to have 26 — know 26
[4] people are going to vote yes.
[5]  **Q:** And the day of the vote, do you
[6] usually know prior to the vote whether or not
[7] you had votes necessary to win?
[8]  **A:** It's been different. There's
[9] been three votes, it's been different every
[10] time. There's been three votes for three
[11] different speakers.
[12]  **Q:** Did Charles Barron support your
[13] candidacy?
[14]  **MR. LEMONEDES:** Objection to
[15] form.
[16]  **Q:** For selection of Speaker?
[17]  **A:** He abstained.
[18]  **Q:** What's the highest level of
[19] education that you've attained?
[20]  **A:** College degree.
[21]  **Q:** In what, in what area? What did
[22] you major in?
[23]  **A:** Urban studies and education.
[24]  **Q:** Where did you go to school?
[25]  **A:** Trinity College.

Page 9

C.C. Quinn

[1]
[2] Q: And that's in?
[3] A: Hartford, Connecticut.
[4] Q: Prior to your election, as a City
[5] Council member in 1999, what type of work did
[6] you do?
[7] A: I was the executive director of
[8] the New York City Gay and Lesbian
[9] Anti-Violence Project.
[10] Q: How long were you doing that?
[11] A: About three years, a little bit
[12] less.
[13] Q: What are the responsibilities of
[14] the Speaker?
[15] A: They're numerous. They're
[16] numerous, they deal from legislative
[17] responsibilities, administrative
[18] responsibilities, organizational
[19] responsibilities, agenda responsibilities.
[20] Q: What are the administrative
[21] responsibilities of the Speaker?
[22] A: Those too are extensive. There
[23] is a large administrative staff that deals
[24] with purchasing, bill paying, payroll, all of
[25] the typical things that go along with running

Page 10

C.C. Quinn

[1]
[2] a city agency.
[3] Q: Are you familiar with the section
[4] of the New York City Charter which establishes
[5] the City Council?
[6] A: No.
[7] Q: Have you ever read it?
[8] A: No.
[9]   (Ms. Viola Plummer enters.)
[10] Q: I know in your previous answer
[11] you referred to the City Council as an agency.
[12] Are you aware that the City Charter
[13] establishes the City Council as a legislative
[14] body?
[15] MR. LEMONEDES: Objection. You
[16] can answer to the degree you have any
[17] knowledge of it. But you will give no
[18] legal advice here.
[19] A: My understanding is the City
[20] Council is a legislative body and an agency.
[21] Q: What are the characteristics of
[22] an agency to your understanding?
[23] A: I'm sorry, I don't understand
[24] your question. Are you asking me for a legal
[25] interpretation?

Page 11

C.C. Quinn

[1]
[2] Q: No. I'm asking you for your lay
[3] interpretation. Let me rephrase the question.
[4]    The difference between a
[5] legislative body and an agency?
[6] A: Well, the City Council is both,
[7] so it has the characteristics of both.
[8] Q: What are the characteristics of
[9] an agency that the City Council has?
[10] A: It's an entity of, comprised of
[11] employees working under the auspicious of the
[12] New York City government.
[13] Q: The employees of, for example,
[14] the employees of the New York City Police
[15] Department, that's an agency?
[16] A: Yes.
[17] Q: Is the Commissioner of the New
[18] York City Police Department elected by the
[19] citizens of New York City?
[20] MR. LEMONEDES: Objection.
[21] A: No.
[22] MR. LEMONEDES: You can answer.
[23] A: No.
[24] Q: The commissioner is appointed by
[25] the executive, is that correct, by the mayor?

Page 12

C.C. Quinn

[1]
[2] A: Yes.
[3] Q: To your knowledge, do the
[4] employees of the New York City Police
[5] Department vote on the budget for the New York
[6] City Police Department?
[7] MR. LEMONEDES: Again, objection.
[8] But you can answer.
[9] A: No.
[10] Q: Are the employees of the New York
[11] City Police Department elected by the citizens
[12] of New York City?
[13] A: No.
[14] Q: Does the commissioner of the
[15] police department make laws for the City of
[16] New York?
[17] MR. LEMONEDES: Again, objection
[18] to this whole line of questioning. I
[19] just don't want to keep interrupting.
[20] MR. WAREHAM: You have a standing
[21] objection.
[22] MR. LEMONEDES: Thanks.
[23] A: The police commissioner has a
[24] power to issue police regulations which have
[25] the force of law.

Page 13

**C.C. Quinn**

[1]
[2] **Q:** Does the police commissioner have
[3] the power to make laws for the City of New
[4] York?
[5] **A:** No.
[6] **Q:** From where did you get the
[7] understanding that the New York City Council
[8] is an agency?
[9] **MR. LEMONEDES:** Objection to the
[10] degree it calls for privilege. I will
[11] allow a limited answer.
[12] **A:** Let's just be clear. My
[13] understanding is that the City Council is a
[14] legislative body and an agency. I got that
[15] understanding when I was a Councilmember, when
[16] I was a Council staff member before that and
[17] that has always been my understanding based on
[18] conversations and information from staff,
[19] since becoming Speaker in 2006.
[20] **Q:** Does the Police Commissioner of
[21] New York have the right to discipline
[22] employees of the police department?
[23] **MR. LEMONEDES:** Just note my
[24] standing objection. Go ahead.
[25] **A:** I can't comment on the full

Page 14

**C.C. Quinn**

[1]
[2] employment and disciplinary powers of the
[3] police commissioner.
[4] **Q:** Does the Police Commissioner of
[5] New York have the authority to fire employees
[6] of the New York City Police Department?
[7] **A:** Again, I'm not fully aware of
[8] what all of the employment and administrative
[9] powers of the police commissioner are.
[10] **Q:** When you were elected to the
[11] Council in 1999 who was the selected Speaker
[12] for that, your first term?
[13] **A:** Peter Vallone, Senior.
[14] **Q:** That was your first term at the
[15] City Council, correct?
[16] **A:** A portion of a term, yes.
[17] **Q:** Were you involved in the
[18] selection of Peter Vallone as the Speaker?
[19] **A:** No.
[20] **Q:** When was the first Speaker
[21] selection you were involved?
[22] **A:** 2002.
[23] **Q:** That was for?
[24] **A:** Gifford Miller.
[25] **Q:** Did you support Gifford Miller?

Page 15

**C.C. Quinn**

[1]
[2] **A:** Yes.
[3] **Q:** When you selected Gifford Miller
[4] as Speaker, was it your understanding that
[5] Gifford Miller as Speaker had authority over
[6] staff members, individuals of your staff?
[7] **A:** I believed I was voting on
[8] Gifford to be the Speaker of the City Council
[9] and as such the agency had among other
[10] responsibilities.
[11] **Q:** Did you have individual staff at
[12] that point in time, staff members?
[13] **A:** Yes.
[14] **Q:** Did you have a staff?
[15] **A:** Yes.
[16] **Q:** And when you hired that staff did
[17] you get approval from Gifford Miller?
[18] **A:** You send paperwork that has to be
[19] approved to the Administrative Services
[20] Division of the New York City Council which
[21] works for the Speaker. So it was approved —
[22] the hiring of those staff was approved and
[23] processed by the City Council's Administrative
[24] Services Division.
[25] **Q:** Do you know who signed off on the

Page 16

**C.C. Quinn**

[1]
[2] approval for the staff members, any of your
[3] staff members?
[4] **A:** I believe it was the director at
[5] that time.
[6] **Q:** Your understanding —
[7] **A:** Some of my staff pre-dated
[8] Gifford so there was staff that were there
[9] from when Peter was Speaker.
[10] **Q:** Is it your understanding that if
[11] Gifford Miller had disapproved of someone you
[12] wanted to hire, that you would not have been
[13] able to hire that person?
[14] **A:** I interviewed individuals, hired
[15] them, sent their paperwork to be processed.
[16] **Q:** Were those people approved?
[17] **A:** Yes.
[18] **Q:** Were you aware of any instance
[19] where an individual Councilmember wanted to
[20] hire a staff person and the Speaker
[21] disapproved of it?
[22] **A:** Yes.
[23] **Q:** When was that?
[24] **A:** I don't know the date, but there
[25] was an incident — there was such a staff

Page 17

### C.C. Quinn

[1]

[2] member.

[3]    **Q:** That was when Gifford Miller was

[4] the —

[5]    **A:** I think it was when Peter Vallone

[6] was Speaker.

[7]    **Q:** But you don't know who that was?

[8]    **A:** I don't recall the name. I don't

[9] recall the name of the staff member, but there

[10] was an employee who was requested to be hired

[11] by a councilmember when Speaker Vallone was

[12] Speaker and that employment was denied.

[13]    **Q:** Do you know what the basis of

[14] that denial was?

[15]    **A:** It had to do with other family

[16] members being on staff.

[17]    **Q:** So it was a conflict of interest

[18] or was it —

[19]    **A:** I can't characterize it.

[20]    **MR. LEMONEDES:** Objection to

[21] form.

[22]    **Q:** Was it in contravention of City

[23] Council rules?

[24]    **MR. LEMONEDES:** Again, objection.

[25]    **A:** My full knowledge was that it was

Page 18

### C.C. Quinn

[1]

[2] related to there being family on staff.

[3]    **Q:** Do you remember who was the City

[4] Councilmember?

[5]    **A:** No.

[6]    **Q:** Do you remember whether the City

[7] Councilmember agreed to the decision by

[8] whoever you said was the — Speaker Vallone

[9] made the division?

[10]    **MR. LEMONEDES:** Again, objection.

[11] Calls for speculation. Go ahead.

[12]    **A:** I don't know. I mean, I don't

[13] know who the Councilmember was, so I couldn't

[14] know what they — how they reacted.

[15]    **Q:** But you're saying it was during

[16] when Vallone, Senior was the Speaker?

[17]    **A:** Yes, sir.

[18]    **Q:** What is your understanding of the

[19] statutory source of the Speaker's authority,

[20] where does it come from, if you know?

[21]    **A:** The charter.

[22]    **Q:** Do you know which provision of

[23] the charter it comes from?

[24]    **A:** No.

[25]    **Q:** Is there any other statutory

Page 19

### C.C. Quinn

[1]

[2] authority that you're aware of for the

[3] authority of the Speaker?

[4]    **A:** As I understand it, it's the

[5] charter.

[6]    **Q:** And your understanding is that

[7] the charter authorizes the Speaker to have

[8] personal responsibility over staff members of

[9] individual councilmembers?

[10]    **A:** As I understand it, this charter

[11] makes the Speaker the agency head of the City

[12] Council.

[13]    **Q:** Is it your understanding that the

[14] charter specifically states that?

[15]    **MR. LEMONEDES:** Objection. Go

[16] ahead.

[17]    **A:** As I understand it, the charter

[18] makes the Speaker the agency head.

[19]    **Q:** Where do you get your

[20] understanding from?

[21]    **MR. LEMONEDES:** Objection to the

[22] degree it calls for privileged

[23] information. I will allow a limited

[24] answer, go ahead.

[25]    **A:** It was my operational

Page 20

### C.C. Quinn

[1]

[2] understanding, so to speak, as a councilmember

[3] and that has been re-affirmed for me by staff

[4] since becoming Speaker.

[5]    **Q:** To the degree that you know that,

[6] is that an understanding of other

[7] councilmembers?

[8]    **A:** I can't —

[9]    **Q:** That the Speaker has the

[10] authority over the personnel of their staff?

[11]    **MR. LEMONEDES:** Again, objection.

[12] Go ahead.

[13]    **A:** You'll have to ask other

[14] councilmembers what their belief is.

[15]    **Q:** Have you ever had any discussion

[16] with the councilmembers on the issue of the

[17] authority of the Speaker over staff members of

[18] individual councilmembers?

[19]    **A:** Yes.

[20]    **Q:** And with whom did you have those

[21] discussions?

[22]    **A:** Members of leadership, members of

[23] the Black, Latino and Asian Caucus Executive

[24] Committee, and other members as well.

[25]    **Q:** Which members of the Black,

Page 21

**C.C. Quinn**

[1]
[2] Latino and Asian Caucus Executive Committee
[3] did you have those discussions with?
[4]    **A:** Maria Arroyo, Robert Jackson,
[5] Melissa Mark Viverito. I can't recall the
[6] other members. There may have been other
[7] members of the executive committee there when
[8] I was talking to them, but I can't recall
[9] right now.
[10]    **Q:** When did you have those
[11] discussions?
[12]    **A:** This summer.
[13]    **Q:** What did you discuss with them in
[14] terms of the authority of the Speaker over
[15] staff members of individual councilmembers?
[16]    **A:** That the employees were employees
[17] of the City Council, and therefore the Speaker
[18] had authority over them.
[19]    **Q:** Did Councilmember Jackson agree
[20] with that analysis?
[21]    **MR. LEMONEDES:** Again, objection.
[22] Answer it if you can.
[23]    **A:** I discussed it with Robert. He
[24] accepted the information I gave him.
[25]    **Q:** Did he indicate whether he agreed

Page 22

**C.C. Quinn**

[1]
[2] with it, with that analysis?
[3]    **A:** He didn't indicate that he
[4] disagreed, he accepted it. He asked what the
[5] advice, what the staff had determined and I
[6] told him.
[7]    **Q:** Your testimony is he just took
[8] it, he didn't reply one way or another? He
[9] didn't say, oh, I agree with this or I
[10] disagree with this?
[11]    **A:** I mean, you'll have to ask Robert
[12] Jackson.
[13]    **Q:** I'm just asking what do you
[14] remember that he said to you when you
[15] presented —
[16]    **A:** I recall no objection to that
[17] information.
[18]    **Q:** And what about Councilmember Mark
[19] Viverito?
[20]    **A:** Viverito with a V.
[21]    **Q:** What did she say when you —
[22]    **A:** She also accepted it.
[23]    **Q:** And Councilmember Arroyo?
[24]    **A:** She accepted it.
[25]    **Q:** Did you have a discussion with

Page 23

**C.C. Quinn**

[1]
[2] Councilmember Vann?
[3]    **A:** Yes.
[4]    **Q:** What was his position?
[5]    **A:** He said it was an employment
[6] matter, these were employment related issues
[7] and didn't want to discuss it.
[8]    **Q:** Did you have a discussion with
[9] Councilmember Barron?
[10]    **A:** No.
[11]    **Q:** And why not?
[12]    **A:** Why didn't I have the discussion
[13] with Councilmember Barron generally about the
[14] powers of the Speaker relating to employees?
[15]    **Q:** Yes.
[16]    **A:** There was no need to.
[17]    **Q:** This discussion was in the
[18] context of Councilmember Barron's staff
[19] members, is that correct?
[20]    **A:** Yes.
[21]    **Q:** Yet you didn't feel it was
[22] necessary to have a discussion with
[23] Councilmember Barron around one of his staff
[24] members that you were considering terminating?
[25]    **A:** Correct.

Page 24

**C.C. Quinn**

[1]
[2]    **Q:** Why not?
[3]    **A:** Because I didn't.
[4]    **Q:** You didn't feel as Speaker of the
[5] Council you had the — you at least owed the
[6] councilmember the courtesy of a discussion
[7] around an action you were taking around his
[8] staff member?
[9]    **MR. LEMONEDES:** Objection. You
[10] can answer it if you'd like.
[11]    **A:** We — I was considering what to
[12] do about a situation that I took very
[13] seriously, a cumulative situation that I took
[14] very seriously.
[15]    Councilmember Barron had made
[16] repeated comments that he did not take the
[17] situation seriously, and he thought there was
[18] no problem, nothing inappropriate about what
[19] had happened, in fact, said supportive and
[20] complementary things about what had happened.
[21]    So, therefore, I thought there
[22] was clearly no possibility to engage in a
[23] conversation that would yield any serious
[24] reflection on the severity of the situation,
[25] and therefore a discussion of what steps could

Page 25

**C.C. Quinn**

[1]
[2] be taken to remedy it.
[3]     **Q:** The discussion around the
[4] authority of the Speaker over staff members of
[5] individual councilmembers, do you consider
[6] that a serious issue?
[7]     **A:** I'm sorry, can you just repeat
[8] the question?
[9]     **Q:** Do you consider the issue of the
[10] authority of the Speaker over the personnel of
[11] individual councilmembers a serious issue?
[12]     **A:** I consider all discussions of the
[13] authority of the City Council Speaker serious
[14] issues.
[15]     **Q:** And your position is or your view
[16] is that Councilmember Barron didn't see that
[17] as a serious issue?
[18]     **MR. LEMONEDES:** Objection,
[19] mischaracterizing the testimony.
[20]     **A:** What I said was that
[21] Councilmember Barron did not see the
[22] employment questions relating to the situation
[23] of a person who worked in his office, and the
[24] comments that had been made, and the
[25] cumulative comments and behavior serious.

Page 26

**C.C. Quinn**

[1]
[2]     **Q:** What was the cumulative situation
[3] that you referred to?
[4]     **A:** I had received numerous
[5] complaints about the behavior of Mrs. Plummer
[6] at committee meetings. I received them from
[7] different staff members — I'm sorry,
[8] different councilmembers.
[9]     I received them from the
[10] Executive Committee of the Black, Latino and
[11] Asian Caucus. There had been a disruption by
[12] Mrs. Plummer on the floor of the City Council
[13] in a Stated Meeting.
[14]     And then there were statements
[15] made relating to Councilmember Comrie after a
[16] Stated Council Meeting.
[17]     And I think the totality of all
[18] of that was very serious.
[19]     **Q:** Let's start at the beginning.
[20] What were the numerous complaints that you
[21] received about Mrs. Plummer? Just detail what
[22] they are.
[23]     **A:** I received complaints about
[24] Mrs. Plummer disrupting committee meetings
[25] from councilmembers, and from the Executive

Page 27

**C.C. Quinn**

[1]
[2] Committee of the Black, Latino and Asian
[3] Caucus.
[4]     **Q:** Let's just walk through one by
[5] one.
[6]     **A:** Sure.
[7]     **Q:** Who complained to you about what
[8] committee meeting?
[9]     **A:** Councilmember Vallone complained,
[10] Councilmember Seabrook complained and, as I
[11] said, the Executive Committee of the Black,
[12] Latino and Asian Caucus complained.
[13]     **Q:** What was Councilman Vallone's
[14] complaint?
[15]     **A:** Disruptions made at committee
[16] meetings.
[17]     **Q:** Did he detail which meetings,
[18] when, how often, what were the nature of the
[19] disruptions?
[20]     **MR. LEMONEDES:** Which question do
[21] you want answered?
[22]     **MR. WAREHAM:** That's why I'm
[23] going to go back right through it.
[24]     **Q:** Did he detail what meeting?
[25]     **A:** Councilmember Vallone described

Page 28

**C.C. Quinn**

[1]
[2] disruptions to me. He didn't detail every
[3] single, you know, instance — meeting to me.
[4]     **Q:** So which ones did he detail to
[5] you that you remember?
[6]     **A:** He told me that there had been
[7] disruptions at meetings, at Public Safety
[8] Committee meetings.
[9]     **Q:** Did he indicate how many
[10] meetings?
[11]     **A:** Not that I recall, to me.
[12]     **Q:** Did he indicate when the meeting
[13] occurred?
[14]     **A:** Not to me, though I instructed
[15] that he should, you know, make sure my staff
[16] had all that information.
[17]     **Q:** Do you know who he gave that
[18] information to —
[19]     **A:** No.
[20]     **Q:** — on your staff?
[21]     **A:** No.
[22]     **Q:** Do you know, would it be Chuck
[23] Meara?
[24]     **A:** It could have been a number of
[25] people.

Page 29

**C.C. Quinn**

[1]
[2] **Q:** Did he indicate what the nature
[3] of the disruption was?
[4] **A:** Verbal outbursts.
[5] **Q:** Did he indicate what the verbal
[6] outbursts were?
[7] **A:** No.
[8] **Q:** Did he indicate what steps he had
[9] taken to deal with that?
[10] **A:** He indicated that he was, you
[11] know, unable to get them to stop and then when
[12] requests were made for the room to be quiet
[13] that they were not taken seriously.
[14] **Q:** So Councilmember Vallone said
[15] that Mrs. Plummer made outbursts during one,
[16] two, three, he didn't detail how many
[17] meetings?
[18] **A:** Not to me.
[19] **MR. LEMONEDES:** Objection to
[20] form.
[21] **Q:** Which committee does he chair?
[22] **A:** Public Safety.
[23] **Q:** According to you, Councilmember
[24] Vallone complained to you that Mrs. Plummer
[25] had made outbursts during a public hearing

Page 30

**C.C. Quinn**

[1]
[2] meeting or meetings?
[3] **A:** At the Public Safety Committee.
[4] **Q:** Public Safety Committee. More
[5] than one meeting?
[6] **A:** I don't recall.
[7] **Q:** And that the nature of the
[8] outbursts was she yelled out something?
[9] **A:** Correct.
[10] **Q:** Did he have the Sergeant-at-Arms
[11] speak to her, do you know?
[12] **A:** I don't know.
[13] **Q:** But he took some step to address
[14] the outburst and Mrs. Plummer ignored it?
[15] **A:** That's my understanding.
[16] **Q:** Did he indicate whether he had
[17] Mrs. Plummer put out of this meeting where she
[18] made the outburst?
[19] **A:** I don't believe that occurred.
[20] **Q:** Did he as chair of the hearing
[21] have the authority to have Mrs. Plummer
[22] removed from the meeting?
[23] **MR. LEMONEDES:** Objection. You
[24] can answer, if you can.
[25] **Q:** If you know?

Page 31

**C.C. Quinn**

[1]
[2] **A:** I don't know if a chair could,
[3] they probably could, but they probably
[4] wouldn't do something like that without
[5] checking with the Speaker's office first,
[6] because it's obviously something you would
[7] prefer not to have happened.
[8] **Q:** But to your understanding, when
[9] there is a committee meeting the chair of that
[10] committee has the authority to maintain order
[11] and decorum?
[12] **A:** Yes.
[13] **Q:** And part of that maintenance of
[14] order and decorum is the ability to have
[15] disruptive elements removed, correct?
[16] **MR. LEMONEDES:** Objection. But
[17] you can answer.
[18] **Q:** If you know?
[19] **A:** It would depend on the meeting,
[20] the circumstance, the chair. I can't
[21] speculate.
[22] **Q:** But in your experience, as you've
[23] been on the council for eight years, in your
[24] experience, do the chairs of meetings have the
[25] authority to maintain order in meetings?

Page 32

**C.C. Quinn**

[1]
[2] **A:** Yes.
[3] **Q:** Councilmember Seabrook, what was
[4] his complaint?
[5] **A:** He complained that there had been
[6] disruptions of Civil Rights Committee meetings
[7] that may have been joint with public safety,
[8] I'm not sure, by Mrs. Plummer.
[9] **Q:** Did Councilmember Seabrook
[10] indicate what the nature of the disruption
[11] was?
[12] **A:** Verbal outbursts also. There may
[13] have been joint Safety and Civil Rights
[14] meetings. I don't recall. They had a lot of
[15] hearings together recently.
[16] **Q:** Did he specify what the —
[17] **A:** No.
[18] **Q:** — what was said?
[19] Did he indicate what steps, if
[20] any, he took to address the outburst?
[21] **A:** Not that I recall.
[22] **Q:** Did he indicate that the outburst
[23] prevented the work of that committee from
[24] being completed that day?
[25] **MR. LEMONEDES:** Objection to

Page 33

**C.C. Quinn**

[1]
[2] form. Go ahead.
[3]    **A:** We didn't have a conversation
[4] relating to that.
[5]    **Q:** Did Councilmember Vallone
[6] indicate whether the outburst prevented the
[7] work of his committee from being completed
[8] that day?
[9]    **MR. LEMONEDES:** Again, objection
[10] to form. Go ahead and answer if you
[11] can.
[12]    **A:** He said it was difficult to
[13] conduct the meeting. I don't know whether he
[14] was able to finish his business that day or
[15] not.
[16]    **Q:** You didn't ask him?
[17]    **A:** I know I asked him to follow up
[18] with staff.
[19]    **Q:** Did you follow-up with your staff
[20] to find out what the resolution of that had
[21] been?
[22]    **A:** We were having conversations. My
[23] staff, the staff and I were having
[24] conversations to try to come up with a plan of
[25] how to deal with the situation, because it was

Page 34

**C.C. Quinn**

[1]
[2] unprecedented.
[3]    **Q:** The discussion with the Executive
[4] Committee of the Black, Latino and Asian
[5] Caucus that you had around these outbursts,
[6] these are the same people you indicated in
[7] your prior question, Arroyo, Jackson, and Mark
[8] Viverito?
[9]    **A:** Yes, and I just can't recall
[10] whether the other two members were there. I
[11] think Miguel Martinez was there, but I cannot
[12] say 100 percent.
[13]    **Q:** You said that they had complaints
[14] about outbursts by Mr. Plummer?
[15]    **A:** Yes.
[16]    **Q:** Did they indicate when?
[17]    **A:** No, just a general concern.
[18]    **Q:** And a general concern was
[19] outbursts at Stated meetings, outbursts at
[20] committee meetings, outburst walking down the
[21] hall of 250 Broadway?
[22]    **MR. LEMONEDES:** Objection to
[23] form.
[24]    **MR. WAREHAM:** Okay, I understand.
[25]    **A:** Committee meetings.

