Exhibit H



Page 1

[1]
[2] UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
[3]
[4] VIOLA PLUMMER,
[5]        Plaintiff,    Civil Action No.
[6]    -against-        07 CV 6154(WHP)
[7] CHRISTINE QUINN,
[8] Speaker of the City Council,
[9]        Defendant.
[10]
[11]    August 15, 2007
        10:32 a.m.
[12]
[13]
[14]    Deposition of CARL D'ALBA, taken
[15] pursuant to Notice held at the Offices of
[16] the Corporation Counsel, 100 Church Street,
[17] New York, New York, before Vicky Galitsis, a
[18] Certified Shorthand Reporter and Notary
[19] Public of the State of New York.
[20]
[21]
[22]
[23]
        GREENHOUSE REPORTING, INC.
[24]    363 Seventh Avenue - 20th Floor
        New York, New York  10001
[25]    (212) 279-5108

Page 2

[1]
[2] APPEARANCES:
[3] ROGER S. WAREHAM, ESQ.
[4] Attorney for the Plaintiff
[5]    394 Putnam Avenue
[6]    Brooklyn, New York  11216
[7]
[8]
[9]
[10] NEW YORK CITY LAW DEPARTMENT
[11] OFFICE OF THE CORPORATION COUNSEL
[12]    Attorneys for the Defendant
[13]    100 Church Street
[14]    New York, New York  10007
[15] BY:  PAUL MARKS, ESQ.,
[16]            of Counsel
[17]
[18]
[19] ALSO PRESENT:
[20]    Alvin Bragg, City Council
[21]
[22]
[23]
[24]
[25]

Page 3

[1]
[2]    IT IS HEREBY STIPULATED AND AGREED,
[3] by and between the attorneys for the
[4] respective parties hereto, that all
[5] objections, except as to form, shall be
[6] reserved to the time of trial.
[7]    IT IS FURTHER STIPULATED AND AGREED
[8] that the sealing and filing of the within
[9] deposition are hereby waived.
[10]    IT IS FURTHER STIPULATED AND AGREED
[11] that the within deposition may be
[12] subscribed and sworn to by the witness
[13] being examined before a Notary Public
[14] other than the Notary Public before whom
[15] this deposition was begun.
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 4

*C. D'Alba*

[2] CARL D 'ALBA,
[3] stating an address of 250 Broadway,
[4] New York, New York 10007, having been
[5] first duly sworn by a Notary Public
[6] of the State of New York, was
[7] examined and testified further as
[8] follows:
[9]    **EXAMINATION BY MR. WAREHAM:**
[10]    **Q:** Good morning, Mr. D'Alba. My
[11] name is Roger Wareham. I represent
[12] Mrs. Plummer in this action?
[13]    **A:** Good morning.
[14]    **Q:** I will just go through some
[15] preliminary steps.
[16]    Have you ever been deposed
[17] before?
[18]    **A:** Yes, sir.
[19]    **Q:** So you're familiar that you're
[20] under oath, you have to answer orally so that
[21] the reporter can put down your answer. If you
[22] don't understand anything I ask you, whether
[23] it's in form or content, just ask me and I
[24] will try to rephrase it.
[25]    Have you taken any medications or

Page 5

### C. D'Alba

[2] anything that would impair your ability to
[3] answer clearly today?
[4] **A:** No, I haven't.
[5] **Q:** What is your position with the
[6] city council?
[7] **A:** I am the director of security for
[8] the New York City Council.
[9] **Q:** How long have you been the
[10] director of security?
[11] **A:** Approximately a little over a
[12] year.
[13] **Q:** What did you do prior to that?
[14] **A:** I was a New York City detective.
[15] **Q:** How long were you a New York City
[16] detective?
[17] **A:** 21 years.
[18] **Q:** And you are retired now?
[19] **A:** Yes, sir, I am.
[20] **Q:** Do you receive a pension from New
[21] York City?
[22] **A:** Currently no, sir.
[23] **Q:** What does your job as director of
[24] security entail?
[25] **A:** The job entails security for all

Page 6

### C. D'Alba

[2] 51 council members, the offices at 250
[3] Broadway, 51 district offices for all the
[4] council members, the chambers at City Hall as
[5] well as the Speaker's office. Primarily the
[6] right side of City Hall.
[7] **Q:** Let me just go back a second.
[8] When you were with the NYPD what was your
[9] highest classification?
[10] **A:** First Detective, First Grade.
[11] **Q:** At stated meetings of the City
[12] Council who gives you directions in terms of
[13] any security matters or does anyone does give
[14] you directions in terms of security matters at
[15] stated meetings?
[16] **A:** It depends on what we're talking
[17] about. I am the director, and usually I give
[18] the orders. If there is something that I'm
[19] not clear about, then I'll ask for help.
[20] **Q:** Who would you ask for help?
[21] **A:** Primarily I would go to Chuck
[22] Mayer, the chief staff.
[23] **Q:** Are you familiar with the rules
[24] of the City Council on the issue of
[25] maintaining order in the stated meetings?

Page 7

### C. D'Alba

[2] **A:** Yes, sir, I am.
[3] **Q:** Who has responsibility for
[4] maintaining order at the stated meetings?
[5] **A:** The Sergeant-at-Arms have the
[6] responsibilities for maintaining the decorum
[7] of all hearings, stated council meetings.
[8] **Q:** Does the Sergeant-at-Arms have to
[9] take direction from anyone in that regard or
[10] can the Sergeant-at-Arms work on his or her
[11] own prerogative?
[12] **A:** To a degree.
[13] **Q:** Which elected official has the
[14] responsibility for maintaining order and
[15] decorum at the stated meetings, do you know?
[16] **A:** Yes, sir.
[17] **Q:** Who is that?
[18] **A:** It would be the Public Advocate
[19] as well as the Speaker of the City Council.
[20] **Q:** Do they have co-equal
[21] responsibility?
[22] **A:** I'm not sure of that.
[23] **Q:** Let me show you what has been
[24] marked Plaintiff's Exhibit 2, which is the
[25] Rules of the City Council. It's previously

Page 8

### C. D'Alba

[2] marked and I refer your attention to section
[3] 3.10?
[4] **A:** Okay.
[5] **Q:** Who is considered the presiding
[6] officer at the stated council meetings?
[7] **A:** That would be the Public
[8] Advocate.
[9] **Q:** And according to the rules, the
[10] person whose responsibility it is to preserve
[11] order and decorum, is it the Public Advocate
[12] at the Stated Meeting?
[13] **A:** According to 3.10?
[14] **Q:** Yes.
[15] **A:** It says the presiding officer and
[16] that would be the Public Advocate. She would
[17] be the presiding officer.
[18] **Q:** But you're saying that the
[19] speaker retains a responsibility to maintain
[20] order and decorum even if she's not the
[21] presiding officer at a particular meeting?
[22] **A:** Yes, she also is responsible for
[23] order.
[24] **Q:** If the Public Advocate or the
[25] presiding officer ascertains that there is a

Page 9

C. D'Alba

[1]
[2] need to maintain order and decorum they will
[3] direct you to do that or they'll direct Chuck
[4] Mayer, I mean, what's the process? How does
[5] that happen?
[6]     A: You're asking me about the Public
[7] Advocate.
[8]     Q: The Public Advocate, when the
[9] Public Advocate is the presiding officer at a
[10] Stated Meeting. If there is an occasion where
[11] the Public Advocate sees the need to preserve
[12] order and decorum, how will she communicate
[13] that?
[14]     A: She will communicate that to me.
[15]     Q: Directly?
[16]     A: Yes.
[17]     Q: Are you aware that there was a
[18] Stated Meeting of the council on May 30th,
[19] 2007?
[20]     A: Yes. Do I need this?
[21]     Q: No, you have to commit it to
[22] memory.
[23]     Prior to that meeting was there a
[24] meeting with the Public Advocate in terms of
[25] preparation for the Stated Meeting on

Page 10

C. D'Alba

[1]
[2] May 30th?
[3]     A: Yes, sir.
[4]     Q: Did you attend that meeting?
[5]     A: Yes.
[6]     Q: Do you remember who else was
[7] there?
[8]     A: Well, I can tell you this. There
[9] were several meetings that day that kind of
[10] like melted together. But at that particular
[11] meeting I believe it was myself, the Public
[12] Advocate, the Speaker, Chuck may have been
[13] there. And I'm not clear as to — I mean, he
[14] was there throughout the day, in and out of
[15] meetings. We had a lot of meetings that day.
[16]     Q: At that meeting were the Public
[17] Advocate and the Speaker, was there any
[18] discussion concerning security or concerns for
[19] that Stated Meeting that was coming up that
[20] afternoon?
[21]     A: Yes, sir.
[22]     Q: What were they?
[23]     A: The concern of the Speaker
[24] primarily was to let everybody's voice be
[25] heard. And she wanted — she made it clear

Page 11

C. D'Alba

[1]
[2] that she wanted — she didn't want to have
[3] anybody removed. She wanted, if there was
[4] somebody going — if somebody was going to
[5] voice their opinion, let them voice their
[6] opinion, give them a reasonable amount of time
[7] before trying to maintain order again. And
[8] she was very clear as to the fact that she
[9] wanted all sides to be heard, and she wanted
[10] everything to be peaceful, and as much as
[11] possible she wouldn't have anybody removed.
[12]     Q: What, if anything, was the
[13] response of the Public Advocate to the
[14] Speaker's position on that?
[15]     A: To my knowledge she agreed.
[16]     Q: You said there were several
[17] meetings that morning?
[18]     A: Yes.
[19]     Q: In preparation for that meeting?
[20]     A: Yes — well, in preparation for
[21] that meeting?
[22]     Q: Yes.
[23]     A: Not in preparation for that
[24] meeting, no.
[25]     Q: What were the security measures

Page 12

C. D'Alba

[1]
[2] taken for the meeting on May 30th, 2007?
[3]     A: Well, I had all of my men there,
[4] and when I say my men, all of my
[5] Sergeant-at-Arms.
[6]     Q: How many Sergeant-at-Arms?
[7]     A: I'd say at least eight men there,
[8] I don't know the exact number. But everybody
[9] that was on hand, it could have been more, I
[10] had there for that particular meeting.
[11]     Q: Do you normally have that amount
[12] of people there for a Stated Meeting?
[13]     A: No.
[14]     Q: How many do you normally have?
[15]     A: We have about six.
[16]     Q: Why did you see the need to have
[17] more people there?
[18]     A: We anticipated the public in the
[19] balcony to be boisterous, and we anticipated
[20] people yelling and screaming, so we wanted to
[21] be prepared for that.
[22]     Q: And what steps, what role did the
[23] New York City Police Department play in terms
[24] of the security that day?
[25]     A: Well normally in NYPD will

Page 13

C. D'Alba

[1]
[2] provide a uniformed officer, one or two for
[3] the meeting. We requested that there would be
[4] additional officers just in case. I should
[5] actually say, I requested that and they also
[6] agreed. How many officer they had, I don't
[7] know.
[8]     Q: Were there officers on the floor
[9] or in the balcony or both?
[10]     A: We're talking NYPD?
[11]     Q: NYPD.
[12]     A: To the best of my recollection,
[13] we had officers on the main floor as well as
[14] the balcony.
[15]     Q: In the event of a disturbance who
[16] gives directions to the New York City Police
[17] Department Officers that are in the building?
[18]     A: Well, it's worked out between
[19] myself and Lieutenant Brennan.
[20]     Q: And Lieutenant Brennan is?
[21]     A: He is in charge of the security
[22] NYPD portion, uniformed detail for City Hall.
[23]     Q: When you worked for the NYPD were
[24] you ever assigned to City Hall?
[25]     A: In what capacity?

Page 14

C. D'Alba

[1]
[2]     Q: For the City Hall detail?
[3]     A: No.
[4]     Q: If the Public Advocate, during a
[5] Stated Meeting, if the Public Advocate sees a
[6] need to clear the room she will direct that
[7] request to you?
[8]     A: Or the Sergeant-at-Arms, which
[9] will be Elias Cabrera or any of the
[10] Sergeant-at-Arms that are uniformed. It
[11] doesn't have to be specifically go to me.
[12] Whoever is — basically whoever is near the
[13] disturbance, she will order that particular
[14] Sergeant-at-Arms to remove that person or to
[15] have them quiet down. She'll also bang the
[16] gavel.
[17]     Q: If the speaker, even though she
[18] was not presiding in meetings, saw the need to
[19] clear the room, could she direct that to you
[20] or would she direct it to the Public Advocate?
[21]     A: She would let me know and then
[22] she would forward a message to the Public
[23] Advocate.
[24]     Q: On the Stated Meeting of
[25] May 30th, 2007, were you there for the entire

Page 15

C. D'Alba

[1]
[2] meeting?
[3]     A: Yes, sir.
[4]     Q: Did you during that meeting, did
[5] you see Mrs. Plummer engage in what you've
[6] called disruptive behavior?
[7]     A: Yes, sir.
[8]     Q: What was the nature of that
[9] behavior? Could you describe what that
[10] behavior was?
[11]     A: She was yelling out loud, very,
[12] very boisterous, interrupting the speakers
[13] that were on the floor during their
[14] statements.
[15]     Q: How often did that happen?
[16]     A: Several times during the course
[17] of the meeting she was yelling.
[18]     Q: And what did she say? What words
[19] did she use?
[20]     A: Particularly I don't remember. I
[21] remember her saying she was calling, I
[22] believe, Councilman Nelson a liar. Things of
[23] that nature.
[24]     Q: What, if any, was the response of
[25] the presiding officer?

Page 16

C. D'Alba

[1]
[2]     A: Several times throughout the
[3] meeting Ms. Gotbaum hit the gavel and asked
[4] for quiet in the room. I mean, a number, a
[5] number, number of times she did that.
[6]     Q: And was Mrs. Plummer the only one
[7] who was yelling out loud and being very
[8] boisterous at the meeting?
[9]     A: On the main floor?
[10]     Q: Wherever. Okay, first on the
[11] main floor?
[12]     A: Yes, she was, yes.
[13]     Q: No one else was yelling out loud
[14] or being very boisterous on the main floor?
[15]     A: No.
[16]     Q: What about in the balcony?
[17]     A: Yes, absolutely in the balcony.
[18]     Q: When the Public Advocate banged
[19] her gavel and asked for quiet, was she
[20] directing that at Mrs. Plummer?
[21]     A: I can't answer for the Public
[22] Advocate.
[23]     Q: Did the Public Advocate ever
[24] direct you to have Mrs. Plummer removed from
[25] the room?

Page 17

*C. D'Alba*

[1]
[2] **A:** No, but at one point I did
[3] overhear the Public Advocate ask to remove
[4] someone, but I was not in direct eye contact
[5] with the Public Advocate.
[6] **Q:** So you don't know who that was?
[7] **A:** No.
[8] **Q:** At some point in time did you
[9] approach Mrs. Plummer while she was yelling
[10] out loud?
[11] **A:** Yes, sir.
[12] **Q:** Who directed you to approach
[13] Mrs. Plummer?
[14] **MR. MARKS:** Objection to form,
[15] but you can answer.
[16] **A:** Prior to that the chief of staff,
[17] Chuck Mayer, had pointed out to me pointed —
[18] pointed to the vicinity in which Mrs. Plummer
[19] was seated and said, go check it out, see
[20] what's going on over there.
[21]     At that point I walked over to
[22] the vicinity to where Mrs. Plummer was
[23] sitting, and I asked her to be quiet.
[24] **Q:** In the vicinity where
[25] Mrs. Plummer was sitting, who else was sitting

Page 18

*C. D'Alba*

[1]
[2] there if you know? Was she sitting by
[3] herself?
[4] **A:** No, she wasn't sitting by
[5] herself.
[6] **Q:** Do you know who else was sitting
[7] by her?
[8] **A:** I don't know who was sitting by
[9] her particularly, but I believe it was people
[10] in her staff.
[11] **Q:** Was she sitting near Councilman
[12] Barron, Mrs. Plummer?
[13] **A:** Yes, she was on the right hand
[14] side of Mr. Barron, Councilman Barron.
[15] **Q:** And when you approached
[16] Mrs. Plummer and you said to her, to be quiet,
[17] is that the term?
[18] **A:** I asked her to be quiet, yes.
[19] **Q:** When you said that to her what
[20] was her response, if any?
[21] **A:** When I asked her that she had
[22] been up in her seat and then she sat down
[23] briefly and then continued.
[24] **Q:** When you asked her that where
[25] were you standing when you asked her that?

Page 19

*C. D'Alba*

[1]
[2] Were you standing in front of her, to the
[3] side, where were you standing when you asked
[4] her that?
[5] **A:** I was not standing in front of
[6] her. I was standing in the aisle approaching
[7] her.
[8] **Q:** And did she do anything to
[9] indicate that she — did she turn around when
[10] you said that, when you spoke with her?
[11] **A:** I made direct eye contact with
[12] Mrs. Plummer.
[13] **Q:** And you said to her, be quiet.
[14] Did she say anything to you?
[15] **A:** No, sir.
[16] **Q:** And you're saying she was
[17] standing up and then she sat down?
[18] **A:** Yes. She was up our — I
[19] remember her being up, not fully standing, but
[20] up out of her seat, looking to the rear.
[21] **Q:** And at that point in time when
[22] that happened do you know were one of the
[23] council members speaking at that point?
[24] **A:** I don't remember offhand who was
[25] speaking.

Page 20

*C. D'Alba*

[1]
[2] **Q:** So you don't know what she was
[3] looking at when she was looking to the rear?
[4] **A:** No.
[5] **Q:** But your testimony is that you
[6] made direct eye contact with her?
[7] **A:** Yes.
[8] **Q:** That to your understanding she
[9] heard you say be quiet, and that she then sat
[10] down after you said that?
[11] **A:** Yes, sir.
[12] **Q:** And then she got right back up?
[13] **A:** No, sir.
[14] **Q:** So she sat down, and then what
[15] did you do after that?
[16] **A:** I returned to the middle isle.
[17] **Q:** At what point did she get back
[18] up?
[19] **A:** She didn't stand up again to my
[20] knowledge.
[21] **Q:** I'm sorry. I thought you
[22] testified that she sat down and then stood
[23] back up. Okay.
[24]     After you returned to the isle
[25] did she make any more loud and boisterous

Page 21

### C. D'Alba

[2] comments?

[3] **A:** Yes, sir.

[4] **Q:** At that point did you return to
[5] her again?

[6] **A:** No, sir.

[7] **Q:** Did you seek guidance from the
[8] Speaker or from Chuck; did you seek guidance
[9] from anyone around about what to do when she
[10] continued to make outbursts?

[11] **A:** No, sir.

[12] **Q:** Did Mrs. Plummer's conduct
[13] prevent the vote on the amendment that
[14] Councilman Vann put forward about Sonny Carson
[15] from going on?

[16] **A:** Prevent the vote?

[17] **Q:** Yes.

[18] **A:** No, sir.

[19] **Q:** Did Mrs. Plummer's conduct
[20] prevent the vote on the package of co-names
[21] from being carried out, if you remember?

[22] **A:** No.

[23] **Q:** To your recollection, did the
[24] council complete its agenda for that day?

[25] **A:** Yes, sir, they did, sir.

Page 22

### C. D'Alba

[2] **Q:** Was anyone asked to leave the
[3] chamber that day?

[4] **A:** Not to my knowledge, sir.

[5] **Q:** Was anyone arrested for
[6] disruptive conduct that day?

[7] **A:** No, sir.

[8] **Q:** When you went and spoke with
[9] Mrs. Plummer and asked her to be quiet, was
[10] anyone with you, was one of your
[11] Sergeant-at-Arms with you?

[12] **A:** No, sir.

[13] **Q:** Was there anyone else who heard
[14] you say that that you know of?

[15] **A:** I wouldn't know.

[16] **Q:** Did you speak to Councilman
[17] Barron when you went over? He was close to
[18] you when you spoke to Mrs. Plummer, correct,
[19] Councilman Barron's seat was adjacent?

[20] **A:** The next isle.

[21] **Q:** Did you say anything to
[22] Councilman Barron about Mrs. Plummer's conduct
[23] at that time?

[24] **A:** About her conduct?

[25] **Q:** About her conduct, yes, at the

Page 23

### C. D'Alba

[2] meeting.

[3] **A:** No, sir.

[4] **Q:** Was there a point in time when
[5] you were told that Mrs. Plummer had made a
[6] comment about assassinating Councilman
[7] Comrie's ass?

[8] **A:** Was there a point in time, yes,
[9] there was.

[10] **Q:** Did you hear the actual comment
[11] yourself?

[12] **A:** No, sir, I did not.

[13] **Q:** Who brought it to your attention?