Page 35

**C.C. Quinn**

[1]
[2]    **Q:** Committee meetings that they
[3] chaired?
[4]    **A:** I'm not sure if Larry Seabrook
[5] was in that meeting or not. I believe he was,
[6] so it would have been one he chaired and the
[7] others were not necessarily ones they chaired,
[8] no.
[9]    **Q:** Is it possible that they were all
[10] talking about the same meeting where
[11] Councilmember Vallone and Councilmember
[12] Seabrook co-chaired a meeting on police Stop
[13] and Frisk activity?
[14]    **A:** You would have to ask them.
[15]    **Q:** But you're not sure?
[16]    **A:** They talked about a general
[17] situation, I can't speculate.
[18]    **Q:** You summed it up as cumulative
[19] though, right? You summed up the outbursts as
[20] being part of a cumulative situation?
[21]    **MR. LEMONEDES:** Objection to
[22] form.
[23]    **A:** I'm not sure you're stating what
[24] I said correctly.
[25]    **Q:** All right. Your testimony is

Page 36

**C.C. Quinn**

[1]
[2] that you received complaints about outbursts
[3] about Mrs. Plummer from Councilmember Vallone
[4] and it may have been more than one meeting,
[5] Councilmember Seabrook and it may have been
[6] more than one meeting, the Executive Committee
[7] of the Black, Latino and Asian Caucus,
[8] correct?
[9]    **A:** Correct.
[10]    **Q:** You summed up that Mrs. Plummer's
[11] activities, that those complaints were part of
[12] what you summed up as a cumulative situation?
[13]    **A:** That's not what I said. The
[14] question relating to the Speaker and the
[15] employees and why I didn't speak to
[16] Councilmember Barron which was — came later
[17] in the time line, I discussed as at that
[18] moment of time being cumulative.
[19]    **Q:** When did you receive these
[20] complaints?
[21]    **A:** This year.
[22]    **Q:** Throughout the year?
[23]    **A:** I don't remember the date they
[24] were.
[25]    **Q:** Do you remember when you received

Page 37

**C.C. Quinn**

[2] the first complaint? Do you remember who made
[3] the first complaint?
[4]    **A:** Councilmember Vallone.
[5]    **Q:** How soon after that did you
[6] receive the next complaint?
[7]    **A:** I don't recall.
[8]    **Q:** At the point in time you received
[9] the complaint did you speak to Mrs. Plummer
[10] about it?
[11]    **A:** No.
[12]    **Q:** Did you have any of your staff
[13] speak to Mrs. Plummer about it?
[14]    **A:** No.
[15]    **Q:** Did you suggest that
[16] Councilmember Vallone speak to Mrs. Plummer
[17] about it?
[18]    **A:** No.
[19]    **Q:** Why not?
[20]    **A:** He had come to the Speaker's
[21] office for the Speaker's office to take
[22] action, and we were deciding how to deal with
[23] the situation.
[24]    **Q:** Why didn't you speak to
[25] Mrs. Plummer about it?

Page 38

**C.C. Quinn**

[2]    **A:** Because we hadn't decided how to
[3] handle the situation.
[4]    **Q:** And part of the decision on how
[5] to handle the situation was whether or not you
[6] had the authority to discipline staff of
[7] individual councilmembers?
[8]    **A:** Which problem are you referring
[9] to?
[10]    **Q:** The one brought to you by
[11] Councilmember Vallone about outbursts at his
[12] committee meeting?
[13]    **MR. LEMONEDES:** Objection to
[14] form. I'm not clear on what you're
[15] asking, I'm sorry.
[16]    **Q:** You stated that you were
[17] addressing, you were deciding how to address
[18] the situation with Mrs. Plummer.
[19]    **A:** At what point, sir?
[20]    **Q:** At the point when Councilmember
[21] Vallone made a complaint, right, you were
[22] deciding how to address it, that's what you
[23] stated.
[24]    **A:** After he made that complaint.
[25]    **Q:** After he made the complaint,

Page 39

**C.C. Quinn**

[2] right. Okay.
[3]    Was part of the assessment on
[4] what authority could the Speaker discipline a
[5] staff member of an individual councilmember?
[6]    **A:** At that moment?
[7]    **Q:** Yes.
[8]    **A:** No.
[9]    **Q:** You were clear even then that you
[10] had the authority to do that?
[11]    **A:** It wasn't a question then.
[12]    **Q:** Was it ever a question whether
[13] the Speaker —
[14]    **A:** Relating to what?
[15]    **Q:** Was it ever a question whether
[16] the Speaker had the authority to discipline a
[17] member of an individual staff member, was that
[18] ever a question to you?
[19]    **A:** In what regard? It's a very open
[20] ended question.
[21]    **Q:** When it came to the question of
[22] Mrs. Plummer's behavior vis-a-vis what
[23] Councilmember Vallone had brought to you —
[24] are you following me?
[25]    **A:** Yes, sir.

Page 40

**C.C. Quinn**

[2]    **Q:** — was your authority to
[3] discipline Mrs. Plummer ever an issue? Was
[4] that an issue as far as you were concerned?
[5]    **A:** No, at that point, no.
[6]    **Q:** Councilmember Vallone brought
[7] that to you, was it in May, was it —
[8]    **A:** I told you I don't recall.
[9]    **Q:** Was it prior to the Stated
[10] Meeting of May 30th, 2007?
[11]    **A:** Yes.
[12]    **Q:** It was prior to the Stated
[13] meeting?
[14]    **A:** Yes.
[15]    **Q:** At that point, you were clear
[16] that you had the authority to discipline
[17] Councilmember Barron's staff members?
[18]    **A:** On May 30th?
[19]    **Q:** Prior to the Stated Meeting of
[20] May 30th, 2007?
[21]    **A:** That's not what I said.
[22]    **Q:** Well, I'm asking you.
[23]    **A:** It wasn't a question. It wasn't
[24] a question related to the matter.
[25]    **Q:** Let's walk through this again.

---

Page 41

[1]                    *C.C. Quinn*
[2] Prior to the Stated Meeting on May 30th, 2007,
[3] Councilmember Vallone brought a complaint to
[4] you about Mrs. Plummer?
[5]    **A:** Correct.
[6]    **Q:** You were making an assessment on
[7] how to deal with it?
[8]    **A:** Yes.
[9]    **Q:** My question to you was —
[10]   **A:** Oh, I'm sorry, yes.
[11]   **Q:** My question to you was, did part
[12] of that assessment involve your authority to
[13] discipline Mrs. Plummer as a staff member of
[14] Councilmember Barron prior to the Stated
[15] Meeting of May 30th, 2007?
[16]   **A:** That wasn't a matter that was
[17] researched prior to that, no. It wasn't a
[18] question relevant to at that moment in time.
[19]   **Q:** Was part of your assessment that
[20] Mrs. Plummer might have to be disciplined for
[21] her outbursts?
[22]   **A:** I'm sorry, can you say that
[23] again?
[24]   **Q:** Was part of your assessment of
[25] how to deal with the situation with

---

Page 42

[1]                    *C.C. Quinn*
[2] Mrs. Plummer prior to the Stated Meeting of
[3] May 30th, 2007 that she might have to be
[4] disciplined for her outbursts?
[5]    **A:** We were assessing what we needed
[6] to do. We had not made a decision.
[7]    **Q:** But part of your assessment
[8] involved a situation where Councilmember
[9] Vallone said to you that Mrs. Plummer had made
[10] an outburst, that he had addressed it, and
[11] that she had ignored it?
[12]   **A:** Something like that, yes.
[13]   **Q:** So it was not an issue of
[14] Mrs. Plummer made an outburst and
[15] Councilmember Vallone just let it go, correct?
[16]   **MR. LEMONEDES:** Objection to
[17] form.
[18]   **A:** No, he complained about it.
[19]   **Q:** And he also made it clear to
[20] Mrs. Plummer that he was upset, that he had a
[21] problem with her behavior and that she just
[22] ignored him.
[23]   **MR. LEMONEDES:** Objection.
[24]   **A:** I can't answer what was or was
[25] not clear to Mrs. Plummer.

---

Page 43

[1]                    *C.C. Quinn*
[2]    **Q:** But what was clear to
[3] Councilmember Vallone was that he brought it
[4] to her attention and that she had ignored it?
[5]    **A:** I cannot address what was or was
[6] not clear to Councilmember Vallone. He'll
[7] have to answer that himself.
[8]    **Q:** Councilmember Vallone told you
[9] that he had brought — he had told
[10] Mrs. Plummer or had taken steps to, about
[11] Mrs. Plummer's outbursts, and that she had
[12] ignored it at that meeting.
[13]   **A:** Chairperson Vallone said he had
[14] tried to keep order and was unable to.
[15]   **Q:** But the order was around the
[16] question of Mrs. Plummer's outbursts?
[17]   **A:** Correct, correct.
[18]   **Q:** You then were making an
[19] assessment of how to deal with Mrs. Plummer's
[20] outbursts, and would it be fair to say,
[21] refusal to abide by the instructions of the
[22] chair at Councilmember Vallone's meeting?
[23]   **A:** Yes. And during that assessment,
[24] during that time of thought or reflection
[25] et cetera, other complaints came in.

---

Page 44

[1]                    *C.C. Quinn*
[2]    **Q:** Were those complaints prior to
[3] the Stated Meeting of May 30th?
[4]    **A:** I believe so, yes.
[5]    **Q:** Therefore, did part of your
[6] assessment look at what authority does the
[7] Speaker have to discipline Mrs. Plummer as a
[8] staff member of Charles Barron?
[9]    **MR. LEMONEDES:** Objection to form
[10] just based on the amount of time. If
[11] you're trying to say prior to —
[12]   **MR. WAREHAM:** Prior to the Stated
[13] Meeting of May 30th, 2007, that's what
[14] we're talking about right now.
[15]   **MR. LEMONEDES:** Thank you very
[16] much.
[17]   **A:** This was an unprecedented
[18] situation to get complaints about a staff
[19] member disrupting committee meetings. It had
[20] never happened before, certainly in the time
[21] that I was Speaker, and I had no knowledge of
[22] it ever happening before. We were trying to
[23] figure out how to handle it.
[24]   **Q:** I understand. My question is, in
[25] terms of looking at the options available,

---

Christine C. Quinn  Case 1:07-cv-06154-WHP    Document 24-6    Filed 10/30/2007    Page 13 of 46
Vol. 1, August 16, 2007                                                Viola Plummer v.
                                                    Christine Quinn, Speaker of the City Council

Page 45

**C.C. Quinn**

[1]
[2] were one of the options considered your
[3] ability as Speaker to discipline Mrs. Plummer
[4] who was a staff member of Councilman Barron,
[5] was that one of the options you looked at?
[6]    A: We were, prior to May 30th,
[7] really beginning to figure out what our
[8] options were.
[9]    Q: Okay. Does that mean that one of
[10] those options you were considering was whether
[11] or not you as Speaker could discipline
[12] Mrs. Plummer?
[13]    A: There weren't a clear set of
[14] options prior to that Stated Meeting that we
[15] were considering. We were generally trying to
[16] figure out how to deal with the situation.
[17] But it wasn't like there was a, you know, an A
[18] to D set of options that were in front of me
[19] that I was considering.
[20]    Q: But your view as, from your
[21] perspective that the City Council was an
[22] agency, that you had as an agency head, your
[23] view was that you could discipline
[24] Mrs. Plummer?
[25]    MR. LEMONEDES: Objection to

Page 46

**C.C. Quinn**

[1]
[2] form. You can answer.
[3]    A: You're misstating what I said. I
[4] said that the City Council was an agency and a
[5] legislative body. So I didn't — so your
[6] characterizations of what my thought processes
[7] were would not be correct.
[8]    Q: But you're very clear that an
[9] agency head has the authority to discipline
[10] his or her employees?
[11]    A: Different agencies may have
[12] stipulations within that but, yes, agency
[13] heads are the employer of the agency.
[14]    Q: And your view was that the City
[15] Council was both a legislative body and an
[16] agency?
[17]    A: That is my view.
[18]    Q: And it was your view prior to the
[19] Stated Meeting of May 30th, 2007?
[20]    A: Correct.
[21]    Q: You said that it was your view
[22] almost from the inception of your tenure at
[23] City Council?
[24]    A: Correct.
[25]    Q: And so that for you the issue —

Page 47

**C.C. Quinn**

[1]
[2] your ability to discipline Mrs. Plummer was
[3] really never an issue, right?
[4]    MR. LEMONEDES: Objection.
[5]    Q: Excuse me. Your authority to
[6] discipline Mrs. Plummer was never really an
[7] issue?
[8]    MR. LEMONEDES: Objection. Go
[9] ahead, you can answer it.
[10]    Q: Prior to May 30th, 2007?
[11]    A: The question of — or the
[12] situation that had occurred of a staff member
[13] disrupting Stated Meetings — I'm sorry,
[14] disrupting committee meetings, disrupting a
[15] Stated Meeting, making, you know, incredibly
[16] inappropriate comments about a sitting
[17] councilmember, none of that had ever happened
[18] before in the New York City Council. It was
[19] unprecedented.
[20]    And when you have unprecedented
[21] things occur, you have to assess the situation
[22] more thoroughly. And we were unfortunately in
[23] an unprecedented waters.
[24]    Q: But first off, I was speaking to
[25] you about prior to the Stated Meeting of

Page 48

**C.C. Quinn**

[1]
[2] May 30th, 2007.
[3]    A: Well, you asked me my general
[4] believe about my powers so I —
[5]    Q: Well, I was asking prior to
[6] May 30th, 2007, in terms of your view that the
[7] Speaker is an agency head, and that as an
[8] agency head you have power over all the
[9] employees of that agency.
[10]    MR. LEMONEDES: Can you just
[11] rephrase the question, because it
[12] sounded more like a statement. I just
[13] want the record to be clear.
[14]    Q: Your view, from my understanding,
[15] is that the City Council is both a legislative
[16] body and an agency?
[17]    A: Yes.
[18]    Q: And that the Speaker derives her
[19] authority over staff members of individual
[20] councilmembers as an agency head?
[21]    A: Prior to May 30th, I believe the
[22] Council, as I still do, the Council is a
[23] legislative body and an agency.
[24]    And I believe that the Speaker,
[25] and I still do, is the head of the legislative

Page 49

### C.C. Quinn

[1]
[2] body and the head of an agency.
[3]     In my term as City Council
[4] Speaker, the complaints about Mrs. Plummer
[5] were the first I had ever gotten of that
[6] nature about an employee who worked for an
[7] individual councilmember. We then began
[8] researching the situation of what the powers
[9] of the Speaker were pursuant to that. It was
[10] unprecedented. This had never happened
[11] before.
[12]     **Q:** And at what point did you get
[13] confirmation of your view that you had the
[14] authority to discipline the staff member of an
[15] individual councilmember?
[16]     **A:** At some point in June or July.
[17] I'm not sure exactly the date.
[18]     **Q:** Do you remember having or holding
[19] a press conference on June 5th, 2007 where the
[20] issue came up around Mrs. Plummer and Charles
[21] Barron?
[22]     **A:** Yes.
[23]     **Q:** Do you remember in response to a
[24] question around what steps you were going to
[25] take on Mrs. Plummer, your concern around what

Page 50

### C.C. Quinn

[1]
[2] your legal options as a Speaker were?
[3]     **MR. LEMONEDES:** Objection. But
[4] you can answer it again.
[5]     **A:** There were, you know, a number of
[6] press conferences where I was asked about the
[7] situation with Mrs. Plummer. I can't tell you
[8] definitively that it was the June 5th press
[9] conference. But I do recall press conferences
[10] where I was asked questions about the
[11] situation, and about the status of the
[12] decision making.
[13]     **Q:** Do you remember responding in
[14] answer to a question, a partial response, "As
[15] it relates to Ms. Plummer we are researching
[16] what our legal options are as a speaker and as
[17] an institution to take action. We want to
[18] make sure that we understand the parameters of
[19] what our options are since she does not work
[20] for me. She works for a separate, you know,
[21] independent councilmember"?
[22]     **MR. LEMONEDES:** Objection to
[23] form, but go ahead.
[24]     **Q:** Do you remember making that
[25] response?

Page 51

### C.C. Quinn

[1]
[2]     **A:** As I said, there were numerous
[3] press conferences where I was asked questions.
[4] I mean, I can't say I remember saying those
[5] exact words. I remember giving, you know,
[6] similar answers to that question at different
[7] press conferences.
[8]     **Q:** Was that an accurate reflection
[9] of your position at that point in time, and
[10] this was on June 5th, 2007?
[11]     **A:** It was accurate to say that we
[12] were researching the situation. It's accurate
[13] to say that we wanted to be thoughtful and
[14] careful, because Mrs. Plummer was an employee
[15] of Councilmember Barron. But it's also fair
[16] to say that she was also an employee of the
[17] New York City Council.
[18]     And I believe that when I spoke
[19] about the situation, I attempted to make
[20] clear, one, that we took the situation
[21] seriously. Two, that it was unprecedented and
[22] we needed to be very thoughtful and careful
[23] and understanding in our research before we
[24] took action. Three, that it was, you know, we
[25] needed to do that because of the nature of

Page 52

### C.C. Quinn

[1]
[2] Mrs. Plummer working for Councilmember Barron.
[3]     But also, I believe, that I
[4] always made clear, that I believe that the
[5] employees had a relationship as employees to
[6] the Council as an institution.
[7]     **Q:** But let me just — this will be
[8] marked as Plaintiff's 15.
[9]     **MR. WAREHAM:** It's the same one,
[10] so we can use that.
[11]     **MR. MARKS:** It's Bates stamped
[12] DO 782 on one side and DO 783 on the
[13] other.
[14]     **MR. WAREHAM:** Thank you.
[15]     **THE WITNESS:** Can I look at this,
[16] sir?
[17]     **MR. WAREHAM:** Sure, I'm going to
[18] give it to you.
[19]     **MR. LEMONEDES:** I want you to
[20] look at the original one, but here it
[21] is.
[22]     **MR. WAREHAM:** Here you go it.
[23]     **MR. LEMONEDES:** Here's the one
[24] that's marked. You can look at that
[25] one. So we have a clear record of

Page 53

**C.C. Quinn**

[1]
[2] exactly with you're saying.
[3]    **Q:** So in this press conference, this
[4] statement, the particular one that I was
[5] referring to, you were very clear that
[6] Mrs. Plummer did not work for you?
[7]    **MR. LEMONEDES:** Objection to
[8] form.
[9]    **Q:** Your statement is, "We want to
[10] make sure that we understand the parameters of
[11] what our options are since she does not work
[12] for me". Is that what you said?
[13]    **A:** That is what — part of what I
[14] said in here, yes. But I also said in here
[15] that I was, that research was being done to
[16] find out what the Speaker's powers were
[17] pursuant to this situation so —
[18]    **Q:** Certainly. But your
[19] understanding was that she did not work for
[20] you?
[21]    **A:** My understanding was I needed
[22] more information.
[23]    **Q:** But your understanding at that
[24] point in time according to your statement was
[25] she did not work for you?

Page 54

**C.C. Quinn**

[1]
[2]    **MR. LEMONEDES:** Again, objection
[3] to form.
[4]    **A:** I think my statement was both
[5] that she worked for Councilmember Barron, and
[6] that I needed more information on exactly the
[7] relationship of her employment to the Speaker,
[8] so to speak. So I think that there's two
[9] things in here.
[10]    **Q:** But your prior testimony is that
[11] you were clear that the City Council was an
[12] agency that you were the head of?
[13]    **A:** Correct, and that it was a
[14] legislative body. I think the two statements
[15] in here reflect that dual nature.
[16]    **Q:** Let me just go back for a second.
[17] The complaint that Councilmember Vallone
[18] brought to your attention about Mrs. Plummer,
[19] did you speak to Councilmember Barron about
[20] that, and was that one of the options you were
[21] considering in terms of how to deal with it?
[22]    **A:** As I said before, we hadn't kind
[23] of delineated what all of the options were
[24] going to be.
[25]    **Q:** Did you speak to Councilmember

Page 55

**C.C. Quinn**

[1]
[2] Barron about Councilmember Vallone's complaint
[3] about Mrs. Plummer?
[4]    **A:** I did not.
[5]    **Q:** Did any of your staff speak to
[6] Councilmember Barron about that?
[7]    **MR. LEMONEDES:** Objection to
[8] form.
[9]    **Q:** If you know?
[10]    **A:** Not to my knowledge.
[11]    **Q:** Did you instruct any of your
[12] staff to speak to Councilmember Vallone about
[13] the disruptive behavior of his employee at a
[14] committee meeting?
[15]    **A:** Councilmember Vallone, no.
[16]    **Q:** Councilmember Barron, excuse me.
[17]    **A:** No.
[18]    **Q:** Why not?
[19]    **A:** Because we hadn't determined yet
[20] what course of action we were going to take or
[21] what the options were.
[22]    **Q:** As Mrs. Plummer was Councilmember
[23] Barron's staff member, wouldn't it have been a
[24] simple courtesy to speak to Councilmember
[25] Barron that there is a complaint around the

Page 56

**C.C. Quinn**

[1]
[2] activity of your staff member at the committee
[3] meeting?
[4]    **A:** We hadn't decided what our course
[5] of action was going to be, and we weren't
[6] going to take any action until we determined
[7] what our full course of action was going to
[8] be.
[9]    **Q:** Well, at the time of the
[10] complaint from Councilmember Vallone, that was
[11] the first complaint, correct?
[12]    **A:** I think so, yes.
[13]    **Q:** So there wasn't any cumulative
[14] history at that point, correct?
[15]    **A:** They came in after that.
[16]    **Q:** But at the point they came,
[17] Thursday Friday, Monday Tuesday, back to back?
[18]    **A:** I don't know when Councilmember
[19] Seabrook came in as it relates to the sequence
[20] of Councilmember Vallone. He came in after,
[21] but I can't tell you it was the next day.
[22]    **MR. WAREHAM:** Can we take a quick
[23] break?
[24]    (Recess 11:27 until 11:37 a.m.)
[25]    **Q:** Are you familiar with the term

Page 57

**C.C. Quinn**

[1]
[2] discretionary funds?
[3]   **A:** Yes.
[4]   **Q:** What are they?
[5]   **A:** Well, I think what you're
[6] referring to is what's also called member
[7] items in the budget, which are allocations
[8] that councilmembers get to give to
[9] organizations in their district. Some can go
[10] through any city agency, some are specified
[11] for the Department for the Aging and the
[12] Department for Youth.
[13]   **Q:** Who decides the amount each
[14] councilmember can get from that fund?
[15]   **A:** The Speaker. There's a minimum,
[16] no one gets less than $80,000. I'm sorry, no
[17] one gets less than $80,000 in the open-ended
[18] ones. In the Department for the Aging and the
[19] Youth, there is a set amount. I don't recall
[20] what that is, but that is set. It is the same
[21] for everybody.
[22]   **Q:** So there's a minimum that every
[23] councilmember gets. Is there a cap in terms
[24] of a maximum?
[25]   **A:** No.

Page 58

**C.C. Quinn**

[1]
[2]   **Q:** And the amount that each member
[3] gets is decided by the Speaker?
[4]   **A:** Beyond the two set pots, yes.
[5]   **Q:** And what are the criteria —
[6] well, let me ask you, when was the last
[7] distribution of member items?
[8]   **A:** The budget.
[9]   **Q:** The budget. What was the range,
[10] what was the minimum, what was the maximum, if
[11] you remember?
[12]   **A:** I don't remember.
[13]   **Q:** Well, you said no one got below
[14] $80,000?
[15]   **A:** Correct.
[16]   **Q:** Do you remember if the maximum
[17] was $500,000?
[18]   **A:** I don't recall.
[19]   **Q:** You don't recall. You have no
[20] idea?
[21]   **A:** I don't recall what the maximum
[22] was.
[23]   **Q:** Was there a spread between —
[24] were there some members that received at least
[25] $400,000?

Page 59

**C.C. Quinn**

[1]
[2]   **A:** I don't recall the maximum.
[3]   **Q:** What criteria do you use as
[4] Speaker to determine the amount that a member
[5] will get from that fund?
[6]   **A:** There's numerous factors.
[7]   **Q:** Is one of the factors that are
[8] considered support received by the Speaker on
[9] different issues that are important to the
[10] Speaker?
[11]   **A:** No.
[12]   **Q:** Are one of the factors considered
[13] loyalty to the Speaker?
[14]   **A:** No.
[15]   **Q:** What are the numerous factors
[16] that are considered?
[17]   **A:** Well, there's many. Some are
[18] what amount of money that councilmember got —
[19] had been getting when I became Speaker. You
[20] know, what was the precedent, so to speak.
[21] The groups in question, their track record,
[22] their focus, how effective they have been,
[23] things like that.
[24]   **Q:** And would each councilmember make
[25] a proposal to you in terms of why they think

Page 60

**C.C. Quinn**

[1]
[2] they should receive a certain amount of
[3] funding?
[4]   **A:** No.
[5]   **Q:** How is it done, how do you
[6] determine, what form does the proposal come
[7] to?
[8]   **A:** It varies.
[9]   **Q:** So it's formal and informal. Is
[10] it written?
[11]   **A:** Usually — yes, it is written.
[12] Yes, it is written.
[13]   **Q:** Is there a particular amount
[14] requested for each group?
[15]   **A:** Usually.
[16]   **Q:** Does the councilmember just ask
[17] for a one amount or —
[18]   **A:** No.
[19]   **Q:** — does he or she specify for
[20] each group?
[21]   **A:** For each group they usually
[22] specify an amount.
[23]   **Q:** Are you familiar with the
[24] procedure for co-naming of streets?
[25]   **A:** Yes.