[14] **A:** Chuck Mayer.

[15] **Q:** When was that?

[16] **A:** The day of the press conference,
[17] right after the press conference he called me.

[18] **Q:** You say it was a press
[19] conference. Did you see a press conference
[20] occurring?

[21] **A:** As the press conference was
[22] happening on the steps, I did witness it, but
[23] I was not there for the press conference.

[24] **Q:** And this was on the steps of City
[25] Hall?

Page 24

### C. D'Alba

[2] **A:** I believe so, yes.

[3] **Q:** And someone told you that the
[4] comments were made by Mrs. Plummer while she
[5] was standing on the steps of City Hall?

[6] **A:** Chuck Mayer told me of the
[7] assassination comments that Mrs. Plummer made,
[8] yes.

[9] **Q:** What did you do when you heard
[10] the report of the comments?

[11] **A:** I made a mental note of it, and I
[12] asked what would you like me to do at this
[13] point? I contacted Councilman Comrie's staff,
[14] I don't remember exactly who I spoke to. And
[15] that's what I did.

[16] **Q:** Did you approach Mrs. Plummer to
[17] ask her whether the comment was accurate?

[18] **A:** I had no conversation with
[19] Mrs. Plummer in regards to that.

[20] **Q:** And you didn't ask her what she
[21] meant by that, you had no conversation with
[22] her about it at all?

[23] **A:** No, sir, I didn't.

[24] **Q:** When you heard the comment, what
[25] was your reaction?

Page 25

### C. D'Alba

[1]
[2]   **A:** When I heard the comment from —
[3]   **Q:** When you heard the report of the
[4] comment, what was your reaction?
[5]   **A:** I was kind of surprised of the
[6] context of it, yes.
[7]   **Q:** And by context you mean?
[8]   **A:** Of the word, using the word
[9] assassination.
[10]   **Q:** Did you personally think that she
[11] meant to, she was going to assassinate
[12] Councilman Comrie?
[13]   **A:** Personally I take every threat
[14] seriously. I mean, in my line of business
[15] there is no room for your own opinion. And
[16] you have to take each threat as face value, as
[17] a threat. You treat it as such.
[18]   **Q:** That's your professional response
[19] to it?
[20]   **A:** Yes, sir.
[21]   **Q:** Personally, did you think that
[22] Mrs. Plummer meant to assassinate Council
[23] member Comrie?
[24]   **A:** At that time I didn't form an
[25] opinion.

Page 26

### C. D'Alba

[1]
[2]   **Q:** You take every threat,
[3] professionally, you take every threat
[4] seriously and you take steps to address it?
[5]   **A:** Yes, sir.
[6]   **Q:** When Council member Vallone said
[7] that —
[8]   **A:** Council member?
[9]   **Q:** Vallone said that Con Edison
[10] should be strung from a lamp post, the
[11] executives of Con Edison should be truck from
[12] a lamp post, did you take any steps to deal
[13] with that?
[14]   **MR. MARKS:** Objection to form,
[15] but you can answer.
[16]   **A:** That didn't come to me as a
[17] threat. So I didn't really think about it
[18] very much.
[19]   **Q:** Did you notify the police
[20] department?
[21]   **A:** I believe —
[22]   **MR. MARKS:** In relation to?
[23]   **Q:** I'm sorry. In relation to
[24] Mrs. Plummer's comments around Council member
[25] Comrie's ass?

Page 27

### C. D'Alba

[1]
[2]   **A:** Personally, I did not.
[3]   **Q:** Do you know who did? Did anyone?
[4]   **A:** I believe Councilman Comrie did.
[5]   **Q:** You met with Councilman Comrie?
[6]   **A:** Yes, sir.
[7]   **Q:** Did you suggest to him that he
[8] should notify the police?
[9]   **A:** I asked him if he would like to
[10] notify the police, I would help him negotiate
[11] that. But I didn't make any suggestion, one
[12] way or the other, what he should do.
[13]   **Q:** What was Councilman Comrie's
[14] response to this comment, to Mrs. Plummer's
[15] comment? What was his response in terms of —
[16] withdrawn.
[17]   Did Councilman Comrie ask for
[18] security?
[19]   **A:** Not to my knowledge, and I don't
[20] know of it.
[21]   **Q:** Was security supplied to Council
[22] member Comrie?
[23]   **A:** I do not believe so.
[24]   **Q:** If security were, would the
[25] security come from your office?

Page 28

### C. D'Alba

[1]
[2]   **A:** Well, it's two fold.
[3]   **Q:** Okay.
[4]   **A:** Threat assessment would be
[5] advised. They would come in and they would
[6] make a determination. At that point, NYPD officers
[7] can be assigned if warranted.
[8]
[9]   **Q:** Threat assessment is a NYPD unit?
[10]   **A:** Yes.
[11]   **Q:** But your security doesn't have
[12] the capacity to make that type of assessment?
[13]   **A:** I'd ask the Council member
[14] personally, if he wanted me, I would be more
[15] than happy to, you know, stay with him, travel
[16] with him, go to his events, as I did with
[17] Mr. Barron.
[18]   **Q:** But Council member Comrie did not
[19] ask you to do that?
[20]   **A:** No, sir.
[21]   **Q:** So to your knowledge, did the
[22] NYPD threat assessment unit make an assessment
[23] of Mrs. Plummer's comments?
[24]   **A:** I believe they did not. I don't
[25] believe they were called.

Carl D'Alba    Case 1:07-cv-06154-WHP    Document 24-8    Filed 10/30/2007    Page 9 of 41    Viola Plummer v.

Vol. 1, August 15, 2007                Christine Quinn, Speaker of the City Council

---

Page 29

### C. D'Alba

[1]
[2] **Q:** And you said you're not aware of
[3] whether or not the NYPD assigned security to
[4] Council member Comrie?
[5] **A:** That's correct.
[6] **Q:** During your tenure as director of
[7] security have there been any other stated
[8] meetings where there were disruptions?
[9] **A:** Stated meetings — not to my
[10] knowledge.
[11] **Q:** Have there been any other
[12] meetings where Mrs. Plummer engaged in
[13] disruptive conduct?
[14] **A:** Any other stated council member
[15] meetings?
[16] **Q:** Committee meetings as well,
[17] stated meetings, committee meeting?
[18] **A:** Hearings, yes.
[19] **Q:** Let me back up a second. There
[20] were stated meetings on June 13th and
[21] June 27th of 2007, correct?
[22] **A:** Yes, sir.
[23] **Q:** Were you present at those
[24] meetings?
[25] **A:** Yes, sir.

---

Page 30

### C. D'Alba

[1]
[2] **Q:** Was Mrs. Plummer present?
[3] **A:** I'm not entirely sure.
[4] **Q:** Were there any disruptions at
[5] those meetings that you went to?
[6] **A:** Not to my knowledge.
[7] **Q:** Now you said there were committee
[8] meetings or meetings where Mrs. Plummer was
[9] engaged in disruptive conduct?
[10] **A:** Hearings, that I recall of, yes.
[11] **Q:** When were there?
[12] **A:** I don't have specific dates, but
[13] Councilman Vallone brought it to my attention.
[14] **Q:** Did he indicate, without the
[15] date, what the hearing was about, when
[16] approximately, when it was?
[17] **A:** I was there actually at the
[18] hearing and I couldn't tell you the date.
[19] **Q:** Did you witness the disruptive
[20] conduct that Mrs. Plummer engaged in at that
[21] hearing?
[22] **A:** No, I did not.
[23] **Q:** But you were there for the entire
[24] meeting?
[25] **A:** I was there for the meeting and

---

Page 31

### C. D'Alba

[1]
[2] — I wasn't there for the entire meeting and
[3] Councilman Vallone brought it to my attention.
[4] He pointed Mrs. Plummer out and explained to
[5] me what had happened.
[6] **Q:** What did Councilman Vallone say
[7] had happened?
[8] **A:** He said that she was interrupting
[9] the hearing by making loud statements.
[10] **Q:** Did he indicate what the loud
[11] statements were?
[12] **A:** He probably did, I don't remember
[13] offhand.
[14] **Q:** This was a meeting that he was
[15] chairing?
[16] **A:** He was the chair, yes.
[17] **Q:** And as chair, he had the
[18] authority to have anyone removed from the
[19] meeting?
[20] **A:** Yes, sir.
[21] **Q:** Did he have Mrs. Plummer removed
[22] from the meeting?
[23] **A:** Not to my knowledge, sir, no.
[24] **Q:** At what point did he bring this
[25] to your attention, during the meeting?

---

Page 32

### C. D'Alba

[1]
[2] **A:** During the meeting and after the
[3] meeting.
[4] **Q:** Did he ask you to do anything
[5] about it?
[6] **A:** Yes, he did.
[7] **Q:** What did he ask you to do?
[8] **A:** He asked me to look into having
[9] Mrs. Plummer banned from all of his hearings.
[10] **Q:** What was the result of his
[11] request, what did you do?
[12] **A:** We did not ban her. We let her
[13] continue to go to hearings and if the problem
[14] persisted then at that point we made a
[15] decision to see what would happen.
[16] **Q:** Did you communicate Councilman
[17] Vallone's concerns to Mrs. Plummer?
[18] **A:** I did not.
[19] **Q:** Did you instruct anyone to
[20] communicate Councilman Vallone's concerns to
[21] Mrs. Plummer?
[22] **A:** I did not.
[23] **Q:** Do you know whether Councilman
[24] Vallone spoke to Mrs. Plummer?
[25] **A:** I have no idea, sir.

---

Page 33

*C. D'Alba*

[1]
[2] **Q:** Do you know if Councilman Vallone
[3] spoke to Councilman Barron about this?
[4] **A:** I have no idea, sir.
[5] **Q:** Did you speak to Council member
[6] Barron about this?
[7] **A:** No, sir.
[8] **Q:** Did you instruct anyone to speak
[9] to Council member Barron about it?
[10] **A:** No, sir.
[11] **Q:** So this plan that you just set
[12] out, that you were allowed to attend
[13] committee meetings and if something happened
[14] in the future she would be banned, was never
[15] communicated to her?
[16] **MR. MARKS:** Objection to the
[17] form. You can answer.
[18] **A:** Not that she would be banned but
[19] at that point she would be advised and be
[20] spoken to and say, this conduct cannot be
[21] continued, and this would be the result.
[22] **Q:** But no one ever communicated that
[23] to her?
[24] **A:** No, sir.
[25] **Q:** That was a plan that security had

Page 34

*C. D'Alba*

[1]
[2] but was never communicated to her?
[3] **A:** That was my plan, sir.
[4] **Q:** That was your plan. Similarly,
[5] back at Stated Meeting on May 30th did you
[6] communicate to Mrs. Plummer that if she
[7] continued to be disruptive she faced
[8] suspension from her job?
[9] **A:** From the May 30th meeting?
[10] **Q:** Yes.
[11] **A:** I had no such conversation.
[12] **Q:** Did the speaker communicate to
[13] you that if Mrs. Plummer continued to be
[14] disruptive she would face suspension from her
[15] job during the meeting of May 30th, 2007?
[16] **A:** No, sir.
[17] **Q:** Aside from Council member
[18] Vallone's complaint at that hearing what other
[19] committee hearings or meetings was
[20] Mrs. Plummer disruptive at?
[21] **A:** None that I'm aware of, sir.
[22] **Q:** Do you remember swearing out an
[23] affidavit that was submitted as part of the
[24] speaker's response to opposing a motion for a
[25] preliminary injunction that we had filed in

Page 35

*C. D'Alba*

[1]
[2] this case?
[3] **A:** Excuse me, sir?
[4] **Q:** Do you remember filling out —
[5] swearing to an affidavit on July 3rd, 2007
[6] concerning Mrs. Plummer's conduct at the
[7] Stated Meeting?
[8] **A:** Yes, sir, I do.
[9] **MR. WAREHAM:** This will be
[10] Plaintiff's 13.
[11]    (Plaintiff's Exhibit 13,
[12] Affidavit, was marked for
[13] identification, as of this date.)
[14] **MR. WAREHAM:** The second page is
[15] stapled backwards.
[16] **MR. MARKS:** Okay.
[17] **Q:** In preparation for this
[18] deposition, did you review any documents?
[19] **A:** Yes, sir.
[20] **Q:** Which documents did you review?
[21] **A:** This particular one.
[22] **Q:** So you're familiar with it. In
[23] paragraph 11 of your affidavit, you refer to
[24] an incident that occurred approximately
[25] two days after the May 30th, 2007 Stated

Page 36

*C. D'Alba*

[1]
[2] Meeting involving your Sergeant-at-Arms.
[3]    Can you just flush that out in
[4] terms of what exactly the Sergeant-at-Arms
[5] told you happened that day?
[6] **A:** He told me that there were was
[7] some kind of altercation between Councilman
[8] Comrie and Mrs. Plummer in the hallway.
[9] **Q:** In the hallway where?
[10] **A:** I believe, on the 18th floor.
[11] **Q:** And what was the nature of the
[12] altercation?
[13] **A:** That I don't know. But they
[14] exchanged words. I don't know if they were
[15] coming off the elevator together, or one was
[16] going on the elevator and one was coming off
[17] the elevator, or going into their offices.
[18] You'd have to ask my Sergeant-at-Arms in
[19] particular.
[20] **Q:** Which Sergeant-at-Arms is that?
[21] **A:** Israel Martinez.
[22] **Q:** Was the location in the area, the
[23] elevator area or in the hallway where the
[24] offices are?
[25] **A:** I'm really not sure, I'd be

**Carl D'Alba**                    Case 1:07-cv-06154-WHP    Document 24-8    Filed 10/30/2007    Page 11 of 41
**Vol. 1, August 15, 2007**                                                 **Viola Plummer v.**
                                                                            **Christine Quinn, Speaker of the City Council**

---

Page 37

C. D'Alba

[1] speculating.

[3]   **Q:** And altercation, was there

[4] physical contact?

[5]   **A:** That wasn't conveyed to me.

[6] Verbal.

[7]   **Q:** It's verbal. And did you ask him

[8] specifically what happened?

[9]   **A:** I did.

[10]   **Q:** What did he tell you?

[11]   **A:** He told me that the Council

[12] member as well as Mrs. Plummer exchanged

[13] words, and were going back and forth at each

[14] other in the hallway.

[15]   **Q:** Exchanged words. I mean, they

[16] were cursing at each other? Did you try to

[17] find out?

[18]   **A:** I have no idea.

[19]   **Q:** Did you try to find out

[20] specifically what it was?

[21]   **A:** I don't remember.

[22]   **Q:** In your affidavit you said that

[23] Mrs. Plummer called Council member Comrie

[24] derisive names. What did that mean to you,

[25] what were the derisive names? He must have

---

Page 38

C. D'Alba

[2] told you something or did he say, Mrs. Plummer

[3] called Councilman Comrie derisive names?

[4]   **A:** Yes, I don't remember exactly

[5] what he had said.

[6]   **Q:** But at the time you swore out the

[7] affidavit you summed up that what those words

[8] were derisive?

[9]   **A:** Yes.

[10]   **Q:** When did he inform you of this?

[11]   **A:** I believe the day of, later on

[12] that evening, I believe.

[13]   **Q:** You indicated was on or about

[14] June 1st?

[15]   **A:** Yes, that could be that's —

[16]   **Q:** Did you speak to Council member

[17] Comrie about that, about the incident?

[18]   **A:** No, I did not.

[19]   **Q:** Did you question him or ask him

[20] what happened, did he want to do anything

[21] about it?

[22]   **A:** No, sir.

[23]   **Q:** Did you suggest that he get

[24] security, this is a day or so after the

[25] May 30th?

---

Page 39

C. D'Alba

[2]   **A:** Well we have the Sergeant-at-Arms

[3] there on the floor.

[4]   **Q:** Did the Sergeant-at-Arms call you

[5] immediately when that happened or when did he

[6] notify you? Immediately at the time it

[7] happened?

[8]   **A:** No, sir, I don't believe so.

[9]   **Q:** So he didn't see it as something

[10] so urgent that it required an immediate

[11] response?

[12]   **MR. MARKS:** Objection to form.

[13] You can answer.

[14]   **A:** I have no opinion as to that.

[15]   **Q:** Are your Sergeants-at-arms

[16] instructed to — is the normal procedure for

[17] them to inform you when there is an urgent

[18] situation that needs to be addressed?

[19]   **A:** They would inform their immediate

[20] supervisor.

[21]   **Q:** Who was Mr. Martinez's immediate

[22] supervisor?

[23]   **A:** That would be Elias Cabrera and

[24] Ralph Martinez.

[25]   **Q:** Do you know whether he informed

---

Page 40

C. D'Alba

[2] either of them immediately?

[3]   **A:** Ralph Perez, I'm sorry.

[4] No, he did not.

[5]   **Q:** Is there a Sergeant-at-Arms on

[6] each floor where Council members have offices?

[7]   **A:** That depends on the day, sir.

[8]   **Q:** Is the Sergeant-at-Arms normally

[9] seated at the or situated at the desk in front

[10] of the elevator bank?

[11]   **A:** Their desk is located in front of

[12] the elevator bank, yes.

[13]   **Q:** Is that where they're stationed,

[14] if a Sergeant-at-Arms is stationed on the 18th

[15] floor that's his station?

[16]   **A:** Yes, they're assigned the lobby,

[17] yes.

[18]   **Q:** The lobby, okay. They don't

[19] normally go inside the office areas, those

[20] locked doors?

[21]   **A:** They can. They're instructed to

[22] go inside the office areas because we do

[23] vertical patrols of the staircases.

[24]   **Q:** So part of their assignment is

[25] not just the lobby area but also to go inside

---

Page 41

**C. D'Alba**

[1]
[2] the office areas?
[3]    **A:** Yes, sir.
[4]    **Q:** In your affidavit of July 3rd, in
[5] paragraph 12, you state that you had to
[6] respond to security threats to council member
[7] Charles Barron that resulted from
[8] Mrs. Plummer's conduct.
[9]    **A:** Yes.
[10]    **Q:** And then you indicated you also
[11] responded to there being threatening flyers
[12] plastered on the outside of Council member
[13] Barron's district office by persons who
[14] apparently was displeased by Mrs. Plummer's
[15] conduct?
[16]    **A:** Yes.
[17]    **Q:** What were the flyers that were
[18] posted on Council member Barron's office?
[19]    **A:** What were they?
[20]    **Q:** What did they say?
[21]    **A:** I don't have one in front of me.
[22] But it was a Jewish organization, I couldn't
[23] tell you what it said word for word.
[24]    **Q:** Did it speak to — did it mention
[25] Mrs. Plummer in the flyer?

Page 42

**C. D'Alba**

[1]
[2]    **A:** Yes, her name was mentioned and
[3] also Councilman Barron's name was mentioned.
[4]    **MR. MARKS:** Would you like a copy
[5] of the flyer?
[6]    **MR. WAREHAM:** Sure.
[7]    **MR. MARKS:** It's not Bates
[8] stamped or anything but I will just
[9] give you a copy of the flyer.
[10]    **MR. WAREHAM:** Thank you.
[11]    **MR. MARKS:** If you want extra
[12] copies made for an exhibit for the
[13] deposition we can do that.
[14]    **MR. WAREHAM:** Okay.
[15]    **MR. MARKS:** Just let the record
[16] reflect that I gave Mr. Wareham a copy
[17] of the flyer that is referred to in
[18] paragraph 12 of Mr. D'Alba's affidavit.
[19]    **MR. WAREHAM:** I guess we'll get a
[20] copy and put it in as Plaintiff's 14.
[21]    **MR. MARKS:** Do you want me to
[22] make this extra copy now?
[23]    **MR. WAREHAM:** Yes, we'll stop for
[24] a second.
[25]    (Recess.)

Page 43

**C. D'Alba**

[1]
[2]    (Plaintiff's Exhibit 14, flyer,
[3] was marked for identification, as of
[4] this date.)
[5]    **Q:** Let's look at Plaintiff's 14,
[6] please. This is the flyer that you said was
[7] posted on the wall?
[8]    **A:** Yes, sir.
[9]    **MR. MARKS:** He didn't say wall
[10] but he said —
[11]    **Q:** On the offices of Council member
[12] Barron, the district offices?
[13]    **A:** Yes.
[14]    **Q:** In East New York?
[15]    **A:** Yes.
[16]    **Q:** And you concluded from that flyer
[17] that it was Mrs. Plummer's conduct which was
[18] the focus of that flyer?
[19]    **A:** Yeah, her remarks as to the
[20] assassination, absolutely, yes, sir.
[21]    **Q:** The flyer speaks to Charles
[22] Barron as well?
[23]    **A:** Yes, sir.
[24]    **Q:** And Sonny Carson?
[25]    **A:** Yes, sir.