---

Page 61

**C.C. Quinn**

[1]
[2] **Q:** Can you describe what that is?
[3] **A:** The procedure was — it's a
[4] legislative procedure. It's a piece of
[5] legislation, a bill, an introduction.
[6] **Q:** Can you just describe how that
[7] works, what's the process, how does a street
[8] co-naming get introduced?
[9] **A:** A member puts in a legislative
[10] request, all of the street co-namings are
[11] grouped together. We only do a few a year
[12] now, as opposed to each one being its own
[13] bill. It's written up into legislation.
[14] **Q:** And during the time that you've
[15] been on the Council, did that package
[16] uniformly go through, always go through?
[17] **MR. LEMONEDES:** Objection.
[18] **A:** You have to be more specific.
[19] **Q:** Prior to the Stated Meeting of
[20] May 30th, 2007, when a councilmember put
[21] forward — when that package was put together
[22] of proposed street co-namings, was that always
[23] passed?
[24] **MR. LEMONEDES:** Objection to
[25] form.

---

Page 62

**C.C. Quinn**

[1]
[2] **A:** It wasn't always a package. The
[3] prior Speaker and at the beginning of Speaker
[4] Miller's term there were individual bills.
[5] **Q:** Prior to the Stated Meeting of
[6] May 30th, 2007, to your knowledge, was a name
[7] that had been proposed by a councilmember ever
[8] removed from the package?
[9] **A:** No, but a street renaming
[10] proposed by a member as an individual bill was
[11] voted down.
[12] **Q:** When was that?
[13] **A:** I don't know the year. It was
[14] introduced by former Councilmember Jose
[15] Rivera, now Assembly Member.
[16] **Q:** Do you remember why it was voted
[17] down, were you part of that vote?
[18] **A:** I'm not sure, I don't think I was
[19] part of it. I am not 100 percent sure.
[20] **Q:** Do you remember who the person
[21] was?
[22] **A:** It was a musical performer, but I
[23] don't remember the name.
[24] **Q:** This is when they were introduced
[25] individually?

---

Page 63

**C.C. Quinn**

[1]
[2] **A:** Correct.
[3] **Q:** But since the time when it's been
[4] voted as a package, has a name ever been
[5] removed from a package?
[6] **A:** Not to my knowledge.
[7] **Q:** Is the rationale for that that
[8] the Council recognizes and respects the wishes
[9] of each councilmember who submits those name?
[10] **MR. LEMONEDES:** Objection to
[11] form. Go ahead.
[12] **A:** No.
[13] **Q:** What's the rationale for the
[14] voting of the entire package?
[15] **A:** There was agreement on — well, I
[16] don't know that every member voted for every
[17] package unanimously.
[18] But for argument's sake, for
[19] those who voted in the affirmative it was
[20] because they agreed with all of the street
[21] re-namings that were in the package.
[22] I should actually — I should
[23] rephrase that. That was why I voted for the
[24] packages. Why individuals, other members did,
[25] they would have to speak for themselves.

---

Page 64

**C.C. Quinn**

[1]
[2] **Q:** In April of this year, there was
[3] a package, I believe, was it 556?
[4] **A:** I don't know.
[5] **Q:** It was an Intro that included the
[6] name of Sonny Carson, for four blocks in
[7] Bedford Stuyvesant to be co-named after Sonny
[8] Carson.
[9] **A:** Yes.
[10] **Q:** At some point you expressed your
[11] opposition to that co-naming?
[12] **MR. LEMONEDES:** Objection to
[13] form. Go ahead.
[14] **A:** Yes, prior to the introduction.
[15] **Q:** Prior to the introduction. What
[16] drew your attention to the name Sonny Carson?
[17] **A:** I'm sorry, I don't understand.
[18] **Q:** Why did Sonny Carson — I mean,
[19] brought Sonny Carson to your attention?
[20] **A:** I was informed by my staff that
[21] there had been, that the street re-naming bill
[22] was going to include Sonny Carson's name.
[23] **Q:** And did you know Sonny Carson?
[24] **A:** Personally, no.
[25] **Q:** Had you ever met Sonny Carson?

---

Viola Plummer, et al. v. Christine C. Quinn
Christine Quinn, Speaker of the City Council
Case 1:07-cv-06154-WHP    Document 24-6    Filed 10/30/2007    Page 18 of 46
Christine C. Quinn
Vol. 1, August 16, 2007

Page 65

*C.C. Quinn*

[1]
[2] **A:** No, I don't think so.
[3]    **Q:** Your staff drew your attention to
[4] the fact that Sonny Carson's name was part of
[5] the package and, therefore, why did you oppose
[6] it?
[7]    **A:** I opposed that street renaming
[8] because I didn't agree with it. He was not an
[9] individual I thought deserved that
[10] governmental honor.
[11]    **Q:** And that was a personal
[12] individual position?
[13]    **MR. LEMONEDES:** Wait. We're
[14] getting way far afield of what this
[15] litigation should be about. What the
[16] Speaker's personal opinion about
[17] Mr. Carson is, is not relevant to this
[18] lawsuit.
[19]    I'll allow some limited questions
[20] on it, but I'm not going to make this
[21] all about the renaming.
[22]    **MR. WAREHAM:** I don't think we
[23] can separate the renaming from the
[24] basis of this lawsuit.
[25]    **MR. LEMONEDES:** Again, I'm going

Page 66

*C.C. Quinn*

[1]
[2] to allow some limited questions, but
[3] we're not going to go into a whole
[4] background of this. What happened at
[5] the Stated Meeting is what happened at
[6] the Stated Meeting.
[7]    **MR. WAREHAM:** But we can't
[8] separate what happened at the Stated
[9] Meeting from what proceeded the Stated
[10] Meeting.
[11]    **MR. LEMONEDES:** Well, you spent
[12] over an hour talking about what
[13] proceeded. I'm not going to go into
[14] politics about Sonny Carson. That's
[15] not what this case is about.
[16]    **MR. WAREHAM:** What we spent the
[17] past hour talking about were the —
[18]    **MR. LEMONEDES:** I'm just saying,
[19] I'm not going to allow this deposition
[20] to be about the politics that concern
[21] Sonny Carson, okay.
[22]    I'll allow you some questions for
[23] all the background, for everything
[24] that's relevant under Federal Rule of
[25] Evidence 26, or anything that could be

Page 67

*C.C. Quinn*

[1]
[2] leading to admissible testimony. But
[3] we are not going to go beyond that.
[4] And at some point I will ask that we
[5] stop. I'm just trying to let you know
[6] where we stand.
[7]    **MR. WAREHAM:** Okay.
[8]    **MR. LEMONEDES:** Okay. Please ask
[9] the next question so we can move on.
[10]    **MR. WAREHAM:** Okay.
[11]    **Q:** What was the criteria that you
[12] used for your opposition to Sonny Carson?
[13]    **A:** I didn't believe Sonny Carson
[14] deserved the very significant government
[15] recognition, permanent government recognition,
[16] that goes along with having a street renamed
[17] in your honor.
[18]    **Q:** Was part of that criteria that
[19] you felt he had been divisive?
[20]    **A:** I felt he had been divisive. I
[21] had believed there was a long record of him
[22] being divisive in the City of New York.
[23]    **Q:** Had that been the practice in
[24] terms of the prior co-namings? Had
[25] divisiveness been a criterion for the prior

Page 68

*C.C. Quinn*

[1]
[2] co-naming, if you know?
[3]    **MR. LEMONEDES:** Objection to
[4] form.
[5]    **A:** Whenever streets were re-named,
[6] there was always an attempt to name them for
[7] individuals who deserved that governmental
[8] honor.
[9]    **Q:** Did you view Martin Luther King
[10] as being divisive?
[11]    **A:** No.
[12]    **Q:** In your view, were there people
[13] in New York City who viewed Martin Luther King
[14] as being divisive?
[15]    **MR. LEMONEDES:** Objection.
[16]    **A:** I can't speak to what other
[17] people think of other people.
[18]    **Q:** Are you familiar with Joseph
[19] Doherty?
[20]    **A:** Yes, not personally.
[21]    **Q:** Is there a street named after him
[22] in New York City, if you know?
[23]    **A:** I don't know.
[24]    **Q:** If I told you there was a street
[25] named after Joseph Doherty in New York would

Page 69

### C.C. Quinn

[1] you be well —

[3] **MR. LEMONEDES:** I'd be making an

[4] objection.

[5] **Q:** Do you know who Joseph Doherty?

[6] **A:** I already stated I do.

[7] **Q:** Okay. And who was Joseph Doherty

[8] or who is Joseph Doherty?

[9] **A:** He was an individual who was

[10] engaged in efforts around freedom in the North

[11] of Ireland.

[12] **Q:** He was a member of the Irish

[13] Republican Army, is that correct?

[14] **A:** I don't know whether he was or

[15] was not.

[16] **Q:** And he was convicted of killing

[17] two British soldiers, is that correct?

[18] **A:** He was convicted, yes.

[19] **Q:** And he was arrested in the United

[20] States?

[21] **A:** Yes.

[22] **Q:** And he was a prisoner in the

[23] Metropolitan Corrections Center?

[24] **A:** Yes.

[25] **Q:** And would you consider him a

Page 70

### C.C. Quinn

[1]

[2] divisive figure?

[3] **MR. LEMONEDES:** Again, objection.

[4] And please don't answer. We're not

[5] going into this area. I instruct the

[6] witness not to answer. Go ahead.

[7] **Q:** Do you know that there is a

[8] street named after Joseph Doherty right

[9] besides Metropolitan Correctional Center?

[10] **MR. LEMONEDES:** Objection.

[11] Assumes facts in evidence.

[12] **A:** I answered that before. I don't

[13] know if there is or isn't a street co-named

[14] for Joseph.

[15] **Q:** Do you know who Malcolm X is?

[16] **A:** Yes.

[17] **Q:** Do you consider him a divisive

[18] figure?

[19] **A:** No.

[20] **MR. LEMONEDES:** Again an

[21] objection.

[22] **Q:** Do you know that there's a street

[23] in Brooklyn named after Malcolm X?

[24] **A:** Yes.

[25] **Q:** Do you know that Malcolm X, at

Page 71

### C.C. Quinn

[1]

[2] one point, called white people blue-eyed

[3] devils?

[4] **A:** I don't know that.

[5] **MR. LEMONEDES:** Again an

[6] objection.

[7] **Q:** Do you know who Al Jolson is?

[8] **A:** Yes.

[9] **Q:** And who is Al Jolson?

[10] **A:** A performer, an artistic

[11] performer.

[12] **Q:** An artistic performer who

[13] performed in black face?

[14] **A:** At times.

[15] **Q:** But that was the high point of

[16] his career, is that correct?

[17] **MR. LEMONEDES:** Objection.

[18] **MR. MARKS:** We can go through his

[19] whole theatrical and film career if you

[20] want to know what his high point was.

[21] **Q:** Did you put forward Al Jolson's

[22] name for a street co-naming?

[23] **A:** Yes.

[24] **Q:** Was that passed?

[25] **A:** Yes.

Page 72

### C.C. Quinn

[1]

[2] **Q:** Once you concluded that you had a

[3] problem with Sonny Carson's co-naming, what

[4] did you do?

[5] **A:** The first thing I did was request

[6] that a meeting be set up with Councilmember

[7] Vann who was the sponsor of the street

[8] re-naming to tell him personally that I

[9] objected to it.

[10] **Q:** And then after that, what did

[11] Councilman Vann say?

[12] **A:** He said basically we would have

[13] to agree to disagree. And that he was going

[14] to be introducing it.

[15] **Q:** And did you take any steps with

[16] the Parks and Recreations Committee?

[17] **A:** No.

[18] **Q:** Did the Parks and Recreations

[19] Committee vote to remove Sonny Carson's name

[20] from the package?

[21] **A:** Yes.

[22] **Q:** Prior to the meeting of the parks

[23] and recreation — of that meeting were the

[24] Parks and Recreations Committee removed Sonny

[25] Carson's name from that package, did you speak

Page 73

C.C. Quinn

[1]
[2] with members of that committee about your
[3] opposition to Sonny Carson's name being
[4] included?
[5]    MR. LEMONEDES: Objection to
[6] form. But go ahead.
[7]    A: I spoke to Tish James the day of
[8] the vote, just to see how she was doing,
[9] because I thought it would be a difficult vote
[10] for her.
[11]    Q: Why did you think it would be a
[12] difficult vote for her?
[13]    A: Because I had heard that she was
[14] torn about what to do.
[15]    Q: And when you spoke to her, did
[16] you tell her that you opposed Sonny Carson's
[17] name being in that package?
[18]    A: She knew that I opposed it.
[19]    Q: How did she know that?
[20]    A: She had heard. I think it was in
[21] the papers at that point.
[22]    Q: You had spoken to the papers
[23] about it?
[24]    A: I think it had been reported at
[25] that point, yes.

Page 74

C.C. Quinn

[1]
[2]    Q: But did you speak to the
[3] newspaper about it?
[4]    A: Yes.
[5]    Q: Did you speak to Councilmember
[6] Foster about it?
[7]    A: No.
[8]    Q: Did you speak to Councilmember
[9] Addabbo about it?
[10]    A: No.
[11]    Q: Did you speak to Councilmember
[12] Gallagher about it?
[13]    A: No, before the meeting, no.
[14]    Q: Did you speak to Councilmember
[15] Gerson about it?
[16]    A: I don't believe I did before the
[17] meeting.
[18]    Q: Did you instruct your staff to
[19] speak to any of those Parks and Recreations
[20] Committee members about your position in
[21] opposition of Sonny Carson's name being
[22] included in that package?
[23]    A: My staff was instructed not to
[24] lobby any councilmembers about my position.
[25] And not to — my instructions to — my staff

Page 75

C.C. Quinn

[1]
[2] were instructed not to pressure any
[3] councilmembers to vote one way or the other
[4] way.
[5]    Q: Did you instruct any of your
[6] staff to speak to members of the Council of
[7] the Parks and Recreations Committee about the
[8] removal — about your position, your
[9] opposition to Sonny Carson's name being
[10] included in the package?
[11]    A: I'm sorry.
[12]    MR. LEMONEDES: Objection to
[13] form. But you can answer if you can.
[14]    A: Can you restate it?
[15]    Q: Sure. Did you instruct any
[16] member of your staff to speak to the members
[17] of the Parks and Recreations Committee about
[18] your opposition to the inclusion of Sonny
[19] Carson's name in the package?
[20]    MR. LEMONEDES: Again, objection.
[21] But go ahead.
[22]    A: No. As I said, I instructed my
[23] staff not to lobby or pressure councilmembers
[24] on the parks committee or any other entity
[25] within the Council.

Page 76

C.C. Quinn

[1]
[2]    Q: So your answer is that you did
[3] not instruct your staff to speak to any of the
[4] members of the Parks and Recreations Committee
[5] about your opposition to the inclusion of
[6] Sonny Carson's name in the package?
[7]    A: I instructed my staff and said to
[8] the press that if my staff violated my
[9] instructions on this that they would be
[10] terminated, not to lobby or pressure any
[11] councilmembers.
[12]    Councilmembers may have had
[13] conversations with my staff about what my
[14] position was, I can't speak to that. People
[15] may have wanted to know what my position was.
[16] But my staff was instructed not to lobby or
[17] pressure councilmembers.
[18]    Q: Who is Chuck Meara?
[19]    A: My chief of staff.
[20]    Q: And if I told you that Chuck
[21] Meara said that he had spoken to members of
[22] the Parks and Recreations Committee about your
[23] opposition to the inclusion of Sonny Carson's
[24] name in the package, what would you say?
[25]    MR. LEMONEDES: Objection,

Page 77

**C.C. Quinn**

[1]
[2] numerous reasons. But go ahead.
[3]     **A:** Clearly he was asked or he stated
[4] to them what my position was. That is quite
[5] different than having lobbied or pressuring —
[6] having lobbied or pressured them.
[7]     But I'm sure that there were
[8] conversations between him and committee
[9] members about what my position was, that they
[10] had asked or that they wanted to clarify. He
[11] may have told them, but they were never
[12] lobbied.
[13]     **Q:** Can you just tell me what your
[14] distinction between lobbying and discussing it
[15] is? What is the difference between the chief
[16] of staff of the Speaker who's speaking to
[17] members of the committee and lobbying members
[18] of the committee?
[19]     **A:** When you lobby an individual you
[20] try to get them to take the position you take.
[21] You — the purpose of lobbying is to get
[22] somebody to take the position that you hold or
[23] represent, which is different than informing
[24] one of what you or your associate's position
[25] is.

Page 78

**C.C. Quinn**

[1]
[2]     **Q:** Are you familiar with the concept
[3] the influence of the Speaker?
[4]     **MR. LEMONEDES:** I'm sorry, what?
[5]     **Q:** Influence of the Speaker.
[6]     **MR. LEMONEDES:** Objection to
[7] form. But go ahead.
[8]     **A:** I don't really know what you're
[9] referring to.
[10]     **Q:** Does the Speaker as Speaker have
[11] a certain amount of influence over the members
[12] of the council?
[13]     **MR. LEMONEDES:** Objection to
[14] form. But go ahead.
[15]     **A:** Depends on the member, depends on
[16] the Speaker, depends on the situation.
[17]     **Q:** Does the Speaker as Speaker have,
[18] for example, through use of discretionary
[19] funds, the ability to influence the vote of
[20] councilmembers?
[21]     **A:** I don't know. You'd have to
[22] speak to individual councilmembers and
[23] individual Speakers about that.
[24]     **Q:** And your testimony is that Chuck
[25] Meara's "discussions" with the councilmembers

Page 79

**C.C. Quinn**

[1]
[2] was not an attempt to influence the vote of
[3] those councilmembers —
[4]     **MR. LEMONEDES:** Objection.
[5]     **Q:** — on the Parks and Recreations
[6] Committee?
[7]     **MR. LEMONEDES:** Objection. But
[8] you can answer, if you can.
[9]     **A:** Correct, it was not an attempt to
[10] influence them.
[11]     **Q:** And who was the chair of the
[12] Parks and Recreations Committee?
[13]     **A:** Helen Foster.
[14]     **Q:** Did she support your position in
[15] opposition to including Sonny Carson's name?
[16]     **MR. LEMONEDES:** Objection to
[17] form.
[18]     **A:** Councilmember Foster and I had
[19] different positions on the street re-naming.
[20]     **Q:** Do committee members generally
[21] support on bills and intros — do committee
[22] members generally support the position of the
[23] chair of their particular committee?
[24]     **MR. LEMONEDES:** Objection. Go
[25] ahead.

Page 80

**C.C. Quinn**

[1]
[2]     **A:** It depends.
[3]     **Q:** Would one say it's the norm for
[4] committee members to support the position of
[5] their chairs?
[6]     **A:** It depends on the bills and the
[7] members and the committee and the chairs.
[8]     **Q:** When the inclusion of Sonny
[9] Carson's name came up in the Parks and
[10] Recreations Committee prior to the vote, did
[11] you know that three members of that committee
[12] were going to vote in opposition to it?
[13]     **MR. LEMONEDES:** Objection.
[14] Answer if you can.
[15]     **A:** We believed that there were a
[16] number of members who were not going to
[17] support it, but you don't know for sure until
[18] the vote is cast.
[19]     **Q:** So you're saying you didn't know
[20] that councilmembers Gallagher, Addabbo and
[21] Gerson were going to vote to remove Sonny
[22] Carson's name from the Parks and Recreations
[23] vote prior to the vote in that committee?
[24]     **MR. LEMONEDES:** Objection. You
[25] can answer, if you can.

**C.C. Quinn**

[1]
[2]    **A:** What I said was that we believed
[3] there would be an amendment introduced. We
[4] had reason to believe that those three members
[5] were going to vote to remove the name, but you
[6] cannot know what a vote will be until it
[7] occurs.
[8]    **Q:** When you say we, who is the we?
[9]    **A:** I'm sorry, my staff and I.
[10]    **Q:** You knew prior to the vote that
[11] Tish James, Councilmember James was going to
[12] abstain?
[13]    **MR. LEMONEDES:** Again same
[14] objection. But go ahead and answer if
[15] you can.
[16]    **A:** I did not know what Tish James
[17] was going to do when she had to vote in the
[18] parks committee.
[19]    **Q:** Did you speak to Councilmember
[20] James after the vote of the Parks and
[21] Recreations Committee about what had happened?
[22]    **A:** I may have, I don't recall. I
[23] may have. After you said, right?
[24]    **Q:** After.
[25]    **A:** I may have, I'm just not sure.

**C.C. Quinn**

[1]
[2]    **Q:** Had a name, in your experience,
[3] had a name ever been removed at the level of
[4] the Parks and Recreations Committee before?
[5]    **A:** No. There had been the one other
[6] street name that was voted down, but I don't
[7] know at what point in the process.
[8]    **Q:** Are you familiar with a term, the
[9] inherent power as Speaker?
[10]    **A:** No.
[11]    **MR. LEMONEDES:** Asked previously,
[12] right?
[13]    **MR. WAREHAM:** No, I didn't ask
[14] that question.
[15]    **MR. LEMONEDES:** Objection. But
[16] go ahead.
[17]    **Q:** Have you ever heard that term
[18] before?
[19]    **A:** No.
[20]    **Q:** Do you have an idea of what it
[21] might mean?
[22]    **MR. LEMONEDES:** Objection.
[23]    **Q:** If it was used in terms —
[24]    **MR. LEMONEDES:** Don't speculate,
[25] please.

**C.C. Quinn**

[1]
[2]    **Q:** Do you have any particular
[3] responsibilities at Stated Meetings of the
[4] Council.
[5]    **A:** Yeah, I run the meetings.
[6]    **Q:** What is the role of the public
[7] advocate at those meetings?
[8]    **A:** The public advocate is the
[9] presiding officer as appointed by the Speaker.
[10]    **Q:** Who is responsible for
[11] maintaining order and decorum at the Stated
[12] Meetings?
[13]    **A:** Myself and the public advocate.
[14]    **Q:** Co-equally?
[15]    **A:** Well, no, because the public
[16] advocate is appointed by the Speaker, so that
[17] the public advocate is serving as a
[18] representative of the Speaker.
[19]    In fact, the public advocate
[20] called me a few days after I was elected
[21] Speaker to request that I continue the
[22] privilege that had been extended by Speaker
[23] Miller that she get to be the presiding
[24] officer.
[25]    **Q:** So at any particular meeting, is

**C.C. Quinn**

[1]
[2] it co-equal responsibility or the public
[3] advocate has the primary authority?
[4]    **A:** No, I would say the Speaker has
[5] the primary authority but we're working
[6] together, obviously.
[7]    **Q:** Are you familiar with the rules
[8] of the City Council?
[9]    **A:** Yes.
[10]    **Q:** Under the rules of the City
[11] Council who is responsible for maintaining
[12] order and decorum at the Stated Meeting of the
[13] council?
[14]    **A:** The public advocate and the
[15] Speaker are the people who run the Council
[16] meetings.
[17]    **Q:** I will show you Plaintiff's
[18] Exhibit 2. Let me draw your attention to
[19] section 3.10 of Plaintiff's Exhibit 2, the
[20] rules of the City Council.
[21]    **MR. LEMONEDES:** Are these all the
[22] rules?
[23]    **MR. WAREHAM:** Yes, I think that's
[24] the entire thing.
[25]    **A:** Which one are you referring to?

                                                                                                    Page 85

**C.C. Quinn**

[1]
[2]  **Q:** 3.10.

[3]  **A:** 3.10, I started reading 3.0, I'm

[4] sorry. Okay.

[5]  **Q:** And what is that section

[6] entitled?

[7]  **A:** Order Decorum.

[8]  **Q:** And what does it state in terms

[9] of responsibility for maintaining order and

[10] decorum?

[11]  **A:** "The presiding officer shall

[12] preserve order and decorum in the event of a

[13] disturbance or disorderly conduct in the

[14] chamber lobby or gallery. The presiding

[15] officer may cause the same to be cleared."

[16]    3.1 follows 3.0 which is titled,

[17] Who Presides. "The Speaker shall be the

[18] presiding officer of the council and may at

[19] his or her discretion designate an acting

[20] president pro tem who shall chair all stated

[21] charter and special meetings."

[22]  **Q:** When you designate the public

[23] advocate —

[24]  **A:** Correct.

[25]  **Q:** — as the presiding officer, she

                                                                                                    Page 86

**C.C. Quinn**

[1]
[2] is the presiding officer for the Stated

[3] Meeting?

[4]  **A:** At the request of the Speaker.

[5]  **Q:** But she is the presiding officer?

[6]  **A:** At the request of the Speaker.

[7]  **Q:** Okay. But it doesn't say the

[8] presiding officer at the request of the

[9] Speaker. It says, the presiding officer.

[10]  **A:** Well, it does actually.

[11]  **MR. LEMONEDES:** This is

[12] argumentative. Don't answer.

[13]  **THE WITNESS:** I'm sorry.

[14]  **MR. LEMONEDES:** Go ahead.

[15]  **Q:** Who gives directions to security

[16] at the Stated Meeting?

[17]  **A:** I do. The chief of staff may as

[18] well.

[19]  **Q:** Does the public advocate?

[20]  **A:** She may consult with the chief of

[21] staff to give directions to security, yes.

[22]  **Q:** But the public advocate cannot

[23] give directions directly to —

[24]  **A:** She could.

[25]  **Q:** — the director of security?

                                                                                                    Page 87

**C.C. Quinn**

[1]
[2]  **A:** She could, she doesn't usually,

[3] but she do.