Page 44

**C. D'Alba**

[1]
[2]    **Q:** But your conclusion is that it
[3] was mainly because of Mrs. Plummer that this
[4] flyer was posted?
[5]    **A:** I didn't say mainly. It had to
[6] do with it, yes, sir.
[7]    **Q:** And because of that, you had to
[8] respond in terms of security?
[9]    **A:** Yes, sir, I did.
[10]    **Q:** And Councilman Barron requested
[11] it?
[12]    **A:** Did he request it? I don't know
[13] that he requested the security. I showed up
[14] at the district office, and I offered my
[15] services.
[16]    **Q:** And did he accept your services?
[17]    **A:** As far as providing security for
[18] Mr. Barron?
[19]    **Q:** Well you said you offered — what
[20] services did you offer him?
[21]    **A:** Well I offered — I said to
[22] Mr. Barron that if you needed I would stay at
[23] the district office for as long as you needed
[24] me to. I would, you know, I would go with him
[25] to his events if he felt uncomfortable in any

Page 45

**C. D'Alba**

[1]
[2] way or manner. I checked in regularly with
[3] staff as far as their well being. Those are
[4] the services that I offered.
[5]    He had already contacted threat
[6] assessment and the local precinct — I don't
[7] know if he did it or his staff did it.
[8]    **Q:** So he didn't take you up on your
[9] offer?
[10]    **A:** He said he felt comfortable, and
[11] at this point in time he was fine. He was
[12] worried, he was very concerned about his
[13] staff.
[14]    **Q:** Do you remember in the early part
[15] of July contacting or e-mailing Chuck Mayer
[16] about how he would like you to handle
[17] Mrs. Plummer in the event she decides she does
[18] not want to abide by the rules regarding
[19] civilians?
[20]    **A:** I don't remember the e-mail
[21] particularly, no.
[22]    **Q:** Let me show you what was marked
[23] Plaintiff's 12.
[24]    **A:** Okay.
[25]    **Q:** Does that refresh your

Page 46

**C. D'Alba**

[1]
[2] recollection?
[3]    **A:** Yes, sir.
[4]    **Q:** What were you referring to in
[5] terms of Mrs. Plummer abiding — refusal to
[6] abide by rules of civilians?
[7]    **A:** I believe this was — I don't
[8] believe this was in reference to City Hall.
[9] This was in reference again, to the best of my
[10] recollection, to Mrs. Plummer's entrance into
[11] 250 Broadway.
[12]    **Q:** Can you just — what about her
[13] entrance into 250 Broadway?
[14]    **A:** Well at this point in time I'm
[15] not sure exactly, but I believe her
[16] identification had been de activated and we
[17] were going to be treating Mrs. Plummer as a
[18] civilian member. And which would mean that
[19] she would have to go to the desk and present
[20] herself to the Sergeant-at-Arms, at which time
[21] he would call upstairs to see — to make sure
[22] that somebody was up there to receive her.
[23] That's what we do for all civilians. I'm
[24] pretty sure that's what this is.
[25]    **Q:** Thank you.

Page 47

**C. D'Alba**

[1]
[2]    **MR. WAREHAM:** I have no further
[3] questions at this time.
[4]    **MR. MARKS:** I have no questions.
[5]    (Time noted: 11:29 a.m.)
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 48

**C. D'Alba**

[1]
[2]
[3] I, the witness herein, having
[4] read the foregoing testimony do hereby
[5] certify it to be a true and correct
[6] transcript, subject to the corrections,
[7] if any, shown on the attached page.
[8]
[9]
[10]
[11]    **CARL D'ALBA**
[12]
[13]
[14]
[15]
[16] Subscribed and sworn to
[17] before me this _____ day
[18] of _____, 2007.
[19]
[20]
[21]
[22]
[23]
[24]
[25]



Page 49

[1]        C. D'Alba
[2]            INDEX
[3] WITNESS      EXAMINATION BY   PAGE
[4] CARL D'ALBA   MR. WAREHAM      4
[5]
[6]
[7]          EXHIBITS
[8] PLAINTIFF'S          PAGE LINE
[9] 13    Affidavit      35  11
[10] 14    Flyer         43  2

Page 51

Page 50

[1]
[2]        CERTIFICATE
[3] STATE OF NEW YORK )
[4]                    :ss.:
[5] COUNTY OF NEW YORK)
[6]
[7]    I, Vicky Galitsis, a Certified
[8] Shorthand Reporter and Notary Public within
[9] and for the State of New York, do hereby
[10] certify:
[11]    That, CARL D'ALBA, the witness whose
[12] deposition is hereinbefore set forth, was
[13] duly sworn by me and that such deposition is
[14] a true record of the testimony given by such
[15] witness.
[16]    I further certify that I am not
[17] related to any of the parties to this action
[18] by blood or marriage that I am in no way
[19] interested in the outcome of this matter.
[20]    In witness whereof, I have hereunto
[21] set my hand this 21st of August 2007.
[22]
[23]
[24]
[25]        VICKY GALITSIS, CSR

**Lawyer's Notes**

# 1

10007 4:4
11:29 47:5
12 41:5; 45:23
13 35:10, 11
13th 29:20
14 42:20; 43:2, 5
18th 36:10; 40:14
1st 38:14

# 2

2007 9:19; 12:2; 14:25; 29:21; 34:15; 35:5, 25; 48:18
250 4:3; 6:2; 46:11, 13
27th 29:21

# 3

3.10 8:3, 13
30th 9:18; 10:2; 12:2; 14:25; 34:5, 9, 15; 35:25; 38:25
3rd 35:5; 41:4

# A

a.m 47:5
abide 45:18; 46:6
abiding 46:5
ability 5:2
absolutely 16:17; 43:20
accept 44:16
according 8:9, 13
accurate 24:17
action 4:12
activated 46:16
actual 23:10
actually 13:5; 30:17
additional 13:4
address 4:3; 26:4; 39:18
adjacent 22:19
advised 28:5; 33:19
Advocate 7:18; 8:8, 11, 16, 24; 9:7, 8, 9, 11, 24; 10:12, 17; 11:13; 14:4, 5, 20, 23; 16:18, 22, 23; 17:3, 5
affidavit 34:23; 35:5, 12, 23; 37:22; 38:7; 41:4; 42:18
afternoon 10:20
again 11:7; 20:19; 21:5; 46:9
agenda 21:24
agreed 11:15; 13:6
aisle 19:6
ALBA 4:2

allowing 33:12
altercation 36:7, 12; 37:3
amendment 21:13
amount 11:6; 12:11
anticipated 12:18, 19
apparently 41:14
approach 17:9, 12; 24:16; 18:15; 19:6
Approximately 5:11; 30:16; 35:24
area 36:22, 23; 40:25, 19, 22; 41:2
around 19:9; 21:9; 26:24
arrested 22:5
ascertains 8:25
Aside 34:17
ass 23:7; 26:25
assassinate 25:11, 22
assassinating 23:6
assassination 24:7; 25:9; 43:20
assessment 28:4, 9, 12, 22, 22; 45:6
assigned 13:24; 28:8; 29:3; 40:16
assignment 40:24
attached 48:7
attend 10:4; 33:12
attention 8:2; 23:13; 30:13; 31:3, 25
authority 31:18
aware 9:17; 29:2; 34:21

# B

back 6:7; 20:12, 17, 23; 29:19; 34:5; 37:13
backwards 35:15
balcony 12:19; 13:9, 14; 16:16, 17
ban 32:12
bang 14:15; 16:18
bank 40:10, 12
banned 29:3; 33:14, 18
Barron 18:12, 14, 14; 22:17, 22; 28:17; 33:3, 6, 9; 41:7; 43:12, 22; 44:10, 18, 22; 22:19; 41:13, 18; 42:3
Based 28:6
basically 14:12
Bates 42:7
behavior 15:6, 9, 10
best 13:12; 46:9
boisterous 12:19; 15:12; 16:8, 14; 20:25
both 13:9
Brennan 13:19, 20
briefly 18:23
bring 31:24
Broadway 4:3; 6:3; 46:11, 13

brought 23:13; 30:13; 31:3
building 13:17
business 25:14

# C

Cabrera 14:9; 39:23
call 39:4; 46:21; 15:6; 23:17; 28:25; 37:23; 38:3; 15:21
can 4:21; 7:10; 10:8; 17:15; 26:15; 28:8; 33:17; 36:3; 39:13; 40:21; 42:13; 46:12
capacity 13:25; 28:12
CARL 4:2; 48:11
carried 21:21
Carson 21:14; 43:24
case 13:4; 35:2
certify 48:5
chair 31:16, 17, 15
chamber 22:3; 6:4
charge 13:21
Charles 41:7; 43:21
check 17:19; 45:2
chief 6:22; 17:16
Chuck 6:21; 9:3; 10:12; 17:17; 21:8; 23:14; 24:6; 45:15
city 5:6, 8, 14, 15, 21; 6:4, 6, 11, 24; 7:19, 25; 12:23; 13:16, 22, 24; 14:2; 23:24; 24:5; 46:8
civilian 46:18; 45:19; 46:6, 23
classification 6:9
clear 6:19; 10:13, 25; 11:8; 14:6, 19
clearly 5:3
close 22:17
co-equal 7:20
co-names 21:20
comfortable 45:10
coming 10:19; 36:15, 16
comment 23:6, 10; 24:17, 24; 25:2, 4; 27:14, 15; 21:2; 24:4, 7, 10; 26:24; 28:23
commit 9:21
Committee 29:16, 17; 30:7; 33:13; 34:19
communicate 9:12, 14; 32:16, 20; 34:6, 12; 33:15, 22; 34:2
complaint 34:18
complete 21:24
Comrie 25:12, 23; 27:4, 5, 17, 22; 28:18; 29:4; 36:8; 37:23; 38:3, 17; 23:7; 24:13; 26:25; 27:13
Con 26:9, 11
concern 10:23; 45:12; 10:18; 35:6; 10:18; 32:17,

20
concluded 43:16
conclusion 44:2
conduct 21:12, 19; 22:6, 22, 24, 25; 29:13; 30:9, 20; 33:20; 35:6; 41:8, 15; 43:17
conference 23:16, 17, 19, 19, 21, 23
considered 8:5
contact 17:4; 19:11; 20:6; 37:4; 24:13; 45:5, 15
content 4:23
context 25:6, 7
continue 32:13; 18:23; 21:10; 33:21; 34:7, 13
conversation 24:18, 21; 34:11
conveyed 37:5
copies 42:12
copy 42:4, 9, 16, 20, 22
corrections 48:6
council 5:6, 8; 6:2, 4, 12, 24; 7:7, 19, 25; 8:6; 9:18; 19:23; 21:24; 25:22; 26:6, 8, 24; 27:21; 28:13, 18; 29:4, 14; 33:5, 9; 34:17; 37:11, 23; 38:16; 40:6; 41:6, 12, 18; 43:11
Councilman 15:22; 18:11, 14; 21:14; 22:16, 19, 22; 23:6; 24:13; 25:12; 27:4, 5, 13, 17; 30:13; 31:3, 6; 32:16, 20, 23; 33:2, 3; 36:7; 38:3; 42:3; 44:10
course 15:16
Currently 5:22
cursing 37:16

# D

D'Alba 4:10; 48:11; 42:18
date 30:15, 18; 35:13; 43:4; 30:12
day 10:9, 14, 15; 12:24; 21:24; 22:3, 6; 23:16; 36:5; 38:11, 24; 40:7; 48:17
days 35:25
deal 26:12
decides 45:17
decision 32:15
decorum 7:6, 15; 8:11, 20; 9:2, 12
degree 7:12
Department 12:23; 13:17; 26:20
depends 6:16; 40:7
deposed 4:16
deposition 35:18; 42:13
derisive 37:24, 25; 38:3, 8
describe 15:9
desk 40:9, 11; 46:19

detail 13:22; 14:2
detective 5:14, 16; 6:10
determination 28:6, 7
direct 9:3, 3; 14:6, 19, 20; 16:24; 17:4; 19:11; 20:6; 17:12; 16:20
Directly 9:15
direction 7:9; 6:12, 14; 13:16
director 5:7, 10, 23; 6:17; 29:6
discussion 10:18
displeased 41:14
disruptions 29:8; 30:9, 19
disruptive 15:6; 22:6; 29:13; 30:9, 19; 34:7, 14, 20
district 6:3; 41:13; 43:12; 44:14, 23
disturbance 13:15; 14:13
documents 35:18, 20
doors 40:20
down 4:21; 14:15; 18:22; 19:17; 20:10, 14, 22
duly 4:5
during 14:4; 15:4, 13, 16; 29:6; 31:25; 32:2; 34:15

# E

e-mail 45:20, 15
early 45:14
East 43:14
Edison 26:9, 11
eight 12:7
either 40:2
elected 7:13
elevator 36:15, 16, 17, 23; 40:10, 12
Elias 14:9; 39:23
else 10:6; 16:13; 17:25; 18:6; 22:13
engage 15:5; 29:12; 30:9, 20
entail 5:24, 25
entire 14:25; 30:23; 31:2
entirely 30:3
entrance 46:10, 13
even 8:20; 14:17; 38:12
event 13:15; 45:17; 28:16; 44:25
everybody 12:8; 10:24
exact 12:8
exactly 24:14; 36:4; 38:4; 46:15
EXAMINATION 4:9
examined 4:7
exchanged 36:14; 37:12, 15
Excuse 35:3
executives 5:9
Exhibit 7:24; 35:11;

Carl D'Alba    Case 1:07-cv-06154-WHP    Document 24-8    Filed 10/30/2007    Viola Plummer  v.
Vol. 1, August 15, 2007                                                        Page 17 of 41
Christine Quinn, Speaker of the City Council

42:12; 43:2
**explained** 31:4
**extra** 42:11, 22
**eye** 17:4; 19:11; 20:6

## F

**face** 25:16; 34:14, 7
**fact** 11:8
**familiar** 4:19; 6:23; 35:22
**far** 44:17; 45:3
**felt** 44:25; 45:10
**filed** 34:25
**filling** 35:4
**find** 37:17, 19
**fine** 45:11
**first** 4:5; 6:10, 10; 16:10
**floor** 13:8, 13; 15:13; 16:9, 11, 14; 36:10; 39:3; 40:6, 15
**flush** 36:3
**flyer** 41:25; 42:5, 9, 17; 43:2, 6, 16, 18, 21; 44:4; 41:11, 17
**focus** 43:18
**fold** 28:2
**follows** 4:8
**foregoing** 48:4
**form** 4:23; 17:14; 25:24; 26:14; 33:17; 39:12
**forth** 37:13
**forward** 14:22; 21:14
**front** 19:2, 5; 40:9, 11; 41:21
**fully** 19:19
**further** 4:7; 47:2
**future** 33:14

## G

**gave** 42:16
**gavel** 14:16; 16:3, 19
**gives** 6:12; 13:16
**Good** 4:10, 13
**Gotbaum** 16:3
**Grade** 6:10
**guess** 42:17
**guidance** 21:7, 8

## H

**Hall** 6:4, 6; 13:22, 24; 14:2; 23:25; 24:5; 46:8
**hallway** 36:8, 9, 23; 37:14
**hand** 12:9; 18:13
**handle** 45:16
**happen** 9:5; 15:15; 32:15; 19:22; 31:5, 7; 33:13; 36:5; 37:8; 38:20; 39:5, 7; 23:22
**happy** 28:15

**hear** 23:10; 10:25; 11:9; 20:9; 22:13; 24:9, 24; 25:2, 3; 30:15, 18, 21; 31:9; 34:18
**hearings** 7:7; 29:18; 30:10; 32:9, 13; 34:19
**help** 6:19, 20; 27:10
**hereby** 48:4
**herein** 48:3
**herself** 18:3, 5; 46:20
**highest** 6:9
**hit** 16:3

## I

**idea** 32:25; 33:4; 37:18
**identification** 35:13; 43:3; 46:16
**immediate** 39:10, 19, 21
**immediately** 39:5, 6; 40:2
**impair** 5:2
**incident** 35:24; 38:17
**indicate** 19:9; 30:14; 31:10; 38:13; 41:10
**inform** 38:10; 39:17, 19, 25
**injunction** 34:25
**inside** 40:19, 22, 25
**instruct** 32:19; 33:8; 39:16; 40:21
**interrupting** 15:12; 31:8
**into** 32:8; 36:17; 46:10, 13
**involving** 36:2
**isle** 20:16, 24; 22:20
**Israel** 36:21
**issue** 6:24

## J

**Jewish** 41:22
**job** 5:23, 25; 34:8, 15
**July** 35:5; 41:4; 45:15
**June** 29:20, 21; 38:14

## K

**kind** 10:9; 25:5; 36:7
**knowledge** 11:15; 20:20; 22:4; 27:19; 28:21; 29:10; 30:6; 31:23

## L

**lamp** 26:10, 12
**later** 38:11
**least** 12:7
**leave** 22:2
**liar** 15:22
**Lieutenant** 13:19, 20

**line** 25:14
**little** 5:11
**lobby** 40:16, 18, 25
**local** 45:6
**located** 40:11
**location** 36:22
**locked** 40:20
**long** 5:9, 15; 44:23
**look** 32:8; 43:5; 19:20; 20:3, 3
**lot** 10:15
**loud** 15:11; 16:7, 13; 17:10; 20:25; 31:9, 10

## M

**main** 13:13; 16:9, 11, 14
**mainly** 44:3, 5
**maintain** 8:19; 9:2; 11:7; 6:25; 7:4, 6, 14
**making** 31:9
**manner** 45:2
**many** 12:6, 14; 13:6
**marked** 7:24; 8:2; 35:12; 43:3; 45:22
**MARKS** 17:14; 26:14, 22; 33:16; 35:16; 39:12; 42:4, 7, 11, 15, 21; 43:9; 47:4
**Martinez** 36:1; 39:24, 21
**matters** 6:13, 14
**May** 9:18; 10:2, 12; 12:2; 14:25; 34:5, 9, 15; 35:25; 38:25
**Mayer** 6:22; 9:4; 17:17; 23:14; 24:6; 45:15
**mean** 9:4; 10:13; 16:4; 25:7, 14; 37:15, 24; 46:18
**meant** 24:21; 25:11, 22
**measures** 11:25
**medications** 4:25
**Meeting** 8:12, 21; 9:10, 18, 23, 24, 25; 10:4, 11, 16, 19; 11:19, 21, 24; 12:2, 10, 12; 13:3; 14:5, 24; 15:2, 4, 17; 16:3, 8; 23:2; 29:17; 30:24, 25; 31:2, 14, 19, 22, 25; 32:2, 3; 34:5, 5, 9; 15; 35:7; 36:2; 6:11, 15, 25; 7:4, 7, 15; 8:6; 10:9, 15, 15; 11:17; 14:18; 29:8, 9, 12, 15, 16, 17, 20, 24; 30:5, 8, 8; 33:13; 34:19
**melted** 10:10
**member** 25:23; 26:6, 8, 24; 27:22; 28:13, 18; 29:4, 14; 33:5, 9; 34:17; 37:12, 23; 38:16; 41:6, 12, 18; 43:11; 46:18; 6:2, 4; 19:23; 40:6
**memory** 9:22
**men** 12:3, 4, 7
**mental** 24:11
**mention** 41:24; 42:2, 3; 6:2, 3; 36:17, 24; 40:6;

**met** 27:5
**middle** 20:16
**more** 12:9, 17; 20:25; 28:14
**morning** 4:10, 13; 11:17
**motion** 34:24
**Mrs** 4:12; 15:5; 16:6, 20, 24; 17:9, 13, 18, 22, 25; 18:12, 16; 19:12; 21:12, 19; 22:9, 18, 22; 23:5; 24:4, 7, 16, 19; 25:22; 26:24; 27:14; 28:23; 29:12; 30:2, 8, 20; 31:4, 21; 32:9, 17, 21, 24; 34:6, 13, 20; 35:6; 36:8; 37:12, 23; 38:2; 41:8, 14, 25; 43:17; 44:3; 45:17; 46:5, 10, 17
**much** 11:10; 26:18
**must** 37:25
**myself** 10:11; 13:19

## N

**name** 4:11; 42:2, 3; 37:24, 25; 38:3
**nature** 15:8, 25; 36:11
**near** 14:12; 18:11
**need** 9:2, 11, 20; 12:16; 14:6, 18; 44:22, 23; 39:18
**negotiate** 27:10
**Nelson** 15:22
**New** 4:4, 4, 6; 5:8, 14, 15, 20; 12:23; 13:16; 43:14
**next** 22:20
**None** 34:21
**normal** 39:16
**normally** 12:11, 14, 25; 40:8, 19
**Notary** 4:5
**note** 24:11; 47:5
**notify** 26:19; 27:8, 10; 39:6
**number** 12:8; 16:4, 5, 5
**NYPD** 6:8; 12:25; 13:10, 11, 22, 23; 28:7, 9, 22; 29:3