[4]  **Q:** But it's within her purview?

[5]  **A:** I would allow that, yes.

[6]  **Q:** So basically —

[7]  **A:** I would allow that.

[8]  **Q:** — she functions at your

[9] discretion?

[10]  **A:** Yes.

[11]  **Q:** And if you feel that the public

[12] advocate is not maintaining order at a

[13] meeting, do you speak to her directly, how do

[14] you communicate that to her?

[15]  **A:** Sometimes I speak to her

[16] directly, sometimes I ask the chief of staff

[17] to speak to her.

[18]  **Q:** Prior to the Stated Meeting of

[19] May 30th, 2007, were you aware that

[20] Councilmember Vann planned to offer an

[21] amendment to introduce Sonny Carson's name in

[22] his co-naming package?

[23]  **A:** Yes, my staff and I believed,

[24] based on what happened at the Parks Committee

[25] meeting that Councilmember Vann would probably

                                                                                                    Page 88

**C.C. Quinn**

[1]
[2] want to put an amendment on the floor.

[3]    So immediately following the

[4] Parks Committee meeting I instructed my staff

[5] to give Councilmember Vann any and all

[6] information he needed about the procedures for

[7] introducing an amendment to make the staff

[8] who, you know, who oversees that type of

[9] paperwork, et cetera, fully available to him

[10] so if he wanted to he would be able to do it

[11] without any problems as it related the

[12] paperwork or anything of that nature.

[13]    I wanted to make sure that if

[14] Councilmember Vann wanted to amend the bill

[15] that there was nothing that hindered him in

[16] his efforts to introduce that amendment on the

[17] floor. And I instructed staff to proactively

[18] reach out to Councilmember Vann in case he

[19] wanted to do that.

[20]  **Q:** Did your staff do that?

[21]  **A:** I believe they did, yes.

[22]  **Q:** What was Councilmember Vann's

[23] response?

[24]  **A:** That he was contemplating it and

[25] he wanted the information about the process.

Page 89

*C.C. Quinn*

[1]
[2] **Q:** Prior to the Stated Meeting of
[3] May 30th, 2007, were there any negotiations
[4] between you and Councilman Vann in the Black,
[5] Latino, and Asian Caucus about resolving the
[6] Sonny Carson impasse?
[7] **A:** There were numerous meetings and
[8] discussions in an attempt to try to come to
[9] some type of resolution that could be seen as
[10] a win-win for everyone, and try to avoid more
[11] tension.
[12] **Q:** What were the nature of those
[13] discussions, what came out of those
[14] discussions?
[15] **A:** Well, in the end there was a
[16] suggested compromise proposed by the Executive
[17] Committee of the Black, Latino and Asian
[18] Caucus that was presented to Councilmember
[19] Vann that he didn't find acceptable.
[20] Both I, the Speaker, presented it
[21] to him as, I believe, the co-chairs of the
[22] Black, Latino and Asian Caucus did, and it
[23] wasn't acceptable to Councilmember Vann,
[24] therefore, we moved forward and had the vote
[25] on the floor.

Page 90

*C.C. Quinn*

[1]
[2] **Q:** What was that compromise, if you
[3] remember?
[4] **A:** It was basically to come up with
[5] a clear and delineated review check process
[6] for all street re-namings. And that moving
[7] forward all street re-namings would have to go
[8] through that, including any that were or had
[9] been in the piece of legislation you
[10] referenced before which would, of course,
[11] include Sonny Carson Street.
[12] And if after going through the
[13] process of this new delineated criteria, which
[14] there would have been councilmember —
[15] extensive councilmember input in developing,
[16] if all of the names that were in 556, I
[17] believe is the number, whichever ones made it
[18] through the process would move forward, and
[19] whichever ones didn't make it through the
[20] process wouldn't move forward.
[21] And Councilmember — there was a
[22] desire on Councilmember Vann's part for there
[23] to be an agreement that Sonny Carson's street
[24] would move through that new process, but we
[25] couldn't guarantee that and prejudge the

Page 91

*C.C. Quinn*

[1]
[2] process. So therefore it wasn't acceptable.
[3] **Q:** I asked you before how Sonny
[4] Carson's name came to your attention. And you
[5] said that a staff member had brought that to
[6] your attention.
[7] **A:** Correct.
[8] **Q:** Do you know who Daniella Notaro
[9] is?
[10] **A:** No.
[11] **Q:** Do you know who Harry Schwartz
[12] is?
[13] **A:** No.
[14] **Q:** Do you know Eileen Sweeney is?
[15] **A:** No.
[16] **Q:** Charley Santiago?
[17] **A:** No.
[18] **Q:** Angelo Feruzzano?
[19] **A:** No.
[20] **Q:** Howard Weaving?
[21] **A:** No.
[22] **Q:** Betty Motresa?
[23] **A:** No.
[24] **Q:** Marlene Rivera?
[25] **A:** No.

Page 92

*C.C. Quinn*

[1]
[2] **Q:** At the Stated Meeting of
[3] May 30th, did you vote on the package of
[4] names?
[5] **A:** Yes.
[6] **Q:** You voted to support that
[7] package?
[8] **A:** Yes.
[9] **Q:** Had you investigated any of the
[10] other names in that package?
[11] **A:** I had not personally, no. There
[12] is a review process that's conducted by the
[13] staff of the Parks Committee, but I don't
[14] typically do personal review or investigation
[15] on street re-naming legislation or any
[16] legislation.
[17] So it is not atypical that I
[18] would not have researched the names in this
[19] bill, or done personal research on any
[20] legislative matter. We have a staff that does
[21] that.
[22] **Q:** And you're saying that it was the
[23] parks, it was the staff of the Parks and
[24] Recreations Committee review that brought
[25] Sonny Carson's names to your attention?

Page 93

**C.C. Quinn**

[1]
[2]    **MR. LEMONEDES:** Objection to
[3] form.
[4]    **A:** A member of my staff brought it
[5] to my attention.
[6]    **Q:** But you didn't review any of the
[7] other names in the package?
[8]    **A:** I did not. Nor do I ever.
[9]    **Q:** This is Plaintiff's 15, this is
[10] the excerpt of the General Order Calendar of
[11] Intro 556A that had the 51 names, the name
[12] coding of the 51 names. This is Bates stamped
[13] page D 0093 and 0098 and 0099.
[14]    (Plaintiff's Exhibit 15, Agenda
[15] for Stated Meeting of May 30, 2007, was
[16] marked for identification as of this
[17] date.)
[18]    **MR. LEMONEDES:** It hasn't been
[19] marked before?
[20]    **MR. WAREHAM:** No, it hasn't been
[21] marked before.
[22]    **MR. LEMONEDES:** It's the agenda
[23] for the Stated Meeting of May 30th,
[24] 2007.
[25]    **MR. WAREHAM:** Correct. It's not

Page 94

**C.C. Quinn**

[1]
[2] the entire agenda, it's just the
[3] section that deals with Intro 556A.
[4]    **A:** Number 12?
[5]    **Q:** Yes.
[6]    **MR. LEMONEDES:** Whenever you're
[7] ready.
[8]    **Q:** You said you're really not
[9] familiar with any of the names, well, not any.
[10] Would it be fair to say that you were not
[11] familiar with the history of the majority of
[12] names on that package?
[13]    **A:** I don't know. I have to go more
[14] carefully than I just did through each of the
[15] names. I was not familiar with the names that
[16] you listed. But there are names here that I
[17] am familiar with.
[18]    **Q:** But you voted for the entire
[19] package on May 30th, 2006?
[20]    **A:** Correct.
[21]    **Q:** Would it be fair to say that if
[22] one of your staff members had not brought
[23] Sonny Carson's name to your attention you
[24] would have voted for that name as well in the
[25] original package?

Page 95

**C.C. Quinn**

[1]
[2]    **MR. LEMONEDES:** Objection. You
[3] can answer.
[4]    **A:** No, that is absolutely not a fair
[5] statement.
[6]    **Q:** You said you did not know Sonny
[7] Carson?
[8]    **A:** Correct.
[9]    **Q:** Which of your staff members
[10] brought Sonny Carson's name to your attention?
[11]    **A:** Ramone Martinez.
[12]    **Q:** When he brought it to your
[13] attention what did he say? What did he say to
[14] you when he brought it to your attention?
[15]    **A:** He said, I wanted to make sure
[16] that you were aware that there was a request
[17] to re-name a street for Sonny Carson in
[18] Brooklyn.
[19]    **Q:** What was your response?
[20]    **A:** I said, I don't want to do that.
[21]    **Q:** Because you knew who Sonny Carson
[22] was?
[23]    **MR. LEMONEDES:** Again, objection.
[24] This has been covered. Please again,
[25] very limited, but I'm not going to

Page 96

**C.C. Quinn**

[1]
[2] allow this to continue to go on this
[3] way. Go ahead, can you just ask a new
[4] question so the record is clear. I
[5] don't mean to interrupt you all of a
[6] sudden.
[7]    **MR. WAREHAM:** Can you repeat the
[8] question?
[9]    (Question read.)
[10]    **A:** Because I believed he didn't
[11] deserve a governmental honor of a street
[12] naming.
[13]    **Q:** Do you believe that because he
[14] allegedly made remarks about Jewish people?
[15]    **A:** I believe that because of the
[16] totality of his record.
[17]    **Q:** And you were familiar with the
[18] totality of his record?
[19]    **A:** I was familiar with a great deal
[20] of his record, yes.
[21]    **Q:** And from what sources did you
[22] gather the totality of his record?
[23]    **A:** From newspapers and other media
[24] sources, and from individuals who had
[25] interacted with him.

Viola Plummer, etc. v. Case 1:07-cv-06154-WHP    Document 24-6    Filed 10/30/2007    Page 26 of 46 Christine C. Quinn
Christine Quinn, Speaker of the City Council
Vol. 1, August 16, 2007

Page 97

**C.C. Quinn**

[1]
[2]   **Q:** Which individuals were those?

[3]   **MR. LEMONEDES:** No, we're not

[4] going there. She just expressed what

[5] was the basis was for her

[6] determination. This is not an

[7] examination of her vote. I object at

[8] this point.

[9]   **Q:** Prior to the Stated Committee

[10] Meeting of May 30th, 2007, you said once the

[11] discussions that Councilman Vann — that the

[12] compromise that had been proposed was

[13] unacceptable to Councilman Vann, correct?

[14]   **A:** Yes. The compromise proposed by

[15] the caucus, yes.

[16]   **Q:** By the caucus. And you was it —

[17]   **A:** It was presented to me by the

[18] caucus.

[19]   **Q:** And it was, that compromise was

[20] acceptable to you?

[21]   **A:** Yes.

[22]   **Q:** So it was acceptable to you, the

[23] caucus, the entire caucus or the executive

[24] committee of the caucus?

[25]   **A:** I don't remember if it was

Page 98

**C.C. Quinn**

[1]
[2] presented to me by the full executive

[3] committee or just by the co-chairs, but it was

[4] on behalf of the executive committee.

[5]   **Q:** It was on behalf of the executive

[6] committee, okay.

[7]   But it was unacceptable to

[8] Councilman Vann?

[9]   **A:** Correct.

[10]   **Q:** And on that basis he decided to

[11] put the item on the agenda for May 30th, 2007?

[12]   **A:** Well, then the item moved

[13] forward, yes.

[14]   **Q:** At the point in time, at that

[15] point in time when you put it on the agenda,

[16] did you have an assessment of whether or not

[17] the amendment would pass?

[18]   **A:** I don't know.

[19]   **MR. LEMONEDES:** I'm sorry, the

[20] amendment?

[21]   **MR. WAREHAM:** The amendment.

[22]   **MR. LEMONEDES:** Objection to

[23] form, because I'm not clear on what

[24] you're asking.

[25]   **Q:** When you moved the item forward,

Page 99

**C.C. Quinn**

[1]
[2] were you aware that Councilman Vann was going

[3] to put forward an amendment on the May 30th,

[4] 2007 meeting to include Sonny Carson's name?

[5]   **A:** Yes.

[6]   **Q:** Did you do a polling of

[7] councilmembers of what their vote would be on

[8] the Vann amendment?

[9]   **A:** We did a vote count, yes. Which

[10] we do on every, almost every piece of

[11] legislation that gets voted on on the City

[12] Council, on a Stated Meeting from

[13] controversial to non-controversial.

[14]   **Q:** And you as the Speaker set the

[15] agenda for a Stated Council Meeting, right?

[16]   **A:** No, not exclusively.

[17]   **Q:** But you can determine whether or

[18] not an item becomes on the agenda for a

[19] particular Stated Meeting?

[20]   **A:** Not exclusively.

[21]   **Q:** Who else has input into it? Who

[22] else has authority to deal with that?

[23]   **A:** The rules have a process by which

[24] members can send things directly to the floor.

[25] I think it's called the discharge process, but

Page 100

**C.C. Quinn**

[1]
[2] I'm not 100 percent.

[3]   **Q:** It requires a certain number of

[4] councilmembers to agree to it, to put an item

[5] on the agenda if you're not willing to do

[6] that, you as Speaker, are not willing to do

[7] that?

[8]   **A:** Correct.

[9]   **Q:** How often has that been exercised

[10] during your tenure as Speaker?

[11]   **A:** I don't think ever, I'm not

[12] 100 percent sure. Actually I might be wrong.

[13] I don't know. I think there was recently —

[14] Councilmember Avella used the rules, but I'm

[15] not sure, just a week ago. But I'm not sure

[16] if it was discharge or a different procedure.

[17]   **Q:** But prior to the May 30th, 2007

[18] meeting that procedure hadn't been used in

[19] your tenure as Speaker?

[20]   **A:** Not that I recall but I can't say

[21] 100 percent, and I don't want to misspeak.

[22]   **Q:** So would it be fair to say that

[23] the vote on the Vann amendment was set by you

[24] for May 30th, 2007?

[25]   **MR. LEMONEDES:** Objection to

Page 101

### C.C. Quinn

[1]
[2] form.
[3]   **A:** No.
[4]   **Q:** The vote on the co-naming was set
[5] by you for May 30th, 2007?
[6]   **A:** Yes.
[7]   **Q:** And you were aware that once that
[8] agenda item is placed that Councilman Vann had
[9] the option of bringing his amendment on that
[10] day?
[11]   **A:** Correct.
[12]   **Q:** And so that if you were going to
[13] bring the amendment it was going to be decided
[14] on May 30th, 2007?
[15]   **A:** What was going to be decided?
[16]   **Q:** The vote on his amendment.
[17]   **MR. LEMONEDES:** Objection to
[18] form. But go ahead.
[19]   **A:** Yes.
[20]   **Q:** And you did a vote count?
[21]   **A:** I did not personally.
[22]   **Q:** You had your staff do a vote
[23] count?
[24]   **A:** Yes.
[25]   **Q:** So that prior to the vote on

Page 102

### C.C. Quinn

[1]
[2] May 30th, 2007 what was your assessment of
[3] whether the Vann amendment was going to pass
[4] or not?
[5]   **A:** Just to be clear, we — I
[6] instruct my staff to do vote counts on almost
[7] every item that the council votes on, so I'm
[8] given a sense of what we think the vote might
[9] be on almost everything we vote on before a
[10] meeting starts. The votes don't always end up
[11] the way the vote count indicates.
[12]     Based on the vote count, I did
[13] not think the Vann amendment was going to
[14] pass.
[15]   **Q:** You as Speaker always have the
[16] option to remove an item from the agenda?
[17]   **A:** No.
[18]   **Q:** You don't have an option?
[19]   **A:** Not every item always, no.
[20]   **Q:** But you as Speaker, if a bill
[21] that you support does not have the votes, you
[22] as Speaker, have the option to put that item
[23] off, is that correct?
[24]   **A:** Not always, no.
[25]   **Q:** But you do have that — sometimes

Page 103

### C.C. Quinn

[1]
[2] you do, correct?
[3]   **A:** It depends.
[4]   **Q:** But that's within your purview
[5] because you set the agenda?
[6]   **MR. LEMONEDES:** Again, objection
[7] to form. It's not what the testimony
[8] has been.
[9]   **A:** It depends.
[10]   **Q:** Does it require a majority vote
[11] for the amendment to pass?
[12]   **A:** I think it requires a majority
[13] vote of the Council, but I kept getting
[14] confused in the process of whether it was a
[15] majority vote in the Council or a majority of
[16] the people in room, and I could never get it
[17] correct in my head. So it's one of those two.
[18]     At the time of the day of the
[19] vote I knew but, I honestly for some reason,
[20] couldn't get it straight in my head an I kept
[21] saying it different ways. It's either a
[22] majority of the Council or a majority of
[23] people present. I can't remember, I couldn't
[24] ever keep that fact straight in my head for
[25] some reason.

Page 104

### C.C. Quinn

[1]
[2]   **Q:** But whichever it was, your view
[3] was that you had enough votes to defeat that
[4] amendment on May 30th, 2007?
[5]   **MR. LEMONEDES:** Objection to
[6] form.
[7]   **A:** My understanding was that the
[8] amendment was not going to pass.
[9]   **Q:** And when the amendment came up
[10] for a vote, what was the final vote on that,
[11] if you remember?
[12]   **A:** I don't remember. It didn't
[13] pass, but I don't remember.
[14]   **Q:** Would it be a fair
[15] characterization to say that nearly all the
[16] white members of the Council voted against the
[17] Vann amendment?
[18]   **MR. LEMONEDES:** Objection.
[19] Answer if you can.
[20]   **A:** I think most of the white members
[21] voted against the amendment, yes.
[22]   **Q:** And the only white member who
[23] didn't was Councilmember Avella?
[24]   **MR. LEMONEDES:** Again, objection.
[25]   **A:** There were a small number, and

Page 105

**C.C. Quinn**

[1]
[2] Councilmember Avella was one of them, but I
[3] can't say for sure he was the only one.
[4]    **Q:** Prior to the Stated Meeting of
[5] May 30th, did you attend a meeting with the
[6] public advocate and some other members of your
[7] staff around security concerns on that
[8] upcoming meeting?
[9]    **A:** I think so, yes. I think it
[10] might have been the day of the meeting though,
[11] so I don't think it was prior.
[12]    **Q:** Do you remember what was
[13] discussed?
[14]    **A:** Some of what was discussed, yes.
[15]    **Q:** What was it?
[16]    **A:** We discussed that we knew it was
[17] going to be a tense meeting, that we thought
[18] there was a possibility for disruption.
[19]    I discussed with Betsy that my
[20] desire was to do everything in our power to
[21] not — to try to keep order in the chamber but
[22] to not have to clear the chamber. I wanted to
[23] avoid, at all costs, having to clear the
[24] balcony of the public. We thought that there
[25] might be a disruption, but we wanted to do

Page 106

**C.C. Quinn**

[1]
[2] everything we could to try to allow people to
[3] see the entirety of the part of the meeting
[4] that they were there for.
[5]    And I instructed Betsy that she
[6] had to be kind of equally aggressive in
[7] gaveling when people were clapping as when
[8] they were booing, so it was just a general no
[9] outburst of any kind policy. But that we
[10] would do our best to try to keep the meeting
[11] going and not to have to recess at any period
[12] of time to remove anyone from the chambers.
[13]    **Q:** Were you present for the
[14] entire —
[15]    **A:** And I did instruct Betsy that if
[16] the chambers were — if the balcony or the
[17] chambers were going to be cleared that she
[18] would get that instruction from me.
[19]    **Q:** At the Stated Meeting were you
[20] present for the entire meeting?
[21]    **A:** For the Stated Meeting?
[22]    **Q:** Yes, on May 30thth, 2007?
[23]    **A:** Yes.
[24]    **Q:** Did you witness any "disruptive
[25] conduct" by Mrs. Plummer during that meeting?

Page 107

**C.C. Quinn**

[1]
[2]    **A:** When I was speaking on the
[3] amendment there was lots of shouting and noise
[4] and disruption going on. And at one point I
[5] looked to the left and saw Mrs. Plummer
[6] screaming.
[7]    **Q:** What was she screaming?
[8]    **A:** I'm not sure what she was
[9] screaming.
[10]    **Q:** Did that happen at any other
[11] point in time?
[12]    **A:** The screaming continued through
[13] the entire time I was speaking on the
[14] amendment. I didn't see Mrs. Plummer more
[15] than once, but the speaking continued the
[16] entire time I was speaking.
[17]    And it was confusing and
[18] disorienting, because I would have expected,
[19] if there was disruption, it to come from
[20] behind, kind of over my head where the balcony
[21] was. And that's not what was occurring.
[22] Actually it was fairly quiet to my back, but
[23] there was other disruptions to my left and
[24] noise to my left.
[25]    And I was kind of confused,

Page 108

**C.C. Quinn**

[1]
[2] because that was very atypical, and not at all
[3] what I was expecting. And I couldn't kind of
[4] figure out for a little bit what was happening
[5] and where the yelling was coming from. And it
[6] was, you know, confusing and difficult to
[7] finish my comments.
[8]    But I wanted as I said before,
[9] very much to not have to clear the balcony or
[10] any part of the room, so I continued. I had
[11] to raise my voice at a point to be heard over
[12] the shouting.
[13]    **Q:** Was anyone else on the floor
[14] engaged in loud —
[15]    **A:** I don't know.
[16]    **Q:** — yelling or screaming as you
[17] put it?
[18]    **A:** I mean, there was yelling going
[19] on, I don't know.
[20]    **Q:** Was there any other conduct by
[21] Mrs. Plummer that you witnessed that
[22] afternoon?
[23]    **A:** That I witnessed that afternoon,
[24] no.
[25]    **Q:** Or heard, just the time when you

Page 109

**C.C. Quinn**

[1]
[2] were speaking?
[3]    **A:** Can you restate that?
[4]    **Q:** I'm saying —
[5]    **A:** Can you restate what you said
[6] before that.
[7]    **Q:** I'm saying, was there any other
[8] "disruptive conduct" by Mrs. Plummer that
[9] afternoon and during the Stated Meeting?
[10]    **A:** During the Stated Meeting that I
[11] — I've heard that there was other, yes. Not
[12] that I saw.
[13]    **Q:** That you personally saw?
[14]    **A:** No.
[15]    **Q:** Or heard?
[16]    **A:** No.
[17]    **Q:** Do you know who Carl D'Alba is?
[18]    **A:** Yes.
[19]    **Q:** Who is he?
[20]    **A:** The City Council's Director of
[21] Security.
[22]    **Q:** At any point in time, did you
[23] instruct Mr. D'Alba to speak to Mrs. Plummer
[24] about her conduct?
[25]    **A:** No.

Page 110

**C.C. Quinn**

[1]
[2]    **Q:** At any point in time, did you see
[3] Mr. D'Alba approaching Mrs. Plummer?
[4]    **A:** No.
[5]    **Q:** At any point in time, did you see
[6] Mr. D'Alba speaking with Mrs. Plummer?
[7]    **A:** No.
[8]    **Q:** And you said if you're facing the
[9] public advocate, Mrs. Plummer was, where was
[10] she?
[11]    **A:** To my left.
[12]    **Q:** Did you instruct security to have
[13] Mrs. Plummer removed from the chambers?
[14]    **A:** No, as I said before, I very much
[15] wanted to get through the meeting without
[16] having to remove anyone, and did not instruct
[17] security to remove anyone from the chambers or
[18] the balcony.
[19]    **Q:** Did the vote on the amendment go
[20] through?
[21]    **A:** What do you mean by, go through?
[22]    **Q:** Did it occur?
[23]    **A:** Yes, the vote on the amendment
[24] occurred.
[25]    **Q:** Did Mrs. Plummer's actions

Page 111

**C.C. Quinn**

[1]
[2] prevent that vote from being carried out?
[3]    **MR. LEMONEDES:** Objection to
[4] form.
[5]    **Q:** If you know?
[6]    **A:** The actions of Mrs. Plummer
[7] didn't prevent the vote from occurring, but
[8] they were disruptive and made it harder for
[9] the process of the Council to occur.
[10]    And as I said, there were moments
[11] when I was speaking when I thought I might
[12] have to take, you know, a break from speaking
[13] to regain order in the chambers. That didn't
[14] happen.
[15]    There was a moment when I had to
[16] during the vote make an announcement that
[17] people who were booing and hissing had to stop
[18] doing that, when people were voting in a way
[19] that people did not like.
[20]    But we had made a commitment to
[21] the best of our efforts to not have to remove
[22] people.
[23]    **Q:** Was Mrs. Plummer booing and
[24] hissing during the vote? Was she one of the
[25] people you were speaking about?