## O

**oath** 4:20
**Objection** 17:14; 26:14; 33:16; 39:12
**occasion** 9:10
**occurred** 35:24
**occurring** 23:20
**off** 36:15, 16
**offer** 44:20; 45:9; 44:14, 19, 21; 45:4
**offhand** 19:24; 31:13
**office** 6:5; 27:25; 40:19, 22; 41:2, 3, 13, 18; 44:14, 23; 6:2, 3; 36:17, 24; 40:6;

**43:11, 12
**officer** 8:6, 15, 17, 21, 25; 9:9; 13:2, 6; 15:25; 13:4, 8, 13, 17; 28:7
**official** 7:13
**often** 15:15
**one** 13:2; 16:6, 13; 17:2; 19:22; 22:10; 27:11; 33:22; 35:21; 36:15, 16; 41:21
**only** 16:6
**opinion** 11:5, 6; 25:15, 25; 39:14
**opposing** 34:24
**orally** 4:20
**order** 6:25; 7:4, 14; 8:11, 20, 23; 9:2, 12; 11:7; 14:13; 6:18
**organization** 41:22
**out** 10:14; 13:18; 15:11; 16:7, 13; 17:10, 17, 19; 19:20; 21:21; 31:4; 33:12; 34:22; 35:4; 36:3; 37:17, 19; 38:6
**outbursts** 21:10
**outside** 41:12
**over** 5:11; 17:20, 21; 22:17
**overhear** 17:3
**own** 7:11; 25:15

## P

**package** 21:20
**page** 35:14; 48:7
**paragraph** 35:23; 41:5; 42:18
**part** 34:23; 40:24; 45:14
**particular** 8:21; 10:10; 12:10; 14:13; 35:21; 36:19
**Particularly** 15:20; 18:9; 45:21
**patrols** 40:23
**peaceful** 11:10
**pension** 5:20
**people** 12:12, 17, 20; 18:9
**Perez** 40:3
**persisted** 32:14
**person** 8:10; 14:14; 41:13
**personally** 25:10, 13, 21; 27:2; 28:14
**physical** 37:4
**Plaintiff's** 7:24; 35:10, 11; 42:20; 43:2, 5; 45:23
**plan** 33:11, 25; 34:3, 4
**plastered** 41:12
**play** 12:23
**please** 43:6
**Plummer** 4:12; 15:5; 16:6, 20, 24; 17:9, 13, 18, 22, 25; 18:12, 16; 19:12; 22:9, 18; 23:5; 24:4, 7, 16,

19; 25:22; 29:12; 30:2, 8, 20; 31:4, 21; 32:9, 17, 21, 24; 34:6, 13, 20; 36:8; 37:12, 23; 38:2; 41:25; 44:3; 45:17; 46:5, 17; 21:12, 19; 22:22; 26:24; 27:14; 28:23; 35:6; 41:8, 14; 43:17; 46:10

**point** 17:2, 8, 21; 19:21, 23; 20:17; 21:4; 23:4, 8; 24:13; 28:7; 31:24; 32:14; 33:19; 45:11; 46:14; 17:17, 17, 18; 31:4

**Police** 12:23; 13:16; 26:19; 27:8, 10

**portion** 13:22

**position** 5:5; 11:14

**possible** 11:11

**post** 26:10, 12; 41:18; 43:7; 44:4

**precinct** 45:6

**preliminary** 4:15; 34:25

**preparation** 9:25; 11:19, 20, 23; 35:17

**prepared** 12:21

**prerogative** 7:11

**present** 29:23; 30:2; 46:19

**preserve** 8:10; 9:11

**presiding** 8:5, 15, 17, 21, 25; 9:9; 14:18; 15:25

**press** 23:16, 17, 18, 19, 21, 23

**pretty** 46:24

**prevent** 21:13, 16, 20

**previously** 7:25

**Primarily** 6:5, 21; 10:24

**prior** 5:13; 9:23; 17:16

**probably** 31:12

**problem** 32:13

**procedure** 39:16

**process** 9:4

**professional** 25:18

**professionally** 26:3

**provide** 13:2

**providing** 44:17

**Public** 4:5; 7:18; 8:7, 11, 16, 24; 9:6, 8, 9, 11, 24; 10:11, 16; 11:13; 12:18; 14:4, 5, 20, 22; 16:18, 21, 23; 17:3, 5

**put** 4:21; 21:14; 42:20

## Q

**quiet** 14:15; 16:4, 19; 17:23; 18:16, 18; 19:13; 20:9; 22:9

## R

**Ralph** 39:24; 40:3

**reaction** 24:25; 25:4

**read** 48:4

**really** 26:17; 36:25

**rear** 19:20; 20:3

**reasonable** 11:6

**recall** 30:10

**Recess** 42:25

**recollection** 13:12; 21:23; 46:2, 10

**record** 42:15

**refer** 8:2; 35:23; 42:17

**reference** 46:8, 9

**referring** 46:4

**reflect** 42:16

**refresh** 45:25

**refusal** 46:5

**regard** 7:9; 45:18; 24:19

**regularly** 45:2

**relation** 26:22, 23

**remarks** 43:19

**remember** 10:6; 15:20, 21; 19:19, 21; 21:21; 24:14; 31:12; 34:22; 35:4; 37:21; 38:4; 45:14, 20

**remove** 14:14; 17:3; 11:3, 11; 16:24; 31:18, 21

**rephrase** 4:24

**report** 24:10; 25:3

**reporter** 4:21

**represent** 4:11

**request** 14:7; 32:11; 44:12; 13:3, 5; 44:10, 13

**required** 39:10

**respond** 41:6; 44:8; 41:11

**response** 11:13; 15:24; 18:20; 25:18; 27:14, 15; 34:24; 39:11

**responsibilities** 7:6

**responsibility** 7:3, 14, 21; 8:10, 19

**responsible** 8:22

**result** 32:10; 33:21; 41:7

**retains** 8:19

**retired** 5:18

**return** 21:4; 20:16, 24

**review** 35:18, 20

**right** 6:6; 18:13; 20:12; 23:17

**Roger** 4:11

**role** 12:22

**room** 14:6, 19; 16:4, 25; 25:15

**rules** 6:23; 7:25; 8:9; 45:18; 46:6

## S

**sat** 18:22; 19:17; 20:9, 14, 22

**saw** 14:18

**saying** 8:18; 15:21; 19:16

**screaming** 12:20

**seat** 18:22; 19:20; 22:19; 17:19; 40:9

**second** 6:7; 29:19; 35:14; 42:24

**section** 8:2

**security** 5:7, 10, 24, 25; 6:13, 14; 10:18; 11:25; 12:24; 13:21; 27:18, 21, 24, 25; 28:11; 29:3, 7; 33:25; 38:24; 41:6; 44:8, 13, 17

**seek** 21:7, 8

**sees** 9:11; 14:5

**Sergeant-at-Arms** 7:5, 8, 10; 12:5, 6; 14:8, 10, 14; 22:11; 36:2, 4, 18, 20; 39:2, 4; 40:5, 8, 14; 46:20

**Sergeants-at-arms** 39:15

**seriously** 25:14; 26:4

**services** 44:15, 16, 20; 45:4

**set** 33:11

**several** 10:9; 11:16; 15:16; 16:2

**show** 7:23; 45:22; 44:13

**shown** 48:7

**side** 6:6; 18:14; 19:3; 11:9

**Similarly** 34:4

**sitting** 17:23, 25, 25; 18:2, 4, 6, 8, 11

**situated** 40:9

**situation** 39:18

**six** 12:15

**somebody** 11:4, 4; 46:22

**someone** 17:4; 24:3

**Sonny** 21:14; 43:24

**sorry** 20:21; 26:23; 40:3

**speak** 22:16; 33:5, 8; 38:16; 41:24; 19:23, 25; 43:21

**Speaker** 7:19; 8:19; 10:12, 17, 23; 14:17; 21:8; 34:12; 6:5; 11:14; 34:24; 15:12

**specific** 30:12

**specifically** 14:11; 37:8, 20

**speculating** 37:2

**spoke** 19:10; 22:8, 18; 24:14; 32:24; 33:3

**spoken** 33:20

**staff** 6:22; 17:16; 18:10; 24:13; 45:3, 7, 13

**staircases** 40:23

**stamped** 42:8

**stand** 20:19; 18:25; 19:2, 3, 5, 6, 17, 19; 24:5

**stapled** 35:15

**State** 4:6; 41:5; 6:11, 15, 25; 7:4, 7, 15; 8:6, 12; 9:10, 18, 25; 10:19; 12:12; 14:5, 24; 29:7, 9, 14, 17, 20; 34:5; 35:7, 25

**statements** 15:14; 31:9, 11

**stating** 4:3

**station** 40:15, 13, 14

**stay** 28:15; 44:22

**steps** 4:15; 12:22; 23:22, 24; 24:5; 26:4, 12

**stood** 20:22

**stop** 42:23

**strung** 26:10

**subject** 48:6

**submitted** 34:23

**Subscribed** 48:16

**suggest** 27:7; 38:23

**suggestion** 27:11

**summed** 38:7

**supervisor** 39:20, 22

**supplied** 27:21

**sure** 7:22; 30:3; 36:25; 42:6; 46:15, 21, 24

**surprised** 25:5

**suspension** 34:8, 14

**swearing** 34:22; 35:5

**swore** 38:6

**sworn** 4:5; 48:16

## T

**talking** 6:16; 13:10

**tenure** 29:6

**term** 18:17; 6:12, 14; 9:24; 12:23; 27:15; 36:4; 44:8; 46:5

**testified** 4:7; 20:22

**testimony** 20:5; 48:4

**though** 14:17

**thought** 20:21

**threat** 25:13, 16, 17; 26:2, 3, 17; 28:4, 9, 22; 45:5; 41:6

**threatening** 41:11

**throughout** 10:14; 16:2

**times** 15:16; 16:2, 5

**today** 5:3

**together** 10:10; 36:15

**told** 23:5; 24:3, 6; 36:5, 6; 37:11; 38:2

**transcript** 48:6

**travel** 28:15

**treat** 25:17; 46:17

**truck** 26:11

**true** 48:5

**try** 4:24; 37:16, 19

**trying** 11:7

**turn** 19:9

**two** 13:2; 28:2; 35:25

**type** 28:12

## U

**uncomfortable** 44:25

**under** 4:20

**uniformed** 13:2, 22; 14:10

**unit** 28:9, 22

**up** 19:19; 20:12, 18, 23

**upon** 28:6

**upstairs** 46:21

**urgent** 39:10, 17

**use** 15:19

**using** 25:8

**usually** 6:17

## V

**Vallone** 26:6, 9; 30:13; 31:3, 6; 32:24; 33:2; 32:17, 20; 34:18

**value** 25:16

**Vann** 21:14

**Verbal** 37:6, 7

**vertical** 40:23

**vicinity** 17:18, 22, 24

**voice** 10:24; 11:5, 5

**vote** 21:13, 16, 20

## W

**walked** 17:21

**wall** 43:7, 9

**WAREHAM** 4:9, 11; 35:9, 14; 42:6, 10, 14, 16, 19, 23; 47:2

**warranted** 28:8

**way** 27:12; 45:2

**what's** 9:4; 17:20

**Wherever** 16:10

**whose** 8:10

**withdrawn** 27:16

**without** 30:14

**witness** 23:22; 30:19; 48:3

**word** 25:8, 8; 41:23, 23; 15:18; 36:14; 37:13, 15; 38:7

**work** 7:10; 13:18, 23

**worried** 45:12

## Y

**year** 5:12, 17

**yelling** 12:20; 15:11, 17; 16:7, 13; 17:9

**York** 4:10, 4; 6:8, 14, 15, 21; 12:23; 13:16; 43:14

**Lawyer's Notes**

# Exhibit I

Page 1

[1]
[2]  UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
[3]
[4]  VIOLA PLUMMER,
[5]        Plaintiff,    Civil Action No.
[6]  -against-            07 CV 6154(WHP)
[7]  CHRISTINE QUINN,
[8]  Speaker of the City Council,
[9]        Defendant.
[10]
[11]       August 13, 2007
           2:26 p.m.
[12]
[13]
[14]
[15]       DEPOSITION of WAYNE KAWADLER, taken
[16] by the Plaintiff, pursuant to Notice, at the law
[17] offices of The Corporation Counsel, 100 Church
[18] Street, New York, New York before Karen Perlman,
[19] a Shorthand Reporter and Notary Public within and
[20] for the State of New York.
[21]
[22]
[23]
           GREENHOUSE REPORTING, INC.
[24]    363 Seventh Avenue - 20th Floor
        New York, New York  10001
[25]       (212) 279-5108

Page 2

[1]
[2]  APPEARANCES:
[3]  LAW OFFICES OF ROGER S. WAREHAM, ESQ.
[4]  Attorneys for the Plaintiff
[5]       394 Putnam Avenue
[6]       Brooklyn, New York  11216
[7]
[8]  NEW YORK CITY LAW DEPARTMENT
[9]  OFFICE OF THE CORPORATION COUNSEL
[10] Attorneys for Defendant
[11]      100 Church Street
[12]      New York, New York  10007
[13] BY:  PAUL MARKS, ESQ.
[14]      -and-
[15]      JAMES M. LEMONEDES, ESQ.
[16]      -and-
[17] NEW YORK CITY COUNCIL
[18] OFFICE OF THE GENERAL COUNSEL
[19] Attorneys for Defendant
[20]      250 Broadway
[21]      New York, New York  10007
[22] BY:  ALVIN L. BRAGG, JR., ESQ.
[23]
[24] ALSO PRESENT:
[25] Viola Plummer

Page 3

[1]
[2]            STIPULATIONS
[3]       IT IS HEREBY STIPULATED AND AGREED
[4]  by and between the attorneys for the respective
[5]  parties hereto, that all objections, except as to
[6]  form, shall be reserved to the time of trial.
[7]       IT IS FURTHER STIPULATED AND AGREED
[8]  that the sealing and filing of the within
[9]  deposition are hereby waived.
[10]      IT IS FURTHER STIPULATED AND AGREED
[11] that the within deposition may be subscribed and
[12] sworn to by the witness being examined before a
[13] Notary Public other than the Notary Public before
[14] whom this deposition was begun.
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 4

[1]                 W. Kawadler
[2]  WAYNE KAWADLER, stating a business
[3]  address of City Hall, New York, New
[4]  York 11412, having been first duly
[5]  sworn by the Notary Public, was
[6]  examined and testified under oath as
[7]  follows:
[8]             EXAMINATION
[9]       BY MR. WAREHAM:
[10]      Q: Good afternoon, Mr. Kawadler, my
[11] name is Roger Wareham, and I'm the attorney for
[12] Viola Plummer, and just a couple of preliminary
[13] questions?
[14]      Have you ever been deposed before?
[15]      A: No.
[16]      Q: Just some basic rules, you're
[17] testifying underneath, if there are any questions
[18] that I ask that you don't understand, either in
[19] terms of form or content, please indicate and
[20] I'll try and clarify it.
[21]      If you need to take a break or
[22] anything, just let somebody know, we can do that.
[23]      I have to ask you, have you taken
[24] any medications or anything today that may impair
[25] your ability to answer clearly?

**Page 5**

**W. Kawadler**

[1]
[2] **A:** No.
[3] **Q:** What is your title at City Hall, at
[4] City Council?
[5] **A:** Senior advisor to the Speaker.
[6] **Q:** And how long have you been senior
[7] advisor to the Speaker?
[8] **A:** For a year and a half.
[9] **Q:** And what did you do prior to that in
[10] terms of work, immediately prior?
[11] **A:** I was special advisor to the
[12] Speaker.
[13] **Q:** And how long were you the special
[14] advisor to the Speaker?
[15] **A:** About a year.
[16] **Q:** And prior to that?
[17] **A:** I was the scheduler to the Speaker.
[18] **Q:** And what are your responsibility as
[19] senior advisor to the Speaker?
[20] **A:** I oversee the administrative
[21] services division the scheduling division, the
[22] Speaker's district office, that's about it.
[23] **Q:** And how did your task as senior
[24] advisor differ from those of special advisor, or
[25] do they?

**Page 6**

**W. Kawadler**

[1]
[2] **A:** I have more direct reports, I have
[3] more — I supervise more departments.
[4] **Q:** Do you have direct access to the
[5] Speaker?
[6] **A:** Yes.
[7] **Q:** Do you have any particular personnel
[8] responsibilities as senior advisor to the
[9] Speaker?
[10] **A:** I don't understand.
[11] **Q:** Do you have responsibility for the
[12] staff that works under the Speaker, is that part
[13] of your job responsibility, supervising the staff
[14] that works under the Speaker?
[15] **A:** Some of them.
[16] **Q:** Do you have responsibilities in
[17] terms of — for which ones, I'm sorry, for which
[18] ones do you have responsibility for supervising?
[19] **A:** The — again, the administrative
[20] services division, the scheduling division and
[21] the district office.
[22] **Q:** Did you review any documents in
[23] preparation for your testimony today?
[24] **A:** My affidavit.
[25] **Q:** That was the only one, the only

**Page 7**

**W. Kawadler**

[1]
[2] document that you reviewed?
[3] **A:** Yes.
[4] **Q:** Were you at the stated meeting on
[5] May 30, 2007?
[6] **A:** Yes.
[7] **Q:** Were you there for the entire
[8] meeting?
[9] **A:** Yes.
[10] **Q:** Did you see Mrs. Plummer at the
[11] meeting?
[12] **A:** Yes. Yes.
[13] **Q:** And how would you describe
[14] Mrs. Plummer's conduct during the meeting, that
[15] you remember?
[16] **A:** Loud, interruptive, disruptive. Can
[17] you repeat the question?
[18] **Q:** I said how would you describe Ms.
[19] Plummer's conduct at the meeting?
[20] **A:** Unprofessional.
[21] **Q:** Can you be more explicit in terms of
[22] when you say loud, interruptive, disruptive, what
[23] in particular, can you refer to something
[24] specifically?
[25] **A:** She spoke in a loud voice while

**Page 8**

**W. Kawadler**

[1]
[2] members were speaking.
[3] **Q:** Do you remember any particular —
[4] **A:** I believe she said, "Liar", several
[5] times, and, you know, like "That is not true", I
[6] believe I even heard her say that — calling
[7] names of people, of members.
[8] **Q:** When you say that, what do you mean
[9] calling names, calling a name out?
[10] **A:** No, calling somebody like a cracker.
[11] **Q:** During the meeting?
[12] **A:** During the meeting.
[13] **Q:** And how often did that happen, if
[14] you remember, how often did that happen during
[15] the meeting?
[16] **A:** During the entire meeting.
[17] **Q:** Throughout the entire meeting?
[18] **A:** Calling someone a cracker, how often
[19] did what happen?
[20] **A:** No, the loud, interruptive,
[21] disruptive, unprofessional behavior?
[22] **A:** Well, during the part of the meeting
[23] that was devoted to the Sonny Carson street
[24] renaming.
[25] Can we go back a couple of

Viola Plummer v. City of New York, Case 1:07-cv-06154-WHP    Document 24-8    Filed 10/30/2007    Page 23 of 41
Wayne Kawadler
Christine Quinn, Speaker of the City Council
Vol. 1, August 13, 2007

Page 9

*W. Kawadler*

[1]
[2] questions?
[3]    Q: What —
[4]    A: I just want to say I observed
[5] Mrs. Plummer, but I didn't at that point know who
[6] she was, I had no idea, I just observed, I know
[7] now who she is.
[8]    Q: Do you remember what she was wearing
[9] that day?
[10]    A: A white hat is what I remember. And
[11] sitting close to Council Member — on the side
[12] close to Council Member Barron's side.
[13]    Q: Was anyone else in the chambers
[14] being loud, being interruptive or disruptive —
[15]    A: People —
[16]    Q: — on May 30th?
[17]    A: — on the balcony. I don't recall
[18] the people on the floor.
[19]    Q: As senior advisor to the Speaker,
[20] are you familiar with rules governing the City
[21] Council?
[22]    A: Yes.
[23]    Q: Do you know under the rules who has
[24] the authority to restore order in the face of a
[25] disruption?