Page 112

**C.C. Quinn**

[1]
[2]    **A:** I don't recall. I don't recall
[3] who I was speaking about at that moment in
[4] time when I made the announcement.
[5]    **Q:** Did the Council carry out and
[6] complete its agenda for the May 30th, Stated
[7] Meeting?
[8]    **A:** Yes, it did, with challenge and
[9] disruption, but we did.
[10]    **Q:** Was there a point in time when it
[11] was brought to your attention that
[12] Mrs. Plummer had made a comment about
[13] assassinating Councilmember Comrie's ass?
[14]    **A:** Yes, a member of my press staff
[15] came in and reported that to me. I said, I
[16] wanted that to be confirmed and I wanted them
[17] to get an audio recording or a confirmation of
[18] that. Because that is obviously a very
[19] serious — the belief or allegation that that
[20] occurred at that moment in time was a very
[21] serious allegation on my part, and I believed
[22] it was very serious allegation. And I didn't
[23] want to do anything about it until we had
[24] confirmation that it actually had occurred.
[25]    I didn't want us to react on

Page 113

**C.C. Quinn**

[1]
[2] hearsay or gossip or something of that nature.
[3] So I told the press after not to do or say
[4] anything and go and get confirmation that that
[5] actually did occur and was said.
[6]    **Q:** Did you get that confirmation?
[7]    **A:** Yeah, an audio, a tape — not a
[8] tape, a recorder was brought back and was
[9] played.
[10]    **Q:** And what was your understanding
[11] of what the remark was?
[12]    **A:** That Mrs. Plummer said that she
[13] was going to assassinate Leroy Comrie's ass.
[14]    **Q:** And that was said in the context
[15] — was there anything further in terms of an
[16] explanation, what she meant, did she mean it
[17] literally?
[18]    **MR. LEMONEDES:** Objection to
[19] form.
[20]    **Q:** Was there anything else in that
[21] tape that indicated that there was a further
[22] explanation of that remark?
[23]    **A:** On the tape, Mrs. Plummer goes on
[24] to say, you know, she means all his stuff, his
[25] borough presidency.

Page 114

**C.C. Quinn**

[1]
[2]    **Q:** Were you aware at the time that
[3] Mrs. Plummer is a constituent of Councilmember
[4] Comrie?
[5]    **A:** No, I don't believe I was.
[6]    **Q:** Are you aware of that at this
[7] time?
[8]    **A:** Yes.
[9]    **Q:** Where was your understanding of
[10] where the statement was made?
[11]    **A:** At a press conference or maybe
[12] not a formerly scheduled one, but a press
[13] gathering, impromptu press conference.
[14]    **Q:** This occurred on the plaza of
[15] City Hall?
[16]    **A:** I knew it occurred outside of
[17] City Hall. I can't say whether it was the
[18] steps or the plaza.
[19]    **Q:** And that's an area that's opened
[20] — that's not an area that's restricted to
[21] members of the City Council, is it, to City
[22] Council employees?
[23]    **A:** I don't know exactly where it
[24] was, so I don't know what the restrictions
[25] are.

Page 115

**C.C. Quinn**

[1]
[2]    **Q:** Are the steps of City Hall
[3] restricted to members of employees of the City
[4] of New York, of the City Council?
[5]    **A:** There are restrictions around the
[6] steps, but those are not the restrictions.
[7]    **Q:** Is the plaza area that's
[8] restricted to employees of the City Council?
[9]    **MR. LEMONEDES:** Objection to
[10] form.
[11]    **A:** It's restricted but not just —
[12]    **Q:** General public has access to that
[13] area as well?
[14]    **A:** No.
[15]    **Q:** The general public cannot get
[16] into the plaza area in front of City Hall?
[17]    **A:** If they have appointment, or if
[18] they're going to a committee hearing, or
[19] they're going to a press conference, or a
[20] meeting in City Hall. But they can't, say,
[21] across from Broadway to Park Row.
[22]    **Q:** But all they only have to do is
[23] just tell security that they're going to a
[24] press conference, and they don't have to have
[25] New York City Council employee identification

Page 116

**C.C. Quinn**

[1]
[2] to get access to that area?
[3]    **MR. LEMONEDES:** Objection to that
[4] form.
[5]    **A:** They don't have to have an ID,
[6] but they need to do more than tell them that's
[7] where they're going. They have to actually
[8] have an event or appointment that they're
[9] going to or a public meeting.
[10]    **Q:** But they don't have to be an
[11] employee of the New York City Council?
[12]    **A:** Correct.
[13]    **Q:** After you had heard the tape, did
[14] you approach Mrs. Plummer?
[15]    **A:** No.
[16]    **Q:** Did you approach Councilman
[17] Barron?
[18]    **A:** No.
[19]    **Q:** Why not?
[20]    **A:** The first thing I did was reach
[21] out to Councilmember Comrie.
[22]    **Q:** What did Councilmember Comrie
[23] say?
[24]    **A:** He was concerned and wanted us to
[25] speak to the police.

Page 117

**C.C. Quinn**

[1]

[2]   **Q:** Councilmember Comrie wanted you

[3] to speak to police. And it wasn't suggested

[4] to Councilmember Comrie that he speak with the

[5] police?

[6]   **MR. LEMONEDES:** Objection to

[7] form.

[8]   **A:** There was a conversation with

[9] myself and Councilmember Comrie and Chuck

[10] Meara when we were listening to the tape. And

[11] Councilmember Comrie was very upset about the

[12] tape and what was on the tape. And in the

[13] context of that conversation we decided to get

[14] in touch with Lieutenant Brennan who is the

[15] Chief Police Officer in City Hall.

[16]   I don't know who first suggested

[17] that the police be called, whether it was

[18] myself or Chuck or Leroy, but everybody was in

[19] agreement that that was what made sense.

[20]   **Q:** Was security supplied to

[21] Councilmember Comrie?

[22]   **A:** Yes, by the police department.

[23]   **Q:** And who suggested that he have

[24] security, was that your suggestion?

[25]   **A:** I don't believe so, no. I think

Page 118

**C.C. Quinn**

[1]

[2] it was Lieutenant Brennan's, but I'm not

[3] 100 percent sure. That's a police department

[4] decision.

[5]   **Q:** Do you know how long security was

[6] supplied to Councilmember Comrie?

[7]   **A:** I believe for the rest of the

[8] night.

[9]   **Q:** Did Councilmember Comrie indicate

[10] that he actually believed that Mrs. Plummer

[11] intended to assassinate his ass?

[12]   **A:** I don't know that we specifically

[13] have that — that I asked him that question.

[14] He took the situation very seriously and was

[15] upset about the situation.

[16]   **Q:** Did Councilmember Comrie hear the

[17] entire tape?

[18]   **MR. LEMONEDES:** Objection to

[19] form.

[20]   **Q:** If you know?

[21]   **A:** When I was with Councilmember

[22] Comrie we played the recording we had. I

[23] can't say whether it was the entire tape of

[24] what was on there. I wasn't holding the

[25] recorder. There was —

Page 119

**C.C. Quinn**

[1]

[2]   **Q:** Well, okay.

[3]   **A:** You know what I mean?

[4]   **Q:** I mean, the part that included

[5] the comment and then the explanation about

[6] borough president, I mean, his whole stuff.

[7]   **MR. LEMONEDES:** Again objection

[8] to form.

[9]   **A:** I believe so. And there was, in

[10] the conversations that followed, the playing

[11] of that tape concern raised by Councilmember

[12] Comrie, which I share, that the comment was

[13] obviously outrageous and unacceptable and

[14] completely inappropriate, but also was made —

[15] and Councilmember Comrie made this comment

[16] himself — was made in front of a group of

[17] people who you have no idea who was in that

[18] group, how they might take that, what they

[19] might do with that information.

[20]   And that troubled and worried

[21] Leroy, that somebody might mis-respond,

[22] inappropriately react to that inappropriate

[23] comment and then do something.

[24]   So there was worry about the

[25] degree to which saying something like that to

Page 120

**C.C. Quinn**

[1]

[2] a crowd of people, what that could engender,

[3] particularly when you say it outside of a

[4] building where, in fact, a councilmember had

[5] been tragically assassinated.

[6]   **Q:** You classify Councilman Davis'

[7] murder as an assassination?

[8]   **A:** Yes.

[9]   **Q:** What is your definition of an

[10] assassination?

[11]   **A:** Councilmember Davis was a

[12] prominent political figure who was murdered by

[13] a political opponent.

[14]   **Q:** And is it your position that the

[15] term assassination is now proscribed from use

[16] around City Hall?

[17]   **MR. LEMONEDES:** Objection to

[18] form.

[19]   **A:** I don't understand what you mean.

[20]   **Q:** That because of what happened to

[21] Councilman Davis no one can use the term

[22] assassinate or assassination in the area of

[23] City Hall?

[24]   **A:** I never in the course of this

[25] deposition have said that people cannot use

Viola Plummer v. Christine C. Quinn
Christine Quinn, Speaker of the City Council
Case 1:07-cv-06154-WHP    Document 24-6    Filed 10/30/2007    Page 32 of 46
Christine C. Quinn
Vol. 1, August 16, 2007

Page 121

**C.C. Quinn**

[1]
[2] the word assassinate around City Hall.
[3]     What I said was that Mrs. Plummer
[4] saying she was going to assassinate Leroy
[5] Comrie's ass, in front of a crowd of people at
[6] a press event, was completely inappropriate
[7] and unacceptable.
[8]     And what I said was that
[9] Councilmember Comrie had the concern, and I
[10] share that, saying that in front of a crowd of
[11] people particularly when you're saying it
[12] outside of a building where an assassination
[13] occurred, it is very, very worrisome and
[14] troublesome, and created a level of concern
[15] for both Councilmember Comrie and myself.
[16]     Q: Following this comment, did you
[17] have meetings with staff members and
[18] councilmembers to assess what to do?
[19]     A: Yes.
[20]     MR. LEMONEDES: Comments, you
[21] mean the tape?
[22]     Q: Mrs. Plummer's comments
[23] concerning Councilmember Comrie in City Hall
[24] during the Stated Meeting.
[25]     A: Yes.

Page 122

**C.C. Quinn**

[1]
[2]     Q: Those meetings, were those
[3] meetings concerned with Mrs. Plummer's
[4] comments about Councilmember Comrie?
[5]     A: Not exclusively, but it was one
[6] of the matters.
[7]     Q: What were the other matters?
[8]     A: The behavior at the Stated
[9] Meeting and the prior disruptions.
[10]     Q: And these were all considered
[11] co-equally as being of equal importance?
[12]     MR. LEMONEDES: Objection to
[13] form.
[14]     A: They were considered
[15] cumulatively.
[16]     Q: Whom did you meet with?
[17]     A: The leadership — the council
[18] leadership team.
[19]     Q: Which is?
[20]     A: Leroy Comrie, Bill de Blasio,
[21] Lewis Fidler, Inez Dickens, and Joel Rivera.
[22]     THE WITNESS: Can you just read
[23] back the names? I just want to make
[24] sure I don't forget anybody.
[25]     (Record read.)

Page 123

**C.C. Quinn**

[1]
[2]     Q: You met with them once? How
[3] often did you meet with them, how many times
[4] did you meet with them?
[5]     A: I'm not sure, I think it was more
[6] than once. It was more than once, but I'm not
[7] sure how many times I met with leadership
[8] about it and then also with the co-chairs of
[9] the Black, Latino and Asian Caucus.
[10]     Q: That's Jackson and?
[11]     A: Arroyo.
[12]     Q: And Arroyo. And you said this
[13] was to consider the cumulative events, or what
[14] did you say, situations?
[15]     A: To consider how to respond to the
[16] various complaints and problems that were
[17] relating to Mrs. Plummer. The outburst at the
[18] committee meeting, the Stated Meeting, and
[19] then the comments after that.
[20]     Q: At some point, did you document
[21] what these cumulative events were, did you
[22] write down this is what we're dealing with,
[23] and document Vallone, Seabrook, Executive
[24] Committee, Stated Meeting, Comrie?
[25]     A: I never wrote it down, no.

Page 124

**C.C. Quinn**

[1]
[2]     MR. LEMONEDES: Objection to
[3] form.
[4]     Q: Did anyone?
[5]     A: I don't know.
[6]     Q: Did you ever see any written
[7] document that spoke to the supposed
[8] transgressions of Mrs. Plummer?
[9]     A: Not that I saw.
[10]     Q: So it was just a discussion with
[11] people, that you had with these people, the
[12] leadership team and with the executive — with
[13] the representatives of the Black, Latino and
[14] Asian Caucus?
[15]     A: Yes.
[16]     Q: What was the outcome of these
[17] discussions?
[18]     A: Eventually the outcome of these
[19] discussions was the decision on my part to
[20] send a letter to Mrs. Plummer, a letter
[21] notifying her that she was suspended for six
[22] weeks without pay, and a letter requesting
[23] that she sign a document in which she would,
[24] basically paraphrasing, but commit to, you
[25] know, no longer disrupt council proceedings

Page 125

**C.C. Quinn**

[1]
[2] and threaten councilmembers.
[3]     And the hope was that she would
[4] serve the suspension, sign the document, and
[5] then be able to come back to Council employee.
[6] And if obviously the document wasn't signed
[7] then she would be terminated.
[8]     **Q:** When did you arrive at the
[9] conclusion that you had the authority to
[10] discipline Mrs. Plummer?
[11]     **A:** At some point after the May 30th
[12] meeting when the research had been concluded
[13] and I had been advised that I did.
[14]     **Q:** What was your understanding of
[15] the statutory basis for your authority to
[16] discipline Mrs. Plummer?
[17]     **A:** It was a review of the charter.
[18]     **Q:** Did you conduct that review of
[19] the charter?
[20]     **A:** No.
[21]     **Q:** You said you hadn't even read the
[22] charter?
[23]     **A:** Correct, and there is numerous
[24] times when the charter gets reviewed at my
[25] request. And it's never done by me, it's done

Page 126

**C.C. Quinn**

[1]
[2] by the appropriate legal staff or other staff.
[3]     **Q:** Is it your understanding that
[4] your authority as to discipline Mrs. Plummer
[5] was based on the City Council being an agency?
[6]     **A:** Among other things and me being
[7] the agency head.
[8]     **Q:** What other things?
[9]     **A:** Well, the Council one, is an
[10] agency and two — so therefore the Speaker is
[11] the head of the agency. And two, the Speaker
[12] is the head of the legislative body.
[13]     **Q:** And is there any documentation
[14] that you're aware of that gives the Speaker,
[15] as head of legislative body, authority over
[16] the staff of individual councilmembers?
[17]     **A:** It corresponds with what's in the
[18] charter.
[19]     **Q:** But you're not sure what those
[20] sections are in the charter that delegate that
[21] authority to the Speaker?
[22]     **A:** No, as I said, you know, there's
[23] numerous times that I, as Speaker, need the
[24] charter to be reviewed on a range of different
[25] matters. And those reviews are conducted by

Page 127

**C.C. Quinn**

[1]
[2] the appropriate staff, and then I am advised
[3] as to what my — or my power and authority is
[4] or the institution's power and authority is,
[5] or the answer to a particular question.
[6]     The many times someone has to go
[7] back and read the charter are numerous and
[8] constant.
[9]     **Q:** So your exercise of that
[10] authority is based upon your reliance on
[11] research that others have done on your behalf?
[12]     **A:** My belief and understanding that
[13] the Speaker is the agency head and has
[14] authority is, in part, from my experience as a
[15] councilmember and in part from what I have
[16] been informed by staff who have done research
[17] into the question.
[18]     **Q:** Are you aware of any prior
[19] incidents where the Speaker has suspended or
[20] terminated an individual councilmember's staff
[21] person?
[22]     **A:** Not that I'm aware of.
[23]     **Q:** I may have asked you this before,
[24] you said you're not — I did ask you this
[25] before about the inherent power of the

Page 128

**C.C. Quinn**

[1]
[2] Speaker. You said you're not familiar with
[3] that term.
[4]     **A:** No, I'm sorry.
[5]     **Q:** The suspension that went into
[6] effect on June 29th that was mentioned in the
[7] letter that you had Chuck Meara send to
[8] Mrs. Plummer on June 28th — do you follow me?
[9]     **A:** Yes.
[10]     **Q:** — says that that suspension is
[11] based on her disruptive activities at the
[12] Stated Meeting and her comments to
[13] Councilmember Comrie, correct?
[14]     **A:** I don't have the letter in front
[15] of me.
[16]     **Q:** This was Defendant's —
[17]     **MR. WAREHAM:** I forget how you
[18] had it marked, Defendants B? You have
[19] it.
[20]     **Q:** That's Defendant's B.
[21]     **A:** Yes.
[22]     **Q:** Of those two, which would you say
[23] was the principle reason that lead to her
[24] suspension?
[25]     **A:** I couldn't say.

Page 129

### C.C. Quinn

[1]
[2] **Q:** Are they of co-equal weight in
[3] your estimation? Were they of co-equal weight
[4] in your estimation? Because you made the
[5] decision around the suspension, right?
[6]    **A:** Yes.
[7]    **Q:** Did you regard them as being of
[8] co-equal weight?
[9]    **A:** I regarded them both as
[10] incredibly serious and very, very
[11] inappropriate and unprofessional.
[12]    And I took both the disruption of
[13] the meeting and the statements made against
[14] Councilmember Comrie very seriously. I
[15] thought they were both outrageous and
[16] unacceptable and not professional behavior.
[17]    And I can't tell you one weighed
[18] 40 percent and one weighed 60 percent, but
[19] they were together something that had to be
[20] responded to.
[21]    And I hoped that with this
[22] response Mrs. Plummer would be able to serve
[23] the suspension and sign the letter and then
[24] come back and act in an appropriate and
[25] professional manner.

Page 130

### C.C. Quinn

[1]
[2]    **Q:** Did either one of those in and of
[3] themselves, in your view, merit suspension,
[4] either one of those activities?
[5]    **A:** That wasn't the question before
[6] me. I mean, the question before me was a
[7] question that had both of those and some
[8] preexisting complaints.
[9]    **Q:** Were those other previous
[10] complaints delineated in that letter?
[11]    **A:** No, no.
[12]    **Q:** She wasn't apprised of those in
[13] that letter?
[14]    **A:** No.
[15]    **Q:** Would your decision have been the
[16] same if you had known at the time that
[17] Mrs. Plummer was a constituent of
[18] Councilmember Comrie?
[19]    **A:** Where Mrs. Plummer lives is
[20] irrelevant to this situation. Where one lives
[21] doesn't cause them to disrupt Council
[22] meetings.
[23]    **Q:** Would your decision around the
[24] comments around Councilmember Comrie have been
[25] any different had you known that she was a

Page 131

### C.C. Quinn

[1]
[2] constituent of Councilmember Comrie?
[3]    **A:** Where she lives is irrelevant.
[4] It was behavior that was inappropriate and
[5] unacceptable.
[6]    **Q:** And you're saying who her elected
[7] representative is is irrelevant as well?
[8]    **MR. LEMONEDES:** Objection to
[9] form.
[10]    **A:** That is absolutely not what I
[11] said. We're not talking about —
[12]    **Q:** I'm asking you whether the fact
[13] that Councilmember Comrie is her elected
[14] representative would have made a difference in
[15] terms of your decision around her comments
[16] around Councilmember Comrie?
[17]    **A:** Who her councilmember is very
[18] relevant to her as an individual. But who
[19] your councilmember is doesn't give you — make
[20] it okay for you to disrupt Council proceedings
[21] and act in disruptive ways, and to make
[22] statements such as had been noted here.
[23]    People have, you know, the
[24] appropriate means to express their disapproval
[25] of their elected officials.

Page 132

### C.C. Quinn

[1]
[2]    **Q:** And then on July 5th you had
[3] Chuck Meara send another letter to
[4] Mrs. Plummer?
[5]    **A:** Yes, sir.
[6]    **Q:** Basically once again reinforcing
[7] the suspension and informing her that she will
[8] be terminated if she didn't sign the letter?
[9]    **A:** I believe that's what the
[10] July 5th letter was, yes.
[11]    **Q:** And at some point in time, did
[12] you actually move to have Mrs. Plummer
[13] terminated?
[14]    **A:** Yes, Mrs. Plummer has been
[15] terminated.
[16]    **Q:** And that was at your direction?
[17]    **A:** Correct.
[18]    **Q:** As Speaker?
[19]    **A:** Correct.
[20]    **Q:** Are you familiar with the New
[21] York City Council policy for harassment and
[22] discrimination?
[23]    **A:** Yes.
[24]    **Q:** Did you file a complaint against
[25] Mrs. Plummer pursuant to that policy

Page 133

**C.C. Quinn**

[2] concerning any of these incidents that we

[3] discussed today?

[4]   **A:** No.

[5]   **Q:** Do you know whether Councilmember

[6] Comrie had?

[7]   **A:** I don't believe he has.

[8]   **MR. WAREHAM:** Let's take

[9] two minutes.

[10]   (Recess 12:59 p.m. until

[11] 1:10 p.m.

[12]   **MR. WAREHAM:** I have no further

[13] questions.

[14]   Do you have anything.

[15]   **MR. LEMONEDES:** No, we have no

[16] questions. Thank you.

[17]   (Time noted: 1:11 p.m.)

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 134

**C.C. Quinn**

[1]

[2]

[3]   I, the witness herein, having

[4] read the foregoing testimony do hereby

[5] certify it to be a true and correct

[6] transcript, subject to the corrections,

[7] if any, shown on the attached page.

[8]

[9]

[10]

[11]

[12]   **CHRISTINE C. QUINN**

[13]

[14]

[15]

[16] Subscribed and sworn to

[17] before me this ____ day

[18] of _____, 2007.

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 135

[1]

[2]      INDEX

[3] WITNESS        EXAMINATION BY   PAGE

[4] CHRISTINE C. QUINN   MR. WAREHAM      4

[5]

[6]

[7]      EXHIBITS

[8] PLAINTIFF'S            PAGE/LINE

[9] 15   Agenda for Stated

[10]   Meeting of May 30, 2007    93  14

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 136

[1]

[2]      CERTIFICATE

[3] STATE OF NEW YORK )

[4]                              :ss.:

[5] COUNTY OF NEW YORK)

[6]

[7]   I, Vicky Galitsis, a Certified

[8] Shorthand Reporter and Notary Public within

[9] and for the State of New York, do hereby

[10] certify:

[11]   That, CHRISTINE C. QUINN, the witness

[12] whose deposition is hereinbefore set forth,

[13] was duly sworn by me and that such

[14] deposition is a true record of the testimony

[15] given by such witness.

[16]   I further certify that I am not

[17] related to any of the parties to this action

[18] by blood or marriage that I am in no way

[19] interested in the outcome of this matter.

[20]   In witness whereof, I have hereunto

[21] set my hand this 21st day of August 2007.