Page 10

*W. Kawadler*

[1]
[2]    A: Yes.
[3]    Q: And who is that?
[4]    A: The Public Advocate.
[5]    Q: And do you know what steps the
[6] Public Advocate can take to restore order in a
[7] case of a disruption?
[8]    A: I believe she can, you know, ask
[9] people to be quiet and respect the Council
[10] members as they speak.
[11]    Q: Are there any other steps that she
[12] can take to restore order that you're aware of?
[13]    A: I think she can clear the floor if
[14] she wanted, or so deemed it necessary.
[15]    Q: And the presiding officer at this
[16] May 30, 2007 stated meeting was?
[17]    A: Betsy Gotbaum, the Public Advocate.
[18]    Q: During that meeting, did the Public
[19] Advocate ask Ms. Plummer to be quiet?
[20]    A: Several times she asked the people
[21] who were watching and were making noise to be
[22] quiet.
[23]    Q: Did she specify Ms. Plummer?
[24]    A: No.
[25]    Q: Did she threaten to have anyone

Page 11

*W. Kawadler*

[1]
[2] removed from the chambers that day?
[3]    A: I don't remember.
[4]    Q: Do you know if anyone was removed
[5] from the chambers that day?
[6]    A: No, I don't believe so.
[7]    Q: Where were you sitting during that
[8] meeting?
[9]    A: I was standing.
[10]    Q: Where were you standing?
[11]    A: In the center aisle between the two
[12] aisles of the members.
[13]    Q: Were you standing near the seat of
[14] the Speaker, of Ms. Quinn?
[15]    A: At times, yes.
[16]    Q: Did the Speaker have any reaction to
[17] Ms. Plummer's conduct that you're aware of?
[18]    A: No, not during the meeting.
[19]    Q: Do you know whether she spoke to Ms.
[20] Gotbaum about Ms. Plummer's conduct during the
[21] meeting, are you aware of the fact of whether or
[22] not she did?
[23]    A: I'm not aware of it.
[24]    Q: Do you know if she spoke to
[25] Mr. D'Alba during the meeting about Ms. Plummer's

Page 12

*W. Kawadler*

[1]
[2] conduct?
[3]    A: I don't know.
[4]    Q: Did Ms. Plummer's conduct prevent
[5] the vote on the amendment to include Sonny
[6] Carson's name for being carried out?
[7]    A: No.
[8]    Q: Did Ms. Plummer's conduct prevent
[9] the vote on the package of street co-namings?
[10]    A: No.
[11]    Q: Do you know if the Council completed
[12] its agenda, its scheduled agenda for the May 30th
[13] meeting, 2007, on that day?
[14]    A: I believe so, yes.
[15]    Q: Was there a point in time when you
[16] became aware of a remark Ms. Plummer made about
[17] assassinating Councilman Comrie's ass or
[18] political ass?
[19]    MR. MARKS: Objection to the form.
[20] You can answer.
[21]    MR. LEMONEDES: You can answer.
[22]    A: Yes.
[23]    Q: And did you hear the comment
[24] yourself?
[25]    A: No.

---

Page 13

**W. Kawadler**

[1]
[2] **Q:** How did it come to your attention?
[3] **A:** I was in the Speaker's office after
[4] the stated meeting, and somebody came down and
[5] told us.
[6] **Q:** Do you remember who that was?
[7] **A:** I don't remember.
[8] **Q:** And what did they tell you?
[9] **A:** That there was a press conference
[10] outside and Ms. Plummer threatened to assassinate
[11] Council Member Comrie.
[12] **Q:** And they said it was a press
[13] conference?
[14] **A:** I believe so.
[15] **Q:** Did they say where it had been, this
[16] press conference had been held?
[17] **A:** On the steps.
[18] **Q:** This is what you were told, because
[19] you didn't see it yourself, right?
[20] **A:** I did not see it.
[21] **Q:** Did you attend the stated meetings
[22] of the Council on June 13th and June 27th of
[23] 2007?
[24] **A:** I believe so.
[25] **Q:** Did you see Ms. Plummer there at

---

Page 14

**W. Kawadler**

[1]
[2] those meetings? Do you remember her being there?
[3] **A:** I don't recall.
[4] **Q:** Is it your understanding that
[5] Speaker Quinn has the legal authority to
[6] discipline, initially to suspend Mrs. Plummer,
[7] that she had the legal authority to do that?
[8] **A:** Say that again.
[9] **Q:** Let me rephrase the question.
[10] Is it your understanding that
[11] Speaker Quinn had the authority to suspend
[12] Mrs. Plummer for her conduct and words or words
[13] basically on May 30th —
[14] **MR. MARKS:** Objection.
[15] **Q:** — 2007?
[16] **MR. MARKS:** Objection to form but
[17] you can answer.
[18] You can answer.
[19] **A:** I — I believe she has the
[20] authority, yes.
[21] **Q:** And from where does she derive that
[22] authority?
[23] **A:** From the Charter.
[24] **Q:** Do you know which section of the
[25] Charter gives her the authority to suspend or

---

Page 15

**W. Kawadler**

[1]
[2] terminate staff members of individual Council
[3] members?
[4] **A:** I don't know the section.
[5] **Q:** If I showed you a section of the
[6] Charter, do you think you would be able to
[7] identify it?
[8] **A:** Possibly. I mean I could tell you
[9] the theory —
[10] **Q:** Okay.
[11] **A:** — or — the legal theory that I
[12] believe.
[13] **Q:** Why don't you first tell me the
[14] first the legal theory then?
[15] **A:** That she is an agency head.
[16] **Q:** And?
[17] **A:** And as head of the New York City
[18] Council agency, that is in quotes, she has the
[19] power to hire and fire personnel.
[20] **Q:** And you said New York City Council
[21] in quotes, what does that mean? You said head
[22] of —
[23] **A:** That is an agency.
[24] **Q:** Now let me refer you to what has
[25] been marked as Plaintiff's Exhibit 7, and refer

---

Page 16

**W. Kawadler**

[1]
[2] you to section 21, just read through that a
[3] second.
[4] You can look through the other
[5] sections as well, if you would like, and maybe
[6] you can identify the section that you said gives
[7] her the authority over personnel of individual
[8] Council members?
[9] **MR. LEMONEDES:** Noting of course
[10] that there are only certain portions of
[11] this.
[12] **MR. WAREHAM:** Certain portions of
[13] this, definitely.
[14] **A:** I don't see it in here.
[15] **Q:** Let me just draw your attention to
[16] section 21 of the Charter. Can you just read
[17] that paragraph into the record —
[18] **A:** "Shall" —
[19] **Q:** — it says, "The Council"?
[20] **A:** "The Council, there shall be a
[21] Council which shall be the legislative body of
[22] the City in addition to the other powers vested
[23] in it by this Charter and other law, the Council
[24] shall be vested with the legislative power of the
[25] City. Any enumeration of powers in this Charter

---

Page 17

W. Kawadler

[2] shall not be held to limit the legislative power
[3] of the Council except as specifically provided in
[4] this Charter."
[5]    Q: Thank you.
[6] So this section identifies the
[7] Council as a legislative body, correct?
[8]    A: Correct.
[9]    Q: It doesn't identify it as an agency
[10] of the City of New York, right?
[11]    A: Correct.
[12] DIR Q. Can you tell me where the theory
[13] that the City Council was an agency of the City
[14] of New York came from? Who presented that theory
[15] to you?
[16]    MR. MARKS: Object to the extent it
[17] calls for an attorney client privileged
[18] communication, I direct him not to answer,
[19] so I don't know.
[20]    MR. WAREHAM: Well, do you want to
[21] confer with him in terms of whether — part
[22] of it is he may not know whether there is
[23] attorney-client privilege.
[24]    MR. MARKS: Before he answers that
[25] question.

Page 18

W. Kawadler

[2]    MR. LEMONEDES: I don't think he
[3] should be brought to answer unless we can
[4] understand whether his understanding came
[5] from counsel or not.
[6]    Q: Did your understanding that the City
[7] Council of New York is an agency come from the
[8] General Counsel of the City Council, from the
[9] legal department of the City Council?
[10]    MR. LEMONEDES: One second.
[11]    MR. MARKS: I guess the better
[12] question would be as long as his
[13] understanding came from the attorneys for
[14] the Council, be it the General Counsel or
[15] other attorneys for the Council, it would
[16] be a privileged conversation, it would be
[17] limited to just attorneys from the General
[18] Counsel or the Council.
[19]    MR. WAREHAM: Say that again.
[20]    MR. MARKS: I'm saying the Council
[21] has other attorneys besides the General
[22] Counsel's office.
[23]    MR. WAREHAM: Are they functioning
[24] as attorneys, or are they just people who
[25] are attorneys who have other administrative

Page 19

W. Kawadler

[2] positions?
[3]    Q: Was the person that you found out —
[4] where you got this theory of the City Council is
[5] an agency from speaking to you as an attorney —
[6]    MR. LEMONEDES: You have to answer
[7] yes or no.
[8]    Q: — in the role as an attorney?
[9]    MR. MARKS: You have to answer the
[10] question.
[11]    MR. LEMONEDES: You can answer it
[12] yes or no.
[13]    A: Yes.
[14]    Q: Who was that person?
[15]    MR. WAREHAM: That is not
[16] privileged.
[17]    MR. LEMONEDES: No, who the exact
[18] attorney was, unless it was more than one,
[19] I mean —
[20]    MR. WAREHAM: The question is which
[21] attorney it is is privileged?
[22]    MR. LEMONEDES: No, I'm saying your
[23] "Who" implies that there is a single, I'm
[24] suggesting —
[25]    MR. WAREHAM: Okay. But if it is

Page 20

W. Kawadler

[2] more than one, he'll tell me each who.
[3]    MR. LEMONEDES: To the degree he can
[4] recall.
[5]    MR. WAREHAM: Of course.
[6]    Q: Who was —
[7]    MR. LEMONEDES: If you can recall
[8] the number of attorneys that you spoke with
[9] about this, and please identify them.
[10]    A: Elizabeth Fine, Barbara Butler,
[11] Alvin Bragg, Jim Lemonedes.
[12]    Q: And do you know, do you remember
[13] approximately when that theory was presented to
[14] you, date wise?
[15]    A: Approximately, you know, middle
[16] June.
[17]    Q: Would it be —
[18]    A: Maybe.
[19]    Q: Would it be after the stated meeting
[20] of June 13th, do you remember?
[21]    A: I don't remember.
[22]    Q: But it was approximately around that
[23] time?
[24]    A: I don't know. I mean it was after
[25] the stated meeting of May 31st at some point.

---

Page 21

**W. Kawadler**

[1]

[2]    **Q:** To your understanding, had a Speaker

[3] of the City Council —

[4]    **MR. WAREHAM:** Withdrawn.

[5]    **Q:** Prior to the suspension of Ms.

[6] Plummer, had a Speaker of the City Council ever

[7] suspended an individual staff member of an

[8] individual Council member?

[9]    **A:** Not that I know of.

[10]    **Q:** Prior to the termination of Ms.

[11] Plummer, had a Speaker of the Council ever

[12] terminated the staff member of an individual

[13] Council member?

[14]    **A:** Not that I know of.

[15]    **Q:** Is it your understanding that none

[16] of the documents that relate to —

[17]    **MR. WAREHAM:** Withdrawn.

[18]    **Q:** On July 2, 2007, did you submit an

[19] affidavit as part of the Speaker's response to a

[20] lawsuit that Ms. Plummer had filed?

[21]    **A:** Yes.

[22]    **Q:** And in that affidavit —

[23]    **MR. WAREHAM:** And just let me mark

[24] this as Plaintiff's 8.

[25]    (Plaintiff's Exhibit 8, affidavit of

---

Page 22

**W. Kawadler**

[1]

[2] Wayne Kawadler, marked for identification.)

[3]    **Q:** You're familiar with this, right?

[4]    **A:** Umm-hmm.

[5]    **Q:** You said you reviewed it in

[6] preparation for this?

[7]    **A:** Umm-hmm.

[8]    **Q:** And in it, in paragraph four, I

[9] believe, you stated the conclusion, "None of

[10] these forms", you indicate the forms were that

[11] all new personnel get, they're provided with

[12] certain materials that include Application of

[13] Employment, Employee Fact Sheet, a Receipt of the

[14] Council's Policy on Harassment and

[15] Discrimination, Receipt of the Council's Ethics

[16] Manual, and then you conclude that none of these

[17] forms refer to the Council member's employees

[18] because the point that you're making is the

[19] people hired by individual Council members are

[20] not employees of that Council member, correct,

[21] they're employees of the Council?

[22]    **A:** Correct.

[23]    **Q:** And are you familiar with the ethics

[24] manual that you refer to in paragraph four,

[25] Council's Ethics Manual, are you familiar with

---

Page 23

**W. Kawadler**

[1]

[2] that?

[3]    **A:** What do you mean am I familiar with

[4] it?

[5]    **Q:** You've seen the document?

[6]    **A:** Yes.

[7]    **Q:** You've read the document? You're

[8] familiar with its contents, you know there is a

[9] policy against harassment and discrimination?

[10]    **A:** Correct.

[11]    **Q:** And there is a procedure for filing

[12] complaints of harassment and discrimination, are

[13] you familiar with that in the ethics manual?

[14]    **A:** I haven't read it for a while but.

[15]    **Q:** When you —

[16]    **A:** If you have it, I can look at it.

[17]    **Q:** Sure.

[18]    (Time noted: 2:56 p.m.)

[19]    (A brief recess is taken.)

[20]    (Time noted: 3:02 p.m.)

[21]    (Plaintiff's Exhibit 9, City

[22] Council's Policy Against Employment

[23] Discrimination and Unlawful Harassment

[24] dated June 13, 2006, marked for

[25] identification.)

---

Page 24

**W. Kawadler**

[1]

[2]    **MR. WAREHAM:** He's reviewing the

[3] ethics manual.

[4]    **MR. MARKS:** It's actually The City

[5] Council Policy Against Discrimination.

[6]    **MR. WAREHAM:** Discrimination.

[7]    **MR. MARKS:** Employment

[8] Discrimination and Unlawful Harassment

[9] dated June 13, 2006.

[10]    **MR. LEMONEDES:** This is going to be

[11] another exhibit?

[12]    **MR. MARKS:** Yes.

[13]    **Q:** Are you done?

[14]    **A:** Yes.

[15]    **Q:** And you've just looked over the New

[16] York City Council Policy Against Employment

[17] Discrimination and Unlawful Harassment, correct?

[18]    **A:** Correct.

[19]    **Q:** That is one of the documents that

[20] you indicated in your affidavit of July 2nd that

[21] Mrs. Plummer had received, that the new hires

[22] received upon being hired, correct?

[23]    **A:** Correct.

[24]    **Q:** And that was one of the documents

[25] you indicated, you said, "None of these forms "in

---

Page 25

**W. Kawadler**

[1]
[2] paragraph four, "None of these forms refer to any
[3] personnel as a Council member's employee",
[4] correct?
[5]   **A:** Right.
[6]   **Q:** That is paragraph four of your
[7] affidavit?
[8]   **A:** Correct.
[9]   **Q:** And prior to signing the affidavit
[10] you had reviewed the materials that you included
[11] as exhibits, is that correct, as part of the
[12] affidavit?
[13]   **A:** Ask it again, please.
[14]   **Q:** I said, prior to signing the
[15] affidavit, your sworn statement, you had reviewed
[16] the materials that you included as exhibits to
[17] that affidavit?
[18]   **A:** I didn't review them all directly.
[19]   **Q:** But you reviewed them sufficiently
[20] to reach conclusions, the conclusions that were
[21] in the affidavit?
[22]   **A:** Correct.
[23]   **Q:** Now let me draw your attention to
[24] page five of Plaintiff's 9, the New York City
[25] Council Policy Against Employment Discrimination

Page 26

**W. Kawadler**

[1]
[2] and Unlawful Harassment, on the top of page
[3] five — I'm sorry, four four, first, under the
[4] heading sub five, "Complaint Review Resolution
[5] and Remedies", there are three subheadings, A, B,
[6] and C, correct?
[7]   **A:** Yes.
[8]   **Q:** Can you just read into the record,
[9] what is subheading A titled?
[10]   **A:** "Unlawful Discrimination Or
[11] Harassment by Employees of Council" — "of the
[12] Council's Central Staff."
[13]   **Q:** And B?
[14]   **A:** "Discrimination, Harassment By
[15] Employees of a Council Member."
[16]   **Q:** And C?
[17]   **A:** "Discriminate or" — "Discrimination
[18] Or Harassment By Members of the City Council."
[19]   **Q:** So this policy indicates three
[20] different categories of employees, is that
[21] correct?
[22]   **A:** Well, it says two are employees and
[23] one are members, so there is three.
[24]   **Q:** So there is two categories of
[25] employees?

Page 27

**W. Kawadler**

[1]
[2]   **A:** I don't know if they're categories
[3] or if there they're — I don't know that they're
[4] categories.
[5]   **Q:** There is a distinction between
[6] employees, it makes a distinction between
[7] employees of the Council's central staff and
[8] employees of a Council member?
[9]   **A:** It — there is a — yes.
[10]   **Q:** And that category discrimination,
[11] the category sub B, "Discrimination and
[12] Harassment by Employees of the Council Member"
[13] contradicts your conclusion of paragraph four of
[14] your affidavit, isn't that so, where you stated
[15] that none of these forms refer to any personnel
[16] as a Council member's employee?
[17]   **A:** Correct.
[18]   **Q:** And in the content of subparagraph
[19] B, "Discrimination and Harassment By Employees of
[20] the Council Member", could you please read that
[21] into the record?
[22]   **A:** That paragraph?
[23]   **Q:** Yes.
[24]   **A:** "The FIC shall promptly investigate
[25] every allegation of discrimination or harassment

Page 28

**W. Kawadler**

[1]
[2] it receives against an employee of a Council
[3] member where the FIC finds that a complaint does
[4] not constitute discrimination or harassment, the
[5] investigation will be closed, because the members
[6] of the Council employ individuals directly if the
[7] FIC determines that an employee of a member has
[8] violated this policy it will recommend remedial
[9] and disciplinary action to the member and shall
[10] provide notice of such recommendations to the
[11] Speaker. The member will promptly determine what
[12] action to take and will notify the FIC of his or
[13] her decision. If the member fails to take action
[14] to address the discrimination or harassment the
[15] FIC shall refer the matter to the committee on
[16] standards and ethics for further consideration."
[17]   **Q:** So according to this procedure, the
[18] FIC, which is the Fairness in?
[19]   **MR. MARKS:** Fair Intervention
[20] Committee.
[21]   **Q:** — Fair Intervention Committee, does
[22] not have the authority to discipline an employee
[23] of an individual Council member directly, is that
[24] correct?
[25]   **MR. MARKS:** Objection to form.

Wayne Kawadler Case 1:07-cv-06154-WHP    Document 24-8    Filed 10/30/2007    Viola Plummer v.

Vol. 1, August 13, 2007                                            Christine Quinn, Speaker of the City Council

Page 28 of 41

Page 29

### W. Kawadler

[1]
[2] **Q:** But you can answer it.

[3] **THE WITNESS:** Can I answer it?

[4] **MR. MARKS:** You can answer it,

[5] sorry.

[6] **A:** Can you repeat the question, please.

[7]    (The record is read.)

[8] **A:** Correct.

[9] **Q:** So according to that procedure there

[10] is no precedent for a Speaker to a committee,

[11] much less the Speaker to discipline staff members

[12] of individual Council members?

[13] **MR. MARKS:** Objection to form, but

[14] you can answer.

[15] **A:** The FIC does not have the power

[16] to — to — to provide any corrective measures to

[17] staff at all. The FIC only recommends.

[18] **Q:** But the FIC recognizes that the

[19] employees of the individual Council members,

[20] quote, because the members of the Council employ

[21] individuals directly, that there is a different

[22] procedure for them than for central staff

[23] members, is that correct?

[24] **MR. MARKS:** Objection to form.

[25] You can answer.

Page 30

### W. Kawadler

[1]
[2] **A:** There is a different procedure, yes,

[3] that FIC recommends for people who are central

[4] staff versus staff to a committee member.

[5] **Q:** Central staff can be dealt with by

[6] the Speaker directly, correct, under procedure

[7] sub A, the recommendation goes to the Speaker

[8] directly?

[9] **A:** Correct.

[10] **Q:** Because the Speaker is the one

[11] accountable for that staff?

[12] **MR. MARKS:** Objection to form.

[13] **Q:** Under subsection B it goes to the

[14] member who hired that person?

[15] **MR. MARKS:** Objection. Objection to

[16] form. The language says more than what

[17] you're saying, but I don't want to make a

[18] speaking objection.

[19]    You can answer.

[20] **Q:** Let me just say, according to

[21] subsection B it is up to the member who hired

[22] that staff member to take whatever action that

[23] member deems appropriate?

[24] **MR. MARKS:** Objection to form.

[25] **THE WITNESS:** Answer?