[22]

[23]

[24]      VICKY GALITSIS, CSR

[25]

**Lawyer's Notes**

## $

**$400,000** 58:25
**$500,000** 58:17
**$80,000** 57:16, 17; 58:14

## 0

**0093** 93:13
**0098** 93:13
**0099** 93:13

## 1

**100** 34:12; 62:19; 100:2, 12, 21; 118:3
**11:27** 56:24
**11:37** 56:24
**12** 94:4
**12:59** 133:10
**15** 52:8; 93:9, 14
**1999** 5:22; 9:5; 14:11
**1:10** 133:11
**1:11** 133:17

## 2

**2002** 14:22
**2006** 13:19; 94:19
**2007** 40:10, 20; 41:2, 15; 42:3; 44:13; 46:19; 47:10; 48:2, 6; 49:19; 51:10; 61:20; 62:6; 87:19; 89:3; 93:15, 24; 97:10; 98:11; 99:4; 100:17, 24; 101:5, 14; 102:2; 104:4; 106:22; 134:18
**250** 34:21
**26** 7:21; 66:25
**28th** 128:8
**29th** 128:6

## 3

**3.0** 85:3, 16
**3.1** 85:16
**3.10** 84:19; 85:2, 3
**30** 93:15
**30th** 40:10, 18, 20; 41:2, 15; 42:3; 44:3, 13; 45:6; 46:19; 47:10; 48:2, 6, 21; 61:20; 62:6; 87:19; 89:3; 92:3; 93:23; 94:19; 97:10; 98:11; 99:3; 100:17, 24; 101:5, 14; 102:2; 104:4; 105:5; 112:6; 125:11
**30thth** 106:22

## 4

**40s** 7:3
**49** 7:3

## 5

**556** 64:3; 90:16
**556A** 93:11; 94:3
**5th** 49:19; 50:8; 51:10; 132:2, 10

## 7

**782** 52:12
**783** 52:12

## A

**a.m** 56:24
**abide** 43:21
**ability** 5:4; 31:14; 45:3; 47:2; 78:19
**able** 16:13; 33:14; 88:10; 125:5; 129:22
**absolutely** 95:4; 130:10
**abstain** 81:12; 8:17
**acceptable** 89:19, 23; 91:2; 97:20, 22
**accepted** 21:24; 22:4, 22, 24
**access** 115:12; 116:2
**According** 29:23; 53:24
**accurate** 51:8, 11, 12
**across** 115:21
**acting** 85:19
**action** 4:10; 24:7; 37:22; 50:17; 51:24; 55:20; 56:5, 6, 7; 110:25; 111:6
**activities** 36:11; 128:11; 130:4
**activity** 35:13; 56:2
**actually** 63:22; 86:10; 100:12; 107:22; 112:24; 113:5; 116:7; 118:10; 132:12
**Addabbo** 74:9; 80:20
**address** 30:13; 32:20; 38:17, 22; 43:5; 42:10; 38:17
**administrative** 9:17, 20, 23; 14:8; 15:19, 23
**admissible** 67:2
**advice** 10:18; 22:5
**advised** 125:13; 127:2
**advocate** 83:7, 8, 13, 16, 17, 19; 84:3, 14; 85:23; 86:19, 22; 87:12; 105:6; 110:9
**affirmative** 63:19
**afield** 65:14
**afternoon** 108:22, 23; 109:9
**Again** 7:6; 12:7, 17; 14:7; 17:24; 18:10; 20:11; 21:21; 33:9; 40:25; 41:23; 50:4; 54:2; 65:25; 70:3, 20; 71:5; 75:20; 81:13; 95:23, 24; 103:6; 104:24; 119:7; 132:6
**against** 104:16, 21; 129:13; 132:24
**agencies** 46:11
**agency** 10:2, 11, 20, 22; 11:5, 9, 15; 13:8, 14; 15:9; 19:11, 18; 45:22, 22; 46:4, 9, 12, 13, 16; 48:7, 8, 9, 16, 20, 23; 49:2; 54:12; 57:10; 126:5, 7, 10, 11; 127:13
**agenda** 9:19; 93:14, 22; 94:2; 98:11, 15; 99:15, 18; 100:5; 101:8; 102:16; 103:5; 112:6
**aggressive** 106:6
**Aging** 57:11, 18
**ago** 100:15
**agree** 21:19; 22:9; 65:8; 72:13; 100:4; 18:7; 21:25; 63:20
**agreement** 63:15; 90:23; 117:19
**ahead** 13:24; 18:11; 19:16, 24; 20:12; 33:2, 10; 47:9; 50:23; 63:11; 64:13; 70:6; 73:6; 75:21; 77:2; 78:7, 14; 79:25; 81:14; 82:16; 86:14; 96:3; 101:18
**allegation** 112:19, 21, 22
**allegedly** 96:14
**allocations** 57:7
**allow** 13:11; 19:23; 65:19; 66:2, 19, 22; 87:5, 7; 96:2; 106:2
**almost** 46:22; 99:10; 102:6, 9
**along** 9:25; 67:16
**always** 13:17; 52:4; 61:16, 22; 62:2; 68:6; 102:10, 15, 19, 24
**amend** 88:14
**amendment** 81:3; 87:21; 88:2, 7, 16; 98:17, 20, 21; 99:3, 8; 100:23; 101:9, 13, 16; 102:3, 13; 103:11; 104:4, 8, 9, 17, 21; 107:3, 14; 110:19, 23
**among** 15:9; 126:6
**amount** 44:10; 57:13, 19; 58:2; 59:4, 18; 60:2, 13, 17, 22; 78:11
**analysis** 21:20; 22:2
**Angelo** 91:18
**announcement** 111:16; 112:4
**answered** 4:23; 27:21; 70:12

**Anti-Violence** 9:9
**appointed** 11:24; 83:9, 16
**appointment** 115:17; 116:8
**apprised** 130:12
**approach** 116:14, 16; 110:3
**appropriate** 126:2; 127:2; 129:24; 131:24
**approval** 15:17; 16:2
**approved** 15:19, 21, 22; 16:16
**April** 64:2
**area** 8:21; 70:5; 114:19, · 20; 115:7, 13, 16; 116:2; 120:22
**argument's** 63:18
**argumentative** 86:12
**Army** 69:13
**around** 23:23; 24:7, 7; 25:3; 34:5; 43:15; 49:20, 24, 25; 55:25; 69:10; 105:7; 115:5; 120:16; 121:2; 129:5; 130:23, 24; 131:15, 16
**arrested** 69:19
**arrive** 125:8
**Arroyo** 21:4; 22:23; 34:7; 123:11, 12
**artistic** 71:10, 12
**Asian** 20:23; 21:2; 26:11; 27:2, 12; 34:4; 36:7; 89:5, 17, 22; 133:9
**ass** 112:13; 113:13; 118:11; 121:5
**assassinate** 113:13; 118:11; 120:22; 121:2, 4; 120:5
**assassinating** 112:13
**assassination** 120:7, 10, 15, 22; 121:12
**Assembly** 62:15
**assess** 47:21; 121:18; 42:5
**assessment** 39:3; 41:6, 12, 19, 24; 42:7; 43:19, 23; 44:6; 98:16; 102:2
**associate's** 77:24
**Assumes** 70:11
**attached** 134:7
**attained** 8:19
**attempt** 68:6; 79:2, 9; 89:8; 51:19
**attend** 105:5
**attention** 43:4; 54:18; 64:16, 19; 65:3; 84:18; 91:4, 6; 92:25; 93:5; 94:23; 95:10, 13, 14; 112:11
**atypical** 92:17; 108:2
**audio** 112:17; 113:7
**auspicious** 11:11
**authority** 14:5; 15:5; 18:19; 19:2, 3; 20:10, 17; 21:14, 18; 25:4, 10, 13;

**30:21; 31:10, 25; 38:6; 39:4, 10, 16; 40:2, 16; 41:12; 44:6; 46:9; 47:5; 48:19; 49:14; 84:3, 5; 99:22; 125:9, 15; 126:4, 15, 21; 127:3, 4, 10, 14**
**authorizes** 19:7
**available** 24:25; 88:9
**Avella** 100:14; 104:23; 105:2
**avoid** 89:10; 105:23
**aware** 10:12; 14:7; 16:18; 19:2; 87:19; 95:16; 99:2; 101:7; 114:2, 6; 126:14; 127:18, 22

## B

**back** 7:10; 27:23; 54:16; 56:17, 17; 107:22; 113:8; 122:23; 125:5; 127:7; 129:24
**background** 66:4, 23
**balcony** 105:24; 106:16; 107:20; 108:9; 110:18
**Barron** 8:12; 23:9, 13, 23; 24:15; 25:16, 21; 36:16; 41:14; 44:8; 45:4; 49:21; 51:15; 52:2; 54:5, 19; 55:2, 6, 16, 25; 116:17; 23:18; 40:17; 55:23
**based** 13:17; 44:10; 87:24; 102:12; 126:5; 127:10; 128:11
**basically** 72:12; 87:6; 90:4; 124:24; 132:6
**basis** 17:13; 65:24; 97:5; 98:10; 125:15
**Bates** 52:11; 93:12
**became** 59:19
**becomes** 99:18
**becoming** 13:19; 20:4
**Bedford** 64:7
**began** 49:7
**beginning** 26:19; 45:7; 62:3
**behalf** 98:4, 5; 127:11
**behavior** 25:25; 26:5; 39:22; 42:21; 55:13; 122:8; 129:16; 131:4
**behind** 107:20
**belief** 20:14; 112:19; 127:12
**below** 58:13
**besides** 70:9
**best** 106:10; 111:21
**Betsy** 105:19; 106:5, 15
**Betty** 91:22
**Beyond** 58:4; 67:3
**Bill** 6:14; 9:24; 61:5, 13; 62:10; 64:21; 88:14; 92:19; 102:20; 122:20; 62:4; 79:21; 80:6
**bit** 9:11; 108:4
**Black** 20:23, 25; 26:10;

27:2, 11; 34:4; 36:7; 71:13;
89:4, 17, 22; 123:9; 124:13
**Blasio** 6:14; 122:20
**blocks** 64:6
**blue-eyed** 71:2
**body** 10:14, 20; 11:5;
13:14; 46:5, 15; 48:16, 23;
49:2; 54:14; 126:12, 15
**booing** 106:8; 111:17, 23
**borough** 113:25; 119:6
**both** 11:6, 7; 46:15;
48:15; 54:4; 89:20;
121:15; 129:9, 12, 15;
130:7
**break** 56:23; 111:12
**Brennan** 117:14; 118:2
**bring** 101:13, 9
**British** 34:21; 115:21
**Broadway** 34:21; 115:21
**Brooklyn** 70:23; 95:18
**brought** 38:10; 39:23;
40:6; 41:3; 43:3, 9; 54:18;
64:19; 91:5; 92:24; 93:4;
94:22; 95:10, 12, 14;
112:11; 113:8
**budget** 12:5; 57:7; 58:8, 9
**building** 12:24; 121:12
**business** 33:14

**C**

**Calendar** 93:10
**called** 57:6; 71:2; 83:20;
99:25; 117:17
**calls** 13:10; 18:11; 19:22
**came** 36:16; 39:21;
43:25; 49:20; 56:15, 16,
19, 20; 80:9; 89:13; 91:4;
104:9; 112:15
**can** 6:19, 19; 7:7, 10;
10:16; 11:22; 12:8; 21:22;
24:10; 25:7; 30:24, 24;
31:17; 33:11; 41:22; 46:2;
47:9; 48:10; 50:4; 52:10,
15, 24; 56:22; 57:9, 14;
61:2, 6; 65:23; 67:9; 71:18;
75:13, 13, 14; 77:13; 79:8,
8; 80:14, 25; 81:15;
95:3; 96:3, 7; 99:17, 24;
104:19; 109:3, 5; 120:21;
122:22
**candidacy** 8:2, 13
**cap** 57:23
**career** 71:16, 19
**careful** 51:14, 22
**carefully** 94:14
**Carl** 109:17
**carried** 111:2
**carry** 112:5
**Carson** 64:6, 8, 16, 18,
19, 23, 25; 65:17; 66:14,
21; 67:12, 13; 89:6; 90:11;
95:7, 17, 21; 64:22; 65:4;
72:3, 19, 25; 73:3, 16;
74:21; 75:9, 19; 76:6, 23;

79:15; 80:9, 22; 87:21;
90:23; 91:4; 92:25; 94:23;
95:10; 99:4
**case** 66:15; 88:18
**cast** 80:18
**Caucus** 20:23; 21:2;
26:11; 27:3, 12; 34:5; 36:7;
89:5, 18, 22; 97:15, 16, 18,
23, 23, 24; 123:9; 124:14
**cause** 85:15; 130:21
**Center** 69:23; 70:9
**certain** 60:2; 78:11;
100:3
**certainly** 44:20; 53:18
**certify** 134:5
**cetera** 43:25; 88:9
**chair** 29:21; 30:20; 31:2,
9, 20; 43:22; 79:11, 23;
85:20; 35:3, 6, 7; 31:24;
80:5, 7
**Chairperson** 43:13
**challenge** 112:8
**chamber** 85:14; 105:21,
22; 106:12, 16, 17; 110:13,
17; 111:13
**characteristics** 10:21;
11:7, 8
**characterization**
104:15; 46:6
**characterize** 17:19
**Charles** 8:12; 44:8; 49:20
**Charley** 91:16
**charter** 7:14, 15; 10:4,
12; 18:21, 23; 19:5, 7, 10,
14, 17; 85:21; 125:17, 19,
22, 24; 126:18, 20, 24;
127:7
**check** 90:5; 31:5
**chief** 76:19; 77:15; 86:17,
20; 87:16; 117:5
**CHRISTINE** 4:2; 134:12
**Chuck** 28:22; 76:18, 20;
78:24; 117:9, 18; 128:7;
132:3
**circumstance** 31:20
**citizens** 11:19; 12:11
**City** 5:15; 7:13; 9:4, 8;
10:2, 4, 5, 11, 12, 13, 19;
11:6, 9, 12, 14, 18, 19;
12:4, 6, 11, 12, 15; 13:3, 7,
13; 14:6, 15; 15:8, 20, 23;
17:22; 18:3, 6; 19:11;
21:17; 25:13; 26:12;
45:21; 46:4, 14, 23; 47:18;
48:15; 49:3; 51:17; 54:11;
57:10; 67:22; 68:13, 22;
84:8, 10, 20; 99:11;
109:20; 114:15, 17, 21, 21;
115:2, 3, 4, 8, 16, 20, 25;
116:11; 117:15; 120:16,
23; 121:2, 23; 126:5;
132:21
**Civil** 32:6, 13
**clapping** 106:7
**clarify** 77:10
**classify** 120:6

**clear** 13:12; 38:14; 39:9;
40:15; 42:19, 25; 43:2, 6;
45:13; 46:8; 48:13; 51:20;
52:4, 25; 53:5; 54:11; 90:5;
96:4; 98:23; 102:5;
105:22, 23; 108:9; 85:15;
106:17
**clearly** 5:5; 44:22; 77:3
**co-chaired** 35:12
**co-chairs** 89:21; 98:3;
123:8
**co-equal** 84:2; 129:2, 3, 8
**Co-equally** 83:14;
122:11
**co-named** 64:7; 70:13
**co-naming** 60:24; 61:8;
64:11; 68:2; 71:22; 72:3;
87:22; 101:4; 61:10, 22;
67:24
**coding** 93:12
**colleagues** 7:17
**College** 8:20, 25
**coming** 108:5
**comment** 13:25; 112:12;
119:5, 12, 15, 23; 121:16;
24:16; 25:24, 25; 47:16;
108:7; 121:20, 22; 122:4;
123:19; 128:12; 130:24;
131:15
**Commissioner** 11:17,
24; 12:14, 23; 13:2, 20;
14:3, 4, 9
**commit** 124:24
**commitment** 111:20
**Committee** 20:24; 21:2,
7; 26:6, 10, 24; 27:2, 8, 11,
15; 28:8; 29:21; 30:3, 4;
31:9, 10; 32:6, 23; 33:7;
34:4, 20, 25; 35:2; 36:6;
38:12; 44:19; 47:14;
55:14; 56:2; 72:16, 19, 24;
73:2; 74:20; 75:7, 17, 24;
76:4, 22; 77:8, 17, 18;
79:6, 12, 20, 21, 23; 80:4,
7, 10, 11, 23; 81:18, 21;
82:4; 87:24; 88:4; 89:17;
92:13, 24; 97:9, 24; 98:3,
4, 6; 115:18; 123:18, 24
**communicate** 87:14
**complained** 27:7, 9, 10,
12; 29:24; 32:5; 42:18
**complaint** 27:14; 32:4;
37:2, 3, 6, 9; 38:21, 24, 25;
41:3; 54:17; 55:2, 25;
56:10, 11; 132:24; 26:5,
20, 23; 34:13; 36:2, 11, 20;
43:25; 44:2, 18; 49:4;
123:16; 130:8, 10
**complementary** 24:20
**complete** 112:6; 32:24;
33:7
**completely** 119:14;
121:6
**comprised** 11:10
**compromise** 89:16;
90:2; 97:12, 14, 19
**Comrie** 13:5; 7:4; 26:15;

114:4; 116:21, 22; 117:2,
4, 9, 11, 21; 118:6, 9, 16,
22; 119:12, 15; 121:9, 15,
23; 122:4, 20; 123:24;
128:13; 129:14; 130:18,
24; 131:2, 13, 16; 133:6;
112:13; 113:13; 121:5
**concept** 78:2
**concern** 34:17, 18;
49:25; 66:20; 119:11;
121:9, 14; 40:4; 116:24;
122:3; 121:23; 133:2;
105:7
**concluded** 72:2; 125:12
**conclusion** 125:9
**conduct** 33:13; 85:13;
106:25; 108:20; 109:8, 24;
125:18; 92:12; 126:25
**conference** 49:19; 50:9;
53:3; 114:11, 13; 115:19,
24; 50:6, 9; 51:3, 7
**confirmation** 49:13;
112:17, 24; 113:4, 6
**confirmed** 112:16
**conflict** 17:17
**confused** 103:14; 107:25
**confusing** 107:17; 108:6
**Connecticut** 9:3
**consider** 25:5, 9, 12;
69:25; 70:17; 123:13, 15;
45:2; 59:8, 12, 16; 122:10,
14; 23:24; 24:11; 45:10,
15, 19; 54:21
**constant** 127:8
**constituent** 114:3;
130:17; 131:2
**consult** 86:20
**contemplating** 88:24
**content** 4:22
**context** 23:18; 113:14;
117:13
**continue** 83:21; 96:2;
107:12, 15; 108:10
**contravention** 17:22
**controversial** 99:13
**conversation** 24:23;
33:3; 117:8, 13; 13:18;
33:22, 24; 76:13; 77:8;
119:10
**convicted** 69:16, 18
**Correctional** 70:9
**Corrections** 69:23;
134:6
**correctly** 35:24
**corresponds** 126:17
**costs** 105:23
**Council** 5:16; 7:13; 9:5;
10:5, 11, 13, 20; 11:6, 9;
13:7, 13, 16; 14:11, 15;
15:8, 20; 17:23; 19:12;
21:17; 24:5; 25:13; 26:12,
16; 31:23; 45:21; 46:4, 15,
23; 47:18; 48:15, 22;
49:3; 51:17; 52:6; 54:11;
61:15; 63:8; 76:25;
78:12; 83:4; 84:8, 11, 13,

15, 20; 85:18; 99:12, 15;
102:7; 103:13, 15, 22;
104:16; 111:9; 112:5;
114:21, 22; 115:4, 8, 25;
116:11; 122:17; 124:25;
125:5; 126:5, 9; 130:21;
131:20; 132:21; 15:23;
109:20
**Councilman** 27:13; 45:4;
72:11; 89:4; 97:11, 13;
98:8; 99:2; 101:8; 116:16;
120:6, 21
**Councilmember** 5:18;
7:4; 13:15; 16:19; 17:11;
18:4, 7, 13; 20:2; 21:19;
22:18, 23; 23:2, 9, 13, 18,
23; 24:6, 15; 25:16, 21;
26:15; 27:9, 10, 25; 29:14,
23; 32:3, 9; 33:5; 35:11,
11; 36:3, 5, 16; 37:4, 16;
38:11, 20; 39:5, 23; 40:6,
17; 41:3, 14; 42:8, 15;
43:3, 6, 8, 22; 47:17; 49:7,
15; 50:21; 51:15; 52:2;
54:5, 17, 19, 25; 55:2, 6,
12, 15, 16, 22, 24; 56:10,
18, 20; 57:14, 23; 59:18,
24; 60:16; 61:20; 62:7, 14;
63:9; 72:6; 74:5, 8, 11, 14;
79:18; 81:11, 19; 87:20,
25; 88:5, 14, 18, 22; 89:18,
23; 90:14, 15, 21, 22;
100:14; 104:23; 105:2;
112:13; 114:3; 116:21, 22;
117:2, 4, 9, 11, 21; 118:6,
9, 16, 21; 119:11, 15;
120:4, 11; 121:9, 15, 23;
122:4; 127:15; 128:13;
129:14; 130:18, 24; 131:2,
13, 16, 17, 19; 133:5;
127:20; 19:9; 20:7, 14, 16,
18; 21:15; 25:5, 11; 26:8,
25; 38:7; 48:20; 57:8;
74:24; 75:3, 23; 76:11, 12,
17; 78:20, 22, 25; 79:3;
80:20; 99:7; 100:4;
121:18; 125:2; 126:16
**count** 29:9; 101:20, 23;
102:11, 12, 6
**course** 55:20; 56:4, 7;
90:10; 120:24
**courtesy** 24:6; 55:24
**covered** 95:24
**created** 121:14
**criteria** 58:5; 59:3; 67:11,
18; 90:13
**criterion** 67:25
**crowd** 120:2; 121:5, 10
**cumulative** 24:13; 25:25;
26:2; 35:18, 20; 36:12, 18;
56:13; 123:13, 21
**cumulatively** 122:15

**D**

**D'Alba** 109:17, 23; 110:3,
6
**Daniella** 91:8

**date** 7:15; 16:24; 36:23;
49:17; 93:17
**David** 6:13
**Davis** 120:6, 11, 21
**day** 8:5; 32:24; 33:8, 14;
56:21; 73:7; 101:10;
103:18; 105:10; 134:17
**days** 83:20
**deal** 9:16; 29:9; 33:25;
37:22; 41:7, 25; 43:19;
45:16; 54:21; 96:19;
99:22; 123:22; 9:23; 94:3
**decided** 38:2; 56:4; 58:3;
98:10; 101:13, 15; 117:13
**decides** 57:13
**deciding** 37:22; 38:17,
22
**decision** 18:7; 38:4; 42:6;
50:12; 118:4; 124:19;
129:5; 130:15, 23; 131:15
**decorum** 31:11, 14;
83:11; 84:12; 85:7, 10, 12
**defeat** 104:3
**Defendant's** 128:16, 20
**Defendants** 128:18
**definition** 120:9
**definitively** 50:8
**degree** 8:20; 10:16;
13:10; 19:22; 20:5; 119:25
**delegate** 126:20
**delineated** 54:23; 90:5,
13; 130:10
**democratic** 6:16
**denial** 17:14
**denied** 17:12
**Department** 11:15, 18;
12:5, 6, 11, 15; 13:22;
14:6; 57:11, 12, 18;
117:22; 118:3
**depend** 31:19; 78:15, 15,
16; 80:2, 6; 103:3, 9
**deposed** 4:14
**deposition** 66:19; 120:25
**derives** 48:18
**describe** 7:11; 61:2, 6;
27:25
**deserve** 96:11; 65:9;
67:14; 68:7
**designate** 85:19, 22
**desire** 90:22; 105:20
**detail** 26:21; 27:17, 24;
28:2, 4; 29:16
**determination** 97:6
**determine** 59:4; 60:6;
99:17; 22:5; 55:19; 56:6
**developing** 90:15
**devils** 71:3
**Dickens** 122:21
**difference** 11:4; 77:15;
131:14
**different** 8:8, 9, 11; 26:7,
8; 46:11; 51:6; 59:9; 77:5,
23; 79:19; 100:16; 103:21;
126:24; 130:25

**difficult** 33:12; 73:9, 12;
108:6
**direction** 132:16; 86:15,
21, 23
**directly** 86:23; 87:13, 16;
99:24
**director** 9:7; 16:4; 86:25;
109:20
**disagree** 22:10; 72:13;
22:4
**disapproval** 131:24
**disapproved** 16:11, 21
**discharge** 99:25; 100:16
**disciplinary** 14:2
**discipline** 13:21; 38:6;
39:4, 16; 40:3, 16; 41:13;
44:7; 45:3, 11, 23; 46:9;
47:2, 6; 49:14; 125:10, 16;
126:4; 41:20; 42:4
**discretion** 85:19; 87:9
**discretionary** 57:2;
78:18
**discrimination** 132:22
**discuss** 21:13; 23:7;
21:23; 36:17; 105:13, 14,
16, 19; 133:3; 77:14
**discussion** 20:15; 22:25;
23:8, 12, 17, 22; 24:6, 25;
25:3; 34:3; 124:10; 20:21;
21:3, 11; 25:12; 78:25;
89:8, 13, 14; 97:11;
124:17, 19
**disorderly** 85:13
**disorienting** 107:18
**disrupt** 124:25; 130:21;
131:20; 26:24; 44:19;
47:13, 14, 14
**disruption** 26:11; 29:3;
32:10; 105:18, 25; 107:4,
19; 112:9; 129:12; 27:15,
19; 28:2, 7; 32:6; 107:23;
122:9
**disruptive** 31:15; 55:13;
106:24; 109:8; 111:8;
128:11; 131:21
**distinction** 77:14
**distribution** 58:7
**district** 5:19; 57:9
**disturbance** 85:13
**Division** 15:20, 24; 18:9
**divisive** 67:19, 20, 22;
68:10, 14; 70:2, 17
**divisiveness** 67:25
**document** 123:20, 23;
124:7, 23; 125:4, 6; 5:7, 10
**documentation** 126:13
**Doherty** 68:19, 25; 69:5,
7, 8; 70:8
**done** 53:15; 60:5; 92:19;
125:25, 25; 127:11, 16
**down** 34:20; 62:11, 17;
82:6; 123:22, 25
**draw** 84:18
**drew** 64:16; 65:3
**drugs** 5:3

**dual** 54:15
**duly** 4:3
**during** 18:15; 29:15, 25;
43:23, 24; 61:14; 100:10;
106:25; 109:9, 10; 111:16,
24; 121:24

## E

**education** 8:19, 23
**effect** 5:3; 128:6
**effective** 59:22
**efforts** 69:10; 88:16;
111:21
**eight** 31:23
**Eileen** 91:14
**either** 103:21; 130:2, 4
**elected** 5:21; 11:18;
12:11; 14:10; 83:20;
131:6, 13, 25
**election** 9:4
**elements** 31:15
**else** 5:13; 99:2, 22;
108:13; 113:20
**employee** 17:10; 49:6;
51:14, 16; 55:13; 115:25;
116:11; 125:5; 11:11, 13,
14; 12:4, 10; 13:22; 14:5;
21:16, 16; 23:14; 36:15;
46:10; 48:9; 52:5, 5;
114:22; 115:3, 8
**employer** 46:13
**employment** 14:2, 8;
17:12; 23:5, 6; 25:22; 54:7
**end** 89:15; 102:10
**ended** 39:20
**engage** 24:22; 69:10;
108:14
**engender** 120:2
**enough** 104:3
**enters** 10:9
**entire** 63:14; 84:24; 94:2,
18; 97:23; 106:14, 20;
107:13, 16; 118:17, 23
**entirety** 106:3
**entitled** 85:6
**entity** 11:10; 75:24
**equal** 122:11
**equally** 106:6
**establishes** 10:4, 13
**estimation** 129:3, 4
**even** 39:9; 125:21
**event** 85:12; 116:8;
121:6; 123:13, 21
**Eventually** 124:18
**everybody** 57:21; 117:18
**everyone** 89:10
**Evidence** 66:25; 70:11
**exact** 51:5
**exactly** 49:17; 53:2; 54:6;
114:23
**EXAMINATION** 4:7; 97:7
**examined** 4:5

**example** 11:13; 78:18
**excerpt** 93:10
**exclusively** 99:16, 20;
122:5
**Excuse** 47:5; 55:16
**executive** 9:7; 11:25;
20:23; 21:2, 7; 26:10, 25;
27:11; 34:3; 36:6; 89:16;
97:23; 98:2, 4, 5; 123:23;
124:12
**exercise** 127:9; 100:9
**Exhibit** 84:18, 19; 93:14
**expected** 107:18
**expecting** 108:3
**experience** 31:22, 24;
82:2; 127:14
**explanation** 113:16, 22;
119:5
**express** 131:24; 64:10;
97:4
**extended** 83:22
**extensive** 9:22; 90:15