Page 31

### W. Kawadler

[1]
[2] **MR. MARKS:** You can answer.

[3] **A:** The member — ask your question

[4] again.

[5]    (The record is read.)

[6] **A:** Well, I'm not sure if it's

[7] appropriate, a member — it says the member will

[8] promptly deem the action to take.

[9] **Q:** But it's the individual Council

[10] member that makes that determination, not the

[11] Speaker?

[12] **A:** Although if the member doesn't take

[13] action appropriately then it refers to the

[14] standards and ethics.

[15] **Q:** Right. But it is not the Speaker

[16] that makes that determination on the staff member

[17] of an individual Council?

[18] **A:** It's the member.

[19] **Q:** Do you know, to your knowledge, did

[20] the Speaker file any complaint against Ms.

[21] Plummer under this policy or under the ethics

[22] manual?

[23] **A:** I don't believe under this policy.

[24] **Q:** Did she file one under the ethics

[25] manual, do you know?

Page 32

### W. Kawadler

[1]
[2] **MR. WAREHAM:** Let the record

[3] indicate that Mr. Kawadler is reviewing his

[4] affidavit.

[5] **A:** No, she did not.

[6] **Q:** Do you know whether Council Member

[7] Comrie filed a complaint against Mrs. Plummer for

[8] the events of May 30, 2007 under either of those

[9] procedures?

[10] **A:** I don't know.

[11] **Q:** You said that the theory you were

[12] presented with was that the City Council is an

[13] agency of the City of New York?

[14] **A:** Correct.

[15] **Q:** Are you aware of any other City

[16] agencies that implement laws, that pass laws for

[17] the City of New York?

[18] **MR. MARKS:** Objection to form.

[19] **THE WITNESS:** Am I to answer?

[20] **MR. MARKS:** You can answer.

[21] **MR. LEMONEDES:** You can answer.

[22] **A:** No, as an agency that's its job is

[23] to pass laws for the City.

[24] **Q:** Section 21 of the Charter that you

[25] read states that as an agency, if we refer back

Page 33

*W. Kawadler*

[2] to the Charter, can you look at section 21, does
[3] it say that as an agency its job is to pass laws?
[4]    A: It says that the Council shall be
[5] the legislative body of the City.
[6]    Q: Is there any language at all in that
[7] paragraph that indicates that it's an agency of
[8] the City of New York?
[9]    A: No.
[10]    Q: Are you aware of any New York City
[11] agency whose members are elected by the general
[12] public, by the voting public?
[13]    A: Oh, I would argue that the City
[14] clerk — well, he's not an elected office, I
[15] would argue that borough presidents, each
[16] individual borough president are elected by the
[17] public and run their — their office as an
[18] agency. And the comptroller.
[19]    Q: They're elected to run an agency,
[20] right, the agency exists, they're elected to run
[21] it?
[22]    A: You asked me who is elected.
[23]    Q: Right, but their membership is
[24] composed of elected members?
[25]    MR. MARKS: Objection to form.

Page 34

*W. Kawadler*

[2] You may answer.
[3] Members are appointed.
[4]    Q: In paragraph 11 of your affidavit,
[5] you state that "As a result of Ms. Plummer's
[6] disruptive conduct during the May 30, 2007
[7] Council Meeting, and additional information
[8] concerning threats she made to assassinate
[9] Council Member Leroy Comrie, the Speaker of the
[10] Council of the City of New York, Christine C.
[11] Quinn, met with the Chief of Staff, Mr. Charles
[12] Meara, the Director of Security for the Council,
[13] Mr. Carl D'Alba, other senior staff and numerous
[14] members of the Council to assess the disruption
[15] caused by Ms. Plummer's outbursts and threats."
[16]    Can you indicate who were the other
[17] senior staff members, those first, who were the
[18] other senior staff members?
[19]    A: There were various meetings, but
[20] there were Ramon Martinez, First Deputy Chief of
[21] Staff, Maura Keaney, Deputy Chief of Staff,
[22] Rodney Capel, Deputy Chief of Staff.
[23]    Q: Did you attend those meetings?
[24]    A: Some of them.
[25]    Q: Which members of the Council did she

Page 35

*W. Kawadler*

[2] meet with?
[3]    A: I don't know. I mean I didn't
[4] attend meetings of the Council that — I know
[5] that she met with the leadership team.
[6]    Q: The leadership team of?
[7]    A: Of the — the leadership a team
[8] which is the members, the people who are on the
[9] leadership team for the Council, so it would be
[10] like Council Member Comrie, Council Member
[11] Fidler, Council Member Dickens, I'm not recalling
[12] all of the people who are on that, Rivera.
[13]    Q: Do you know if she met With Counsel
[14] Member Barron?
[15]    A: I don't know. He's not on
[16] leadership team.
[17]    Q: Ms. Plummer is his employer,
[18] correct?
[19]    A: Ms. Plummer worked for him, but she
[20] worked for the Council, the New York City
[21] Council.
[22]    Q: So you're saying —
[23]    A: The ID —
[24]    Q: — you don't know whether she met
[25] with Council Member Barron?

Page 36

*W. Kawadler*

[2]    A: The ID cards for all staff say New
[3] York City Council.
[4]    Q: When Ms. Plummer was hired did
[5] Council Member Barron have to submit a form for
[6] her hire?
[7]    A: Yes.
[8]    Q: And it's called An Appointment
[9] Request Form?
[10]    A: Correct.
[11]    Q: And who signs that?
[12]    A: The Council member.
[13]    Q: And who approves the hiring, is it
[14] the Speaker?
[15]    A: The speaker's staff.
[16]    Q: So the Speaker's staff has the final
[17] say so over whether a —
[18]    A: And therefore the Speaker, yes.
[19]    Q: So you're saying that once an
[20] Appointment Request Form comes in, the Speaker
[21] staff can veto the hiring of a person that an
[22] individual Council member wants to hire?
[23]    A: Correct.
[24]    Q: Has that ever happened?
[25]    A: I don't know.

Page 37

**W. Kawadler**

[1]
[2]    Q: And where would there be a record of
[3] those people who had not been hired whose
[4] requests for hiring had been denied by the
[5] Speaker's staff?
[6]    A: We would probably have it at our
[7] offices.
[8]    Q: And once the hiring has been
[9] approved, who signs this sheet, who signs the
[10] sheet approving the hire of a staff member of an
[11] individual Council member, is it the Speaker?
[12]    A: No.
[13]    Q: Who signs that? Who signs the
[14] approval?
[15]    A: The member signs the — signs off
[16] and once the member —
[17]    Q: Well you said somebody has to
[18] approve it, once the —
[19]    A: I mean —
[20]    Q: — Council member makes a request
[21] for appointment, somebody can deny it and
[22] somebody has to approve it?
[23]    A: Right, if there — if the member —
[24] if the person doesn't have a — have a proper
[25] paperwork, or if there are things missing, then

Page 38

**W. Kawadler**

[1]
[2] it would be sent back to the member.
[3]    Q: So you're saying that the basis for
[4] the Council member staff denying that is that the
[5] paperwork is incomplete?
[6]    MR. MARKS: Objection to form.
[7] You can answer.
[8]    A: Or if they're not — unless they're
[9] not eligible.
[10]    Q: What are the grounds of eligibility?
[11] What determines ineligibility?
[12]    A: You have to have proper
[13] identification.
[14]    Q: So what you're saying is that the
[15] Council, the Speaker's staff can reject an
[16] application for technical reasons?
[17]    MR. MARKS: Objection to form.
[18] You can answer.
[19]    A: Well, they can — they can reject a
[20] person based on the law, I mean the law doesn't
[21] allow us to hire somebody who doesn't have work
[22] papers, proper work papers.
[23]    Q: That is a technical reason?
[24]    A: That is not —
[25]    Q: The Speaker's staff cannot reject an

Page 39

**W. Kawadler**

[1]
[2] application because they don't like the politics
[3] of the person being hired, the political beliefs
[4] of the person being hired?
[5]    A: Correct, that would be illegal.
[6]    Q: They cannot reject it because they
[7] do not like the race of the person being hired?
[8]    A: That would be illegal.
[9]    Q: They cannot reject it because they
[10] do not like the sex of the person being hired?
[11]    A: Again, that would be illegal.
[12]    Q: So assuming that the paperwork is in
[13] order, who approves the application that for the
[14] hiring of an individual Council members staff,
[15] who signs off on it?
[16]    A: Physically signs off on it?
[17]    Q: Yes. Physically signs off on it.
[18] Just like somebody physically signed off on the
[19] termination of Viola Plummer, who signs, who
[20] signed the approval of her hire? Was it the
[21] Speaker?
[22]    A: No.
[23]    Q: Who was it?
[24]    A: The Council member.
[25]    Q: The Council member.

Page 40

**W. Kawadler**

[1]
[2] So it is the Council member who
[3] approves the hire?
[4]    A: It is the Council member who
[5] recommends the hire.
[6]    Q: And approves it so that that person
[7] can be put on the payroll and start getting paid?
[8]    A: Well, it's the Council member who
[9] signs the paper, it's the Council member who
[10] recommends the hire.
[11]    Q: So we're very clear, it is not
[12] Christine Quinn, right? Christine Quinn doesn't
[13] sign off on that, is that right?
[14]    A: That's correct.
[15]    Q: Thank you.
[16]    A: But it should also be said that
[17] Christine Quinn doesn't sign off on — doesn't
[18] sign the paper for most hires for the City
[19] Council.
[20]    MR. WAREHAM: I'll ask that that be
[21] stricken as unresponsive. I didn't ask
[22] that.
[23]    Q: Do you know Maria Alvarado?
[24]    A: Yes.
[25]    Q: And who is she?

Page 41

**W. Kawadler**

[1]
[2] **A:** Press secretary to the Speaker.
[3] **Q:** Are you aware of a memo she sent to
[4] the Speaker on June 1st that according to
[5] Charles Meara, only Charles Barron has the
[6] authority to fire Viola Plummer?
[7] **MR. MARKS:** Objection to the form.
[8] **THE WITNESS:** Answer it?
[9] **MR. MARKS:** You can answer it.
[10] **A:** Am I aware of —
[11] **Q:** Were you aware of a memo that Maria
[12] Alderado sent to Christine Quinn on June 1, 2007
[13] that according to Chuck Meara, only Charles
[14] Barron had the authority to fire Viola Plummer?
[15] **A:** No.
[16] **Q:** If I told you that such a memo
[17] existed, would you —
[18] **MR. WAREHAM:** Withdrawn.
[19] **Q:** Were you aware that the Speaker had
[20] a question when —
[21] **MR. WAREHAM:** Withdrawn.
[22] **Q:** Are you aware that when this
[23] incident first happened, and people like Leroy
[24] Comrie asked for Ms. Plummer to be terminated,
[25] that the Speaker had a question around whether

Page 42

**W. Kawadler**

[1]
[2] she had the authority to do that?
[3] **MR. MARKS:** Objection to the form.
[4] You can answer.
[5] **A:** Yes.
[6] **Q:** Did you have any discussions with
[7] the Speaker about her authority to be able to
[8] fire Viola Plummer?
[9] **A:** With counsel.
[10] **Q:** You had a discussion with counsel,
[11] or you had a discussion with the Speaker?
[12] **A:** With the Council while the Speaker
[13] was there.
[14] **Q:** Did you have any discussions with
[15] the Speaker without counsel present around her
[16] authority to be able to fire Viola Plummer?
[17] **A:** You mean just with the Speaker
[18] alone?
[19] **Q:** Yes, with the Speaker and no
[20] attorney present?
[21] **A:** I'm sure we had many conversations
[22] with various — there were meetings with various,
[23] there were a lot of meetings.
[24] **Q:** And was the Speaker's initial
[25] understanding that she did not have the authority

Page 43

**W. Kawadler**

[1]
[2] to fire Viola Plummer?
[3] **MR. MARKS:** Objection to form.
[4] You can answer.
[5] **A:** I don't know what her understanding
[6] was.
[7] **Q:** Did she ever say to you, you know
[8] what, I don't have the authority to fire Viola
[9] Plummer?
[10] **A:** Not that I recall.
[11] **Q:** Was it said to her in your presence
[12] outside of counsel that she does not have the
[13] authority to fire Viola Plummer?
[14] **A:** Without counsel present?
[15] **Q:** Yes.
[16] **A:** I mean there were discussions —
[17] there were discussions about whether or not she
[18] had the power to do that, yes.
[19] **Q:** And what was the discussion, yes or
[20] no? I mean what was the conclusion of the
[21] discussion?
[22] **MR. MARKS:** Objection to form.
[23] You can answer.
[24] **A:** The conclusion is that she thought
[25] she did have the power, and it happened.

Page 44

**W. Kawadler**

[1]
[2] **Q:** When was that discussion, and who
[3] was present?
[4] **MR. MARKS:** Objection to form.
[5] You can answer.
[6] **A:** There were many discussions about
[7] this issue.
[8] **Q:** Let's start with the first one you
[9] can remember in terms of when it was and who was
[10] present?
[11] **A:** That she had the power?
[12] **Q:** Yes.
[13] **A:** With counsel?
[14] **Q:** There was a discussion with counsel.
[15] Let's talk about the ones where counsel was not
[16] present, that you can remember?
[17] **A:** When was that?
[18] **Q:** Yes. When was it, and with whom?
[19] **A:** That she has the power to fire Viola
[20] Plummer?
[21] **Q:** Yes.
[22] **A:** It was after our discussions with
[23] the General Counsel's office.
[24] **Q:** Can you give me a date?
[25] **A:** I can't give you a specific date,

Page 45

**W. Kawadler**

[1] there were a lot of the meetings then, I don't

[2] know. I mean it was sometime — it was sometime

[3] in June.

[4] **Q:** Do you know Sandra Mullin?

[5] **A:** Yes.

[6] **Q:** And who is she?

[7] **A:** She worked at the Council.

[8] **Q:** Do you know what her position is?

[9] **A:** She was communications director.

[10] **Q:** Did you attend a press conference

[11] that the Speaker had on June 5, 2007 where she

[12] discussed the issue of Viola Plummer?

[13] **A:** I don't know. I could have. There

[14] are a lot of press conferences.

[15] **MR. WAREHAM:** Let me mark this

[16] Plaintiff's 10.

[17]    (Plaintiff's Exhibit 10, transcript

[18] of a press conference on June 5, 2007

[19] bearing Bates numbers D 0782 and D 0783,

[20] marked for identification.)

[21] **MR. WAREHAM:** This is Bates stamped

[22] D 0782 and 0783, this is a transcript of a

[23] press conference on June 5, 2007.

[24] **A:** Is there a particular paragraph I'm

Page 46

**W. Kawadler**

[1] reading?

[2] **Q:** The first paragraph where it says

[3] CQ, the second half?

[4] **A:** On 0782?

[5] **Q:** 0782, yes.

[6] **A:** Okay. Okay.

[7] **Q:** You've indicated that the Speaker's

[8] position is that Ms. Plummer doesn't work for

[9] Councilman Barron, she works for the Council,

[10] right?

[11] **A:** I don't know if I've indicated that.

[12] **Q:** Is that the Speaker's position?

[13] **A:** I don't know — I don't know what

[14] her position is.

[15] **Q:** You said that the Speaker believes

[16] that she has the authority to terminate Ms.

[17] Plummer, because she was an employee of the City

[18] Council?

[19] **A:** I would have to read back what I

[20] said. I don't know if I said the Speaker did

[21]    or —

[22] **Q:** Is that your view of the Speaker's

[23] position?

[24] **MR. MARKS:** Objection to form.

Page 47

**W. Kawadler**

[1] **Q:** Let me ask you another question.

[2] Mrs. Plummer was terminated at the behest of the

[3] Speaker, isn't that correct?

[4] **MR. MARKS:** Objection to form.

[5] You can answer.

[6] **MR. LEMONEDES:** You can answer it if

[7] you can.

[8] **A:** Mrs. Plummer was terminated through

[9] a letter from the Speaker, yes.

[10] **Q:** What is your academic background,

[11] did you get a college degree?

[12] **A:** Yes.

[13] **Q:** From?

[14] **A:** I have an undergraduate degree from

[15] Northeastern University.

[16] **Q:** In?

[17] **A:** Business marketing.

[18] **Q:** Do you have a graduate degree?

[19] **A:** Yes.

[20] **Q:** In?

[21] **A:** Public health.

[22] **Q:** Mrs. Plummer was terminated from her

[23] job as Chief of Staff for Charles Barron,

[24] correct?

Page 48

**W. Kawadler**

[1] **A:** Correct.

[2] **Q:** This was done at the direction of

[3] the Speaker of the City Council, correct?

[4] **A:** Say that again.

[5] **Q:** She was terminated at the direction

[6] through a letter from Chuck Meara at the

[7] direction of the Speaker of the City Council?

[8] **A:** Correct, correct.

[9] **Q:** The Speaker of the City Council's

[10] position was that she had the authority to fire

[11] Viola Plummer?

[12] **A:** Correct.

[13] **Q:** In this press conference, on June 5,

[14] 2007, in response to a question reporter one,

[15] last week at the City Counsel meeting the Chief

[16] of Staff of Council Charles Barron made a death

[17] threat against another Council member outside

[18] City Hall, what was your reaction? Is she going

[19] to remain on the City payroll? Are you consult

[20] ing lawyers to find out what the Council can do?

[21] What is happening on that front? That was the

[22] question.

[23]    Her response, I'm not going to read

[24] the entire response, it's included in it, but at

Page 49

*W. Kawadler*

[1]
[2] one point near the end of that paragraph she
[3] says, "As it relates to Ms. Plummer we're
[4] researching what our legal options are as a
[5] Speaker and as an institution to take action. We
[6] want to make sure that we understand the
[7] parameters of what our options are since she does
[8] not work for me, she works for a separate, you
[9] know, an independent Council member. I hope to
[10] get those fine legal interpretations from my
[11] General Counsel's office soon and then I will
[12] discuss the matter with my leadership team and
[13] the rest of the Council."
[14]      Do you know when the Council
[15] Speaker's position changed around who Viola
[16] Plummer worked for?
[17]    **MR. MARKS:** Objection to form.
[18] You can answer.
[19]    **A:** Well sometime after this press
[20] conference when we got our final legal
[21] interpretation from the General Counsel's office.
[22]    **Q:** Are you familiar with an employment
[23] or unemployment form called a Termination Form?
[24]    **A:** I know we have one, yes.
[25]    **MR. WAREHAM:** Mark this as

Page 50

*W. Kawadler*

[1]
[2] Plaintiff's 11.
[3]      (Plaintiff's Exhibit 11, document
[4] bearing Bates number D 0944, marked for
[5] identification.)
[6]    **Q:** Have you looked at it?
[7]    **A:** Yes.
[8]    **Q:** This is a form that is submitted
[9] when an individual staff member, an individual
[10] Council member wants to terminate an individual
[11] member of his or her staff, correct?
[12]    **A:** Correct.
[13]    **Q:** And it is that Council member who
[14] submits it, correct?
[15]    **A:** Correct.
[16]    **Q:** And it is the Council member who
[17] signs off on it, right?
[18]    **A:** Correct.
[19]    **Q:** Does the Speaker sign off on these?
[20] Does the Speaker sign off when an individual
[21] Council member wants to terminate an individual
[22] member of his or her staff?
[23]    **A:** The Speaker does not sign off on it
[24] if the Council member wants to terminate an
[25] employee.