## F

**face** 71:13
**facing** 110:8
**fact** 24:19; 65:4; 83:19;
103:24; 120:4; 131:12;
70:11
**factors** 59:6, 7, 12, 15
**fair** 43:20; 51:15; 94:10,
21; 95:4; 100:22; 104:14
**fairly** 107:22
**familiar** 10:3; 56:25;
60:23; 68:18; 78:2; 82:8;
84:7; 94:9, 11, 15, 17;
96:17, 19; 128:2; 132:20
**family** 17:15; 18:2
**far** 40:4; 65:14
**February** 5:22
**Federal** 66:24
**feel** 23:21; 24:4; 87:11
**felt** 67:19, 20
**Feruzzano** 91:18
**few** 4:11; 61:11; 83:20
**Fidler** 6:14; 122:21
**figure** 44:23; 45:7, 16;
70:2, 18; 108:4; 120:12
**file** 132:24
**film** 71:19
**final** 104:10
**find** 33:20; 53:16; 89:19
**finish** 33:14; 108:7
**fire** 14:5
**first** 4:3; 14:12, 14, 20;
31:5; 37:2, 3; 47:24; 49:5;
56:11; 72:5; 116:20;
117:16
**floor** 26:12; 88:2, 17;
89:25; 99:24; 108:13
**focus** 59:22
**follow** 33:17; 128:8;

119:10; 39:24; 88:3;
121:16; 4:6; 85:16
**follow-up** 33:19
**force** 12:25
**foregoing** 134:4
**forget** 122:24; 128:17
**form** 4:21; 6:19, 25; 8:15;
17:21; 29:20; 33:2, 10;
34:23; 35:22; 38:14;
42:17; 44:9; 46:2; 50:23;
53:8; 54:3; 55:8; 60:6;
61:25; 63:11; 64:13; 68:4;
73:6; 75:13; 78:7, 14;
79:17; 93:3; 98:23; 101:2,
18; 103:7; 104:6; 111:4;
113:19; 115:10; 116:4;
117:7; 118:19; 119:8;
120:18; 122:13; 124:3;
131:9
**formal** 60:9
**former** 62:14
**formerly** 114:12
**forward** 61:21; 71:21;
89:24; 90:7, 18, 20; 98:13,
25; 99:3
**Foster** 74:6; 79:13, 18
**four** 64:6
**freedom** 69:10
**Friday** 56:17
**Frisk** 35:13
**front** 45:18; 115:16;
119:16; 121:5, 10; 128:14
**full** 13:25; 17:25; 56:7;
98:2
**fully** 14:7; 88:9
**functions** 87:8
**fund** 57:14; 59:5; 60:3;
57:2; 78:19
**further** 4:6; 113:15, 21;
133:12

## G

**Gallagher** 74:12; 80:20
**gallery** 85:14
**gather** 96:22; 114:13
**gave** 21:24; 28:17
**gaveling** 106:7
**Gay** 9:8
**general** 34:17, 18; 35:16;
48:3; 93:10; 106:8;
115:12, 15
**generally** 23:13; 45:15;
79:20, 22
**Gerson** 74:15; 80:21
**gets** 57:16, 17, 23; 58:3;
99:11; 125:24
**Gifford** 14:24, 25; 15:3, 5,
8, 17; 16:8, 11; 17:3
**given** 102:8
**gives** 86:15; 126:14
**giving** 51:5
**goes** 7:12; 67:16; 113:23
**Good** 4:8



gossip 113:2
government 11:12;
57:14, 15
governmental 65:10;
68:7; 96:11
great 96:19
group 60:14, 20, 21;
119:16, 18; 61:11; 59:21
guarantee 90:25

**H**

hall 34:21; 114:15, 17;
115:2, 16, 20; 117:15;
120:16, 23; 121:2, 23
handle 38:3, 5; 44:23
happen 107:10; 111:14;
24:19, 20; 31:7; 44:20;
47:17; 49:10; 66:4, 5, 8;
81:21; 87:24; 120:20;
44:22; 108:4
harassment 132:21
harder 111:8
Harry 91:11
Hartford 9:3
head 19:11, 18; 45:22;
46:9; 48:7, 8, 20, 25; 49:2;
54:12; 103:17, 20, 24;
107:20; 126:7, 11, 12, 15;
27:13; 46:13
hear 118:16; 73:13, 20;
82:17; 108:11, 25; 109:11,
15; 116:13; 29:25; 30:20;
115:18
hearings 32:15
hearsay 113:2
Helen 79:13
Here's 52:23
hereby 134:4
herein 134:3
high 7:3; 71:15, 20
highest 8:18
himself 43:7; 119:16
hindered 88:15
hire 16:12, 13, 20; 15:16;
16:14; 17:10
hiring 15:22
hissing 111:17, 24
history 56:14; 94:11
hold 77:22; 49:18; 118:24
honestly 103:19
honor 65:10; 67:17; 68:8;
96:11
hope 125:3; 129:21
hour 66:12, 17
Howard 91:20

**I**

ID 116:5
idea 58:20; 82:20; 119:17
identification 93:16;
115:25

ignored 30:14; 42:11, 22;
43:4, 12
immediately 88:3
impasse 89:6
importance 122:11
important 59:9
impromptu 114:13
inappropriate 24:18;
47:16; 119:14, 22; 121:6;
129:11; 131:4
inappropriately 119:22
inception 46:22
incident 25:17; 127:19;
133:2
include 64:22; 90:11;
99:4; 64:5; 73:4; 74:22;
75:10; 119:4
including 6:9, 10; 79:15;
90:8
inclusion 75:18; 76:5,
23; 80:8
incredibly 47:15; 129:10
independent 50:21
indicate 21:25; 22:3;
28:9, 12; 29:2, 5, 8; 30:16;
32:10, 19, 22; 33:6; 34:16;
118:9; 29:10; 34:6;
113:21; 102:11
individual 15:11; 16:19;
19:9; 20:18; 21:15; 25:5,
11; 38:7; 39:5, 17; 48:19;
49:7, 15; 62:4, 10; 65:9,
12; 69:9; 77:19; 78:22, 23;
126:16; 127:20; 131:18;
15:6; 16:14; 63:24; 68:7;
96:24; 97:2
individually 62:25
Inez 122:21
influence 78:3, 5, 11, 19;
79:2, 10
informal 60:9
information 13:18;
19:23; 21:24; 22:17;
28:16, 18; 53:22; 54:6;
88:6, 25; 119:19
informed 64:20; 127:16
informing 77:23; 132:7
inherent 82:9; 127:25
input 90:15; 99:21
instance 16:18; 28:3
institution 50:17; 52:6;
127:4
instruct 55:11; 70:5;
74:18; 75:5, 15; 76:3;
102:6; 106:15; 109:23;
110:12, 16; 28:14; 74:23;
75:2, 22; 76:7, 16; 88:4,
17; 106:5
instruction 106:18;
43:21; 74:25; 76:9
intended 118:11
interacted 96:25
interest 17:17
interpretation 10:25;
11:3

interrogatories 5:12
interrupt 96:5; 12:19
interviewed 16:14
into 61:13; 66:3, 13; 70:5;
99:21; 115:16; 127:17;
128:5
Intro 64:5; 93:11; 94:3;
79:21
introduce 87:21; 88:16;
61:8; 62:14, 24; 81:3
introducing 72:14; 88:7
introduction 61:5; 64:14,
15
investigated 92:9
investigation 92:14
involve 41:12; 14:17, 21;
42:8
Ireland 69:11
Irish 69:12
irrelevant 130:20; 131:3,
7
issue 12:24; 20:16; 25:6,
9, 11, 17; 40:3, 4; 42:13;
46:25; 47:3, 7; 49:20; 23:6;
25:14; 59:9
item 98:11, 12, 25; 99:18;
100:4; 101:8; 102:7, 16,
19, 22; 57:7; 58:7

**J**

Jackson 21:4, 19; 22:12;
34:7; 123:10
James 73:7; 81:11, 11,
16, 20
Jewish 96:14
Joel 6:13; 122:21
joint 32:7, 13
Jolson 71:7, 9, 21
Jose 62:14
Joseph 68:18, 25; 69:5,
7, 8; 70:8, 14
July 49:16; 132:2, 10
June 49:16, 19; 50:8;
51:10; 128:6, 8

**K**

Katz 6:12
keep 12:19; 43:14;
103:24; 105:21; 106:10
kept 103:13, 20
killing 69:16
kind 54:22; 106:6, 9;
107:20, 25; 108:3
King 68:9, 13
knew 73:18; 81:10;
95:21; 103:19; 105:16;
114:16
knowledge 10:17; 12:3;
17:25; 44:21; 55:10; 62:6;
63:6
known 130:16, 25

**L**

large 9:23
Larry 35:4
last 58:6
later 36:16
Latino 20:23; 21:2; 26:10;
27:2, 12; 34:4; 36:7; 89:5,
17, 22; 123:9; 124:13
law 12:25
laws 12:15; 13:3
lawsuit 65:18, 24
lay 11:2
lead 128:23; 67:2
leadership 20:22;
122:17, 18; 123:7; 124:12
least 24:5; 58:24
left 107:5, 23, 24; 110:11
legal 10:18, 24; 50:2, 16;
126:2
legislation 61:5, 13;
90:9; 92:15, 16; 99:11
legislative 9:16; 10:13,
20; 11:15; 13:14; 46:5, 15;
48:15, 23, 25; 54:14; 61:4,
9; 92:20; 126:12, 15
LEMONEDES 6:18, 24;
7:6; 8:14; 10:15; 11:20, 22;
12:7, 17, 22; 13:9, 23;
17:20, 24; 18:10; 19:15,
21; 20:11; 21:21; 24:9;
25:18; 27:20; 29:19;
30:23; 31:16; 32:25; 33:9;
34:22; 35:21; 38:13;
42:16, 23; 44:9, 15; 45:25;
47:4, 8; 48:10; 50:3, 22;
52:19, 23; 53:7; 54:2; 55:7;
61:17, 24; 63:10; 64:12;
65:13, 25; 66:11, 18; 67:8;
68:3, 15; 69:3; 70:3, 10,
20; 71:5, 17; 73:5; 75:12,
20; 76:25; 78:4, 6, 13;
79:4, 7, 16, 24; 80:13, 24;
81:13; 82:11, 15, 22, 24;
84:21; 86:11, 14; 93:2, 18,
22; 94:6; 95:2, 23; 97:3;
98:19, 22; 100:25; 101:17;
103:6; 104:5, 18, 24;
111:3; 113:18; 115:9;
116:3; 117:6; 118:18;
119:7; 120:17; 121:20;
122:12; 124:2; 131:8;
133:15
Leroy 6:12; 113:13;
117:18; 119:21; 121:4;
122:20
Lesbian 9:8
less 9:12; 57:16, 17
letter 124:20, 20, 22;
128:7, 14; 129:23; 130:10,
13; 132:3, 8, 10
level 8:18; 82:3; 121:14
Lewis 6:14; 122:21
Lieutenant 117:14; 118:2
limited 5:23; 13:11;

19:23; 65:19; 66:2; 95:25
line 12:18; 36:17
listed 94:16
listening 117:10
literally 113:17
litigation 65:15
little 9:11; 108:4
lives 130:19, 20; 131:3
lobbied 77:5, 6, 12
lobby 74:24; 75:23;
76:10, 16; 77:19; 85:14;
77:14, 17, 21
long 9:10; 67:21; 118:5
longer 124:25
look 44:6; 52:15, 20, 24;
45:5; 107:5; 44:25
lot 32:14
lots 107:3
loud 108:14
loyalty 59:13
Luther 68:9, 13

**M**

maintain 31:10, 25;
83:11; 84:11; 85:9; 87:12
maintenance 31:13
major 8:22
majority 7:16, 19; 94:11;
103:10, 12, 15, 15, 22, 22
makes 19:11, 18
making 41:6; 43:18;
47:15; 50:12, 24; 69:3
Malcolm 70:15, 23, 25
manner 129:25
many 6:7, 22; 28:9;
29:16; 59:17; 123:3, 7;
127:6
Maria 21:4
Mark 21:5; 22:18; 34:7;
52:8, 24; 93:16, 19, 21;
128:18; 52:11; 71:18
Marlene 91:24
Martin 68:9, 13
Martinez 34:11; 95:11
matter 23:6; 40:24;
41:16; 92:20; 122:6, 7;
126:25
maximum 57:24; 58:10,
16, 21; 59:2
may 21:6; 32:7, 12; 36:4,
5; 40:7, 10, 18, 20; 41:2,
15; 42:3; 44:3, 13; 45:6;
46:11, 19; 47:10; 48:2, 6,
21; 61:20; 62:6; 76:12, 15;
77:11; 81:22, 23, 25;
85:15, 18; 86:17, 20;
87:19; 89:3; 92:3; 93:15,
23; 94:19; 97:10; 98:11;
99:3; 100:17, 24; 101:5,
14; 102:2; 104:4; 105:5;
106:22; 112:6; 125:11;
127:23
maybe 114:11

mayor 11:25
mean 18:12; 22:11; 45:9; 51:4; 64:18; 82:21; 96:5; 108:18; 110:21; 113:16; 119:3, 4, 6; 120:19; 121:21; 130:6; 7:19; 113:24; 131:24
meant 113:16
Meara 28:23; 76:18, 21; 117:10; 128:7; 132:3; 78:25
media 96:23
medications 5:3
meet 122:16; 123:3, 4; 5:12; 7:14; 26:13, 16; 27:8, 24; 28:3, 12; 30:2, 5, 17, 22; 31:9, 19; 33:13; 35:5, 10, 12; 36:4, 6; 38:12; 40:10, 13, 19; 41:2, 15; 42:2; 43:12, 22; 44:3, 13; 45:14; 46:19; 47:15, 25; 55:14; 56:3; 61:19; 62:5; 66:5, 6, 9, 10; 72:6, 22, 23; 74:13, 17; 83:25; 84:12; 86:3, 16; 87:13, 18, 25; 88:4; 89:2; 92:2; 93:15, 23; 97:10; 99:4, 12, 15, 19; 100:18; 102:10; 105:4, 5, 8, 10, 17; 106:3, 10, 19, 20, 21, 25; 109:9, 10; 110:15; 112:7; 115:20; 116:9; 121:24; 122:9; 123:18, 18, 24; 125:12; 128:12; 129:13
meetings 26:6, 24; 27:16, 17; 28:7, 8, 10; 29:17; 30:2; 31:24, 25; 32:6, 14; 34:19, 20, 25; 35:2; 44:19; 47:13, 14; 83:3, 5, 7, 12; 84:16; 85:21; 89:7; 121:17; 122:2, 3; 130:24
Melinda 6:12
Melissa 21:5
member 9:5; 13:16; 17:2, 9; 24:8; 39:5, 17, 17; 41:13; 44:8, 19; 45:4; 47:12; 49:14; 55:23; 56:2; 57:6; 58:2, 7; 59:4; 61:9; 62:10, 15; 63:16; 69:12; 75:16; 78:15; 91:5; 93:4; 104:22; 112:14; 156, 12; 16:2, 3; 17:16; 19:8; 20:17, 22, 22, 24, 25; 21:6, 7, 15; 23:19, 24; 25:4; 26:7; 34:10; 40:17; 48:19; 58:24; 63:24; 73:2; 74:20; 75:6, 16; 76:4, 21; 77:9, 17, 17; 78:11; 79:20, 22; 80:4, 7, 11, 16; 81:4; 94:22; 95:9; 99:24; 104:16, 20; 105:6; 114:21; 115:3; 121:17
mentioned 128:6
merit 130:3
met 64:25; 123:2, 7
Metropolitan 69:23; 70:9
might 41:20; 42:3; 82:21; 100:12; 102:18; 105:10, 25;

111:11; 119:18, 19, 21
Miguel 34:11
Miller 14:24, 25; 15:3, 5, 17; 16:11; 17:3; 83:23; 62:4
minimum 57:15, 22; 58:10
minutes 133:9
mis-respond 119:21
mischaracterizing 25:19
misspeak 100:21
misstating 46:3
moment 36:18; 39:6; 41:18; 111:15; 112:3, 20; 111:10
Monday 56:17
money 59:18
more 6:20; 30:4; 36:4, 6; 47:22; 48:12; 53:22; 54:6; 61:18; 89:10; 94:13; 107:14; 116:6; 123:5, 6
morning 4:8
most 104:20
Motresa 91:22
move 67:9; 90:18, 20, 24; 132:12; 89:24; 98:12, 25
moving 90:6
Mrs 26:5, 12, 21, 24; 29:15, 24; 30:14, 17, 21; 32:8; 36:3, 10; 37:9, 13, 16, 25; 38:18; 39:22; 40:3; 41:4, 13, 20; 42:2, 9, 14, 20, 25; 43:10, 11, 16, 19; 44:7; 45:3, 12, 24; 47:2, 6; 49:4, 20, 25; 50:7; 51:14; 52:2; 53:6; 54:18; 55:3, 22; 106:25; 107:5, 14; 108:21; 109:8, 23; 110:3, 6, 9, 13, 25; 111:6, 23; 112:12; 113:12, 23; 114:3; 116:14; 118:10; 121:3, 22; 122:3; 123:17; 124:8, 20; 125:10, 16; 126:4; 128:8; 129:22; 130:17, 19; 132:4, 12, 14, 25
much 44:16; 108:9; 110:14
multi 7:9
murder 120:7, 12
musical 62:22
myself 6:9, 10, 12; 83:13; 117:9, 18; 121:15

## N

name 4:8; 17:8, 9; 62:6, 23; 63:4, 9; 64:6, 16, 22; 65:4; 68:6; 71:22; 72:19, 25; 73:3, 17; 74:21; 75:9, 19; 76:6, 24; 79:15; 80:9, 22; 81:5; 82:2, 3, 6; 87:21; 91:4; 93:11; 94:23, 24; 95:10; 99:4; 68:21, 25; 70:8, 23; 90:16; 92:4, 10, 18, 25; 93:7, 11, 12; 94:9,

12, 15, 16; 122:23
naming 96:12
nature 27:18; 29:2; 30:7; 32:10; 49:6; 51:25; 54:15; 88:12; 89:12; 113:2
nearly 104:15
necessarily 35:7
necessary 8:7; 23:22
need 4:12; 23:16; 116:6; 126:23; 42:5; 51:22, 25; 53:21; 54:6; 88:6
negotiations 89:3
New 4:4; 9:8; 10:4; 11:12, 14, 17, 19; 12:4, 5, 10, 12, 16; 13:3, 7, 21; 14:5, 6; 15:20; 47:18; 51:17; 67:22; 68:13, 22, 25; 90:13, 24; 96:3; 115:4, 25; 116:11; 132:20
newspaper 74:3; 96:23
next 37:6; 56:21; 67:9
night 118:8
noise 107:3, 24
non-controversial 99:13
none 47:17
Nor 93:8
norm 80:3
North 69:10
Notaro 91:8
Notary 4:4
note 13:23; 131:22; 133:17
notifying 124:21
number 28:24; 50:5; 80:16; 90:17; 94:4; 100:3; 104:25
numerous 6:5; 9:15, 16; 26:4, 20; 51:2; 59:6, 15; 77:2; 89:7; 125:23; 126:23; 127:7

## O

oath 4:18
object 97:7; 72:9
Objection 6:18, 24; 7:6; 8:14; 10:15; 11:20; 12:7, 17, 21; 13:9, 24; 17:20, 24; 18:10; 19:15, 21; 20:11; 21:21; 22:16; 24:9; 25:18; 29:19; 30:23; 31:16; 32:25; 33:9; 34:22; 35:21; 38:13; 42:16, 23; 44:9; 45:25; 47:4, 8; 50:3, 22; 53:7; 54:2; 55:7; 61:17, 24; 63:10; 64:12; 68:3, 15; 69:4; 70:3, 10, 21; 71:6, 17; 73:5; 75:12, 20; 76:25; 78:6, 13; 79:4, 7, 16, 24; 80:13, 24; 81:14; 82:15, 22; 93:2; 95:2, 23; 98:22; 100:25; 101:17; 103:6; 104:5, 18, 24; 111:3; 113:18; 116:3; 117:6; 118:18; 119:7;

120:17; 122:12; 124:2; 131:8
obviously 31:6; 84:6; 112:18; 119:13; 125:6
occur 47:21; 110:22; 111:9; 113:5; 28:13; 30:19; 47:12; 110:24; 112:20, 24; 114:14, 16; 121:13; 81:7
occurring 107:21; 111:7
off 15:25; 47:24; 102:23
offer 87:20
office 25:23; 31:5; 37:21, 21
officer 83:9, 24; 85:11, 15, 18, 25; 86:2, 5, 8, 9; 117:15
officials 131:25
often 27:18; 100:9; 123:3
Once 72:2; 97:10; 101:7; 107:15; 123:2, 6, 6; 132:6
one 22:8; 23:23; 27:4, 5; 29:15; 30:5; 35:6; 36:4, 6; 38:10; 45:2, 5, 9; 51:20; 52:9, 12, 20, 23, 25; 53:4; 54:20; 57:16, 17; 58:13; 59:7, 12; 60:17; 61:12; 71:2; 75:3; 77:24; 80:3; 82:5; 84:25; 94:22; 103:17; 105:2, 3; 107:4; 111:24; 114:12; 120:21; 122:5; 126:9; 129:17, 18; 130:2, 4, 20
ones 6:11; 28:4; 35:7; 57:18; 90:17, 19
only 61:11; 104:22; 105:3; 115:22
open 39:19; 114:19
open-ended 57:17
operational 19:25
opinion 65:16
opponent 120:13
oppose 65:5; 61:12; 65:7; 73:16, 18
opposition 64:11; 67:12; 73:3; 74:21; 75:9, 18; 76:5, 23; 79:15; 80:12
option 101:9; 102:16, 18, 22; 44:25; 45:2, 5, 8, 10, 14, 18; 50:2, 16, 19; 53:11; 54:20, 23; 55:21
orally 4:23
order 31:10, 14, 25; 43:14, 15; 83:11; 84:12; 85:7, 9, 12; 87:12; 93:10; 105:21; 111:13
organizational 9:18
organizations 57:9
original 52:20; 94:25
others 35:7; 127:11
out 30:18, 17; 33:20; 44:23; 45:7, 16; 53:16; 88:18; 89:13; 108:4; 111:2; 112:5; 116:21
outburst 30:14, 18; 32:20, 22; 33:6; 34:20;

42:10, 14; 106:9; 123:17; 29:4, 6, 15, 25; 30:8; 32:12; 34:5, 14, 19, 19; 35:19; 36:2; 38:11; 41:21; 42:4; 43:11, 16, 20
outcome 124:16, 18
outrageous 119:13; 129:15
outside 114:16; 120:3; 121:12
over 15:5; 19:8; 20:10, 17; 21:14, 18; 25:4, 10; 48:8, 19; 66:12; 78:11; 107:20; 108:11; 126:15
oversees 88:8
owed 24:5
own 61:12

## P

p.m 133:10, 11, 17
package 61:15, 21; 62:2, 8; 63:4, 5, 14, 17, 21; 64:3; 65:5; 72:20, 25; 73:17; 74:22; 75:10, 19; 76:6, 24; 87:22; 92:3, 7, 10; 93:7; 94:12, 19, 25; 63:24
page 93:13; 134:7
papers 73:21, 22
paperwork 15:18; 16:15; 88:9, 12
parameters 50:18; 53:10
paraphrasing 124:24
Pardon 7:24
Park 115:21; 72:16, 18, 22, 24; 74:19; 75:7, 17, 24; 76:4, 22; 79:5, 12; 80:9, 22; 81:18, 20; 82:4; 87:24; 88:4; 92:13, 23, 23
part 31:13; 35:20; 36:11; 38:4; 39:3; 41:11, 19, 24; 42:7; 44:5; 53:13; 62:17, 19; 65:4; 67:18; 90:22; 106:3; 108:10; 112:21; 119:4; 124:19; 127:14, 15
partial 50:14
particular 53:4; 60:13; 79:23; 83:2, 25; 99:19; 127:5
particularly 120:3; 121:11
party 6:16
pass 98:17; 102:3, 14; 103:11; 104:8, 13; 61:23; 71:24
past 66:17
pay 124:22
paying 9:24
payroll 9:24
people 6:5, 7, 8, 10; 8:4; 16:16; 28:25; 34:6; 68:12, 17, 17; 71:2; 76:14; 84:15; 96:14; 103:16, 23; 106:2, 7; 111:17, 18, 19, 22, 25; 119:17; 120:2, 25; 121:5,

11; 124:11, 11; 131:23

**percent** 34:12; 62:19; 100:2, 12, 21; 118:3; 129:18, 18

**performed** 71:13

**performer** 62:22; 71:10, 11, 12

**period** 106:11

**permanent** 67:15

**person** 16:13, 20; 25:23; 62:20; 127:21

**personal** 19:8; 65:11, 16; 92:14, 19

**Personally** 64:24; 68:20; 72:8; 92:11; 101:21; 109:13

**personnel** 20:10; 25:10

**perspective** 45:21

**Peter** 14:13, 18; 16:9; 17:5

**piece** 61:4; 90:9; 99:10

**placed** 101:8

**Plaintiff's** 52:8; 84:17, 19; 93:9, 14

**plan** 33:24; 87:20

**played** 113:9; 118:22

**playing** 119:10

**plaza** 114:14, 18; 115:7, 16

**Please** 67:8; 70:4; 82:25; 95:24

**Plummer** 4:9; 10:9; 26:5, 12, 21, 24; 29:15, 24; 30:14, 17, 21; 32:8; 34:14; 36:3; 37:9, 13, 16, 25; 38:18; 40:3; 41:4, 13, 20; 42:2, 9, 14, 20, 25; 43:10; 44:7; 45:3, 12, 24; 47:2, 6; 49:4, 20, 25; 50:7, 15; 51:14; 52:2; 53:6; 54:18; 55:3, 22; 106:25; 107:5, 14; 108:21; 109:8, 23; 110:3, 6, 9, 13; 111:6, 23; 112:12; 113:12, 23; 114:3; 116:14; 118:10; 121:3; 123:17; 124:8, 20; 125:10, 16; 126:4; 128:8; 129:22; 130:17, 19; 132:4, 12, 14, 25; 36:10; 39:22; 43:11, 16, 19; 110:25; 121:22; 122:3