Page 51

*W. Kawadler*

[1]
[2]    **Q:** Who signed off on Ms. Plummer's
[3] termination, was it Council Member Barron?
[4]    **A:** The Speaker.
[5]    **Q:** In paragraph 11 of your affidavit,
[6] you say in the middle of the paragraph, "In order
[7] to maintain the integrity of the Council and
[8] ensure the efficient operation of the Council,
[9] safeguard the relationships between Council
[10] members in conducting their business and the
[11] necessary need to address any threat to a Council
[12] member, Speaker Quinn, relying on her inherent
[13] powers as Speaker directed that the Chief of
[14] Staff of the Council transmit a letter of
[15] termination to Mrs. Plummer."
[16]      Where do her inherent powers as
[17] Speaker come from?
[18]    **A:** As the head of the City agency, her
[19] inherent — her inherent powers come from the
[20] fact that she's elected by the members to be the
[21] head of the agency.
[22]    **Q:** And your testimony is that when the
[23] other 51, 52 members of the Council, 50 members
[24] of the Council selected her as Speaker, that they
[25] were selecting her as the person who had control

Page 52

*W. Kawadler*

[1]
[2] over the personnel decisions of their staff?
[3]    **MR. MARKS:** Objection to form.
[4] You can answer.
[5]    **A:** Can you repeat that?
[6]      (The record is read.)
[7]    **A:** My testimony is that she was elected
[8] as the head of the City Council as an agency
[9] whose — and her job, part of her job was to —
[10] is to ensure the integrity of the Council and the
[11] efficient operation of the Council, and to
[12] safeguard relationships between Council members
[13] in conducting their business and the necessary
[14] need to address any threat to a Council member.
[15]    **Q:** Did you develop this concept of the
[16] inherent powers as Speaker?
[17]    **A:** Did I —
[18]    **MR. MARKS:** Objection.
[19]    **A:** Did I develop it?
[20]    **MR. MARKS:** Objection to form.
[21]    **Q:** That was your term? Where did that
[22] term come from, inherent powers of the Speaker?
[23]    **A:** I don't — probably the — our
[24] General Counsel's office.
[25]    **Q:** This is your affidavit, right? I

Wayne Kawadler Case 1:07-cv-06154-WHP    Document 24-8    Filed 10/30/2007    Page 34 of 41
Vol. 1, August 13, 2007                                                    Viola Plummer v.
                                                    Christine Quinn, Speaker of the City Council

---

Page 53

### W. Kawadler

[1]
[2] mean you're swearing to this?
[3]   **A:** Yes.
[4]   **Q:** Where did that term come from?
[5]   **A:** I don't know where that term came
[6] from.
[7]   **Q:** But your understanding is that it
[8] means that — state once again what your
[9] understanding of inherent powers as Speaker
[10] means?
[11]   **A:** It's her inherent power to run the
[12] Council in a professional manner and to protect
[13] the institution as a professional institution.
[14]   **Q:** So it's basically giving her carte
[15] blanche to do whatever she wants, as long as the
[16] rational is those things you just said,
[17] safeguarding the relationship and maintain the
[18] integrity?
[19]   **MR. MARKS:** Objection to form.
[20] You can answer.
[21]   **A:** It gives her power to ensure that
[22] the agency is run, and that the Council is run
[23] with integrity and with professionalism.
[24]   **Q:** Who makes that decision, the
[25] Speaker?

---

Page 54

### W. Kawadler

[1]
[2]   **A:** Yes.
[3]   **Q:** These powers are undefined any place
[4] in any — can you —
[5]   **A:** I — I —
[6]   **Q:** — point to any —
[7]   **A:** I am not a lawyer.
[8]   **Q:** — situation where this is set out?
[9]   **A:** We can look at the full Charter and
[10] find it, but I'm not a lawyer.
[11]   **Q:** Will you look through the full
[12] Charter and then indicate to me where that is?
[13]   **MR. MARKS:** You're asking him to
[14] look through the entire New York City
[15] Charter? Actually, I don't think that is a
[16] proper question in a deposition, generally
[17] the attorney can't instruct the witness —
[18]   **MR. WAREHAM:** That is true.
[19]   **MR. MARKS:** We got a Charter
[20] section, don't worry.
[21]   **MR. WAREHAM:** Can we take a
[22] two-minute break.
[23]   (Time noted: 3:52 p.m.)
[24]   (A brief recess is taken.)
[25]   (Time noted: 3:56 p.m.)

---

Page 55

### W. Kawadler

[1]
[2]   **MR. WAREHAM:** I'm finished. Do you
[3] have any questions?
[4]   **MR. MARKS:** I don't have any
[5] questions.
[6]   (Time noted: 3:56 p.m.)

---

Page 56

### W. Kawadler

[1]
[2] I, the witness herein, having read
[3] the foregoing testimony, do hereby certify
[4] it to be a true and correct transcript,
[5] subject to the corrections, if any, shown
[6] on the attached page.

[11]
[12]       **WAYNE KAWADLER**

[15] Subscribed and sworn to
[16] before me this ____ day
[17] of _____ 2007.

Page 57

[1]            L. Comrie

[2]            CERTIFICATE

[3] STATE OF NEW YORK )

[4]

[5] COUNTY OF NEW YORK)

[6]        I, KAREN PERLMAN, a Shorthand Reporter and

[7] Notary Public within and for the State of New

[8] York, do hereby certify:

[9]        That WAYNE KAWADLER, the witness whose

[10] deposition is hereinbefore set forth, was duly

[11] sworn by me and that such deposition is a true

[12] record of the testimony given by such witness.

[13]        I further certify that I am not related to

[14] any of the parties to this action by blood or

[15] marriage, and that I am in no way interested in

[16] the outcome of this matter.

[17]        IN WITNESS WHEREOF, I have hereunto set my

[18] hand this 20th day of August, 2007.

[19]

[20]

[21]

[22]

[23]

[24]            KAREN PERLMAN

[25]

Page 58

[1]            W. Kawadler

[2]            INDEX

[3] WITNESS        EXAMINATION BY        PAGE

[4] WAYNE KAWADLER  MR. WAREHAM        4

[5]

[6]            EXHIBITS

[7] PLAINTIFF'S  EXHIBIT            PAGE LINE

[8] 8    Affidavit of Wayne Kawadler...... 21  25

[9] 9    City Council's Policy Against.... 23  21

        Employment Discrimination and

[10]    Unlawful Harassment

        dated June 13, 2006

[11]

    10    Transcript of a press............ 45  18

[12]    conference on June 5, 2007

        Bearing Bates numbers D 0782

[13]    and D 0783

[14] 11  Document bearing Bates........... 50  3

        number D 0944

[15]

[16]

[17]    QUESTIONS DIRECTED NOT TO ANSWER

[18]        PAGE   /  LINE

[19]        17      12

[20]

[21]

[22]

[23]

[24]

[25]

**Lawyer's Notes**

# 0

**0782** 45:20, 23; 46:5, 6
**0783** 45:20, 23
**0944** 50:4

# 1

**10** 45:17, 18
**11** 50:2, 3
**11412** 4:4
**13** 23:24; 24:9
**13th** 13:22; 20:20
**1st** 41:4

# 2

**2006** 23:24; 24:9
**2007** 7:5; 10:16; 12:13;
13:23; 14:15; 21:18; 32:8;
34:6; 41:12; 45:12, 19, 24;
48:15; 56:17
**21** 16:2; 33:2
**27th** 13:22
**2:56** 23:18
**2nd** 24:20

# 3

**30** 7:5; 10:16; 32:8; 34:6
**30th** 9:16; 12:12; 14:13
**31st** 20:25
**3:02** 23:20
**3:52** 54:23
**3:56** 54:25; 55:6

# 5

**51** 51:23

# A

**ability** 4:25
**able** 15:6; 42:7, 16
**academic** 47:11
**access** 6:4
**according** 28:17; 29:9;
30:20; 41:4, 13
**accountable** 30:11
**action** 28:9, 12, 13;
30:22; 31:8, 13; 49:5
**actually** 24:4; 54:15
**addition** 16:22
**additional** 34:7
**address** 4:3; 28:14;
51:11; 52:14
**administrative** 5:20;
6:19; 18:25
**advisor** 5:5, 7, 11, 14, 19,

24, 24; 6:8; 9:19
**Advocate** 10:4, 6, 17, 19
**affidavit** 6:24; 21:19, 22,
25; 24:20; 25:7, 9, 12, 15,
17, 21; 27:14; 32:4; 34:4;
51:5; 52:25
**afternoon** 4:10
**again** 6:19; 14:8; 18:19;
25:13; 31:4; 39:11; 48:5;
53:8
**against** 23:9, 22; 24:5,
16; 25:25; 28:2; 31:20;
32:7; 48:18
**agencies** 32:16
**agency** 15:15, 18, 23;
17:9, 13; 18:7; 19:5; 32:13,
22, 25; 33:3, 7, 11, 18, 19,
20; 51:18, 21; 52:8; 53:22
**agenda** 12:12, 12
**aisle** 11:11, 12
**Alderado** 41:12
**allegation** 27:25
**allow** 38:21
**alone** 42:18
**Although** 31:12
**Alvarado** 40:23
**Alvin** 20:11
**amendment** 12:5
**Application** 22:12;
38:16; 39:2, 13
**appointed** 34:3
**Appointment** 36:8, 20;
37:21
**appropriate** 30:23; 31:7
**appropriately** 31:13
**approval** 37:14; 39:20
**approve** 37:18, 22, 9;
36:13; 39:13; 40:3, 6
**approving** 37:10
**approximately** 20:13,
15, 22
**argue** 33:13, 15
**around** 20:22; 41:25;
42:15; 49:15
**ass** 12:17, 18
**assassinate** 13:10; 34:8
**assassinating** 12:17
**assess** 34:14
**assuming** 39:12
**attached** 56:6
**attend** 13:21; 34:23; 35:4;
45:11
**attention** 13:2; 16:15;
25:23
**attorney** 4:11; 17:17;
19:5, 8, 18, 21; 42:20;
54:17; 18:13, 15, 17, 21,
24, 25; 20:8
**attorney-client** 17:23
**authority** 9:24; 14:5, 7,
11, 20, 22, 25; 16:7; 28:22;
41:6, 14; 42:2, 7, 16, 25;
43:8, 13; 46:17; 48:11
**aware** 10:12; 11:17, 21,

23; 12:16; 32:15; 33:10;
41:3, 10, 11, 19, 22

# B

**back** 8:25; 32:25; 38:2;
46:20
**background** 47:11
**balcony** 9:17
**Barbara** 20:10
**Barron** 35:14, 25; 36:5;
41:5, 14; 46:10; 47:24;
48:17; 51:3; 9:12
**based** 38:20
**basic** 4:16
**basically** 14:13; 53:14
**basis** 38:3
**Bates** 45:20, 22; 50:4
**bearing** 45:20; 50:4
**became** 17:6
**behavior** 8:21
**behest** 47:3
**beliefs** 39:3
**believes** 46:16
**besides** 18:21
**Betsy** 10:17
**better** 18:11
**blanche** 53:15
**body** 16:21; 17:7; 33:5
**borough** 33:15, 16
**Bragg** 20:11
**break** 4:21; 54:22
**brief** 23:19; 54:24
**brought** 18:3
**business** 4:2; 47:18;
51:10; 52:13
**Butler** 20:10

# C

**called** 36:8; 49:23
**calling** 8:6, 9, 9, 10, 18
**calls** 17:17
**came** 13:4; 17:14; 18:4,
13; 53:5
**can** 4:22; 7:16, 21, 23;
8:25; 10:6, 8, 12, 13;
12:20, 21; 14:17, 18; 16:4,
6, 16; 17:12; 18:3; 19:11;
20:3, 7; 23:16; 26:8; 29:2,
3, 4, 6, 14, 25; 30:5, 19;
31:2; 32:20, 21; 33:2;
34:16; 36:21; 37:21; 38:7,
15, 18, 19, 19; 40:7; 41:9;
42:4; 43:4, 23; 44:5, 9, 16,
24; 47:6, 7, 8; 48:21;
49:18; 52:4, 5; 53:20; 54:4,
9, 21
**Capel** 34:22
**cards** 36:2
**Carl** 34:13
**carried** 12:6
**Carson** 8:23; 12:6

**carte** 53:14
**case** 10:7
**categories** 26:20, 24;
27:2, 4
**category** 27:10, 11
**caused** 34:15
**center** 11:11
**Central** 26:12; 27:7;
29:22; 30:3, 5
**certain** 16:10, 12; 22:12
**certify** 56:3
**chambers** 9:13; 11:2, 5
**changed** 49:15
**Charles** 34:11; 41:5, 5,
13; 47:24; 48:17
**Charter** 14:23, 25; 15:6;
16:16, 23, 25; 17:4; 32:24;
33:2; 54:9, 12, 15, 19
**Chief** 34:11, 20, 21, 22;
47:24; 48:16; 51:13
**Christine** 34:10; 40:12,
12, 17; 41:12
**Chuck** 41:13; 48:7
**City** 4:3; 5:3, 4; 9:20;
15:17, 20; 16:22, 25;
17:10, 13, 13; 18:6, 8, 9;
19:4; 21:3, 6; 23:21; 24:4,
16; 25:24; 26:18; 32:12,
13, 15, 17, 23; 33:5, 8, 10,
13; 34:10; 35:20; 36:3;
40:18; 46:18; 48:4, 8, 10,
16, 19, 20; 51:18; 52:8;
54:14
**clarify** 4:20
**clear** 10:13; 40:11
**clearly** 4:25
**clerk** 33:14
**client** 17:17
**close** 9:11, 12; 28:5
**co-namings** 12:9
**college** 47:12
**comment** 12:23
**committee** 28:15, 20, 21;
29:10; 30:4
**communication** 17:18;
45:10
**Complaint** 26:4; 28:3;
31:20; 32:7; 23:12
**completed** 12:11
**composed** 33:24
**comptroller** 33:18
**Comrie** 13:11; 32:7; 34:9;
35:10; 41:24; 12:17
**concept** 52:15
**concerning** 34:8
**conclude** 22:16
**conclusion** 22:9; 27:13;
43:20, 24; 25:20, 20
**conduct** 7:14, 19; 11:17,
20; 12:2, 4, 8; 14:12; 34:6;
51:10; 52:13
**confer** 17:21
**conference** 13:9, 13, 16;
45:11, 19, 24; 48:14;

49:20; 45:15
**consideration** 28:16
**constitute** 28:4
**consult** 48:20
**content** 4:19; 27:18; 23:8
**contradicts** 27:13
**control** 51:25
**conversation** 18:16;
42:21
**corrections** 56:5
**corrective** 29:16
**Council** 5:4; 9:11, 12, 21;
9:10; 12:11; 13:11, 22;
15:2, 18, 20; 16:8, 19, 20,
21, 23; 17:3, 7, 13; 18:7, 8,
9, 14, 15, 18, 20; 19:4;
21:3, 6, 8, 11, 13; 22:17,
19, 20, 21; 24:5, 16; 25:3,
25; 26:11, 15, 18; 27:8, 12,
16, 20; 28:2, 6, 23; 29:12,
19, 20; 31:9, 17; 32:6, 12;
33:4; 34:7, 9, 10, 12, 14,
25; 35:4, 9, 10, 10, 11, 20,
21, 25; 36:3, 5, 12, 22;
37:11, 20; 38:4, 15; 39:14,
24, 25; 40:2, 4, 8, 9; 41:12,
15; 45:8; 46:10, 19;
48:4, 8, 17, 18, 21; 49:9;
13, 14; 50:10, 13, 16, 21,
24; 51:3, 7, 8, 9, 11, 14, 23,
24; 52:8, 10, 11, 12, 14;
53:12, 22; 26:14, 15, 25;
23:22; 26:12; 27:7; 48:10
**Councilman** 12:17;
46:10
**counsel** 18:5, 8, 14, 18;
35:13; 42:9, 10, 15; 43:12,
14; 44:13, 14, 15; 48:16;
18:22; 44:23; 49:11, 21;
52:24
**couple** 4:12; 8:25
**course** 16:9; 20:5
**CQ** 46:4
**cracker** 8:10, 18

# D

**D'Alba** 11:25; 34:13
**date** 20:14; 44:24, 25;
23:24; 24:9
**day** 9:9; 11:2, 5; 12:13;
56:16
**dealt** 30:5
**death** 48:17
**decision** 28:13; 53:24;
52:2
**deem** 31:8; 10:14; 30:23
**definitely** 16:13
**degree** 20:3; 47:12, 15,
19
**denied** 37:4
**deny** 37:21; 38:4
**department** 18:9; 6:3
**deposed** 4:14
**deposition** 54:16

Wayne Kawadler

Viola Plummer v.
Christine Quinn, Speaker of the City Council

Vol. 1, August 13, 2007

Deputy 34:20, 21, 22
derive 14:21
describe 7:13, 18
determination 31:10, 16
determine 28:11, 7;
38:11
develop 52:15, 19
devoted 8:23
Dickens 35:11
differ 5:24
different 26:20; 29:21;
30:2
DIR 17:12
direct 6:2, 4; 17:18; 51:13
direction 48:3, 6, 8
directly 25:18; 28:6, 23;
29:21; 30:6, 8
Director 34:12; 45:10
disciplinary 28:9
discipline 14:6; 28:22;
29:11
Discriminate 26:17
Discrimination 22:15;
23:9, 12, 23; 24:5, 6, 8, 17;
25:25; 26:10, 14, 17;
27:10, 11, 19, 25; 28:4, 14
discuss 49:12; 45:13
discussion 42:10, 11;
43:19, 21; 44:2, 14; 42:6,
14; 43:16, 17; 44:6, 22
disruption 9:25; 10:7;
34:14
disruptive 7:16, 22; 8:21;
9:14; 34:6
distinction 27:5, 6
district 5:22; 6:21
division 5:21, 21; 6:20,
20
document 7:2; 23:5, 7;
50:3; 6:22; 21:16; 24:19,
24
done 24:13; 48:3
down 13:4
draw 16:15; 25:23
duly 4:4
during 7:14; 8:11, 12, 14,
16, 22; 10:18; 11:7, 18, 20,
25; 34:6

**E**

efficient 51:8; 52:11
either 4:18; 32:8
elected 33:11, 14, 16, 19,
20, 22, 24; 51:20; 52:7
eligibility 38:10
eligible 38:9
Elizabeth 20:10
else 9:13
employ 28:6; 29:20
Employee 22:13; 25:3;
27:16; 28:2, 7, 22; 46:18;
50:25; 22:17, 20, 21;

26:11, 15, 20, 22, 25; 27:6,
7, 8, 12, 19; 29:19
employer 35:17
Employment 22:13;
23:22; 24:7, 16; 25:25;
49:22
end 49:2
ensure 51:8; 52:10;
53:21
entire 7:7; 8:16, 17;
48:25; 54:14
enumeration 16:25
Ethics 22:15, 23, 25;
23:13; 24:3; 28:16; 31:14,
21, 24
even 8:6
events 32:8
exact 19:17
EXAMINATION 4:8
examined 4:6
except 17:3
Exhibit 15:25; 21:25;
23:21; 24:11; 45:18; 50:3;
25:11, 16
existed 41:17
exists 33:20
explicit 7:21
extent 17:16

**F**

face 9:24
fact 11:21; 22:13; 51:20
fails 28:13
Fair 28:19, 21
Fairness 28:18
familiar 9:20; 22:3, 23,
25; 23:3, 8, 13; 49:22
FIC 27:24; 28:3, 7, 12, 15,
18; 29:15, 17, 18; 30:3
Fidler 35:11
file 31:20, 24; 21:20; 32:7
filing 23:11
final 36:16; 49:20
find 48:21; 54:10; 28:3
Fine 20:10; 49:10
finished 55:2
fire 15:19; 41:6, 14; 42:8,
16; 43:2, 8, 13; 44:19;
48:11
first 4:4; 15:13, 14; 26:3;
34:17, 20; 41:23; 44:8;
46:3
five 25:24; 26:3, 4
floor 9:18; 10:13
follows 4:7
foregoing 56:3
form 4:19; 12:19; 14:16;
28:25; 29:13, 24; 30:12,
16, 24; 32:18; 33:25; 36:5,
9, 20; 38:6, 17; 41:7; 42:3;
43:3, 22; 44:4; 46:25; 47:5;
49:17, 23, 25; 50:8; 52:3,

20; 53:19; 22:10, 10, 17;
24:25; 25:2; 27:15
found 19:3
four 22:8, 24; 25:2, 6;
26:3; 27:13
front 48:22
full 54:9, 11
functioning 18:23
further 28:16

**G**

General 18:8, 14, 17, 21;
33:11; 44:23; 49:11, 21;
52:24
generally 54:16
gives 14:25; 16:6; 53:21
giving 53:14
goes 30:7, 13
Good 4:10
Gotbaum 10:17; 11:20
governing 9:20
graduate 47:19
grounds 38:10
guess 18:11

**H**

half 5:8; 46:4
Hall 4:3; 5:3; 48:19
happen 8:13, 14, 19;
36:24; 41:23; 43:25; 48:22
Harassment 22:14; 23:9,
12, 23; 24:8, 17; 26:2, 11,
14, 18; 27:12, 19, 25; 28:4,
14
hat 9:10
head 15:15, 17, 21;
51:18, 21; 52:8; 26:4
health 47:22
hear 12:23; 8:6
held 13:16; 17:2
hereby 56:3
herein 56:2
hire 15:19; 36:6, 22;
37:10; 38:21; 39:20; 40:3,
5, 10; 22:19; 24:22; 30:14,
21; 36:4; 37:3; 39:3, 4, 7,
10; 24:21; 40:18
hiring 36:13, 21; 37:4, 8;
39:14
hope 49:9