**point** 6:20; 7:8; 15:12; 37:8; 38:19, 20; 40:5, 15; 49:12, 16; 51:9; 53:24; 56:14, 16; 64:10; 67:4; 71:2, 15, 20; 73:21, 25; 82:7; 97:8; 98:14, 15; 107:4, 11; 108:11; 109:22; 110:2, 5; 112:10; 123:20; 125:11; 132:11

**Police** 11:14, 18; 12:4, 6, 11, 15, 23, 24; 13:2, 20, 22; 14:3, 4, 6, 9; 35:12; 115:25; 117:3, 5, 15, 17, 22; 118:3

**policy** 106:9; 132:21, 25

**political** 120:12, 13

**politics** 66:14, 20

**polling** 99:6

**portion** 14:16

**position** 6:2; 23:4; 25:15; 51:9; 65:12; 74:20, 24; 75:8; 76:14, 15; 77:4, 9, 20, 22, 24; 79:14, 22; 80:4; 120:14; 79:19

**possibility** 24:22; 105:18

**possible** 35:9

**pots** 58:4

**power** 12:24; 13:3; 48:8; 82:9; 105:20; 127:3, 4, 25; 14:2, 9; 23:14; 48:4; 49:8; 53:16

**practice** 67:23

**pre-dated** 16:7

**precedent** 59:20

**preexisting** 130:8

**prefer** 31:7

**prejudge** 90:25

**preliminary** 4:11

**preparation** 5:8

**present** 103:23; 106:13, 20; 22:15; 89:18, 20; 97:17; 98:2

**preserve** 85:12

**presidency** 113:25

**president** 85:20; 119:6

**Presides** 85:17

**presiding** 83:9, 23; 85:11, 14, 18, 25; 86:2, 5, 8, 9

**press** 49:19; 50:6, 8, 9; 51:3, 7; 53:3; 76:8; 112:14; 113:3; 114:11, 12, 13; 115:19, 24; 121:6

**pressure** 75:2, 23; 76:10, 17; 77:6

**pressuring** 77:5

**prevent** 111:2, 7; 32:23; 33:6

**previous** 10:10; 130:9

**previously** 82:11

**primary** 84:3, 5

**principle** 128:23

**prior** 7:22, 25; 8:6; 9:4; 34:7; 40:9, 12, 19; 41:2, 14, 17; 42:2; 44:2, 11, 12; 45:6, 14; 46:18; 47:10, 25; 48:5, 21; 54:10; 61:19; 62:3, 5; 64:14, 15; 67:24, 25; 72:22; 80:10, 23; 81:10; 87:18; 89:2; 97:9; 100:17; 101:25; 105:4, 11; 122:9; 127:18

**prisoner** 69:22

**privilege** 13:10; 83:22; 19:22

**pro** 85:20

**proactively** 88:17

**probably** 31:3, 3; 87:25

**problem** 24:18; 38:8; 42:21; 72:3; 88:11; 123:16

**procedure** 7:11, 12;

60:24; 61:3, 4; 100:16, 18; 88:6

**proceeded** 66:9, 13

**proceedings** 124:25; 131:20

**process** 61:7; 82:7; 88:25; 90:5, 13, 18, 20, 24; 91:2; 92:12; 99:23, 25; 103:14; 111:9; 15:23; 16:15; 46:6

**professional** 129:16, 25

**Project** 9:9

**prominent** 120:12

**proposal** 59:25; 60:6

**proposed** 61:22; 62:7, 10; 89:16; 97:12, 14

**proscribed** 120:15

**provision** 18:22

**Public** 4:4; 28:7; 29:22, 25; 30:3, 4; 32:7; 83:6, 8, 13, 15, 17, 19; 84:2, 14; 85:22; 86:19, 22; 87:11; 105:6, 24; 110:9; 115:12, 15; 116:9

**purchasing** 9:24

**purpose** 77:21

**pursuant** 49:9; 53:17; 132:25

**purview** 87:4; 103:4

**put** 30:17; 61:20, 21; 71:21; 88:2; 98:11, 15; 99:3; 100:4; 102:22; 108:17

**puts** 61:9

# Q

**Queens** 6:16

**quick** 56:22

**quiet** 29:12; 107:22

**QUINN** 134:12

**quite** 77:4

# R

**raise** 108:11; 119:11

**Ramone** 95:11

**ran** 5:25

**range** 58:9; 126:24

**rationale** 63:7, 13

**re-affirmed** 20:3

**re-name** 95:17; 68:5

**re-naming** 64:21; 72:8; 79:19; 92:15; 63:21; 90:6, 7

**reach** 88:18; 116:20

**react** 112:25; 119:22; 18:14

**read** 10:7; 96:9; 122:22, 25; 125:21; 127:7; 134:4; 85:3

**ready** 94:7

**really** 45:7; 47:3, 6; 78:8;

94:8

**reason** 81:4; 103:19, 25; 128:23; 77:2

**recall** 17:8, 9; 21:5, 8; 22:16; 28:11; 30:6; 32:14, 21; 34:9; 37:7; 40:8; 50:9; 57:19; 58:18, 19, 21; 59:2; 81:22; 100:20; 112:2, 2

**receive** 36:19; 37:6; 60:2; 26:4, 6, 9, 21, 23; 36:2, 25; 37:8; 58:24; 59:8

**recently** 32:15; 100:13

**Recess** 56:24; 106:11; 133:10

**recognition** 67:15, 15

**recognizes** 63:8

**record** 48:13; 52:25; 59:21; 67:21; 96:4, 16, 18, 20, 22; 122:25; 112:17; 118:22

**recorder** 113:8; 118:25

**recreation** 72:23, 16, 18, 24; 74:19; 75:7, 17; 76:4, 22; 79:5, 12; 80:10, 22; 81:21; 82:4; 92:24

**referenced** 90:10

**referred** 10:11; 26:3

**referring** 38:8; 53:5; 57:6; 78:9; 84:25

**reflect** 54:15

**reflection** 24:24; 43:24; 51:8

**refusal** 43:21

**regain** 111:13

**regard** 39:19; 129:7, 9

**regulations** 12:24

**reinforcing** 132:6

**related** 18:2; 23:6; 40:24; 88:11

**relates** 50:15; 56:19

**relating** 23:14; 25:22; 26:15; 33:4; 36:14; 39:14; 123:17

**relationship** 52:5; 54:7

**relevant** 41:18; 65:17; 66:24; 131:18

**reliance** 127:10

**remark** 113:11, 22; 96:14

**remedy** 25:2

**remember** 6:7, 11; 18:3, 6; 22:14; 28:5; 36:23, 25; 37:2; 49:18, 23; 50:13, 24; 51:4, 5; 58:11, 12, 16; 62:16, 20, 23; 90:3; 97:25; 103:23; 104:11, 12, 13; 105:12

**removal** 75:8

**remove** 72:19; 80:21; 81:5; 102:16; 106:12; 110:16, 17; 111:21; 30:22; 31:15; 62:8; 63:5; 72:24; 82:3; 110:13

**renamed** 67:16

**renaming** 62:9; 65:7, 21, 23

**repeat** 4:22; 25:7; 96:7; 24:16

**rephrase** 4:22; 11:3; 48:11; 63:23

**reply** 22:8

**reported** 73:24; 112:15

**represent** 4:9; 77:23

**representative** 83:18; 131:7, 14; 124:13

**Republican** 69:13

**request** 61:10; 72:5; 83:21; 86:4, 6, 8; 95:16; 125:25; 17:10; 60:14; 124:22; 29:12

**require** 103:10; 100:3; 103:12

**research** 51:23; 53:15; 92:19; 125:12; 127:11, 16; 41:17; 92:18; 49:8; 50:15; 51:12

**resolution** 33:20; 89:9

**resolving** 89:5

**respects** 63:8

**respond** 123:15; 129:20; 50:13

**response** 49:23; 50:14, 25; 88:23; 95:19; 129:22

**responsibilities** 9:13, 17, 18, 19, 19, 21; 15:10; 83:3

**responsibility** 19:8; 84:2; 85:9

**responsible** 83:10; 84:11

**rest** 118:7

**restate** 75:14; 109:3, 5

**restricted** 114:20; 115:3, 8, 11

**restrictions** 114:24; 115:5, 6

**review** 90:5; 92:12, 14, 24; 93:6; 125:17, 18; 5:7; 125:24; 126:24, 25

**right** 13:21; 21:9; 27:23; 35:19, 25; 38:21; 39:2; 44:14; 47:3; 70:8; 81:23; 82:12; 99:15; 129:5; 32:6, 13

**Rivera** 6:13; 62:15; 91:24; 122:21

**Robert** 21:4, 23; 22:11

**Roger** 4:8

**role** 83:6

**room** 29:12; 103:16; 108:10

**Row** 115:21

**Rule** 62:24; 17:23; 84:7, 10, 20, 22; 99:23; 100:14

**run** 83:5; 84:15

**running** 6:2, 6; 9:25

# S

**Safety** 28:7; 29:22; 30:3,

4; 32:7, 13
**sake** 63:18
**same** 34:6; 35:10; 52:9;
57:20; 81:13; 85:15;
130:16
**Santiago** 91:16
**saw** 107:5; 109:12, 13;
124:9
**saying** 18:15; 51:4; 53:2;
66:18; 80:19; 92:22;
103:21; 109:4, 7; 119:25;
121:4, 10, 11; 131:6
**scheduled** 114:12
**school** 8:24
**Schwartz** 91:11
**screaming** 107:6, 7, 9,
12; 108:16
**Seabrook** 27:10; 32:3, 9;
35:4, 12; 36:5; 56:19;
123:23
**second** 7:10; 54:16
**section** 10:3; 84:19; 85:5;
94:3; 126:20
**secure** 7:23; 8:2
**security** 86:15, 21, 25;
105:7; 109:21; 110:12, 17;
115:23; 117:20, 24; 118:5
**select** 7:12; 6:23; 14:11;
15:3
**selection** 6:17; 7:5; 8:16;
14:18, 21
**send** 15:18; 99:24;
124:20; 128:7; 132:3
**Senior** 14:13; 18:16
**sense** 102:8; 117:19
**sent** 16:15
**separate** 50:20; 65:23;
66:8
**sequence** 56:19
**Sergeant-at-Arms** 30:10
**serious** 24:23; 25:6, 11,
13, 17, 25; 26:18; 112:19,
21, 22; 129:10
**seriously** 24:13, 14, 17;
29:13; 51:21; 118:14;
129:14
**serve** 125:4; 129:22
**Services** 15:19, 24
**serving** 83:17
**set** 45:13, 18; 57:19, 20;
58:4; 72:6; 99:14; 100:23;
101:4; 103:5
**seven** 6:10
**severity** 24:24
**shall** 85:11, 17, 20
**share** 119:12; 121:10
**shouting** 107:3; 108:12
**show** 84:17
**shown** 134:7
**side** 52:12
**sign** 124:23; 125:4;
129:23; 132:8; 15:25;
125:6
**significant** 67:14

**similar** 51:6
**simple** 55:24
**single** 28:3
**sitting** 47:16
**situation** 24:12, 13, 17,
24; 25:22; 26:2; 33:25;
35:17, 20; 36:12; 37:23;
38:3, 5, 18; 41:25; 42:8;
44:18; 45:16; 47:12, 21;
49:8; 50:7, 11; 51:12, 19,
20; 53:17; 78:16; 118:14,
15; 130:20; 123:14
**six** 6:8; 124:21
**small** 104:25
**soldiers** 69:17
**somebody** 77:22; 119:21
**someone** 7:12; 16:11;
127:6
**Sometimes** 87:15, 16;
102:25
**Sonny** 64:6, 7, 16, 18, 19,
22, 23, 25; 65:4; 66:14, 21;
67:12, 13; 72:3, 19, 24;
73:3, 16; 74:21; 75:9, 18;
76:6, 23; 79:15; 80:8, 21;
87:21; 89:6; 90:11, 23;
91:3; 92:25; 94:23; 95:6,
10, 17, 21; 99:4
**soon** 37:5
**sorry** 6:9; 10:23; 25:7;
26:7; 38:15; 41:10, 22;
47:13; 57:16; 64:17;
75:11; 78:4; 81:9; 85:4;
86:13; 98:19; 128:4
**sounded** 48:12
**source** 18:19; 96:21, 24
**speak** 20:2; 30:11; 36:15;
37:9, 13, 16, 24; 54:8, 19,
25; 55:5, 12, 24; 59:20;
63:25; 68:16; 72:25; 74:2,
5, 8, 11, 14, 19; 75:6, 16;
76:3, 14; 78:22; 81:19;
87:13, 15, 17; 109:23;
116:25; 117:3, 4; 47:24;
77:16; 107:2, 13, 15, 16;
109:2; 110:6; 111:11, 12,
25; 112:3
**Speaker** 5:17, 25; 6:17,
23; 7:5, 13, 18; 8:16; 9:14,
23; 13:19; 14:11, 18, 20;
15:4, 5, 8, 21; 16:9, 20;
17:6, 11, 12; 18:8, 16;
19:3, 7, 11, 18; 20:4, 9, 17;
21:14, 17; 23:14; 24:4;
25:4, 10, 13; 36:14; 39:4,
13, 16; 44:7, 21; 45:3, 11;
48:7, 18, 24; 49:4, 9; 50:2,
16; 54:7; 57:15; 58:3; 59:4,
8, 10, 13, 19; 62:3, 3;
77:16; 78:3, 5, 10, 10, 16,
17, 17; 82:9; 83:9, 16, 18,
21, 22; 84:4, 15; 85:17;
86:4, 6, 9; 89:20; 99:14;
100:6, 10, 19; 102:15, 20,
22; 126:10, 11, 14, 21, 23;
127:13, 19; 128:2; 132:18;
18:19; 31:5; 37:20, 21;
53:16; 65:16; 8:11; 78:23

**special** 85:21
**specific** 6:21; 61:18
**specifically** 19:14;
118:12
**specified** 57:10
**specify** 32:16; 60:19, 22
**speculate** 31:21; 35:17;
82:24
**speculation** 18:11
**spent** 66:11, 16
**spoke** 51:18; 73:7, 15;
124:7
**spoken** 73:22; 76:21
**sponsor** 72:7
**spread** 58:23
**staff** 9:23; 13:16, 18;
15:6, 6, 11, 12, 14, 16, 22;
16:2, 3, 7, 8, 20, 25; 17:9,
16; 18:2; 19:8; 20:3, 10,
17; 21:15; 22:5; 23:18, 23;
24:8; 25:4; 26:7; 28:15, 20;
33:18, 19, 23, 23; 37:12;
38:6; 39:5, 17; 40:17;
41:13; 44:8, 18; 45:4;
47:12; 48:19; 49:14; 55:5,
12, 23; 56:2; 64:20; 65:3;
74:18, 23, 25; 75:6, 16, 23;
76:3, 7, 8, 13, 16, 19;
77:16; 81:9; 86:17, 21;
87:16, 23; 88:4, 7, 17, 20;
91:5; 92:13, 20, 23; 93:4;
94:22; 95:9; 101:22;
102:6; 105:7; 112:14;
121:17; 126:2, 2, 16;
127:2, 16, 20
**stamped** 52:11; 93:12
**stand** 67:6; 12:20; 13:24
**start** 26:19; 85:3; 102:10
**State** 4:4; 85:8; 5:11;
26:13, 16; 34:19; 38:16,
23; 40:9, 12, 19; 41:2, 14;
42:2; 44:3, 12; 45:14;
46:19; 47:13, 15, 25;
61:19; 62:5; 66:5, 6, 8, 9;
69:6; 77:3; 83:3, 11; 84:12;
85:20; 86:2, 16; 87:18;
89:2; 92:2; 93:15, 23; 97:9;
99:12, 15, 19; 105:4;
106:19, 21; 109:9, 10;
112:6; 121:24; 122:8;
123:18, 24; 128:12; 19:14;
69:20
**statement** 48:12; 53:4, 9,
24; 54:4; 95:5; 114:10;
26:14; 54:14; 129:13;
131:22
**stating** 35:23
**status** 50:11
**statutory** 18:19, 25;
125:15
**step** 30:13; 7:23, 25;
24:25; 29:8; 32:19; 43:10;
49:24; 72:15; 114:18;
115:2, 6
**still** 48:22, 25
**stipulated** 7:15
**stipulations** 46:12

**stop** 29:11; 35:12; 67:5;
111:17
**straight** 103:20, 24
**street** 61:7, 10, 22; 62:9;
63:20; 64:21; 65:7; 67:16;
68:21, 24; 70:8, 13, 22;
71:22; 72:7; 79:19; 82:6;
90:6, 7, 11, 23; 92:15;
95:17; 96:11; 60:24; 68:5
**studies** 8:23
**stuff** 113:24; 119:6
**Stuyvesant** 64:7
**subject** 134:6
**submits** 63:9
**Subscribed** 134:16
**sudden** 96:6
**suggest** 37:15; 89:16;
117:3, 16, 23
**suggestion** 117:24
**summed** 35:18, 19;
36:10, 12
**summer** 21:12
**supplied** 117:20; 118:6
**support** 6:15; 7:4, 23;
8:2, 12; 14:25; 59:8; 79:14,
21, 22; 80:4, 17; 92:6;
102:21
**supportive** 24:19
**supposed** 124:7
**Sure** 27:6; 28:15; 32:8;
35:4, 15, 23; 49:17; 50:18;
52:17; 53:10; 62:18, 19;
75:15; 77:7; 80:17; 81:25;
88:13; 95:15; 100:12, 15,
15; 105:3; 107:8; 118:3;
122:24; 123:5, 7; 126:19
**suspended** 124:21;
127:19
**suspension** 125:4;
128:5, 10, 24; 129:5, 23;
130:3; 132:7
**Sweeney** 91:14
**sworn** 4:3; 134:16

# T

**talked** 35:16
**talking** 21:8; 35:10;
44:14; 66:12, 17; 131:11
**tape** 113:7, 8, 21, 23;
116:13; 117:10, 12, 12;
118:17, 23; 119:11;
121:21
**team** 122:18; 124:12
**tem** 85:20
**tense** 105:17
**tension** 89:11
**tenure** 46:22; 100:10, 19
**term** 5:23; 14:12, 14, 16;
49:3; 56:25; 62:4; 82:8, 17;
120:15, 21; 128:3; 4:21;
21:14; 44:25; 48:6; 54:21;
57:23; 59:25; 67:24;
82:23; 85:8; 113:15;
131:15

**terminated** 76:10; 125:7;
127:20; 132:8, 13, 15
**terminating** 23:24
**testified** 4:5
**testimony** 22:7; 25:19;
35:25; 54:10; 67:2; 78:24;
103:7; 134:4
**Thanks** 12:22
**theatrical** 71:19
**therefore** 21:17; 24:21,
25; 44:5; 65:5; 89:24; 91:2;
126:10
**Third** 5:20
**thoroughly** 47:22
**though** 28:14; 35:19;
105:10
**thought** 24:17, 21; 43:24;
46:6; 65:9; 73:9; 105:17,
24; 111:11; 129:15
**thoughtful** 51:13, 22
**threaten** 125:2
**three** 8:9, 10, 10; 9:11;
29:16; 51:24; 80:11; 81:4
**Throughout** 36:22
**Thursday** 56:17
**times** 71:14; 123:3, 7;
125:24; 126:23; 127:6
**Tish** 73:7; 81:11, 16
**title** 5:15; 85:16
**today** 5:3; 133:3
**together** 32:15; 61:11,
21; 84:6; 129:19
**told** 22:6; 28:6; 40:8;
43:8, 9; 68:24; 76:20;
77:11; 113:3
**took** 22:7; 24:12, 13;
30:13; 32:20; 51:20, 24;
118:14; 129:12
**torn** 73:14
**total** 6:9
**totality** 26:17; 96:16, 18,
22
**touch** 117:14
**track** 59:21
**tragically** 120:5
**transcript** 5:11; 134:6
**transgressions** 124:8
**tried** 43:14
**Trinity** 8:25
**troubled** 119:20
**troublesome** 121:14
**true** 134:5
**try** 33:24; 77:20; 89:8, 10;
105:21; 106:2, 10
**trying** 44:11, 22; 45:15;
67:5
**Tuesday** 56:17
**two** 29:16; 34:10; 51:21;
54:8, 14; 58:4; 69:17;
103:17; 126:10, 11;
128:22; 133:9
**type** 9:5; 88:8; 89:9
**typical** 9:25
**typically** 92:14

# U

UINN 4:2
unable 29:11; 43:14
unacceptable 97:13;
98:7; 119:13; 121:7;
129:16; 131:5
unanimously 63:17
under 4:18; 11:11; 66:24;
84:10
unfortunately 47:22
uniformly 61:16
United 69:19
unprecedented 34:2;
44:17; 47:19, 20, 23;
49:10; 51:21
unprofessional 129:11
upcoming 105:8
upon 127:10
upset 42:20; 117:11;
118:15
Urban 8:23
use 52:10; 59:3; 78:18;
120:15, 21, 25
used 67:12; 82:23;
100:14, 18
usually 8:6; 60:11, 15,
21; 87:2

# V

Vallone 14:13, 18; 17:5,
11; 18:8, 16; 27:9, 25;
29:14, 24; 33:5; 35:11;
36:3; 37:4, 16; 38:11, 21;
39:23; 40:6; 41:3; 42:9, 15;
43:3, 6, 8, 13; 54:17;
55:12, 15; 56:10, 20;
123:23; 27:13; 43:22; 55:2
Vann 23:2; 72:7, 11;
87:20, 25; 88:5, 14, 18;
89:4, 19, 23; 97:11, 13;
98:8; 99:2, 8; 100:23;
101:8; 102:3, 13; 104:17;
88:22; 90:22
varies 60:8
various 123:16
Verbal 29:4, 5; 32:12
view 25:15; 45:20, 23;
46:14, 17, 18, 21; 48:6, 14;
49:13; 68:9, 12; 104:2;
130:3; 68:13
Viola 4:9; 10:9; 76:8
vis-a-vis 39:22
Viverito 21:5; 22:19, 20;
34:8
voice 108:11
vote 7:16, 17, 19, 22; 8:2,
4, 5, 6; 12:5; 62:17; 72:19;
73:8, 9, 12; 75:3; 78:19;
79:2; 80:10, 12, 18, 21, 23,
23; 81:5, 6, 10, 17, 20;
89:24; 92:3; 97:7; 99:7, 9;
100:23; 101:4, 16, 20, 22,

25; 102:6, 8, 9, 11, 12;
103:10, 13, 15, 19; 104:10,
10; 110:19, 23; 111:2, 7,
16, 24; 62:11, 16; 63:4, 16,
19, 23; 82:6; 92:6; 94:18,
24; 99:11; 104:16, 21;
6:22; 7:2; 8:7, 9, 10; 102:7,
10, 21; 104:3
voting 15:7; 63:14;
111:18

# W

Wait 65:13
walk 27:4; 40:25; 34:20
WAREHAM 4:7, 9; 12:20;
27:22; 34:24; 44:12; 52:9,
14, 17, 22; 56:22; 65:22;
66:7, 16; 67:7, 10; 82:13;
84:23; 93:20, 25; 96:7;
98:21; 128:17; 133:8, 12
waters 47:23
way 22:8; 65:14; 75:3, 4;
96:3; 102:11; 111:18
ways 103:21; 131:21
Weaving 91:20
week 100:15; 124:22
weighed 129:17, 18
weight 129:2, 3, 8
Weprin 6:13
weren't 45:13; 56:5
What's 8:18; 57:6; 61:7;
63:13; 126:17
Whenever 68:5; 94:6
whichever 90:17, 19;
104:2
white 71:2; 104:16, 20, 22
who's 77:16
whole 12:18; 66:3; 71:19;
119:6
willing 100:5, 6
win 8:7
win-win 89:10
wishes 63:8
within 46:12; 75:25; 87:4;
103:4
without 31:4; 88:11;
110:15; 124:22
WITNESS 52:15; 70:6;
86:13; 106:24; 122:22;
134:3; 108:21, 23
word 121:2; 51:5
work 9:5; 32:23; 33:7;
50:19; 53:6, 11, 19, 25;
25:23; 49:6; 54:5; 11:11;
52:2; 84:5; 15:21; 50:20;
61:7
worried 119:20
worrisome 121:13
worry 119:24
write 123:22
written 60:10, 11, 12;
61:13; 124:6
wrong 100:12

wrote 123:25

# Y

year 36:21, 22; 61:11;
62:13; 64:2; 9:11; 31:23
yelled 30:8
yelling 108:5, 16, 18
yield 24:23
York 4:5; 9:8; 10:4; 11:12,
14, 18, 19; 12:4, 5, 10, 12,
16; 13:4, 7, 21; 14:5, 6;
15:20; 47:18; 51:17;
67:22; 68:13, 22, 25;
115:4, 25; 116:11; 132:21
Youth 57:12, 19

**Lawyer's Notes**