**I**

idea 9:6
identification 22:2;
23:25; 38:13; 45:21; 50:5
identifies 17:6
identify 15:7; 16:6; 17:9;
20:9
illegal 39:5, 8, 11

immediately 5:10
impair 4:24
implement 32:16
implies 19:23
incident 41:23
include 22:5; 22:12;
25:10, 16; 48:25
incomplete 38:5
independent 49:9
indicate 4:19; 22:10;
32:3; 34:16; 54:12; 24:20,
25; 46:8, 12; 26:19; 33:7
individual 15:2; 16:7;
21:7, 8, 12; 22:19; 28:23;
29:12, 19; 31:9, 17; 33:16;
36:22; 37:11; 39:14; 50:9,
9, 10, 20, 21; 28:6; 29:21
ineligibility 38:11
information 34:7
ing 48:21
inherent 51:12, 16, 19,
19; 52:16, 22; 53:9, 11
initial 42:24
initially 14:6
institution 49:5; 53:13,
13
instruct 54:17
integrity 51:7; 52:10;
53:18, 23
interpretation 49:21, 10
interruptive 7:16, 22;
8:20; 9:14
Intervention 28:19, 21
into 16:17; 26:8; 27:21
investigate 27:24
investigation 28:5
issue 44:7; 45:13

**J**

Jim 20:11
job 6:13; 32:22; 33:3;
47:24; 52:9, 9
July 21:18; 24:20
June 13:22, 22; 20:16,
20; 23:24; 24:9; 41:4, 12;
45:4, 12, 19, 24; 48:14

**K**

KAWADLER 4:2, 10;
22:2; 32:3; 56:12
Keaney 34:21
knowledge 31:19

**L**

language 30:16; 33:6
last 48:16
law 16:23; 38:20, 20
laws 21:16, 20, 23; 33:3
lawsuit 21:20

lawyer 54:7, 10; 48:21
leadership 35:5, 6, 7, 9,
16; 49:12
legal 14:5, 7; 15:11, 14;
18:9; 49:4, 10, 20
legislative 16:21, 24;
17:2, 7; 33:5
LEMONEDES 12:21;
16:9; 18:2, 10; 19:6, 11,
17, 22; 20:3, 7, 11; 24:10;
32:21; 47:7
Leroy 34:9; 41:23
less 29:11
letter 47:10; 48:7; 51:14
Liar 8:4
limit 17:2; 18:17
long 5:6, 13; 18:12; 53:15
look 16:4; 23:16; 33:2;
54:9, 11, 14; 24:15; 50:6
lot 42:23; 45:2, 15
Loud 7:16, 22, 25; 8:20;
9:14

**M**

maintain 51:7; 53:17
makes 27:6; 31:10, 16;
33:20; 53:24
making 10:21; 22:18
manner 53:12
Manual 22:16, 24, 25;
23:13; 24:3; 31:22, 25
many 42:21; 44:6
Maria 40:23; 41:11
mark 21:23; 45:16; 49:25;
15:25; 22:2; 23:24; 45:21;
50:4; 12:19; 14:14, 16;
17:16, 24; 18:11, 20; 19:9;
24:4, 7, 12; 28:19, 25;
29:4, 13, 24; 30:12, 15, 24;
31:2; 32:18, 20; 33:25;
38:6, 17; 41:7, 9; 42:3;
43:3, 22; 44:4; 46:25; 47:5;
49:17; 52:3, 18, 20; 53:19;
54:13, 19; 55:4
marketing 47:18
Martinez 34:20
materials 22:12; 25:10,
16
matter 28:15; 49:12
Maura 34:21
may 4:24; 7:5; 9:16;
10:16; 12:12; 14:13;
17:22; 20:25; 32:8; 34:2, 6
maybe 16:5; 20:18
mean 8:8; 15:8, 21;
19:19; 20:24; 23:3; 35:3;
37:19; 38:20; 42:17;
43:16, 20; 45:3; 53:2, 8, 10
Meara 34:12; 41:5, 13;
48:7
measures 29:16
medications 4:24
meet 35:2; 7:4, 8, 11, 14,



19; 8:11, 12, 15, 16, 17,
22; 10:16, 18; 11:8, 18, 21,
25; 12:13; 13:4; 20:19, 25;
34:7; 48:16
**meetings** 13:21; 14:2;
34:19, 23; 35:4; 42:22, 23;
45:2
**Member** 9:11, 12; 13:11;
21:7, 8, 12, 13; 22:20;
26:15; 27:8, 12, 20; 28:3,
7, 9, 11, 13, 23; 30:4, 14,
21, 22, 23; 31:3, 7, 7, 10,
12, 16, 18; 32:6; 34:9;
35:10, 10, 11, 14, 25; 36:5,
12, 22; 37:10, 11, 15, 16,
20, 23; 38:2, 4; 39:24, 25;
40:2, 4, 8, 9; 48:18; 49:9;
50:9, 10, 11, 13, 16, 21,
22, 24; 51:3, 12; 52:14;
22:17; 25:3; 27:16; 8:2, 7;
10:10; 11:12; 15:2, 3; 16:8;
22:19; 26:18, 23; 28:5;
29:11, 12, 19, 20, 23;
33:11, 24; 34:3, 14, 17, 18,
25; 35:8; 39:14; 51:10, 20,
23, 23; 52:12
**membership** 33:23
**memo** 41:3, 11, 16
**met** 34:11; 35:5, 13, 24
**middle** 20:15; 51:6
**missing** 37:25
**more** 6:2, 3, 3; 7:21;
19:18; 20:2; 30:16
**most** 40:18
**Mrs** 7:10, 14; 9:5; 14:6,
12; 24:21; 32:7; 47:3, 9,
23; 51:15
**much** 29:11
**Mullin** 45:5

# N

**name** 4:11; 8:9; 12:6; 8:7,
9
**near** 11:13; 49:2
**necessary** 10:14; 51:11;
52:13
**need** 4:21; 51:11; 52:14
**New** 4:3, 3; 15:17, 20;
17:10, 14; 18:7; 22:11;
24:15, 21; 25:24; 32:13,
17; 33:8, 10; 34:10; 35:20;
36:2; 54:14
**noise** 10:21
**none** 21:15; 22:9, 16;
24:25; 25:2; 27:15
**Northeastern** 47:16
**Notary** 4:5
**noted** 23:18, 20; 54:23,
25; 55:6
**notice** 28:10
**notify** 28:12
**Noting** 16:9
**number** 20:8; 50:4; 45:20
**numerous** 34:13

# O

**oath** 4:6
**Object** 17:16
**Objection** 12:19; 14:14,
16; 28:25; 29:13, 24;
30:12, 15, 15, 18, 24;
32:18; 33:25; 38:6, 17;
41:7; 42:3; 43:3, 22; 44:4;
46:25; 47:5; 49:17; 52:3,
18, 20; 53:19
**observed** 9:4, 6
**off** 37:15; 39:15, 16, 17,
18; 40:13, 17; 50:17, 19,
20, 23; 51:2
**office** 5:22; 6:21; 13:3;
18:22; 33:14, 17; 44:23;
49:11, 21; 52:24; 37:7
**officer** 10:15
**often** 8:13, 14, 18
**once** 36:19; 37:8, 16, 18;
53:8
**one** 6:25; 18:10; 19:18;
20:2; 24:19, 24; 26:23;
30:10; 31:24; 44:8; 48:15;
49:2, 24
**ones** 6:17, 18; 44:15
**only** 6:25, 25; 16:10;
29:17; 41:5, 13
**operation** 52:8; 52:11
**options** 49:4, 7
**order** 9:24; 10:6, 12;
39:13; 51:6
**out** 8:9; 12:6; 19:3; 48:21;
54:8
**outbursts** 34:15
**outside** 13:10; 43:12;
48:18
**over** 16:7; 24:15; 36:17;
52:2
**oversee** 5:20

# P

**p.m** 23:18, 20; 54:23, 25;
55:6
**package** 12:9
**page** 25:24; 26:2, 3; 56:6
**paid** 40:7
**paper** 40:9, 18; 38:22, 22
**paperwork** 37:25; 38:5;
39:12
**paragraph** 16:17; 22:8,
24; 25:2, 6; 27:13, 22;
33:7; 34:4; 45:25; 46:3;
49:2; 51:5, 6
**parameters** 49:7
**part** 6:12; 8:22; 17:21;
21:19; 25:11; 52:9
**particular** 6:7; 7:23; 8:3;
45:25
**pass** 32:16, 23; 33:3
**payroll** 40:7; 48:20

**people** 8:7; 9:15, 18;
10:9, 20; 18:24; 22:19;
30:3; 35:8, 12; 37:3; 41:23
**person** 19:3, 14; 30:14;
36:21; 37:24; 38:20; 39:3,
4, 7, 10; 40:6; 51:25
**personnel** 6:7; 15:19;
16:7; 22:11; 25:3; 27:15;
52:2
**Physically** 39:16, 17, 18
**place** 54:3
**Plaintiff's** 15:25; 21:24,
25; 23:21; 25:24; 45:17,
18; 50:2, 3
**please** 4:19; 20:9; 25:13;
27:20; 29:6
**Plummer** 4:12; 7:10; 9:5;
10:19, 23; 12:16; 13:10,
25; 14:6, 12; 21:6, 11, 20;
24:21; 31:21; 32:7; 35:17,
19; 36:4; 39:19; 41:6, 14,
24; 42:8, 16; 43:2, 9, 13;
44:20; 45:13; 46:9, 18;
47:3, 9, 23; 48:12; 49:3,
16; 51:15; 7:14, 19; 11:17,
20, 25; 12:4, 8; 34:5, 15;
51:2
**point** 9:5; 12:15; 20:25;
22:18; 49:2; 54:6
**Policy** 22:14; 23:9, 22;
24:5, 16; 25:25; 26:19;
28:8; 31:21, 23
**political** 12:18; 39:3
**politics** 39:2
**portions** 16:10, 12
**position** 45:9; 46:9, 13,
15, 24; 48:11; 49:15; 19:2
**Possibly** 15:8
**power** 15:19; 16:24; 17:2;
29:15; 43:18, 25; 44:11,
19; 53:11, 21; 16:22, 25;
51:13, 16, 19; 52:16, 22;
53:9; 54:3
**precedent** 29:10
**preliminary** 4:12
**preparation** 6:23; 22:6
**presence** 43:11
**present** 42:15, 20; 43:14;
44:3, 10, 16; 17:14; 20:13;
32:12
**president** 33:16, 15
**presiding** 10:15
**press** 13:9, 12, 16; 41:2;
45:11, 15, 19, 24; 48:14;
49:19
**prevent** 12:4, 8
**prior** 5:9, 10, 16; 21:5, 10;
25:9, 14
**privilege** 17:23, 17;
18:16; 19:16, 21
**probably** 37:6; 52:23
**procedure** 23:11; 28:17;
29:9, 22; 30:2, 6; 32:9
**professional** 53:12, 13
**professionalism** 53:23
**promptly** 27:24; 28:11;

31:8
**proper** 37:24; 38:12, 22;
54:16
**protect** 53:12
**provide** 28:10; 29:16;
17:3; 22:11
**Public** 4:5; 10:4, 6, 17,
18; 33:12, 12, 17; 47:22
**put** 40:7

# Q

**quiet** 10:9, 19, 22
**Quinn** 11:14; 14:5, 11;
34:11; 40:12, 12, 17;
41:12; 51:12
**quote** 29:20; 15:18, 21

# R

**race** 39:7
**Ramon** 34:20
**rational** 53:16
**reach** 25:20
**reaction** 11:16; 48:19
**read** 16:2, 16; 23:7, 14;
26:8; 27:20; 29:7; 31:5;
32:25; 46:20; 48:24; 52:6;
56:2; 46:2
**reason** 38:23, 16
**recall** 9:17; 14:3; 20:4, 7;
43:10; 35:11
**Receipt** 22:13, 15
**received** 24:21, 22
**receives** 28:2
**recess** 23:19; 54:24
**recognizes** 29:18
**recommend** 28:8; 29:17;
30:3; 40:5, 10
**recommendation** 30:7;
28:10
**record** 16:17; 26:8;
27:21; 29:7; 31:5; 32:2;
37:2; 52:6
**refer** 7:23; 15:24, 25;
22:17, 24; 25:2; 27:15;
28:15; 32:25; 31:13
**reject** 38:15, 19, 25; 39:6,
9
**relate** 21:16; 49:3
**relationship** 53:17; 51:9;
52:12
**relying** 51:12
**remain** 48:20
**remark** 12:16
**remedial** 28:8
**Remedies** 26:5
**remember** 7:15; 8:3, 14;
9:8, 10; 11:3; 13:6, 7; 14:2;
20:12, 20, 21; 44:9, 16
**removed** 11:2, 4
**renaming** 8:24
**repeat** 7:17; 29:6; 52:5

**rephrase** 14:9
**reporter** 48:15
**reports** 6:2
**Request** 36:9, 20; 37:20,
4
**researching** 49:4
**Resolution** 26:4
**respect** 10:9
**response** 21:19; 48:15,
24, 25
**responsibilities** 6:8, 16
**responsibility** 5:18;
6:11, 13, 18
**rest** 49:13
**restore** 9:24; 10:6, 12
**result** 34:5
**review** 6:22; 25:18; 26:4;
7:2; 22:5; 25:10, 15, 19;
24:2; 32:3
**right** 13:19; 17:10; 22:3;
25:5; 31:15; 33:20, 23;
37:23; 40:12, 13; 46:11;
50:17; 52:25
**Rivera** 35:5
**Rodney** 34:22
**Roger** 4:11
**role** 19:8
**rules** 4:16; 9:20, 23
**run** 33:17, 19, 20; 53:11,
22, 22

# S

**safeguard** 51:9; 52:12;
53:17
**Sandra** 45:5
**saying** 18:20; 19:22;
30:17; 35:22; 36:19; 38:3,
14
**scheduled** 12:12
**scheduler** 5:17
**scheduling** 5:21; 6:20
**seat** 11:13
**second** 16:3; 18:10; 46:4
**secretary** 41:2
**section** 14:24; 15:4, 5;
16:2, 6, 16; 17:6; 32:24;
33:2; 54:20; 16:5
**Security** 34:12
**selected** 51:24
**selecting** 51:25
**Senior** 5:5, 6, 19, 23; 6:8;
9:19; 34:13, 17, 18
**sent** 38:2; 41:3, 12
**separate** 49:8
**services** 5:21; 6:20
**set** 54:8
**several** 8:4; 10:20
**sex** 39:10
**Shall** 16:18, 20, 21, 24;
17:2; 27:24; 28:9, 15; 33:4
**Sheet** 22:13; 37:9, 10
**showed** 15:5

**shown** 56:5
**side** 9:11, 12
**sign** 40:13, 17, 18; 50:19, 20, 23; 39:18, 20; 51:2; 25:9, 14; 36:11; 37:9, 9, 13, 13, 15, 15; 39:15, 16, 17, 19; 40:9; 50:17
**single** 19:23
**sitting** 9:11; 11:7
**situation** 54:8
**somebody** 4:22; 8:10; 13:4; 37:17, 21, 22; 38:21; 39:18
**someone** 8:18
**sometime** 45:3, 3; 49:19
**Sonny** 8:23; 12:5
**soon** 49:11
**sorry** 6:17; 26:3; 29:5
**speak** 10:10; 8:2; 19:5; 50:18
**Speaker** 5:5, 7, 12, 14, 17, 19; 6:5, 9, 12, 14; 9:19; 11:14, 16; 14:5, 11; 21:2, 6, 11; 28:11; 29:10, 11; 30:6, 7, 10; 31:11, 15, 20; 34:9; 36:14, 18, 20; 37:11; 39:21; 41:2, 4, 19, 25; 42:7, 11, 12, 15, 17, 19; 45:12; 46:16, 21; 47:4, 10; 48:4, 8, 10; 49:5; 50:19, 20, 23; 51:4, 12, 13, 17, 24; 52:16, 22; 53:9, 25; 5:22; 13:3; 21:19; 36:15, 16; 37:5; 38:15, 25; 42:24; 46:8, 13, 23; 49:15
**special** 5:11, 13, 24
**specific** 44:25
**specifically** 7:24; 17:3
**specify** 10:23
**spoke** 7:25; 11:19, 24; 20:8
**staff** 6:12, 13; 15:2; 21:7, 12; 26:12; 27:7; 29:11, 17, 22; 30:4, 4, 5, 11, 22; 31:16; 34:11, 13, 17, 18, 21, 21, 22; 36:2, 15, 16, 21; 37:5, 10; 38:4, 15, 25; 39:14; 47:24; 48:17; 50:9, 11, 22; 51:14; 52:2
**stamped** 45:22
**standards** 28:16; 31:14
**standing** 11:9, 10, 13
**start** 40:7; 44:8
**state** 34:5; 53:8; 7:4; 10:16; 13:4, 21; 20:19, 25; 22:9; 27:14; 32:25
**statement** 25:15
**stating** 4:2
**steps** 10:5, 11; 13:17
**street** 8:23; 12:9
**stricken** 40:21
**sub** 26:4; 27:11; 30:7
**subheading** 26:9, 5
**subject** 56:5
**submit** 21:18; 36:5;

50:14, 8
**subparagraph** 27:18
**Subscribed** 56:15
**subsection** 30:13, 21
**sufficiently** 25:19
**suggesting** 19:24
**supervise** 6:3
**supervising** 6:13, 18
**Sure** 23:17; 31:6; 42:21; 49:6
**suspend** 14:6, 11, 25; 21:7
**suspension** 21:5
**swearing** 53:2
**sworn** 4:5; 25:15; 56:15

**T**

**talk** 44:15
**task** 5:23
**team** 35:5, 6, 7, 9, 16; 49:12
**technical** 38:16, 23
**term** 52:21, 22; 53:4, 5; 4:19; 5:10; 6:17; 7:21; 17:21; 44:9
**terminate** 15:2; 46:17; 50:10, 21, 24; 21:12; 41:24; 47:3, 9, 23; 48:6
**termination** 21:10; 39:19; 49:23; 51:3, 15
**testified** 4:6
**testifying** 4:17
**testimony** 6:23; 51:22; 52:7; 56:3
**theory** 15:9, 11, 14; 17:12, 14; 19:4; 20:13; 32:11
**therefore** 36:18
**thought** 43:24
**threat** 48:18; 51:11; 52:14; 34:8, 15
**threaten** 10:25; 13:10
**three** 26:5, 19, 23
**Throughout** 8:17
**times** 8:5; 10:20; 11:15
**title** 5:3; 26:9
**today** 4:24; 6:23
**told** 13:5, 18; 41:16
**top** 26:2
**transcript** 45:18, 23; 56:4
**transmit** 51:14
**true** 8:5; 54:18; 56:4
**try** 4:20
**two** 11:11; 26:22, 24
**two-minute** 54:22

**U**

**Umm-hmm** 22:4, 7
**undefined** 54:3
**under** 4:6; 6:12, 14; 9:23;

26:3; 30:6, 13; 31:21, 21, 23, 24; 32:8
**undergraduate** 47:15
**underneath** 4:17
**unemployment** 49:23
**University** 47:16
**Unlawful** 23:23; 24:8, 17; 26:2, 10
**unless** 18:3; 19:18; 38:8
**Unprofessional** 7:20; 8:21
**unresponsive** 40:21
**upon** 24:22

**V**

**various** 34:19; 42:22, 22
**versus** 30:4
**vested** 16:22, 24
**veto** 36:21
**view** 46:23
**Viola** 4:12; 39:19; 41:6, 14; 42:8, 16; 43:2, 8, 13; 44:19; 45:13; 48:12; 49:15; 28:8
**voice** 7:25
**vote** 12:5, 9
**voting** 33:12

**W**

**wants** 36:22; 50:10, 21, 24; 53:15
**WAREHAM** 4:9, 11; 16:12; 17:20; 18:19, 23; 19:15, 20, 25; 20:5; 21:4, 17, 23; 24:2, 6; 32:2; 40:20; 41:18, 21; 45:16, 22; 49:25; 54:18, 21; 55:2
**watching** 10:21
**WAYNE** 4:2; 22:2; 56:12
**wearing** 9:8
**week** 48:16
**white** 9:10
**whose** 33:11; 37:3; 52:9
**wise** 20:14
**Withdrawn** 21:4, 17; 41:18, 21
**without** 42:15; 43:14
**WITNESS** 29:3; 30:25; 32:19; 41:8; 54:17; 56:2
**words** 14:12, 12
**work** 5:10; 38:21, 22; 46:9; 49:8; 35:19, 20; 45:8; 49:16; 6:12, 14; 46:10; 49:8
**worry** 54:20

**Y**

**year** 5:8, 15
**York** 4:3, 4; 15:17, 20;

17:10, 14; 18:7; 24:16; 25:24; 32:13, 17; 33:8, 10; 34:10; 35:20; 36:3; 54:14

**Lawyer's Notes**