Exhibit J

**Page 1**

[1]
[2] UNITED STATES DISTRICT COURT
[2] SOUTHERN DISTRICT OF NEW YORK
[3]
[4] VIOLA PLUMMER,
[5]     Plaintiff,    Civil Action No.
[6] -against-    07 CV 6154(WHP)
[7] CHRISTINE QUINN,
[8] Speaker of the City Council,
[9]     Defendant.
[10]
[11]    August 13, 2007
        10:12 a.m.
[12]
[13]
[14]
[15]    DEPOSITION of LEROY COMRIE, taken by
[16] the Plaintiff, pursuant to Notice, at the law
[17] offices of The Corporation Counsel, 100 Church
[18] Street, New York, New York before Karen Perlman,
[19] a Shorthand Reporter and Notary Public within and
[20] for the State of New York.
[21]
[22]
[23]
[24]    GREENHOUSE REPORTING, INC.
[24]    363 Seventh Avenue · 20th Floor
       New York, New York  10001
[25]    (212) 279-5108

**Page 2**

[1]
[2] APPEARANCES:
[3] LAW OFFICES OF ROGER S. WAREHAM, ESQ.
[4] Attorneys for the Plaintiff
[5]    394 Putnam Avenue
[6]    Brooklyn, New York  11216
[7]
[8] NEW YORK CITY LAW DEPARTMENT
[9] OFFICE OF THE CORPORATION COUNSEL
[10] Attorneys for Defendant
[11]    100 Church Street
[12]    New York, New York 10007
[13] BY:  PAUL MARKS, ESQ.
[14]     -and-
[15]     JAMES M. LEMONEDES, ESQ.
[16]     -and-
[17] NEW YORK CITY COUNCIL
[18] OFFICE OF THE GENERAL COUNSEL
[19] Attorneys for Defendant
[20]    250 Broadway
[21]    New York, New York  10007
[22] BY:  ALVIN L. BRAGG, JR., ESQ.
[23]
[24] ALSO PRESENT:
[25] Viola Plummer

**Page 3**

[1]
[2]    STIPULATIONS
[3]    IT IS HEREBY STIPULATED AND AGREED
[4] by and between the attorneys for the respective
[5] parties hereto, that all objections, except as to
[6] form, shall be reserved to the time of trial.
[7]    IT IS FURTHER STIPULATED AND AGREED
[8] that the sealing and filing of the within
[9] deposition are hereby waived.
[10]    IT IS FURTHER STIPULATED AND AGREED
[11] that the within deposition may be subscribed and
[12] sworn to by the witness being examined before a
[13] Notary Public other than the Notary Public before
[14] whom this deposition was begun.
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

**Page 4**

[1]    *L. Comrie*
[2] LEROY COMRIE, stating a business
[3] address of 113-43 Farmers Boulevard,
[4] Saint Albans, New York 11412,
[5] having been first duly sworn by the
[6] Notary Public, was examined and
[7] testified under oath as follows:
[8]    **EXAMINATION**
[9]    **BY MR. WAREHAM:**
[10]    **Q:** Good morning, Mr. Comrie.
[11]    **A:** Good morning.
[12]    **Q:** Let me just give you some
[13] preliminary rules, have you done a deposition
[14] before?
[15]    **A:** Never, never.
[16]    **Q:** As you can tell —
[17]    **A:** Knock on wood.
[18]    **Q:** Let me —
[19]    **A:** Is this real wood?
[20]    **Q:** — give you some basic background.
[21] As you can tell, your testimony is
[22] under oath, if I ask you a question and you don't
[23] understand it either in form or content just say
[24] so.
[25]    **A:** Umm-hmm.

**Page 5**

### L. Comrie

[1]
[2]  **Q:** If I ask you a question that you
[3]  don't know, you can say, "I don't know."
[4]  **A:** Umm-hmm.
[5]  **Q:** Have you taken any medications
[6]  today?
[7]  **A:** No.
[8]  **Q:** Or yesterday?
[9]  **A:** No.
[10]  **Q:** Anything that might impair your
[11]  ability to answer clearly?
[12]  **A:** I don't take any medication, thank
[13]  God.
[14]  **Q:** How old are you?
[15]  **A:** I turn 49 on Friday.
[16]  **Q:** And your current position is?
[17]  **A:** Council Member, New York City
[18]  Council, 27th Council District, Queens.
[19]  **Q:** And how long have you been a Council
[20]  member?
[21]  **A:** Since 2002, January 2002.
[22]  **Q:** And what did you do prior to being
[23]  elected Council member?
[24]  **A:** I worked for my predecessor and ran
[25]  his district office.

**Page 6**

### L. Comrie

[1]
[2]  **Q:** And your predecessor was?
[3]  **A:** Archie Spigner.
[4]  **Q:** And what did that entail, running
[5]  his district office?
[6]  **A:** Managing the staff, dealing with
[7]  constituent services, representing him in
[8]  meetings, doing everything that he asked me to do
[9]  to ensure that the district was represented.
[10]  **Q:** And this prepared you for the
[11]  present job that you have?
[12]  **A:** Yes.
[13]  **Q:** And in representing him, you related
[14]  to what is called the Queens democratic machine?
[15]  **A:** No.
[16]  **Q:** Did you have any dealings with the
[17]  head of the Queens democratic party?
[18]  **A:** When I was running as a candidate.
[19]  **Q:** But prior to that you didn't?
[20]  **A:** When I was active in politics, but
[21]  that is separate from working in an office.
[22]  **Q:** And when you were running for
[23]  office, what was your relationship to the Queens
[24]  democratic party?
[25]  **A:** I solicited them for support.

**Page 7**

### L. Comrie

[1]
[2]  **Q:** And did they support you?
[3]  **A:** Yes.
[4]  **Q:** Were there other candidates running
[5]  against you in your first election?
[6]  **A:** Yes.
[7]  **Q:** How many?
[8]  **A:** Five, six.
[9]  **Q:** And out of those five, six, which
[10]  one, which candidate was supported by the Queens
[11]  democratic party?
[12]  **A:** I was.
[13]  **Q:** During your first electoral
[14]  campaign, was there a candidate named Erica Ford
[15]  running against you?
[16]  **A:** Yes.
[17]  **Q:** And was she, to your knowledge, was
[18]  she supported by Viola Plummer?
[19]  **A:** Yes.
[20]  **Q:** And do you remember what percentage
[21]  of votes Erica Ford had against you in that
[22]  campaign?
[23]  **A:** I don't remember.
[24]  **Q:** Following the last Council election
[25]  that was in 2006?

**Page 8**

### L. Comrie

[1]
[2]  **A:** Five.
[3]  **Q:** 2005, at some point did you plan to
[4]  run for Speaker of the Council?
[5]  **A:** Yes.
[6]  **Q:** Did you ask Councilman Barron for
[7]  support, to support you in that endeavor?
[8]  **A:** I asked every Council member.
[9]  **Q:** That is a yes?
[10]  **A:** Yes.
[11]  **Q:** Did Councilman Barron do that,
[12]  support you?
[13]  **A:** Yes, but he only supported me to
[14]  ensure that I would lose, and in fact after —
[15]  after we got into the campaign, he withdrew his
[16]  support publically telling me that he wouldn't
[17]  support me because Viola told him that I was a
[18]  member of the racist Queens County democratic
[19]  organization, and then he chose to support
[20]  another white candidate, which was his plan all
[21]  along.
[22]  **Q:** And you knew that was his plan all
[23]  along because he told you that?
[24]  **A:** I didn't know that — I didn't know
[25]  that until after the Speaker's race was over,

Viola Plummer v.
Christine Quinn, Speaker of the City Council

Leroy Comrie
Vol. 1, August 13, 2007

Page 9

**L. Comrie**

[1]
[2] when it was revealed to me.
[3]    **Q:** So your implication is that
[4] Councilman Barron does whatever Viola Plummer
[5] tells him to do?
[6]    **A:** Yes.
[7]    **Q:** Do you remember having a discussion
[8] with Councilman Barron around that at that point
[9] the two people he had or three people he had that
[10] would support your candidacy for the Speaker?
[11]    **A:** He never revealed any names.
[12]    **Q:** And do you remember him saying that,
[13] and you're saying to him that when he asked you
[14] how many people you had and you said three?
[15]    **A:** I never discussed numbers with him.
[16]    **Q:** But basically that you didn't have
[17] anybody — the only support you had was the ones
[18] that he had garnered?
[19]    **MR. MARKS:** Objection to form.
[20]    **A:** That is not true.
[21]    **Q:** And eventually, did you support
[22] Christine Quinn —
[23]    **A:** Yes.
[24]    **Q:** — as Speaker?
[25] During your tenure on the Council —

Page 10

**L. Comrie**

[1]
[2]    **MR. WAREHAM:** Withdrawn.
[3]    **Q:** What is the procedure for street
[4] re-namings or co-namings, as far as you know?
[5]    **A:** If the Community Board adopts it,
[6] votes it, it goes to the Council committee, if
[7] the Council committee votes it, and then the full
[8] Council passes it, then the Mayor signs a bill.
[9]    **Q:** And during the time that you've been
[10] on the Council, approximately how many street
[11] naming packets have you voted on?
[12]    **A:** I don't know the number. I think we
[13] have gotten it down to two per year, so let's say
[14] 12.
[15]    **Q:** And prior to the May 30th stated
[16] meeting, have you ever abstained on a vote for a
[17] street package re-naming?
[18]    **MR. MARKS:** May 30th, May 30, 2007?
[19]    **MR. WAREHAM:** Yes.
[20]    **Q:** Prior to the stated meeting of the
[21] Council on May 30, 2007, do you remember ever
[22] abstaining on a vote for a street naming?
[23]    **A:** No, I don't remember.
[24]    **Q:** Prior to the stated Council meeting
[25] of May 30, 2007, do you remember a name that has

Page 11

**L. Comrie**

[1]
[2] been submitted by a Community Board and approved
[3] by a Council person ever being removed from a
[4] package of street names?
[5]    **A:** No.
[6]    **Q:** Did you vote to support the street
[7] named after Al Jolson?
[8]    **A:** Yes.
[9]    **Q:** When Speaker Quinn intervened to
[10] have Sonny Carson's name removed from the
[11] package, did you think that that was proper?
[12]    **MR. MARKS:** Objection to form.
[13] You can answer.
[14]    **Q:** You can answer.
[15]    **THE WITNESS:** What does the
[16] objection to form mean?
[17]    **MR. MARKS:** It means, it just means
[18] I'm objecting. You can answer the
[19] question. I'm just objecting to the way
[20] the question is being asked, but if you can
[21] answer the question.
[22]    **A:** Say your question again.
[23]    **Q:** When the Speaker, Christine Quinn,
[24] intervened to have Sonny Carson's name removed
[25] from the package of names that had been

Page 12

**L. Comrie**

[1]
[2] originally submitted, did you think that that was
[3] a proper thing to do?
[4]    **MR. MARKS:** Objection as to form
[5] again.
[6]    **A:** I asked her as to her reasons why.
[7]    **Q:** And why did she say she did that?
[8]    **A:** She said she did it because she felt
[9] that it was not a street naming she could
[10] support.
[11]    **Q:** And my question is, do you think
[12] that it was proper for her to exercise her
[13] influence as the Speaker to have his name removed
[14] from the package?
[15]    **MR. MARKS:** Objection as to form.
[16]    **A:** Yes.
[17]    **Q:** And why do you think that that was a
[18] proper exercise of the influence of the Speaker?
[19]    **MR. MARKS:** Same objection as to
[20] form.
[21]    **A:** Because she has the ability to put
[22] any bill or any package of bills before — or
[23] remove them from the stuff that we're going to
[24] vote on.
[25]    **Q:** And because she has the power to do

**L. Comrie**

[1]
[2] that —

[3]    **MR. WAREHAM:** Withdrawn.

[4]    **A:** Yes, she has the power to do that.

[5]    **Q:** Let me rephrase my question.

[6] So are you saying that any exercise

[7] of the power of the Speaker is a correct one

[8] simply because she has the power to do it?

[9]    **MR. MARKS:** Objection to form.

[10]    **A:** Yes.

[11]    **Q:** Did you agree with her reasons for

[12] removing Sonny Carson's name from the bill?

[13]    **MR. MARKS:** Objection to form, but

[14] you can answer.

[15]    **A:** Yes.

[16]    **Q:** Did you view her intervention as an

[17] improper infringement on the prerogative of the

[18] particular City Council person?

[19]    **A:** No.

[20]    **MR. MARKS:** Objection to form.

[21] You can answer.

[22]    **Q:** Did you view her intervention as

[23] infringement on the particular Community Board's

[24] right to decide whom to name the streets after?

[25]    **A:** No.

**L. Comrie**

[1]
[2]    **MR. MARKS:** Objection to form.

[3]    **A:** No.

[4]    **Q:** Why not?

[5]    **A:** Council Member Al Vann whose

[6] district this street was in was in the process of

[7] negotiating to try to figure out a win-win

[8] scenario, so that the community could have its

[9] right to self-designate its own heroes,

[10] Councilman Barron decided not to let that happen.

[11]    We knew three weeks before the vote

[12] what the vote was going to be. The City Council,

[13] the Speaker wouldn't take a vote if she didn't

[14] already know what the vote was. The Black and

[15] Hispanic Caucus had asked and was negotiating to

[16] try to make a win-win and figure out a way to

[17] allow the community to self-designate, knowing

[18] that the Council was not going to pass the bill

[19] for Sonny Carson.

[20]    Al Vann was in the process of

[21] negotiating it, the Black and Hispanic Caucus was

[22] in the process of negotiating it, the Speaker was

[23] about to allow that to happen, and hold up the

[24] other street re-namings until it happened,

[25] Councilman Barron decided not to let it — that

**L. Comrie**

[1]
[2] he wanted to vote on May 30th.

[3]    **Q:** And —

[4]    **A:** He refused to negotiate and allowed

[5] the negotiation to continue.

[6]    **Q:** So your position is that Councilman

[7] Barron was the architect of the entire vote on

[8] May 30th?

[9]    **A:** Correct.

[10]    **MR. MARKS:** Objection, objection to

[11] form.

[12]    **Q:** And your position is that the

[13] decision to hold the vote on May 30th was

[14] Councilman Barron's decision?

[15]    **A:** Correct.

[16]    **Q:** And your position is that the

[17] Speaker didn't have the ability to postpone the

[18] vote for a further session until the negotiations

[19] could be finished?

[20]    **A:** No, what I'm saying is he didn't

[21] want to negotiate. So if —

[22]    **Q:** Let me ask you —

[23]    **A:** What I said was that the Black and

[24] Hispanic Caucus, Council Member Vann, Speaker

[25] Quinn were all willing to continue negotiations.

**L. Comrie**

[1]
[2] Councilman Barron decided that he did not want to

[3] continue to negotiate and did not want to

[4] participate in the negotiation, and wanted to

[5] vote on the 30th.

[6]    **Q:** Who is the Chair of The Black,

[7] Hispanic and Asian Caucus?

[8]    **A:** Maria Carmen Arroyo, and Robert

[9] Jackson.

[10]    **Q:** Who were the negotiations being held

[11] with with The Black, Hispanic and Asian Caucus?

[12]    **A:** The chairs of the Caucus and the

[13] Speaker's office and Al Vann.

[14]    **Q:** And your position is that assuming

[15] it's true that Councilman Barron did not want to

[16] negotiate, that because he didn't want to

[17] negotiate, The Black, Hispanic and Asian Caucus

[18] cut off negotiations?

[19]    **MR. MARKS:** Objection to form.

[20]    **A:** I don't understand.

[21]    **MR. MARKS:** And —

[22]    **MR. WAREHAM:** Compound?

[23]    **MR. MARKS:** I want to say —

[24]    **THE WITNESS:** Yeah.

[25]    **MR. MARKS:** — the line of

Page 17

*L. Comrie*

[1]
[2] questioning seems irrelevant to the claims
[3] in this case.
[4] **THE WITNESS:** Yeah.
[5] **MR. MARKS:** Don't say anything.
[6] Certainly we'll permit some
[7] background, but, you know, from what I
[8] understand the case is about, is an alleged
[9] violation of Ms. Plummer's first amendment
[10] rights by Speaker Quinn in the suspension
[11] of Ms. Plummer and her termination as well
[12] as a race discrimination claim and a undue
[13] process claim, the background to — none of
[14] the questions you're asking bears on that.
[15] **MR. WAREHAM:** Well, I differ on that
[16] in terms of it has to be put in the
[17] context, that meeting has to be put in the
[18] context and any comments or actions taken
[19] by Ms. Plummer has to be put in the context
[20] of how we got to that point and I think —
[21] okay.
[22] **MR. MARKS:** You can go on for a
[23] little bit.
[24] **Q:** So your view is that because
[25] Councilman Barron did not want to negotiate —

Page 18

*L. Comrie*

[1]
[2] **A:** Right.
[3] **Q:** — negotiations were cut off by The
[4] Black, Hispanic —
[5] **A:** They had no more authority, it was
[6] up to Councilman Vann and Barron to do the
[7] negotiations. And if either one of them stopped,
[8] then the negotiation — then it took their
[9] authority away to negotiate.
[10] Councilman Barron was involved in
[11] all of the discussions and had the opportunity to
[12] participate —
[13] **Q:** Was this —
[14] **A:** — and create —
[15] **Q:** Was this Councilman Barron's
[16] district involved with the street naming?
[17] **A:** No. It was Councilman Vann's.
[18] **Q:** Did Councilman Vann want to continue
[19] to negotiate?
[20] **A:** As far as I know, yes.
[21] **Q:** So —
[22] **A:** I never heard that he stopped
[23] negotiation.
[24] **Q:** So Councilman Vann wanted to
[25] negotiate, according to you Speaker Quinn wanted

Page 19

*L. Comrie*

[1]
[2] to negotiate, The Black, Latino, Asian Caucus
[3] wanted to negotiate, and your position is that
[4] because Councilman Barron didn't want to
[5] negotiate, all of the negotiations were cut off?
[6] **A:** Right.
[7] **Q:** And that Councilman Barron was the
[8] one who controlled when the vote was going to be
[9] held on —
[10] **A:** No, I didn't say controlled.
[11] **MR. MARKS:** Objection to form.
[12] **A:** I didn't say controlled.
[13] I'm saying once the negotiations
[14] ended then it was to move to a vote, once there
[15] was no ability to work on a compromise or come up
[16] with an alternative that was acceptable and which
[17] we needed more time to create, there was no
[18] reason to hold up votes for firefighters or
[19] people that died on September 11th or the other
[20] package.
[21] **Q:** So let me just be clear. Councilman
[22] Barron overrode the wishes of Councilman Vann who
[23] wanted to continue to negotiate —
[24] **A:** That's my understanding.
[25] **Q:** — a resolution?

Page 20

*L. Comrie*

[1]
[2] **MR. MARKS:** Objection to form.
[3] **Q:** When Councilman Vann said that he
[4] was putting forward an amendment to include Sonny
[5] Carson's name, did you support that?
[6] **A:** I don't understand the question.
[7] **Q:** Prior to the stated meeting of May
[8] 30, 2007, did Councilman Vann indicate that he
[9] was going to put forward an amendment to include
[10] Sonny Carson's name in the package —
[11] **A:** Yes.
[12] **Q:** — of names?
[13] **A:** Yes.
[14] **Q:** Was there a meeting of The Black,
[15] Latino and Asian Caucus prior to the May 30, 2007
[16] stated meeting —
[17] **A:** Yes.
[18] **Q:** — where that was discussed?
[19] **A:** Yes.
[20] **Q:** Was that May 29th?
[21] **A:** No, that was —
[22] **Q:** May 28th?
[23] **A:** That was like May 2nd.
[24] **Q:** May 2nd?
[25] **A:** Maybe even April.

Page 21

**L. Comrie**

[2] Q: And on May 2nd —

[3] A: There was at least — that was

[4] discussed at least three to four weeks before the

[5] actual vote.

[6] Q: And at that meeting, was there a

[7] decision made by The Black, Latino and Asian

[8] Caucus to support Councilman Vann's —

[9] A: There was a vote taken, yes.

[10] MR. MARKS: You have to let him

[11] finish the question before you answer.

[12] THE WITNESS: I'm sorry.

[13] Q: And when that vote was taken, how

[14] did you vote? What did you vote?

[15] A: I voted to support Al Vann.

[16] Q: Do you remember what Council Member

[17] James voted, how she voted?

[18] A: I think she abstained.

[19] Q: Even at that meeting she indicated

[20] that she would abstain?

[21] A: I don't remember her exact words.

[22] Q: But your recollection is she

[23] abstained?

[24] A: She didn't vote. I don't remember

[25] if it was a no or an abstention, but she didn't

Page 22

**L. Comrie**

[1] vote in the affirmative.

[2] Q: But you said that you would support

[4] it?

[5] A: Right.

[6] Q: Subsequent to that meeting, you

[7] changed your mind?

[8] A: No.

[9] MR. WAREHAM: Withdrawn.

[10] Q: Subsequent to that meeting did you

[11] change your mind around support for the

[12] amendment?

[13] A: Subsequent to the first meeting of

[14] the Black and Hispanic Caucus?

[15] Q: Right. The meeting where you

[16] initially voted to support the Vann amendment?

[17] A: Subsequent to the meeting four weeks

[18] before the vote? I'm not sure of your timing.

[19] Q: Was there a point in time when you

[20] changed your mind around supporting the Vann

[21] amendment?

[22] A: Yes.

[23] Q: When was that?

[24] A: Three days before the vote on May

[25] 30th.

Page 23

**L. Comrie**

[2] Q: And why did you change your mind?

[3] A: Because I — the count — the Black

[4] and Hispanic Caucus met a second time before the

[5] vote.

[6] Q: When was that?

[7] A: About a week before the actual vote,

[8] and had asked that we try to continue to figure

[9] out a way to create a win-win, and it was turned

[10] down by Council Member Barron.

[11] Q: By Council Member Barron?

[12] A: Right.

[13] Q: And did —

[14] A: And — and, you know, this is —

[15] this is — the New York City Council is a body

[16] that has to work collectively to make things

[17] happen, and if there is no collective will in

[18] order to effectuate change, then change can't

[19] happen.

[20] Q: Did the majority of The Black Latino

[21] Asian Caucus want to continue to negotiate?

[22] A: Yes.

[23] Q: And so was Councilman Barron the

[24] only one who wanted to end the negotiation?

[25] MR. MARKS: Objection to form.

Page 24

**L. Comrie**

[2] A: Yes, as far as I recall.

[3] Q: Does The Black Latino Asian Caucus

[4] function by majority vote?

[5] A: Yes.

[6] Q: And the majority wanted to continue

[7] negotiations?

[8] A: Yes.

[9] Q: And Councilman Barron was the only

[10] one who didn't want to continue negotiations?

[11] A: Correct.

[12] Q: And Councilman Barron, according to

[13] you, Councilman Barron's position won?

[14] A: Right. Because the — the — the —

[15] Q: Just —

[16] A: — the caucus got frustrated and

[17] felt, you know, how could they negotiate if they

[18] don't have a consensus of the primary individuals

[19] that were involved.

[20] Q: Councilman Vann wanted to continue

[21] to negotiate?

[22] A: I hadn't heard anything different.

[23] Q: And so you're saying this had to be

[24] by consensus, not by majority vote?

[25] MR. MARKS: Objection to form.

Viola Plummer, *et al.* v. Case 1:07-cv-06154-WHP   Document 24-9   Filed 10/30/2007   Page 8 of 45 Leroy Comrie
Christine Quinn, Speaker of the City Council
Vol. 1, August 13, 2007

Page 25

**L. Comrie**

[1]
[2] **A:** By consensus of the primary people
[3] involved. We don't — we don't — we don't
[4] involve ourselves in other members' districts if
[5] the members don't want.
[6] **Q:** Whose district was involved in this?
[7] **A:** Councilman Vann.
[8] **Q:** Not Councilman Barron's district?
[9] **A:** But Councilman Barron was the — how
[10] do you say it — the primary person pushing the
[11] agenda.
[12] **Q:** Who sponsored the amendment to
[13] include Sonny Carson's name, was it Councilman
[14] Barron?
[15] **A:** Councilman Barron.
[16] **Q:** The primary is the person whose
[17] district it comes from, is that correct?
[18] **A:** Right, right.
[19] **Q:** That is the person who wanted to
[20] continue negotiations?
[21] **A:** As far as I know. Are you aware of
[22] Councilman Vann requesting —
[23] **Q:** Let me just say, at this time, I'm
[24] the one who asks the questions.
[25] **MR. MARKS:** You just answer the

Page 26

**L. Comrie**

[1]
[2] questions.
[3] **THE WITNESS:** Sorry.
[4] **Q:** And at the second meeting, was
[5] another vote taken to see where people stood in
[6] terms of support for the Vann amendment?
[7] **A:** No.
[8] **Q:** So at that point you still continued
[9] to support the Vann amendment?
[10] **A:** People left the meeting frustrated.
[11] There was no —
[12] **Q:** At that point did you, Councilman
[13] Leroy Comrie, continue to support the Vann
[14] amendment?
[15] **A:** We didn't take another vote, so I
[16] was still in the same position and —
[17] **Q:** Which means that you still supported
[18] the Vann amendment?
[19] **A:** Right.
[20] **Q:** That was three days before?
[21] **A:** Right.
[22] **Q:** Sometime between May 27th and May
[23] 30th, did you change your mind around supporting
[24] the Vann amendment?
[25] **A:** Yes.

Page 27

**L. Comrie**

[1]
[2] **Q:** And when was that?
[3] **A:** I said three days before, after that
[4] meeting.
[5] **Q:** I thought you had answered that when
[6] you left that meeting your position was that you
[7] still supported the Vann amendment?
[8] **A:** Yeah, but later that day, after I
[9] talked to all of the people involved, the level
[10] of frustration — to me, working in the City
[11] Council is you try to work to build a collective
[12] among members to get things done, to try to
[13] create an ability to have a collegial environment
[14] and an understanding in order to make things
[15] happen. When that breaks down, it — it — it
[16] undermines the ability of Council to make
[17] effective changes, or to make things happen.
[18] Council Members Jackson and Arroyo
[19] were working hard to try to find a way to create
[20] a win-win. They were frustrated. I spoke to
[21] them. I spoke to both of them about what they
[22] were trying to do, I spoke to Councilman Vann, I
[23] spoke to a few other members and the ability of
[24] the Council to move forward to try to create a
[25] win for the community had been broken.

Page 28

**L. Comrie**

[1]
[2] And at that point I did not feel
[3] that there was a — an obligation to hold on to a
[4] promise that was made, when there was a desire
[5] for the entire caucus to continue in negotiation
[6] and find a way for the community to win.
[7] **Q:** Let me just ask you a procedural
[8] question, who sets the agenda for the state of
[9] meetings?
[10] **A:** The Speaker sets the agenda.
[11] **Q:** Who decides what items are going to
[12] be on a particular day?
[13] **A:** Generally the Speaker's office.
[14] **Q:** So the decision to hold the vote on
[15] the Vann amendment on May 30th was the Speaker's
[16] decision?
[17] **A:** Yes.
[18] **Q:** And if the Speaker and the members
[19] The Black Latino Asian Caucus felt that this
[20] could be resolved by further negotiation, the
[21] Speaker could have set a later date?
[22] **A:** Yes.
[23] **Q:** You said that you spoke with Council
[24] Member Jackson, what was his position around the
[25] Vann amendment?

Page 29

**L. Comrie**

[1]
[2]  **A:** He was supportive of the Vann
[3]  amendment.
[4]  **Q:** And what was his position around
[5]  continued negotiation?
[6]  **A:** He was desirous of continued
[7]  negotiation. He was frustrated that he was
[8]  spending hours on this and got boarded.
[9]  **Q:** And what was Council Member Arroyo's
[10] position around the Vann amendment?
[11] **A:** She — she supported it also, but
[12] she wanted further negotiation, she didn't want
[13] it to end with a lose, and they knew what the
[14] vote was, I said, four weeks earlier and again
[15] three days before.
[16] **Q:** And what was the vote going to be?
[17] **A:** They knew that they were going to
[18] lose the vote.
[19] **Q:** How did they know that they were
[20] going to lose the vote?
[21] **A:** They had polled all the Council
[22] members, all 51 members. They knew what the vote
[23] was going to be before the May 30th, and they
[24] knew that they had — did not have the votes to
[25] win, and they knew that a month before, they knew

Page 30

**L. Comrie**

[1]
[2]  that again three days before.
[3]  **Q:** And were any of the members you
[4]  spoke with concerned about the precedent that was
[5]  being set by the Council, by the Speaker's
[6]  intervention, unprecedented intervention into
[7]  this process of street co-naming?
[8]  **MR. MARKS:** Objection to form, and I
[9]  really think we're getting — there is so
[10] much background that is worth going into,
[11] none of this — I haven't heard the word
[12] Viola Plummer except in apparently some
[13] reference in her pulling the strings for
[14] Councilman Barron, but, you know, I'm not
[15] going to allow these depositions to become
[16] like a political platform for the
[17] plaintiff. So I don't know how much —
[18] **MR. WAREHAM:** His thesis was that
[19] Viola Plummer pulls Charles Barron's
[20] strings, and these questions have been
[21] around the role of Charles Barron in terms
[22] of short-circuiting the process that got us
[23] to the stated meeting, which I'm about to
[24] get to.
[25] **MR. MARKS:** But Charles Barron is

Page 31

**L. Comrie**

[1]
[2]  not a plaintiff here, at least on the
[3]  caption, so if you want to get to the
[4]  stated meeting, Ms. Plummer's conduct at
[5]  the stated meeting and her statements
[6]  afterwards about Mr. Comrie, I think that
[7]  is really what the deposition should be
[8]  about.
[9]  **Q:** Did you speak to the Speaker about
[10] the Vann amendment?
[11] **A:** Yes.
[12] **Q:** I'm talking about prior to the
[13] stated meeting?
[14] **A:** Yes.
[15] **Q:** And did she ask for your support
[16] around that?
[17] **A:** No.
[18] **Q:** What did she say to you about the
[19] Vann amendment?
[20] **A:** I talked to her about this in —
[21] in — in terms of the spirit of negotiating a
[22] win-win for the community and how we could figure
[23] out a way to do a win-win for the community that
[24] desired to commemorate someone in their own
[25] community, and that I talked to her about I

Page 32

**L. Comrie**

[1]
[2]  never talked to her about my vote or the vote.
[3]  **Q:** So she never solicited your support
[4]  or your abstention?
[5]  **A:** No, she had her votes with me. As I
[6]  said earlier, she knew a month before what the
[7]  position of the Council was going to be.
[8]  **Q:** Let's go to the stated meeting of
[9]  May 30th.
[10] **A:** Excuse me.
[11] **Q:** Were you present at that meeting, at
[12] the stated Council meeting of May 30, 2007?
[13] **A:** Yes.
[14] **Q:** Were you there for the entire
[15] meeting?
[16] **A:** Yes.
[17] **Q:** When the Vann amendment was put on
[18] the floor, can you describe the meeting at the
[19] point in time from the Vann amendment was put on
[20] the floor?
[21] **MR. MARKS:** Objection to form.
[22] **A:** You got to be more specific.
[23] **Q:** How would you describe the
[24] atmosphere of the meeting at the point that the
[25] Vann amendment was put on the floor Councilman

Page 33

L. Comrie

[1]
[2] Vann?
[3]   A: The beginning of the meeting was
[4] technical, the beginning of the meeting was very
[5] technical.
[6]   Q: Once we get passed the technical
[7] part of the meeting, were there many people in
[8] the chambers that day?
[9]   A: Chambers was packed, and upstairs
[10] was packed. I was in and out of the meeting
[11] because my mentor's wife died that morning, so I
[12] was on — catching a lot of phone calls and
[13] having to step out of the meeting a lot, but I
[14] did sit — sit in the meeting while the Vann
[15] amendment was being produced.
[16]   Q: And just one last question, when you
[17] changed your mind around the vote you said three
[18] days prior to the meeting, did you inform The
[19] Black Latino Asian Caucus that you had done so?
[20]   A: The co-chairs, yes.
[21]   Q: The co-chairs. Did you inform
[22] Councilman Vann?
[23]   A: No.
[24]   Q: Did you inform Councilman Barron?
[25]   A: Yes. And I didn't speak to anybody

Page 34

L. Comrie

[1]
[2] else about my vote.
[3]   Q: But Councilman Barron knew before
[4] the meeting that you had changed your vote?
[5]   A: Yes.
[6]   Q: Do you know that the Speaker has
[7] accused Ms. Plummer of engaging in disruptive
[8] conduct during the stated meeting of May 30,
[9] 2007?
[10]   MR. MARKS: Objection to form.
[11] You can answer.
[12]   A: Yes.
[13]   Q: Do you know what the nature of that
[14] disruptive conduct supposedly was?
[15]   A: Yes.
[16]   Q: And what was that, to your
[17] understanding?
[18]   A: What was the proper word? Vile and
[19] disruptive statements made during the Council
[20] meeting, denigrating statements made to and about
[21] individual members.
[22]   Q: Were you there when this happened?
[23]   A: Yes.
[24]   Q: Can you describe exactly what were
[25] the vile, disruptive, denigrating statements that

Page 35

L. Comrie

[1]
[2] were made?
[3]   A: There was specific words used to
[4] Council Members Fidler, Koppell, de Blasio that
[5] were — I can't — that were — that were just
[6] totally out of line.
[7]   Q: Can you just say what those words
[8] were, please?
[9]   A: I don't even remember the exact
[10] words, but I know that they were words that no
[11] staff person would ever use in that capacity that
[12] I would hire or would allow to maintain in my
[13] employ.
[14]   Q: But that would be a decision that
[15] you would make around your employee, right?
[16]   MR. MARKS: Objection to form.
[17] You can answer.
[18]   A: No. That would be an objection that
[19] any Council Member would make if a person acted
[20] in a public venue.
[21]   Q: And —
[22]   A: Any elected official.
[23]   Q: But my question is, somebody that
[24] you employed, you're saying that if somebody that
[25] you employed acted like that, you would not keep

Page 36

L. Comrie

[1]
[2] them on staff?
[3]   A: Correct.
[4]   Q: You would fire them?
[5]   A: Right.
[6]   Q: But you don't remember the
[7] particular words that were used?
[8]   A: I don't — didn't bother to keep
[9] them in my memory.
[10]   Q: In preparation for this hearing, did
[11] you review any documents?
[12]   A: No.
[13]   Q: Do you know whether the stated
[14] meeting was taped?
[15]   A: They're always taped.
[16]   Q: Did you review the tape —
[17]   A: No.
[18]   Q: — in preparation for this?
[19]   A: No.
[20]   Q: Was Ms. Plummer's alleged disruptive
[21] conduct the only disruptive conduct in the
[22] chamber that day?
[23]   A: No.
[24]   Q: Where else did you see or hear
[25] disruptive conduct?

Leroy Comrie  Case 1:07-cv-06154-WHP    Document 24-9    Filed 10/30/2007    Page 11 of 45
Vol. 1, August 13, 2007                                    Viola Plummer  v.
                                          Christine Quinn, Speaker of the City Council

Page 37

### L. Comrie

[1]
[2] **A:** There was disruptive conduct from
[3] the upper level.
[4]   **Q:** And can you describe what that was?
[5]   **A:** Verbal reactions to statements and
[6] verbal words to statements that were made from
[7] the Council floor.
[8]   **Q:** And was Ms. Plummer's disruptive
[9] conduct verbal?
[10]  **A:** Yes.
[11]  **Q:** Was it physical?
[12]  **A:** No.
[13]  **Q:** You've been on the City Council
[14] since 2002?
[15]  **A:** Correct.
[16]  **Q:** Are you familiar with rules of the
[17] City Council?
[18]  **A:** Yes.
[19]  **MR. WAREHAM:** Mark this as 4.
[20]   (Plaintiff's Exhibit 4, Rules of the
[21] Council, marked for identification.)
[22]  **Q:** Have you had a chance to look at it?
[23]  **A:** I'm not sure what you want me to
[24] look for.
[25]  **Q:** Just a question, under the rules of

Page 38

### L. Comrie

[1]
[2] the City Council, who has the authority to
[3] restore order in the face of disruption?
[4]  **MR. MARKS:** Objection to form.
[5]  **A:** The presiding officer.
[6]  **Q:** And who was the presiding officer at
[7] that meeting, on May 30, 2007?
[8]  **A:** Betsy Gotbaum.
[9]  **Q:** And under the rules, what steps can
[10] the presiding officer take to restore order in
[11] the meeting?
[12]  **A:** They can cause the gallery or the
[13] chamber be cleared, or request that the chamber
[14] be cleared and bring in whatever personnel
[15] necessary to make that happen.
[16]  **Q:** Did Public Advocate Gotbaum have the
[17] chamber cleared out that day, do you remember?
[18]  **A:** No, she didn't.
[19]  **Q:** Did she have Viola Plummer removed
[20] from the chamber that day?
[21]  **A:** No.
[22]  **Q:** Do you know what did Speaker Quinn
[23] do in the face of this disruptive conduct by
[24] Viola Plummer?
[25]  **MR. MARKS:** Objection to form.

Page 39

### L. Comrie

[1]
[2] You can answer.
[3]  **A:** Request order to be reestablished.
[4]  **Q:** I'm talking about Speaker Quinn?
[5]  **A:** Yes.
[6]  **Q:** You heard her request order?
[7]  **A:** Yes.
[8]  **Q:** She did that over the microphone?
[9]  **A:** Yes. I thought so. And I know there
[10] were a few requests for re-establishment of
[11] decorum.
[12]  **Q:** And those requests for
[13] re-establishment came from Speaker Quinn or from
[14] the Public Advocate?
[15]  **A:** Both.
[16]  **Q:** And in your view, when in your
[17] experience at Council meetings, when the Public
[18] Advocate is presiding over the meeting, have —
[19]  **MR. WAREHAM:** Withdrawn.
[20]  **Q:** Have there been prior stated
[21] meetings where there have been disruptions?
[22]  **A:** Yes.
[23]  **Q:** And when there are disruptions, who
[24] is the person who requests order?
[25]  **A:** The Public Advocate or the Speaker.

Page 40

### L. Comrie

[1]
[2]  **Q:** They both take turns, even if the
[3] Public Advocate is the presiding officer, the
[4] Speaker will request order as well?
[5]  **MR. MARKS:** Objection to form.
[6]  **A:** Yes.
[7]  **Q:** And that is not viewed as an
[8] infringement of the authority of the pubic
[9] advocate?
[10]  **MR. MARKS:** Objection to form.
[11]  **A:** The Public — the Public Advocate
[12] serves at the Speaker's pleasure, according to
[13] the rules the Speaker is the presiding officer or
[14] he designated an acting president pro tem
[15] according to — I forget when we found out that
[16] the Public Advocate was no longer automatically
[17] given the privilege of presiding over the
[18] Council, I think that was under Speaker Miller,
[19] and he continued to allow the Public Advocate to
[20] serve at his behest.
[21]  **Q:** Do you know whether Speaker Quinn
[22] spoke to Public Advocate Gotbaum about restoring
[23] order in the room?
[24]  **A:** Individually?
[25]  **Q:** Yes.

Page 41

*L. Comrie*

[1]
[2]    **A:** I don't recall.
[3]    **Q:** Did Speaker Quinn single out Ms.
[4] Plummer in terms of disruptive conduct during the
[5] meeting?
[6]    **MR. MARKS:** Objection to form.
[7]    **A:** I don't recall any specific names
[8] being used.
[9]    **Q:** Did Ms. Plummer's quote alleged
[10] disruptive actions prevent the vote, the conduct
[11] of the vote on the Vann amendment?
[12]    **A:** No, it didn't prevent it.
[13]    **MR. MARKS:** Objection to form.
[14]    **Q:** Did Ms. Plummer's alleged disruptive
[15] actions prevent the vote on the package of street
[16] names?
[17]    **MR. MARKS:** Objection to form.
[18]    **A:** No, it just slowed down the process.
[19]    **Q:** Did the Council complete its
[20] scheduled agenda for the May 30, 2007 stated
[21] meeting?
[22]    **A:** Yes, after delays.
[23]    **Q:** Did Charles Barron speak on the Vann
[24] amendment?
[25]    **A:** Yes.

Page 42

*L. Comrie*

[1]
[2]    **Q:** Were you present when he spoke?
[3]    **A:** Yes.
[4]    **MR. WAREHAM:** Mark this as
[5] Plaintiff's 5, this is Charles Barron's
[6] comments at the stated meeting.
[7]    **MR. MARKS:** The transcript of?
[8]    **MR. WAREHAM:** The transcript, sorry.
[9]    (Plaintiff's Exhibit 5, document
[10] bearing Bates numbers D 0539, 0576 - 0580,
[11] marked for identification.)
[12]    **MR. LEMONEDES:** Just for the clarity
[13] of the record, to indicate, Plaintiff's
[14] Deposition Exhibit 5 is Bates stamped D
[15] 0539, and then D 0576 through 580.
[16]    **Q:** Did you look through that?
[17]    **A:** No.
[18]    **Q:** In particular I draw your attention
[19] to page 37 on the transcript, from lines 1
[20] through 23.
[21]    Let me know when you're finished.
[22]    **A:** You said 1 to 23?
[23]    **Q:** Yes. On the first page.
[24]    **A:** Okay.
[25]    **Q:** And you already testified that you

Page 43

*L. Comrie*

[1]
[2] had told Charles Barron ahead of time that you
[3] were abstaining on the vote?
[4]    **A:** Correct.
[5]    **Q:** And would it be fair to say that
[6] Charles Barron is someone who usually speaks his
[7] mind?
[8]    **MR. MARKS:** Objection to form.
[9]    **Q:** Doesn't bite his tongue on what he's
[10] thinking?
[11]    **MR. MARKS:** Objection to form.
[12]    **MR. WAREHAM:** Withdrawn.
[13]    **Q:** If Charles Barron has a
[14] contradiction with you, he'll usually tell you,
[15] isn't that correct, Mr. Comrie?
[16]    **MR. MARKS:** Objection to form.
[17]    **A:** I don't understand the question.
[18]    **Q:** Charles Barron knew ahead of time
[19] that Council Member James was not supporting the
[20] amendment?
[21]    **MR. MARKS:** Objection.
[22]    **Q:** The Vann amendment, is that correct?
[23]    **MR. MARKS:** Objection to form.
[24]    **A:** Yes.
[25]    **Q:** Council Member Barron, according to

Page 44

*L. Comrie*

[1]
[2] you Council Member Barron knew ahead of time that
[3] you were not supporting the Vann amendment?
[4]    **A:** Right.
[5]    **Q:** In his remarks to the Council, does
[6] he mention any Council members' names in
[7] particular around not supporting the amendment?
[8]    **A:** Just James.
[9]    **Q:** And if I could just draw your
[10] attention to the statement, can you read what he
[11] says starting from line 9 through line 16?
[12]    **MR. MARKS:** Do you mean read to
[13] himself?
[14]    **MR. WAREHAM:** I was going to say
[15] read it into the record but I guess it's in
[16] the record.
[17]    **A:** Okay, I've read it again.
[18]    **Q:** He mentions just James around people
[19] who are abstaining, right?
[20]    **A:** Umm-hmm.
[21]    **Q:** Does he mention your name?
[22]    **A:** No.
[23]    **Q:** But you're saying he knew your name?
[24]    **A:** Yes.
[25]    **Q:** Did Council Member Barron have any

Page 45

L. Comrie

[1]
[2] reason to shield you from his criticism around
[3] people not supporting the Vann amendment?
[4]    MR. MARKS: Objection to form.
[5]    A: I have no idea, you would have to
[6] ask him that.
[7]    Q: How long have you known Viola
[8] Plummer?
[9]    A: Fifteen, 20 years.
[10]   Q: And in what context have you known
[11] her?
[12]   A: I never knew her on a real personal
[13] context, I always knew her on an advocate, either
[14] advocating or at demonstrations or at civic or —
[15] not necessarily civic meetings, but at meetings.
[16]   Q: Is she one of your constituents?
[17]   A: Yes.
[18]   Q: The comment that Ms. Plummer made
[19] around quote/unquote assassinating your, Council
[20] Member Comrie's ass or political ass, did you
[21] hear her say that yourself?
[22]   MR. MARKS: Objection to form.
[23] You can answer.
[24]   A: No.
[25]   Q: Who brought it to your attention?

Page 46

L. Comrie

[1]
[2]    A: Originally it was brought to my
[3] attention by one of the reporters in the room.
[4]    Q: Do you remember which reporter?
[5]    A: The reporter from the — the Staten
[6] Island paper, Advance, The Staten Island Advance.
[7]    Q: Did that person hear the comment
[8] themself?
[9]    A: Yes.
[10]   Q: Did that person record the comment?
[11]   A: I believe so, yes.
[12]   Q: Did they play the recording for you?
[13]   A: Yes.
[14]   Q: And when you heard the comment, what
[15] was your reaction?
[16]   A: I was surprised. I was — I was,
[17] you know, I mean my — my brain was not even on
[18] that anymore, I was dealing with the fact that my
[19] mentor's wife had died. I stayed down in the
[20] lounge making phone calls after the meeting was
[21] over, just trying to help him set up things and
[22] talk to people and give notification, so it
[23] really caught me off guard. I had no sense of it
[24] or no understanding of it, and I was just
[25] completely bewildered by it.

Page 47

L. Comrie

[1]
[2]    Q: And at the point in time when you,
[3] you know, gave it some thought, did you think she
[4] really intended to assassinate you?
[5]    A: The reporter's reaction from it made
[6] me think that she said it in a hostile, demeaning
[7] manner.
[8]    Q: My question is did you, Council
[9] Member Comrie, not the reporter —
[10]   A: Right.
[11]   Q: — did you think Viola Plummer's
[12] comment meant that she intended to assassinate
[13] you?
[14]   A: She individually?
[15]   Q: Yes.
[16]   A: I had no idea at the point.
[17]   Q: Yes.
[18] You said you know Viola Plummer 10
[19] or 15 years in an advocacy role?
[20]   A: Right. And — and —
[21]   Q: Did you feel physically threatened?
[22]   A: I was in a state of shock, dealing
[23] with other issues, so I — my focus was not even
[24] on that issue.
[25]   Q: At some point in time, when you got

Page 48

L. Comrie

[1]
[2] past the trauma of your mentor's wife's death,
[3] and you thought about Ms. Plummer's comments, did
[4] you feel physically threatened by Viola Plummer?
[5]    A: I felt physically threatened by the
[6] fact that that got in the front page of the
[7] paper, that we've had other incidence in the
[8] Council where members have been assaulted and one
[9] member was even murdered in the Council, and
[10] after I thought about it and got passed or —
[11] well, still hadn't gotten passed it because we
[12] hadn't buried him for another five days, but I
[13] thought about the fact that that was now
[14] underneath the as per, and you have a lot of sick
[15] people in the world, and I'm a public person, a
[16] person of decent name recognition, pretty
[17] well-known around the City, I mean not a person
[18] that can hide, because I'm a large person so
[19] people will distinguish me in a crowd.
[20]     Part of my job as a public person is
[21] to great strangers and to speak to people that I
[22] don't know that come up to me and encounter me on
[23] the street, pull me over in my car, stop me at
[24] the grocery store, the laundromat or wherever I'm
[25] walking.

Page 49

[1]                    **L. Comrie**
[2]    **Q:** Did you feel physically threatened
[3] by Viola Plummer?
[4]    **A:** I hadn't thought about it at the
[5] initial, and when I thought about it later on, I
[6] was more threatened by the individual statement
[7] than the individual person.
[8]    **Q:** Did you ask for security from the
[9] City Council?
[10]    **A:** No.
[11]    **Q:** Was security provided to you by the
[12] City Council?
[13]    **A:** Yes.
[14]    **Q:** At whose behest?
[15]    **A:** The Speaker's behest.
[16]    **Q:** Did you file a report with the
[17] police?
[18]    **A:** Not yet.
[19]    **Q:** Do you intend to file a report with
[20] the police?
[21]    **A:** Yes.
[22]    **Q:** And the report, what is the nature
[23] of the complaint that you intend to file with the
[24] police?
[25]    **A:** I don't know, I'm not — I

Page 50

[1]                    **L. Comrie**
[2] haven't — I don't know what the technical term
[3] is.
[4]    **Q:** Well, just put it in layman's,
[5] layperson's terms, what is the nature of the
[6] report that you intend to file with the police?
[7]    **A:** I've been instructed by the police
[8] department that I had an unlimited amount of time
[9] to file a report of the incident and what
[10] happened and my opinion of the incident. And
[11] since I had unlimited time to do it, I hadn't
[12] made it a priority to do so, since I was focused
[13] on immediately dealing with the funeral of my
[14] mentor, working on budget, and working on other
[15] things, just since I had unlimited time and it
[16] wasn't a time deadline, I didn't get to it.
[17]    **Q:** And you didn't file it because you
[18] don't urgently feel threatened by Viola Plummer?
[19]    **MR. MARKS:** Objection to form.
[20]    **A:** No, I had — I had already notified
[21] the police, the police were involved and they had
[22] already been on notice about the incident, my
[23] local police commander was aware of it and
[24] actually dispatched police cars to my house for a
[25] week. The borough commander was aware of the

Page 51

[1]                    **L. Comrie**
[2] incident, the head of security for City Hall was
[3] aware of it, and also the head of the Council of
[4] security was aware of it.
[5]    **Q:** When you say "aware", they were
[6] aware of the comment?
[7]    **A:** The comment, the incident, the
[8] entire happenings that day.
[9]    **Q:** You're making a distinction between
[10] the comment and the incident. What do you see as
[11] the comment and what do you see as the incident?
[12]    **A:** Her specific comment that made the
[13] front page of the papers, and it said
[14] assassination of my behind, period, in bold
[15] letters in the papers.
[16]    **Q:** Is she the publisher of the
[17] newspaper that printed that headline?
[18]    **A:** No.
[19]    **Q:** Did you interpret assassinate your
[20] behind to mean assassinate you?
[21]    **A:** No. But I'm not every reader, I'm an
[22] individual and when a reader sees that in the
[23] paper, they may not read the fine or the rest of
[24] the paragraph or the rest of the paper, or any
[25] other articles involved with it, they're just

Page 52

[1]                    **L. Comrie**
[2] seeing those three words.
[3]    **Q:** And —
[4]    **A:** My mother got a call later that day
[5] that someone was trying to assassinate me, my
[6] mother lives in Florida, because one of her
[7] friends didn't read the whole article, she called
[8] me up in a panic.
[9]    **Q:** And you explained to her that you
[10] were not in danger of being assassinated?
[11]    **A:** No, I didn't explain that to her.
[12]    **MR. MARKS:** Objection to form.
[13]    **Q:** So you —
[14]    **A:** I couldn't — I can't — you
[15] can't —
[16]    **Q:** You left your mother with the
[17] impression that you were in danger of being
[18] assassinated?
[19]    **MR. MARKS:** Objection to form.
[20]    **A:** It was a half — it was a half hour
[21] conversation, you just can't tell somebody that
[22] when somebody sends them an e-mail of an article
[23] that they're not reading.
[24]    **Q:** Did you explain to your mother how
[25] newspapers can distort stories?

Page 53

### L. Comrie

[1]
[2]    A: Yes, but that was a direct quote.

[3]    Q: You didn't believe that you were in
[4] physical danger from Viola Plummer?

[5]    A: I explained to her that I didn't
[6] think I was in physical danger from Viola
[7] Plummer, but I was concerned about the fact that
[8] that was in the paper and who knows what sick
[9] person may get off on trying to activate that
[10] word, or that statement, so there was — there
[11] was and still is a concern.

[12]    Q: And you explained to your mother
[13] that Viola Plummer is a 70 year old grandmother?

[14]    A: Yes, I explained that part. With a
[15] history of statements against me.

[16]    Q: And isn't it a fact that the next
[17] day you saw Ms. Plummer at 250 Broadway?

[18]    A: Yes.

[19]    Q: And that the two of you made —

[20]    MR. WAREHAM: Withdrawn.

[21]    Q: And that Ms. Plummer said to you
[22] something like Leroy and you turned around,
[23] pulled up the flap of your jacket and pushed out
[24] your rear end and laughed about it?

[25]    A: No.

Page 54

### L. Comrie

[1]
[2]    Q: That didn't happen?

[3]    A: No.

[4]    Q: Well, tell us what happened the next
[5] day at 250 Broadway when you saw Ms. Plummer?

[6]    A: I was coming — going through the —
[7] the doors headed to my office, she was coming
[8] into the 18th floor walkway on the elevator bank,
[9] she was coming into the elevator bank, she said,
[10] "Leroy" to me, I turned around, looked at her,
[11] didn't bend over, and kept walking and then
[12] she — she said some other words I didn't hear,
[13] and then when I was in the hall, I was just
[14] laughing in derision because I wasn't going to
[15] speak to her or acknowledge her or deal with her
[16] presence. At that point the only thing that I
[17] wanted from her is for her to go back on the
[18] steps and apologize.

[19]    Q: So you were laughing at her? With
[20] her? At her?

[21]    A: Not with her.

[22]    Q: You were laughing —

[23]    A: — in derision, because I had
[24] already gotten calls from people that were

Page 55

### L. Comrie

[1]
[2] telling me that the only thing they expected from
[3] her was for her to apologize, from people that we
[4] both know.

[5]    Q: I just want to be clear.

[6]    A: I'm being clear. I did not laugh
[7] with her, I was not in anyway near her —

[8]    Q: You were laughing —

[9]    A: — I did not respond to her, I was
[10] just laughing on my own.

[11]    Q: When you saw her in the hallway, was
[12] there anybody else there?

[13]    A: The Sergeant of Arms was at the
[14] desk.

[15]    Q: Do you remember who the Sergeant At
[16] Arms was?

[17]    A: Izzy, Izzy, Izzy, I forget, Israel
[18] Martinez, I believe.

[19]    Q: This is on the 18th floor, or what
[20] floor was this on?

[21]    A: The 18th.

[22]    Q: The 18th floor.

[23] And you said you don't remember what
[24] if any words were exchanged?

[25]    A: I wasn't listening for words,

Page 56

### L. Comrie

[1]
[2] because I didn't exchange any words. I didn't
[3] say one word to her.

[4]    Q: Did the Sergeant At Arms have to
[5] intervene between the two of you, was he saying
[6] anything to you?

[7]    A: No, we weren't anywhere near each
[8] other, she was at one set of doors, I was at
[9] another set of doors, that hallway is at least
[10] 500 feet wide.

[11]    Q: Did you make any complaint or
[12] anything?

[13]    A: No. I understand he made a
[14] complaint.

[15]    Q: Who, the Sergeant At Arms?

[16]    A: Yes.

[17]    Q: And do you know what the nature of
[18] his complaint was?

[19]    A: He expressed to me that he was upset
[20] with her comments that were made after I walked
[21] down the hall.

[22]    Q: Did he say what those comments were?

[23]    A: I didn't ask.

[24]    Q: Did he say who those comments were
[25] made to?

Page 57

**L. Comrie**

[1]
[2] **A:** No, I didn't ask.

[3] **Q:** When —

[4] I don't know if anybody else was in
[5] the hall.

[6] **Q:** It was at that point, it was you,
[7] Ms. Plummer and the Sergeant At Arms?

[8] **A:** Right.

[9] **Q:** There was nobody else there?

[10] **A:** Not that I saw.

[11] **Q:** But he said those were comments that
[12] were made in his presence after you walked out?

[13] **A:** Comments that he overheard.

[14] **Q:** The security that was provided to
[15] you by the City, by the Speaker's office, how
[16] long did you keep it?

[17] **A:** I had a fundraiser that evening
[18] three blocks from City Hall.

[19] **MR. MARKS:** Objection to form.

[20] **A:** And they stayed for the duration of
[21] the fundraiser, which was three hours.

[22] **Q:** And at the fundraiser, who spoke at
[23] the fundraiser?

[24] **A:** Many people spoke at the fundraiser.

[25] **Q:** Did the Speaker Christine Quinn

Page 58

**L. Comrie**

[1]
[2] speak at the fundraiser?

[3] **A:** Yes.

[4] **Q:** And was the fundraiser successful?

[5] **A:** Yes.

[6] **Q:** And the support of the Speaker was
[7] helpful in terms of its success?

[8] **MR. MARKS:** Objection to form.

[9] **A:** No, not really.

[10] **Q:** The support of the Speaker hurt?

[11] **A:** No. A fundraiser is generated on
[12] your ability to make calls in to get people
[13] there, and any name that is on there, most people
[14] know that everybody has the Speaker's name on
[15] their fundraiser that has an interest to City
[16] Hall, you don't make the calls and then twist
[17] peoples' arms yourself into coming.

[18] **Q:** But if the Speaker has a
[19] contradiction, she doesn't necessarily come to
[20] every fundraiser she's asked to?

[21] **MR. MARKS:** Objection to form.

[22] **A:** I don't know.

[23] **Q:** Do you think she would come to a
[24] fundraiser for Charles Barron?

[25] **MR. MARKS:** Objection to form.

Page 59

**L. Comrie**

[1]
[2] **A:** I don't know.

[3] **Q:** What is your educated guess?

[4] **MR. MARKS:** He's not here to guess.

[5] My understanding is he's here to present
[6] facts.

[7] **A:** Every day is a new day in the world.

[8] **Q:** You're saying anything is possible?

[9] **A:** Anything is possible.

[10] **Q:** Has the Speaker supported you with
[11] other fundraisers?

[12] **MR. MARKS:** Objection to form.

[13] **A:** I don't — I don't — this is my
[14] first fundraiser since '05.

[15] **Q:** Are you familiar with the ethics
[16] manual?

[17] **A:** No, I'm not on the Ethics Committee,
[18] so I never had to go through the manual, I never
[19] had a reason to.

[20] **Q:** Are you aware that —

[21] **MR. LEMONEDES:** Before you continue
[22] into another area, can I ask for a
[23] two-minute break?

[24] **MR. WAREHAM:** Sure.

[25] **MR. LEMONEDES:** Would that be okay?

Page 60

**L. Comrie**

[1]
[2] **MR. WAREHAM:** Sure.

[3] **MR. LEMONEDES:** I wanted to a catch
[4] you before you went ahead.

[5] **MR. WAREHAM:** Not a problem.

[6] **MR. LEMONEDES:** If you want to
[7] continue, that is fine.

[8] **MR. WAREHAM:** No, it's okay.

[9] (Time noted: 11:25 a.m.)

[10] (A brief recess is taken.)

[11] (Time noted: 11:33 a.m.)

[12] **Q:** I had asked you earlier if you were
[13] familiar with the ethics manual?

[14] **A:** Right.

[15] **Q:** Do you remember receiving one when
[16] you first took office?

[17] **A:** Yes, I guess so, yes.

[18] **Q:** Are you familiar with the procedure
[19] for complaints of harassment or discrimination
[20] that can be brought against City Council members
[21] or employees?

[22] **A:** Yes. We reviewed that since we came
[23] into office and updated it.

[24] **Q:** Did you file a complaint against Ms.
[25] Plummer as per the ethics manual?

Page 61

### L. Comrie

[1]
[2] MR. MARKS: Objection to form.
[3] A: No.
[4] Q: Why not?
[5] A: I didn't realize there was an option
[6] available to me.
[7] Q: Did you discuss what options were
[8] available to you around Ms. Plummer's comments
[9] with the Speaker?
[10] A: Yes.
[11] Q: And what were you told?
[·2] MR. MARKS: Objection to form.
[13] A: I expressed to the Speaker my desire
[14] to seek to terminate her.
[15] Q: And did the speaker raise the
[16] possibility of filing a complaint as per the
[17] ethics manual?
[18] MR. MARKS: Objection to form.
[19] You may answer.
[20] A: No.
[21] Q: And you expressed to the Speaker
[22] your desire for Ms. Plummer to be terminated
[23] because of the remark that she made outside of
[24] City Hall?
[25] A: No.

Page 62

### L. Comrie

[1]
[2] Q: You expressed to the Speaker your
[3] desire for Ms. Plummer to be terminated for what
[4] remarks?
[5] A: Both sets of remarks, the remarks in
[6] the Council that day, and the remarks on the
[7] steps.
[8] Q: And isn't it a fact that your
[9] concerns were the remarks outside the steps of
[10] City Hall?
[11] A: No.
[12] MR. MARKS: Objection to form.
[13] Q: Your concerns were always the
[14] remarks that she made, the ones that —
[15] MR. WAREHAM: Withdrawn.
[16] Q: The remarks that she made inside the
[17] Council, you don't remember what they were?
[18] A: I'm not — I didn't need to hold
[19] onto the specifics, I just knew that they were
[20] vile and unacceptable.
[21] Q: But you don't remember what they
[22] specifically were?
[23] A: No.
[24] Q: And it's your position that your
[25] problem with Ms. Plummer's remarks from the

Page 63

### L. Comrie

[1]
[2] beginning always included the remarks in the City
[3] Council and outside the City Council chambers?
[4] A: Yes, yes.
[5] Q: And that was the position you made
[6] clear to the Speaker?
[7] A: Yes.
[8] Q: And to your staff?
[9] A: Yes.
[10] Q: And who is Rance Huff?
[11] A: My communications director.
[12] Q: And did you have him release a press
[13] statement on June 1, 2007?
[14] A: Yes, yes, I think that is the date.
[15] Q: And who wrote that press statement?
[16] A: We did collectively.
[17] Q: We being?
[18] A: Myself and Rance Huff.
[19] Q: With any input from the Speaker's
[20] office?
[21] A: No.
[22] Q: And did that release reflect, was
[23] that an accurate reflection of your position on
[24] Ms. Plummer at that time?
[25] MR. MARKS: Objection to form.

Page 64

### L. Comrie

[1]
[2] A: It did require that I stated that I
[3] thought she should be fired, it stated that I
[4] thought her actions, that they warrant
[5] termination, I think I said actions that day and
[6] I don't remember every word that I wrote in the
[7] release.
[8] MR. WAREHAM: Mark this as
[9] Plaintiff's Exhibit 6.
[10] (Plaintiff's Exhibit 6, document
[11] bearing Bates numbers D 0771 and D 0772,
[12] marked for identification.)
[13] Q: Is this an accurate copy of the
[14] release that your office issued that day?
[15] MR. MARKS: Just for the record, it
[16] is a one-page document, two sides, and the
[17] first page of Exhibit 6 is Bates stamped D
[18] 0771 and the next is D 0772.
[19] A: Yes.
[20] Q: And can I draw your attention to the
[21] third paragraph?
[22] A: Yes.
[23] Q: And I ask you to read that into the
[24] record, or just read that out loud?
[25] A: Okay. But the second paragraph is

Page 65

**L. Comrie**

[1]
[2] germane to the third paragraph.
[3]    Q: At this point would you please read
[4] the third paragraph?
[5]    A: Threats of assassination made by
[6] Viola Plummer Chief of Staff to Council Member
[7] Charles Barron clearly crossed the line. The
[8] reckless remarks made by Ms. Plummer as an
[9] employee of the City of New York cannot be
[10] tolerated, and it is my opinion that she should
[11] be fired immediately. Considering the recent
[12] history of this Council, the word assassination
[13] clearly evokes painful memories of our late
[14] colleague James Davis.
[15]    Q: Thank you.
[16] And is that your position, that the
[17] basis of Ms. Plummer's firing were the reckless
[18] remarks?
[19]    A: Yes.
[20]    MR. MARKS: Objection.
[21]    A: And I said in the second paragraph,
[22] and again in paragraph — where am I? The third
[23] paragraph on the end where I spoke about — in
[24] the second paragraph, "Even more so derisive and
[25] repugnant remarks by members of staffers" —

Page 66

**L. Comrie**

[1]
[2]    "members and staff of this body during and after
[3] the stated meeting is an issue that must be
[4] addressed." And I also say in here, in paragraph
[5] what is it, six, that I'm calling upon the
[6] Speaker, "I'm not surprised by my colleague
[7] Charles Barron, who would defend Ms. Plummer and
[8] her heinous remarks, I'm calling for the Speaker
[9] and other members of this body to join me in
[10] publically censoring her and calling for her
[11] termination" and I also say in here that I was
[12] appalled by the lack of respect and other
[13] disregard for this body that also sought to see
[14] this debate disintegrate into a racial argument.
[15]    Q: Are you saying that even absent the
[16] remarks outside of City Hall, you would call for
[17] Ms. Plummer's termination for the remarks she
[18] made in City Hall?
[19]    A: Correct.
[20]    Q: But you don't remember what those
[21] remarks were?
[22]    A: I didn't freeze them in my memory.
[23]    Q: So it wasn't the assassination that
[24] tipped the scale, it was just her remarks both
[25] inside of City Hall —

Page 67

**L. Comrie**

[1]
[2]    A: Her conduct that day in total.
[3]    Q: Her conduct?
[4]    A: Right.
[5]    Q: And her conduct, what was her
[6] conduct that day?
[7]    A: Her remarks that she made in the
[8] chambers.
[9]    Q: The words she issued? The words she
[10] spoke?
[11]    A: Yes.
[12]    Q: And you're saying that this press
[13] release of June 1st, Plaintiff's 6, you had no
[14] discussion with anyone from the Speaker's office
[15] in formulating it?
[16]    A: No.
[17]    Q: This came totally out of —
[18]    A: Yes.
[19]    Q: — consultation between you and
[20] Mr. Huff?
[21]    A: Right.
[22]    Q: When you said that Ms. Plummer
[23] should be fired, who in your view had the
[24] authority to fire Ms. Plummer?
[25]    A: The Speaker.

Page 68

**L. Comrie**

[1]
[2]    Q: The Speaker had the authority to
[3] fire Ms. Plummer?
[4]    A: Yes.
[5]    Q: Does the Speaker have the authority
[6] to fire Rance Huff?
[7]    A: Yes.
[8]    Q: Did the Speaker hire Rance Huff?
[9]    A: No.
[10]    Q: Who hired Rance Huff?
[11]    A: I did.
[12]    Q: You put in the form to hire Rance
[13] Huff?
[14]    A: Correct.
[15]    Q: Did the Speaker sign off on that?
[16]    A: I don't think so, no.
[17]    Q: Where does the Speaker get the
[18] authority to fire Viola Plummer?
[19]    MR. MARKS: Objection to form.
[20]    A: She is in charge of all Council
[21] personnel.
[22]    Q: Where does that say that? Where is
[23] that stated? Where is that written that the
[24] Speaker is in charge of all Council personnel?
[25]    MR. MARKS: Objection to form.

Page 69

**L. Comrie**

[2] **A:** I don't — in the Charter, from my

[3] understanding. I don't —

[4] **Q:** Have you read the Charter?

[5] **A:** I saw the chapter at one point, yes.

[6] **Q:** And can you cite the section in the

[7] Charter where it gives the Speaker —

[8] **A:** No, I didn't commit it to memory.

[9] I'm sorry.

[10] **Q:** — where it gives the Speaker the

[11] authority over all City Council personnel?

[12] **A:** I don't have it committed to memory.

[13] **Q:** But you're saying you've read that

[14] in the Charter where the Speaker has authority

[15] over all City Council personnel?

[16] **A:** Right.

[17] **MR. WAREHAM:** Make this 7.

[18] This is part of the Charter, an

[19] excerpt from the Charter of the City

[20] Council of New York, beginning with

[21] chapters two, sections 21 through 23, and

[22] sections 41 through 49.

[23]     (Plaintiff's Exhibit 7, Excerpt of

[24] New York City Charter as Amended Through

[25] July 2004, marked for identification.)

Page 70

**L. Comrie**

[1]

[2] **Q:** If you can just look at that, in

[3] particular sections 21 through 23, and section

[4] 44, which is entitled, "Speaker".

[5] **A:** Okay.

[6] **Q:** In the sections that I presented

[7] you, and there are certain sections that aren't

[8] there that deal with Public Advocate and

[9] elections, but in the sections that I've shown

[10] you, is there anything that indicates the Speaker

[11] has control over personnel of the City Council?

[12] **MR. MARKS:** Objection to form.

[13] You can answer.

[14] **A:** Yes.

[15] **Q:** Excuse me?

[16] **THE WITNESS:** I'm sorry.

[17] **MR. MARKS:** Go ahead.

[18] **A:** I said yes.

[19] **Q:** Would you please, what section is

[20] that?

[21] **A:** 45, 47, and 48.

[22] **Q:** Is there anything that indicates

[23] that the Speaker has —

[24] **A:** And 44, I'm sorry, 44, 45, 47 and

[25] 48.

Page 71

**L. Comrie**

[1]

[2] **Q:** Is there anything that indicates

[3] that the Speaker has control over the

[4] disciplining or the suspension of individual

[5] members of the City Council, of staff members of

[6] individual members of the City Council?

[7] **A:** Yes.

[8] **Q:** What section is that?

[9] **A:** 45.

[10] **Q:** And would you please read that part

[11] that you think says that?

[12] **A:** "Shall have the authority" —

[13] **Q:** Please indicate which section you're

[14] reading from.

[15] **A:** Section 45, right after, "Mailing

[16] cost".

[17] **Q:** After "Mailing cost", how many lines

[18] down?

[19] **A:** It's like four lines from the

[20] bottom. "Shall have authority to compel

[21] attendance of absent members, punish members for

[22] disorderly behavior and to expel any member after

[23] charges and a hearing with the concurrence of

[24] two-thirds of all the Council members."

[25] **Q:** Let me just stop you right there.

Page 72

**L. Comrie**

[1]

[2] Is that referring to Council members?

[3] **A:** It says members.

[4] **Q:** Does that refer to staff of

[5] individual Council members?

[6] **A:** It says members. It doesn't say

[7] Council members or — I'm interpreting it as any

[8] member of the City Council staff.

[9] **Q:** So a staff member is a member of the

[10] City Council?

[11] **A:** I'm sorry, say that again.

[12] **Q:** Is a staff member a member of the

[13] City Council?

[14] **A:** No, City Council members are

[15] elected.

[16] **Q:** So you're saying that this section

[17] you're referring to has a more inclusive

[18] definition of member?

[19] **MR. MARKS:** Objection to form.

[20] You can answer.

[21] **A:** Yes.

[22] **Q:** And that the definition of member in

[23] this section means members and employees of

[24] members?

[25] **A:** Yes.

Page 73

*L. Comrie*

[1]
[2] **Q:** And according to this section, and
[3] at the end it says "To expel any member after
[4] charges and the hearing with the concurrence of
[5] two-thirds of all the Council members", were
[6] charges and a hearing brought against Viola
[7] Plummer?
[8] **A:** No.
[9] **Q:** Did two-thirds of the members of the
[10] City Council concur that she should be expelled?
[11] **A:** No.
[12] **Q:** Is there another section that you
[13] think gives the Speaker the authority to suspend
[14] a member of an individual Council Member, aside
[15] from paragraph 45?
[16] **A:** Section 21.
[17] **Q:** And for the benefit of the record
[18] can you read what section 21 says?
[19] **A:** "There shall be a Council which
[20] shall be invested with the ledge" — "There shall
[21] be the legislative body of the City in addition
[22] to the other powers vested in it by this Charter
[23] and other law, the Council shall be vested with
[24] the legislative power of the City. Any
[25] enumerations of powers in this Charter shall not

Page 74

*L. Comrie*

[1]
[2] be held to the limit of the legislative power of
[3] the Council, except as specifically provided in
[4] this Charter."
[5] **Q:** And you interpret that section to
[6] mean that the Speaker of the City Council has the
[7] authority to fire an employee of an individual
[8] staff member?
[9] **A:** Yes.
[10] **Q:** Are there any other sections in here
[11] that you think gives the Speaker that authority?
[12] **A:** I said 47, right? Section 47.
[13] **Q:** Can you please read into the record
[14] what part of section 47 gives her that authority?
[15] **A:** "The Council shall establish a
[16] structure within the City Council and retain
[17] professional staff to review and analyze proposed
[18] budgets and departmental estimates, request for
[19] new taxes or changes in taxes, budget
[20] modifications, capital borrowings and Mayoral
[21] management reports. Such staff shall assist the
[22] committees of the Council and their Council
[23] member in their analysis of the proposed
[24] legislation and their review of the performance
[25] of management of City agencies."

Page 75

*L. Comrie*

[1]
[2] **Q:** And you're saying that your
[3] interpretation of that language is that it says
[4] it gives the Speaker the authority to fire the
[5] employee of an individual Council member?
[6] **A:** It doesn't say that here
[7] specifically.
[8] **Q:** Does it say that in section 45
[9] specifically?
[10] **A:** It — no.
[11] **Q:** Does it say it in section 21
[12] specifically?
[13] **A:** No, it gives her the general power
[14] as the head of the counsel to make decisions.
[15] **Q:** And did you participate in the vote
[16] for the Speaker when Council Member Gifford was
[17] elected Speaker of the City Council?
[18] **A:** Yes, yes.
[19] **Q:** And was it your understanding that
[20] when you selected him as Speaker he would have
[21] control over the individual staff members that
[22] you hire?
[23] **MR. MARKS:** Objection to form.
[24] **A:** I didn't have that understanding
[25] then.

Page 76

*L. Comrie*

[1]
[2] **Q:** When you selected, when you voted to
[3] select Council Member Quinn as Speaker, was it
[4] your understanding that you were giving her the
[5] authority to suspend or fire your individual
[6] staff members?
[7] **A:** Yes.
[8] **Q:** That was your understanding?
[9] **A:** Yes.
[10] **Q:** That was part of the platform?
[11] **A:** No. Sorry.
[12] **Q:** When did you come to that
[13] understanding between the time of the selection
[14] of Speaker Gifford and Speaker Quinn?
[15] **MR. MARKS:** Miller.
[16] **Q:** Miller, I'm sorry.
[17] **A:** The Alan Jennings incident.
[18] **Q:** Excuse me?
[19] **A:** The Alan Jennings incident.
[20] **Q:** In the Alan Jennings incident, the
[21] Speaker had him fired?
[22] **A:** No.
[23] **Q:** What in the Alan Jennings incident
[24] gave you the understanding that the Speaker had
[25] the authority to fire individual employees, staff

**Page 77**

L. Comrie

[1]
[2] employees of individual Council members?
[3]   **A:** That the plaintiffs in the case sued
[4] the Speaker and the Council.
[5]   **Q:** The plaintiffs were?
[6]   **A:** The women that were harassed by
[7] Council Member Jennings, and during that time it
[8] was discovered that the Speaker is responsible
[9] for all the staff members of the City Council.
[10]   **Q:** Is a Council member considered a
[11] staff member?
[12]   **A:** No.
[13]   **Q:** The staff members that you're
[14] speaking of were the staff members of Councilman
[15] Jennings?
[16]   **A:** Yes.
[17]   **Q:** And you're saying it was discovered
[18] that the —
[19]   **A:** The Speaker —
[20]   **Q:** — the Speaker —
[21]   **A:** — is responsible for all employees
[22] hired to the City Council.
[23]   **Q:** And what authority was cited for the
[24] Speaker to have that?
[25]   **A:** I don't know the chapter and verse,

**Page 78**

L. Comrie

[1]
[2] but it was —
[3]   **Q:** Was it in the Charter?
[4]   **A:** I believe so, yes.
[5]   **Q:** But you didn't see it in the
[6] sections that we looked at today, right?
[7]   **A:** Yes.
[8]   **Q:** You did see it?
[9]   **A:** No, I didn't — I mean — yes, I'm
[10] sorry, I'm —
[11]   **Q:** Sorry.
[12]   **A:** — I'm confused.
[13]   **Q:** This authority that you said that
[14] was discovered during the lawsuit against
[15] Councilman Jennings —
[16]   **A:** Right.
[17]   **Q:** — this authority that the Speaker
[18] has over personnel of individual Council
[19] members —
[20]   **A:** The responsibility.
[21]   **Q:** The responsibility, does
[22] responsibility include the right to fire them?
[23]   **A:** Yes.
[24]   **Q:** Were the staff members of Councilman
[25] Jennings fired by the Speaker?

**Page 79**

L. Comrie

[1]
[2]   **A:** No.
[3]   **Q:** Were they rehired by the Speaker?
[4]   **A:** No.
[5]   **Q:** So what was the responsibility that
[6] the Speaker had over Councilman Jennings' staff
[7] members?
[8]   **A:** My understanding is that the
[9] Speaker's office is responsible for all personnel
[10] that is hired under the Council's umbrella.
[11]   **Q:** And it is your understanding that
[12] the responsibility means the right to suspend
[13] those personnel?
[14]   **A:** Yes.
[15]   **Q:** And the right to fire those
[16] personnel?
[17]   **A:** Right.
[18]   **Q:** And that all of the City Council
[19] members, when they selected Christine Quinn,
[20] those who selected Christine Quinn as Speaker
[21] understood that —
[22]   **MR. WAREHAM:** Withdrawn.
[23]   **Q:** Was there a consensus amongst the
[24] Council when they selected the last Speaker, that
[25] she had the authority to hire and fire, to fire,

**Page 80**

L. Comrie

[1]
[2] suspend —
[3]   **MR. WAREHAM:** Excuse me.
[4]   **Q:** — to discipline or terminate staff
[5] members of individual Council members?
[6]   **MR. MARKS:** Objection to form.
[7]   **A:** No, I never — there had never been
[8] a reason.
[9]   **Q:** Was that your understanding when you
[10] selected Christine Quinn as the Speaker, that she
[11] would have that authority over your staff
[12] members?
[13]   **A:** Yes.
[14]   **Q:** But you don't know where that is
[15] written down? Is it in the City Council rules?
[16]   **A:** I don't know where it's written
[17] down. I don't know. I don't know what part of
[18] the Charter it was shown to me, it might be a
[19] different part of it.
[20]   **Q:** Are you familiar with the rules of
[21] the City Council?
[22]   **A:** Some of them, I don't have it
[23] verbatim. I don't have it all, you know — I'm
[24] not — I don't have what do you call it, computer
[25] recollection, whatever, I read it, but I don't

Page 81

**L. Comrie**

[1]
[2] have it committed to memory.
[3]    **Q:** Those are the rules by which the
[4] City Council conducts its business, correct?
[5]    **A:** Yes.
[6]    **Q:** Those are more specific than what is
[7] laid out in the New York City Charter, correct?
[8]    **MR. MARKS:** Objection to form.
[9]    **A:** I'm not sure.
[10]    **Q:** Would you look back at Plaintiff's 7
[11] at paragraph 46?
[12]    **A:** Umm-hmm.
[13]    **Q:** And what is that entitled?
[14]    **A:** "Rules of the Council".
[15]    **Q:** Can you just for the record read
[16] what that paragraph says?
[17]    **A:** "The Council shall determine the
[18] rules of its own proceedings at the first stated
[19] meeting of the Council in each year and shall
[20] file a copy with the City clerk. Such rules
[21] shall include but not be limited to rules that
[22] the chairs of all standing committees be elected
[23] by the Council as a whole, that the first named
[24] sponsor of a proposed law or resolution be able
[25] to require a committee vote on such proposed law

Page 82

**L. Comrie**

[1]
[2] or resolution, that a majority of the members of
[3] the Council should be able to discharge a
[4] proposed local law or resolution from committee,
[5] that the committee shall provide reasonable
[6] advance notice of committee meetings to the
[7] public, that all committee votes be recorded and
[8] made available to the public."
[9]    **Q:** So this is the City Charter giving
[10] the authority to the Council to set its rules,
[11] correct?
[12]    **A:** Yes.
[13]    **Q:** Now, let's look at Plaintiff's 4, I
[14] want to refer you back to Plaintiff's 4, which
[15] was the Rules of the Council, the excerpts from
[16] the Rules of the Council. I draw your attention
[17] to chapter two.
[18]    **MR. MARKS:** I want to make it clear
[19] that Plaintiff's 4 is not the entire, just
[20] excerpts.
[21]    **MR. WAREHAM:** Right, it's an
[22] excerpt.
[23]    **Q:** I draw your attention to section 2
[24] entitled "Speaker", and could you just read that
[25] and just read for the record what that section

Page 83

**L. Comrie**

[1]
[2] says about the Speaker?
[3]    **A:** Section 2.00?
[4]    **Q:** Yes. Exactly.
[5]    **A:** "The Council shall elect from its
[6] members a Speaker and other such officers as it
[7] deems appropriate. During absences the Speaker
[8] may designate in writing any member to perform
[9] the duties of the Speaker for that legislative
[10] day."
[11]    **Q:** Now I draw your attention to section
[12] 2.40, and that is entitled —
[13]    **A:** "Personnel and fiscal report."
[14]    **Q:** Can you just read that first
[15] paragraph?
[16]    **A:** "The Speaker shall provide to each
[17] member an annual report detailing the names of
[18] all individuals receiving compensation for work
[19] performed in the Council, its members or any of
[20] its committees, the amount of such compensation,
[21] and a title, and job description, including
[22] identification of the function or division of the
[23] Council to which the individual is assigned.
[24] Each report shall also set forth the amount of
[25] allowance in lieu of expenses received by each

Page 84

**L. Comrie**

[1]
[2] committee chairperson."
[3]    **Q:** Is there any place in the rules that
[4] you're looking at where it indicates that the
[5] Speaker has the authority to discipline or fire
[6] the staff members of individual Council members?
[7]    **A:** I don't see anything specifically
[8] written, no.
[9]    **Q:** Did you attend the two stated
[10] meetings in June 2007, June 3rd?
[11]    **A:** Yes.
[12]    **Q:** Do you know if Mrs. Plummer was at
[13] those meetings? Do you remember her being there?
[14]    **A:** Yes, I think she was there.
[15]    **Q:** Do you remember her engaging in any
[16] alleged disruptive conduct at those meetings?
[17]    **A:** I don't remember.
[18]    **Q:** So as far as you remember, those
[19] meetings went along smoothly as per the norm?
[20]    **MR. MARKS:** Objection, objection to
[21] form.
[22]    **A:** I wouldn't say they were smooth, but
[23] they were completed. Yeah, I think one of them
[24] got disruptive over an issue, I don't remember.
[25]    **Q:** Do you remember what the issue was?

Page 85

**L. Comrie**

[1]

[2] **A:** No.

[3] **Q:** Was Ms. Plummer involved with that?

[4] **MR. MARKS:** Objection to form.

[5] **A:** I don't remember.

[6] **Q:** Did the Speaker meet with you at any

[7] point in time after May 30th to assess the

[8] disruption caused by Mrs. Plummer's outbursts,

[9] quote/unquote, alleged outbursts and threats?

[10] **MR. MARKS:** Objection to form.

[11] **A:** Yes.

[12] **Q:** When was that?

[13] **A:** The — the — the day of.

[14] **Q:** On May 30th?

[15] **A:** Yes.

[16] **Q:** You had a meeting on May 30th?

[17] **A:** When — when — it wasn't a meeting,

[18] but when the reporter came in with the tape,

[19] there was a request from the speaker to have a

[20] quick discussion about it and the overall tenure

[21] of the day.

[22] **Q:** And who was at that meeting?

[23] **A:** Myself, the Speaker, Chuck Meara,

Ramon Martinez, that was when we were listening

to the tape from the reporter, so I forget her

Page 86

**L. Comrie**

[1]

[2] communications woman, a Hispanic woman was there

[3] also.

[4] **Q:** Maria Alvarado?

[5] **A:** Yes.

[6] **Q:** So there were five people?

[7] **A:** Umm-hmm.

[8] **Q:** And what did you discuss at the

[9] meeting?

[10] **A:** We discussed the tape and also

[11] the — the — what happened at the meeting, what

[12] happened during the stated meeting.

[13] **Q:** And what was the conclusion?

[14] **MR. MARKS:** Objection to form.

[15] **A:** Yeah. And we concluded that we

[16] would speak about it again.

[17] **Q:** Was there any discussion around any

[18] steps, any actions being taken against Viola

[19] Plummer?

[20] **A:** I'm sorry, say that again.

[21] **Q:** Was there any discussion about

[22] taking any type of disciplinary action against

[23] Viola Plummer at that meeting of May 30, 2007?

[24] **A:** No discussion. I had stated then

that I wanted to see her fired, and that was the

Page 87

**L. Comrie**

[1]

[2] first time that I — I made that public request

[3] or personal request to the Speaker.

[4] **Q:** And what was the Speaker's response

[5] when you said that?

[6] **A:** She would take it under advisement.

[7] **Q:** Did she respond that she did not

[8] have the authority over the staff members of

[9] individual Council members?

[10] **A:** No.

[11] **Q:** She didn't —

[12] **A:** She didn't say that, no.

[13] **Q:** Did you have any subsequent meetings

[14] with the Speaker around what steps might be

[15] taken —

[16] **A:** Yes.

[17] **Q:** — against Ms. Viola Plummer?

[18] When was the next meeting?

[19] **A:** I don't remember the date.

[20] **Q:** How many days after the stated

[21] meeting of May 30, 2007?

[22] **A:** Within a week.

[23] **Q:** And what was discussed at that

[24] meeting?

[25] **A:** There was a discussion of what can

Page 88

**L. Comrie**

[1]

[2] be done by the Council.

[3] **Q:** And were any conclusions drawn about

[4] what could be done by the Council?

[5] **A:** No.

[6] **Q:** At that point in time, did the

[7] Speaker indicate that she was in agreement with

[8] you that Viola Plummer should be terminated?

[9] **A:** Yes.

[10] **Q:** Did the Speaker indicate that, the

[11] Speaker being Council Member Quinn, did the

[12] Speaker indicate that she did not have the

[13] authority over the staff member of an individual

[14] Council member?

[15] **A:** No.

[16] **Q:** Did this meeting occur after June

[17] 3rd, do you remember?

[18] **A:** I don't remember.

[19] **Q:** Was there any point in time during

[20] the month of June when you understood, when the

[21] Speaker indicated —

[22] **MR. WAREHAM:** Withdrawn.

[23] **Q:** Was there any point in time during

[24] the month of June when the Speaker indicated that

[25] she did not have the authority as Speaker over

Page 89

**L. Comrie**

[1]
[2] the firing of Viola Plummer as a staff member of
[3] an individual Council member?
[4]   A: No.
[5]   Q: Was there any point in time when the
[6] Speaker indicated to you that Viola Plummer, that
[7] staff employees of individual Council members are
[8] considered her employees as Speaker?
[9]   A: Yes.
[10]   Q: When did she say that?
[11]   A: After they did the research.
[12]   Q: Do you remember when that was?
[13]   A: About a week before the letter was
[14] drafted.
[15]   Q: And when you say after they did the
[16] research, who is they?
[17]   A: Council's legal staff.
[18]   Q: And your understanding at that point
[19] was that individual staff members, staff
[20] employees of individual Council members are under
[21] the personnel control of —
[22]   A: — the Speaker.
[23]   Q: — the Speaker?
[24]   A: Correct.
[25]   Q: And when they told you that, did

Page 90

**L. Comrie**

[1]
[2] they indicate to you what that was based upon,
[3] what legal authority that was based upon?
[4]   A: Yes.
[5]   Q: And what was that legal authority?
[6]   A: I didn't commit it to specific
[7] chapter and verse.
[8]   Q: Was it the New York City Charter?
[9]   A: I believe so.
[10]   Q: But it wasn't in that section that
[11] we just looked at, right?
[12]   A: Correct.
[13]   Q: Some other section?
[14]   A: Right. I don't know. I mean —
[15]   Q: Was it in the City Council Rules?
[16]   A: I — again, I didn't commit it to
[17] member.
[18]   Q: When you met with her and that was
[19] communicated to you, who else was present?
[20]   A: Liz Fine.
[21]   Q: Liz Fine is?
[22]   A: The — the — the Chief Counsel, I
[23] forget her title, Director of the Law Counsel,
[24] Chief Counsel for the Speaker, Chuck Meara and
[25] Ramon Martinez.

Page 91

**L. Comrie**

[1]
[2]   Q: And the Speaker, right?
[3]   A: Right.
[4]   Q: You said that was about a week
[5] before the letter of suspension was drafted?
[6]   A: Yes.
[7]   Q: And that was a letter that was sent
[8] to Ms. Plummer on June 28th, if you know?
[9]   A: Okay. I'm not locked in on dates.
[10]   Q: And that was a week before the next
[11] stated meeting, the last stated meeting in June,
[12] June 27th?
[13]   A: Umm-hmm, umm-hmm.
[14]   Q: It was before that?
[15] And did you have any discussion with
[16] any other Council members about the significance
[17] of this power of the Speaker —
[18]   MR. MARKS: Objection to form.
[19]   Q: — over hiring of their staff
[20] members?
[21]   MR. MARKS: Objection to form.
[22]   A: Yes.
[23]   Q: And who did you discuss that with?
[24]   A: Most of the members at some point,
[25] the caucus leaders, the other members of the

Page 92

**L. Comrie**

[1]
[2] Council leadership team, the — so there would
[3] be — and I think most of the members of the
[4] Council.
[5]   Q: And did any of them express concern
[6] about this expansion of the powers of the
[7] Speaker —
[8]   MR. MARKS: Objection to form.
[9]   Q: — over their personnel, over the
[10] personnel of their staff?
[11]   MR. MARKS: Objection to form.
[12]   A: Yes.
[13]   Q: Did they think that the Speaker did
[14] not have that power?
[15]   A: No.
[16]   MR. MARKS: Objection to form.
[17]   Q: You're saying that the people you
[18] spoke with all agreed that the Speaker does have
[19] the power of firing their staff employees?
[20]   A: Right.
[21]   MR. MARKS: Objection to form.
[22]   Q: Have you heard the term, "The
[23] inherent powers as Speaker" before?
[24]   A: Can't say that I have.
[25]   Q: Let me re-ask.

Page 93

### L. Comrie

[1]
[2] Have you heard that term in
[3] justification of the right of the Speaker of the
[4] City Council to discipline individual staff
[5] members' employees, I'm sorry, individual Council
[6] members' staff employees?
[7]     **MR. MARKS:** Objection to form.
[8]     **A:** No.
[9]     **Q:** Let me just take you back a second.
[10] You said that you intend to file a complaint with
[11] the police department against Ms. Plummer?
[12]     **A:** I'll file it — I'll file a
[13] statement of record.
[14]     **Q:** I'm still trying to be clear, what
[15] will the complaint be?
[6]     **MR. MARKS:** If he knows.
[7]     **A:** Yeah —
[8]     **MR. WAREHAM:** He's filing it.
[9]     **A:** I mean — I was told that I should
[20] file for the record the statement of what
[21] happened that day.
[22]     **Q:** You were told by?
[23]     **A:** The police.
[24]     **Q:** Who? Who in the police? Somebody,
[25] an officer on the block?

Page 94

### L. Comrie

[1]
[2]     **A:** Lieutenant Brennan, Lieutenant
[3] Brennan who is the head of the Council's — the
[4] City Hall security.
[5]     **Q:** Lieutenant Brennan?
[6]     **A:** Umm-hmm. He suggested that I should
[7] file the statement for the record.
[8]     **Q:** Did he say what would come of that,
[9] whether criminal charges would be filed?
[10]     **A:** No. He said that they would not
[11] generate criminal charges.
[12]     **Q:** This is just a statement for the
[13] record?
[14]     **A:** Right.
[15]     **Q:** Like a paper trail?
[16]     **A:** Right.
[17]     **MR. MARKS:** Objection to form.
[18]     **MR. WAREHAM:** I need about a five
[19] minute break, we're almost finished.
[20]     (Time noted: 12:24 p.m.)
[21]     (A brief recess is taken.)
[22]     (Time noted: 12:34 p.m.)
[23]     **Q:** During your time on City Council,
[24] what committees have you chaired?
[25]     **A:** Rules Privileges and Elections, and

Page 95

### L. Comrie

[1]
[2] Consumer Affairs.
[3]     **Q:** Rules Privileges and Elections.
[4] So that makes you fairly conversant
[5] with the rules —
[6]     **A:** Right.
[7]     **Q:** — in terms of the power of the
[8] Speaker, okay.
[9]     **A:** That is how I knew about the Alan
[10] Jennings stuff.
[11]     **Q:** And when this incident happened with
[12] Ms. Plummer, did you speak with — are you still
[13] the chair of the rules committee?
[14]     **A:** No.
[15]     **Q:** Did you speak with any members of
[16] the rules committee in terms of what avenues of
[17] redress were opened to you?
[18]     **MR. MARKS:** Objection, objection to
[19] form.
[20]     **A:** I spoke to every member in the
[21] Council to reaffirm to them my position that I
[22] thought she should be terminated.
[23]     **Q:** And did any of those people indicate
[24] to you that the Speaker had the authority to
[25] terminate Ms. Plummer, any of the people that you

Page 96

### L. Comrie

[1]
[2] spoke with, any of the Council members that you
[3] spoke with?
[4]     **A:** Yes. Yes.
[5]     **Q:** Which one?
[6]     **A:** I'm running through names.
[7] Members that were familiar with the
[8] Jennings incident that served on ethics and
[9] rules, Peter Vallone, Helen Sears, Joel Rivera,
[10] they're on both committees. I can't remember who
[11] else served on both committees.
[12]     **Q:** But they agreed that the Speaker has
[13] the authority?
[14]     **A:** Right.
[15]     **Q:** And the precedent for that was from
[16] the Alan Jennings case?
[17]     **MR. MARKS:** Objection to form.
[18]     **A:** I don't know if that was the
[19] precedent, that was the — the issue that let us
[20] know.
[21]     **Q:** I understand that since your
[22] election you've moved into a new house?
[23]     **A:** No.
[24]     **Q:** You had one built?
[25]     **A:** In the process.

Viola Plummer v. Christine Quinn, Speaker of the City Council
Case 1:07-cv-06154-WHP   Document 24-9   Filed 10/30/2007   Page 26 of 45

Leroy Comrie
Vol. 1, August 13, 2007

Page 97

**L. Comrie**

[1]

[2] **Q:** From the ground up? Excuse me?

[3] **A:** Yes.

[4] **Q:** A large house?

[5] **MR. MARKS:** Objection to form.

[6] **Q:** How many rooms?

[7] **MR. MARKS:** Why is this relevant?

[8] Actually, it's not relevant. If you're

[9] asking him questions about his house, the

[10] fixtures, what kind of floor it is, the

[11] roof, the bathrooms, what kind of curtains

[12] he wants, I'm not allowing him to answer

[13] that, we're really getting pretty far

[14] afield here from Ms. Plummer's comments and

[15] actions at the May 30th meeting made about

[16] Mr. Comrie.

[17] **Q:** Aside from the Alan Jennings matter,

[18] do you know of any time before Ms. Plummer's

[19] termination that a speaker has terminated the

[20] staff member of an individual Council member?

[21] **A:** No.

[22] **MR. WAREHAM:** I have no further

[23] questions.

[24] **MR. MARKS:** I have no questions.

[25] (Time noted: 12:39 p.m.)

Page 98

**L. Comrie**

[1]

[2] I, the witness herein, having read

[3] the foregoing testimony, do hereby certify

[4] it to be a true and correct transcript,

[5] subject to the corrections, if any, shown

[6] on the attached page.

[7]

[8]

[9]

[10]

[11]

[12] **LEROY COMRIE**

[13]

[14]

[15] Subscribed and sworn to

[16] before me this ____ day

[17] of _____ 2007.

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 99

L. Comrie

[1]

[2] CERTIFICATE

[3] STATE OF NEW YORK )

[4]

[5] COUNTY OF NEW YORK)

[6]    I, KAREN PERLMAN, a Shorthand Reporter and

[7] Notary Public within and for the State of New

[8] York, do hereby certify:

[9]    That LEROY COMRIE, the witness whose

[10] deposition is hereinbefore set forth, was duly

[11] sworn by me and that such deposition is a true

[12] record of the testimony given by such witness.

[13]    I further certify that I am not related to

[14] any of the parties to this action by blood or

[15] marriage, and that I am in no way interested in

[16] the outcome of this matter.

[17]    IN WITNESS WHEREOF, I have hereunto set my

[18] hand this 20th day of August, 2007.

[19]

[20]

[21]

[22]

[23]

[24]    KAREN PERLMAN

[25]

Page 100

[1]    L. Comrie

[2]    INDEX

[3] WITNESS   EXAMINATION BY   PAGE
[4] LEROY COMRIE   MR. WAREHAM   4
[5]

[6]    EXHIBITS
[7] PLAINTIFF'S  EXHIBIT   PAGE LINE
[8] 4   Rules of the Council............ 37   20
[9] 5   Document bearing Bates.......... 42   9
       numbers D 0539, 0576 - 0580
[10]
     6   Document bearing Bates.......... 64   10
[11] numbers D 0771 and D 0772
[12] 7   Excerpt of New York City........ 69   23
     Charter as Amended Through
[13] July 2004
[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

**Lawyer's Notes**

# 0

**05** 59:14
**0539** 42:10, 15
**0576** 42:10, 15
**0580** 42:10
**0771** 64:11, 18
**0772** 64:11, 18

# 1

**113-43** 4:3
**11412** 4:4
**11:25** 60:9
**11:33** 60:11
**11th** 19:19
**12** 10:14
**12:24** 94:20
**12:34** 94:22
**12:39** 97:25
**16** 44:11
**18th** 54:8; 55:19, 21, 22
**1st** 67:13

# 2

**2.00** 83:3
**2.40** 83:12
**2002** 5:21, 21; 37:14
**2004** 69:25
**2005** 8:3
**2006** 7:25
**2007** 10:18, 21, 25; 20:8,
15; 32:12; 34:9; 38:7;
41:20; 63:13; 84:10;
86:23; 87:21; 98:17
**21** 73:16
**23** 42:20, 22; 69:21; 70:3
**250** 53:17; 54:5
**27th** 5:18; 26:22; 91:12
**28th** 20:22; 91:8
**29th** 20:20
**2nd** 20:23, 24; 21:2

# 3

**30** 10:18, 21, 25; 20:8, 15;
32:12; 34:8; 38:7; 41:20;
86:23; 87:21
**30th** 10:15, 18; 15:2, 8,
13; 16:5; 22:25; 26:23;
28:15; 29:23; 32:9; 85:7,
14, 16; 97:15
**3rd** 84:10; 88:17

# 4

**44** 70:4, 24, 24
**45** 70:21, 24; 71:9, 15;
73:15

**46** 81:11
**47** 70:21; 74:12, 12
**48** 70:21, 25
**49** 69:22

# 5

**500** 56:10
**580** 42:15

# A

**a.m** 60:9, 11
**ability** 5:11; 12:21; 15:17;
19:15; 27:13, 16, 23; 58:12
**able** 81:24; 82:3
**absences** 83:7
**absent** 66:15; 71:21
**abstain** 21:20; 10:16;
21:18, 23; 10:22; 43:3;
44:19
**abstention** 21:25; 32:4
**acceptable** 19:16
**according** 18:25; 24:12;
40:12, 15; 43:25; 73:2
**accurate** 63:23; 64:13
**accused** 34:7
**acknowledge** 54:15
**acted** 35:19, 25
**acting** 40:14
**action** 86:22; 17:18;
41:10, 15; 64:4, 5; 86:18;
97:15
**activate** 53:9
**active** 6:20
**actual** 21:5; 23:7
**actually** 50:24; 97:8
**addition** 73:21
**address** 4:3; 66:4
**adopts** 10:5
**Advance** 46:6, 6; 82:6
**advisement** 87:6
**advocacy** 47:19
**Advocate** 38:16; 39:14,
18, 25; 40:3, 9, 11, 16, 19,
22; 45:13; 70:8
**advocating** 45:14
**Affairs** 95:2
**affirmative** 22:2
**afield** 97:14
**afterwards** 31:6
**again** 11:22; 12:5; 29:14;
30:2; 44:17; 65:22; 72:11;
86:16, 20; 90:16
**against** 7:5, 15, 21;
53:15; 60:20, 24; 73:6;
78:14; 86:18, 22; 87:17;
93:11
**agencies** 74:25
**agenda** 25:11; 28:8; 10;
41:20
**agree** 13:11; 92:18; 96:12

**agreement** 88:7
**ahead** 43:2, 18; 44:2;
60:4; 70:17
**Alan** 76:17, 19, 20, 23;
95:9; 96:16; 97:17
**Albans** 4:4
**alleged** 17:8; 36:20; 41:9,
14; 84:16; 85:9
**allow** 14:17, 23; 30:15;
35:12; 40:19; 15:4; 97:12
**allowance** 83:25
**almost** 94:19
**along** 8:21, 23; 84:19
**alternative** 19:16
**Alvarado** 86:4
**always** 36:15; 45:13;
62:13; 63:2
**Amended** 69:24
**amendment** 17:9; 20:4,
9; 22:12, 16, 21; 25:12;
26:6, 9, 14, 18, 24; 27:7;
28:15, 25; 29:3, 10; 31:10,
19; 32:17, 19, 25; 33:15;
41:11, 24; 43:20, 22; 44:3,
7; 45:3
**among** 27:12
**amongst** 79:23
**amount** 50:8; 83:20, 24
**analysis** 74:23
**analyze** 74:17
**annual** 83:17
**answered** 27:5
**anymore** 46:18
**apologize** 54:19; 55:3
**appalled** 66:12
**apparently** 30:12
**appropriate** 83:7
**approved** 11:2
**approximately** 10:10
**April** 20:25
**Archie** 6:3
**architect** 15:7
**area** 59:22
**argument** 66:14
**Arms** 55:13, 16; 56:4, 15;
57:7; 58:17
**around** 9:8; 22:11, 20;
26:23; 28:24; 29:4, 10;
30:21; 31:16; 33:17;
35:15; 44:7, 18; 45:2, 19;
48:17; 53:22; 54:10; 61:8;
86:17; 87:14
**Arroyo** 16:8; 27:18; 29:9
**article** 52:7, 22; 51:25
**Asian** 16:7, 11, 17; 19:2;
20:15; 21:7; 23:21; 24:3;
28:19; 33:19
**aside** 73:14; 97:17
**ass** 45:20, 20
**assassinate** 47:4, 12;
51:19, 20; 52:5, 10, 18
**assassinating** 45:19
**assassination** 51:14;
65:5, 12; 66:23

**assaulted** 48:8
**assess** 85:7
**assigned** 83:23
**assist** 74:21
**assuming** 16:14
**atmosphere** 32:24
**attached** 98:6
**attend** 84:9
**attendance** 71:21
**attention** 42:18; 44:10;
45:25; 46:3; 64:20; 82:16,
23; 83:11
**authority** 18:5, 9; 38:2;
40:8; 67:24; 68:2, 5, 18;
69:11, 14; 71:12, 20;
73:13; 74:7, 11, 14; 75:4;
76:5, 25; 77:23; 78:13, 17;
79:25; 80:11; 82:10; 84:5;
87:8; 88:13, 25; 90:3, 5;
95:24; 96:13
**automatically** 40:16
**available** 61:6, 8; 82:8
**avenues** 95:16
**aware** 25:21; 50:23, 25;
51:3, 4, 5, 6; 59:20
**away** 18:9

# B

**back** 54:18; 81:10; 82:14;
93:9
**background** 4:20; 17:7,
13; 30:10
**bank** 54:8, 9
**Barron** 8:6, 11; 9:4, 8;
14:10, 25; 15:7; 16:2, 15;
17:25; 18:6, 10; 19:4, 7,
22; 23:10, 11, 23; 24:9, 12;
25:9, 14, 15; 30:14, 21, 25;
33:24; 34:3; 41:23; 43:2, 6,
13, 18, 25; 44:2, 25; 58:24;
65:7; 66:7; 15:14; 18:15;
24:13; 25:8; 30:19; 42:5
**based** 90:2, 3
**basic** 4:20
**basically** 9:16
**basis** 65:17
**Bates** 42:10, 14; 64:11,
17
**bathrooms** 97:11
**bearing** 42:10; 64:11
**bears** 17:14
**become** 30:15
**beginning** 33:3, 4; 63:2;
69:20
**behavior** 71:22
**behest** 40:20; 49:14, 15
**behind** 51:14, 20
**bend** 54:11
**benefit** 73:17
**Betsy** 38:18
**bewildered** 46:25
**bill** 10:8; 12:22; 13:12;
14:18; 12:22

**bit** 17:23
**bite** 43:9
**Black** 14:14, 21; 15:23;
16:6, 11, 17; 18:4; 19:2;
20:14; 21:7; 22:14; 23:3,
20; 24:3; 28:19; 33:19
**Blasio** 35:4
**block** 93:25; 57:18
**Board** 10:5; 11:2; 13:23;
29:8
**body** 23:15; 66:2, 9, 13;
73:21
**bold** 51:14
**borough** 50:25
**borrowings** 74:20
**both** 27:21; 39:15; 40:2;
55:4; 62:5; 66:24; 96:10,
11
**bother** 36:8
**bottom** 71:20
**Boulevard** 4:3
**brain** 46:17
**break** 59:23; 94:19; 27:15
**Brennan** 94:2, 3, 5
**brief** 60:10; 94:21
**bring** 38:14
**Broadway** 53:17; 54:5
**broken** 27:25
**brought** 45:25; 46:2;
60:20; 73:6
**budget** 50:14; 74:19, 18
**build** 27:11
**built** 96:24
**buried** 48:17
**business** 4:2; 81:4

# C

**call** 52:4; 66:16; 80:24;
6:14; 52:7; 66:5, 8, 10;
33:12; 46:20; 54:25;
58:12, 16
**came** 39:13; 60:22;
67:17; 85:18
**campaign** 7:14, 22; 8:15
**can** 4:16, 21; 5:3; 11:13,
14, 18, 20; 13:14, 21;
17:22; 32:18; 34:11, 24;
35:7, 17; 37:4; 38:9, 12;
39:2; 44:10; 45:23; 48:18;
52:25; 59:22; 60:20;
64:20; 69:6; 70:2, 13;
72:20; 73:18; 74:13;
81:15; 83:14; 87:25
**candidacy** 9:10
**candidate** 6:18; 7:10, 14;
8:20; 7:4
**capacity** 35:11
**capital** 74:20
**caption** 31:3
**car** 48:23
**Carmen** 16:8
**cars** 50:10

Leroy Comrie    Case 1:07-cv-06154-WHP    Document 24-9    Filed 10/30/2007    Page 29 of 45
Viola Plummer v.
Christine Quinn, Speaker of the City Council

Vol. 1, August 13, 2007

Carson 14:19; 11:10, 24; 13:12; 20:5, 10; 25:13
case 17:3, 8; 77:3; 96:16
catch 60:3; 33:12
Caucus 14:15, 21; 15:24; 16:7, 11, 12, 17; 19:2; 20:15; 21:8; 22:14; 23:4, 21; 24:3, 16; 28:5, 19; 33:19; 91:25
caught 46:23
cause 38:12; 85:8
censoring 66:10
certain 70:7
Certainly 17:6
certify 98:3
Chair 16:6; 95:13; 94:24; 16:12; 81:22
chairperson 84:2
chamber 36:22; 38:13, 13, 17, 20; 33:8, 9; 63:3; 7:8
chance 37:22
change 22:11; 23:2, 18, 18; 26:23; 22:7, 20; 33:17; 34:4; 27:17; 74:19
chapter 69:5; 77:25; 82:17; 90:7; 69:21
charge 68:20, 24; 71:23; 73:4, 6; 94:9, 11
Charles 30:19, 21, 25; 41:23; 42:5; 43:2, 6, 13, 18; 58:24; 65:7; 66:7
Charter 32:2, 4, 7, 14, 18, 19, 24; 73:22, 25; 74:4; 78:3; 80:18; 81:7; 82:9; 90:8
Chief 65:6; 90:22, 24
chose 8:19
Christine 9:22; 11:23; 57:25; 79:19, 20; 80:10
Chuck 85:23; 90:24
cite 69:6; 77:23
City 5:17; 13:18; 14:12; 23:15; 27:10; 37:13, 17; 38:2; 48:17; 49:9, 12; 51:2; 57:15, 18; 58:15; 60:20; 61:24; 62:10; 63:2, 3; 65:9; 66:16, 18, 25; 69:11, 15, 19, 24; 70:11; 71:5, 6; 72:8, 10, 13, 14; 73:10, 21, 24; 74:6, 16, 25; 75:17; 77:9, 22; 79:18; 80:15, 21; 81:4, 7, 20; 82:9; 90:8, 15; 93:4; 94:4, 23
civic 45:14, 15
claim 17:12, 13, 2
clarity 42:12
clear 19:21; 55:5, 6; 63:6; 82:18; 93:14; 38:13, 14, 17
clearly 5:11; 65:7, 13
clerk 81:20
co-chairs 33:20, 21
co-naming 30:7; 10:4
colleague 65:14; 66:6
collective 23:17; 27:11

collectively 23:16; 63:16
collegial 27:13
coming 54:6, 7, 9; 58:17
commander 50:23, 25
commemorate 31:24
comment 45:18; 46:7, 10, 14; 47:12; 51:6, 7, 10, 11, 12; 17:18; 42:6; 48:3; 56:20, 22, 24; 57:11, 13; 61:8; 97:14
commit 69:8; 90:6, 16; 69:12; 81:2
committee 10:6, 7; 59:17; 81:25; 82:4, 5, 6, 7; 84:2; 95:13, 16; 74:22; 81:22; 83:20; 94:24; 96:10, 11
communicated 90:19
communications 63:11; 86:2
Community 10:5; 11:2; 13:23; 14:8, 17; 27:25; 28:6; 31:22, 23, 25
compel 71:20
compensation 83:18, 20
complaint 49:23; 56:11, 14, 18; 60:24; 61:16; 93:10, 15; 60:19
complete 41:19; 84:23
completely 46:25
Compound 16:22
compromise 19:15
computer 80:24
COMRIE 4:2, 10; 26:13; 31:6; 43:15; 47:9; 97:16; 98:12; 45:20
concern 53:11; 92:5; 30:4; 53:7; 62:9, 13
concluded 86:15
conclusion 86:13; 88:3
concur 73:10
concurrence 71:23; 73:4
conduct 31:4; 34:8, 14; 36:21, 21, 25; 37:2, 9; 38:23; 41:4, 10; 67:2, 3, 5, 6; 84:16; 81:4
confused 78:12
consensus 24:18, 24; 25:2; 79:23
considered 77:10; 89:8
Considering 65:11
constituent 6:7; 45:16
consultation 67:19
Consumer 95:2
content 4:23
context 17:17, 18, 19; 45:10, 13
continue 15:5, 25; 16:3; 18:18; 19:23; 23:8, 21; 24:6, 10, 20, 20; 26:13; 28:5; 59:21; 60:7; 26:8; 29:5, 6; 40:19
contradiction 43:14; 58:19
control 70:11; 71:3;

75:21; 89:21; 19:8, 10, 12
conversant 95:4
conversation 52:21
copy 64:13; 81:20
corrections 98:5
cost 71:16, 17
Council 5:17, 18, 18, 19, 23; 7:24; 8:4, 8; 9:25; 10:6, 7, 8, 10, 21, 24; 11:3; 13:18; 14:5, 12, 18; 15:24; 21:16; 23:10, 11, 15; 27:11, 16, 18, 24; 28:23; 29:9, 21; 30:5; 32:7, 12; 34:19; 35:4, 19; 37:7, 13, 17, 21; 38:2; 39:17; 40:18; 41:19; 43:19, 25; 44:2, 5, 6, 25; 45:19; 47:8; 48:8, 9; 49:9, 12; 51:3; 60:20; 62:6, 17; 63:3, 3; 65:6, 12; 68:20, 24; 69:11, 15, 20; 70:11; 71:5, 6, 24; 72:2, 5, 7, 8, 10, 13, 14; 73:5, 10, 14, 19, 23; 74:3, 6, 15, 16, 22, 24; 75:5, 16, 17; 76:3; 77:2, 4, 7, 9, 10, 22; 78:18; 79:18, 24; 80:5, 15, 21; 81:4, 14, 17, 19, 23; 82:3, 10, 15, 16; 83:5, 19, 23; 84:6; 87:9; 88:2, 4, 11, 14; 89:3, 7, 20; 90:15; 91:16; 92:2, 4; 93:4, 5; 94:23; 95:21; 96:2; 97:20; 79:10; 89:17; 94:3
Councilman 8:6; 11; 9:4, 8; 14:10, 25; 15:6, 14; 16:2, 15; 17:25; 18:6, 10, 15, 17, 18, 24; 19:4, 7, 21, 22; 20:3, 8; 21:8; 23:23; 24:9, 12, 13, 20; 25:7, 8, 9, 13, 15, 22; 26:12; 27:22; 30:14; 32:25; 33:22, 24; 34:3; 77:14; 78:15, 24; 79:6
counsel 75:14; 90:22, 23, 24
count 23:3
County 8:18
create 18:14; 19:17; 23:9; 27:13, 19, 24
criminal 94:9, 11
criticism 45:2
crossed 65:7
crowd 48:19
current 5:16
curtains 97:11
cut 16:18; 18:3; 19:5

D

danger 52:10, 17; 53:4, 6
date 28:21; 63:14; 87:19; 91:9
Davis 65:14
day 27:8; 28:12; 33:8; 36:22; 38:17, 20; 51:8; 52:4; 53:17; 54:5; 59:7, 7;

62:6; 64:5, 14; 67:2, 6; 83:10; 85:13, 21; 93:21; 98:16
days 22:24; 26:20; 27:3; 29:15; 30:2; 33:18; 48:12; 87:20
deadline 50:16
deal 54:15; 70:8; 6:6; 46:18; 47:22; 50:13
dealings 6:16
death 48:2
debate 66:14
decent 48:16
decide 13:24; 14:10, 25; 16:2; 28:11
decision 15:13, 14; 21:7; 28:14, 16; 35:14; 75:14
decorum 39:11
deems 83:7
defend 66:7
definition 72:18, 22
delays 41:22
demeaning 47:6
democratic 6:14, 17, 24; 7:11; 8:18
demonstrations 45:14
denigrating 34:20, 25
department 50:8; 93:11
departmental 74:18
deposition 4:13; 31:7; 42:14; 30:15
derision 54:14, 24
derisive 65:24
describe 32:18, 23; 34:24; 37:4
description 83:21
designate 83:8; 40:14
desire 8:4; 61:13, 22; 62:3; 31:24
desirous 29:6
desk 55:14
detailing 83:17
determine 81:17
died 19:14; 33:11; 46:19
differ 17:15
different 24:22; 80:19
direct 53:2
director 63:11; 90:23
discharge 53:6
disciplinary 86:22
discipline 80:4; 84:5; 93:4
disciplining 71:4
discovered 77:8, 17; 78:14
discrimination 17:12; 60:19
discuss 61:7; 86:8; 91:23; 9:15; 20:18; 21:4; 86:10; 87:23
discussion 9:7; 67:14; 85:20; 86:17, 21, 24; 87:25; 91:15; 18:11

disintegrate 66:14
disorderly 71:22
dispatched 50:24
disregard 66:13
disruption 38:3; 85:8; 39:21, 23
disruptive 34:7, 14, 19, 25; 36:20, 21, 25; 37:2, 8; 38:23; 41:4, 10, 14; 84:16, 24
distinction 51:9
distinguish 48:19
distort 52:25
District 5:18, 25; 6:5, 9; 14:6; 18:16; 25:6, 8, 17, 4
division 83:22
document 42:9; 64:10, 16; 36:11
done 4:13; 27:12; 33:19; 88:2, 4
doors 54:7; 56:8, 9
down 10:13; 23:10; 27:15; 41:18; 46:19; 56:21; 71:18; 80:15, 17
drafted 89:14; 91:5
draw 42:18; 44:9; 64:20; 82:16, 23; 83:11
drawn 88:3
duly 4:5
duration 57:20
During 7:13; 9:25; 10:9; 34:8, 19; 41:4; 66:2; 77:7; 78:14; 83:7; 86:12; 88:19, 23; 94:23
duties 83:9

E

e-mail 52:22
earlier 29:14; 32:6; 60:12
educated 59:3
effective 27:17
effectuate 23:18
either 4:23; 18:7; 45:13
elect 83:5; 5:23; 35:22; 72:15; 75:17; 81:22
election 7:5, 24; 96:22; 70:9; 94:25; 95:3
electoral 7:13
elevator 54:8, 9
else 34:2; 36:24; 55:12; 57:4, 9; 90:19; 96:11
employ 35:13, 24, 25
employee 35:15; 65:9; 74:7; 75:5; 60:21; 72:23; 76:25; 77:2, 21; 89:7, 8, 20; 92:19; 93:5, 6
encounter 48:22
end 23:24; 29:13; 53:24; 65:23; 73:3
endeavor 8:7
ended 19:14
engaging 34:7; 84:15



**ensure** 6:9; 8:14
**entail** 6:4
**entire** 15:7; 28:5; 32:14; 51:8; 82:19
**entitled** 70:4; 81:13; 82:24; 83:12
**enumerations** 73:25
**environment** 27:13
**Erica** 7:14, 21
**establish** 74:15
**estimates** 74:18
**ethics** 59:15, 17; 60:13, 25; 61:17; 96:8
**even** 20:25; 21:19; 35:9; 40:2; 46:17; 47:23; 48:9; 65:24; 66:15; 57:17
**eventually** 9:21
**everybody** 58:14
**evokes** 65:13
**exact** 21:21; 35:9
**exactly** 34:24; 83:4
**EXAMINATION** 4:8
**examined** 4:6
**except** 30:12; 74:3
**excerpt** 69:19, 23; 82:22, 15, 20
**exchange** 56:2; 55:24
**Excuse** 32:10; 70:15; 76:18; 80:3; 97:2
**exercise** 12:12, 18; 13:6
**Exhibit** 37:20; 42:9, 14; 64:9, 10, 17; 69:23
**expansion** 92:6
**expected** 55:2
**expel** 71:22; 73:3, 10
**expenses** 85:25
**experience** 39:17
**explain** 52:11, 24, 9; 53:5, 12, 14
**express** 92:5; 56:19; 61:13, 21; 62:2

**F**

**face** 38:3, 23
**fact** 8:14; 46:18; 48:6, 13; 53:7, 16; 62:8; 59:6
**fair** 43:5
**fairly** 95:4
**familiar** 37:16; 59:15; 60:13, 18; 80:20; 96:7
**far** 10:4; 18:20; 24:2; 25:21; 84:18; 97:13
**Farmers** 4:3
**feel** 28:2; 47:21; 48:4; 49:2; 50:18
**feet** 56:10
**felt** 12:8; 24:17; 28:19; 48:5
**few** 27:23; 39:10
**Fidler** 35:4
**Fifteen** 45:9

**figure** 14:7, 16; 23:8; 31:22
**file** 49:16, 19, 23; 50:6, 9, 17; 60:24; 81:20; 93:10, 12, 12, 20; 94:7, 9
**filing** 61:16; 93:18
**find** 27:19; 28:6
**fine** 51:23; 60:7; 90:20, 21
**finish** 21:11; 15:19; 42:21; 94:19
**fire** 36:4; 67:24; 68:3, 6, 18; 74:7; 75:4; 76:5, 25; 78:22; 79:15, 25, 25; 84:5; 64:3; 65:11; 67:23; 76:21; 78:25; 86:25
**firefighters** 19:18
**firing** 65:17; 89:2; 92:19
**first** 4:5; 7:5, 13; 17:9; 22:13; 42:23; 59:14; 60:16; 64:17; 81:18, 23; 83:14; 87:2
**fiscal** 83:13
**Five** 7:8, 9; 8:2; 48:12; 86:6; 94:18
**fixtures** 97:10
**flap** 53:23
**floor** 32:18, 20, 25; 37:7; 54:8; 55:19, 20, 22; 97:10
**Florida** 52:6
**focus** 47:23; 50:12
**Following** 7:24
**follows** 4:7
**Ford** 7:14, 21
**foregoing** 98:3
**forget** 40:15; 55:17; 85:25; 90:23
**form** 4:23; 9:19; 11:12, 16; 12:4, 15, 20; 13:9, 13, 20; 14:2; 15:11; 16:19; 19:11; 20:2; 23:25; 24:25; 30:8; 32:21; 34:10; 35:16; 38:4, 25; 40:5, 10; 41:6, 13, 17; 43:8, 11, 16, 23; 45:4, 22; 50:19; 52:12, 19; 57:19; 58:8, 21, 25; 59:12; 61:2, 12, 18; 62:12; 63:25; 68:12, 19, 25; 70:12; 72:19; 75:23; 80:6; 81:8; 84:21; 85:4, 10; 86:14; 91:18, 21; 92:8, 11, 16, 21; 93:7; 94:17; 95:19; 96:17; 97:5
**formulating** 67:15
**forth** 83:24
**forward** 20:4, 9; 27:24
**found** 40:15
**four** 21:4; 22:17; 29:14; 71:19
**freeze** 66:22
**Friday** 5:15
**friends** 52:7
**front** 48:6; 51:13
**frustrated** 24:16; 26:10; 27:20; 29:7
**frustration** 27:10

**full** 10:7
**function** 24:4; 83:22
**fundraiser** 57:17, 21, 22, 23, 24; 58:2, 4, 11, 15, 20, 24; 59:14, 11
**funeral** 50:13
**further** 15:18; 28:20; 29:12; 97:22

**G**

**gallery** 38:12
**garnered** 9:18
**gave** 47:3; 76:24
**general** 75:13
**Generally** 28:13
**generate** 94:11; 58:11
**germane** 65:2
**Gifford** 75:16; 76:14
**given** 40:17
**gives** 69:7, 10; 73:13; 74:11, 14; 75:4, 13
**giving** 76:4; 82:9
**God** 5:13
**goes** 10:6
**Good** 4:10, 11
**Gotbaum** 38:8, 16; 40:22
**grandmother** 53:13
**great** 48:21
**grocery** 48:24
**ground** 97:2
**guard** 46:23
**guess** 44:15; 59:3, 4; 60:17

**H**

**half** 52:20, 20
**Hall** 51:2; 54:13; 56:21; 57:5, 18; 58:16; 61:24; 62:10; 66:16, 18, 25; 94:4
**hallway** 55:11; 56:9
**happen** 14:10, 23; 23:17, 19; 27:15, 17; 38:15; 54:2; 14:24; 34:22; 50:10; 54:4; 86:11, 12; 93:21; 95:11
**happenings** 51:8
**harassed** 77:6
**harassment** 60:19
**hard** 27:19
**head** 6:17; 51:2, 3; 75:14; 94:3; 54:7
**headline** 51:17
**hear** 36:24; 45:21; 46:7; 54:12; 18:22; 24:22; 30:11; 39:6; 46:14; 92:22; 93:2; 36:10; 71:23; 73:4, 6
**heinous** 66:8
**held** 16:10; 19:9; 74:2
**Helen** 96:9
**help** 46:21
**helpful** 58:7

**hereby** 98:3
**herein** 98:2
**heroes** 14:9
**hide** 48:18
**himself** 44:13
**hire** 35:12; 68:8, 12; 75:22; 79:25; 68:10; 77:22; 79:10
**hiring** 91:19
**Hispanic** 14:15, 21; 15:24; 16:7, 11, 17; 18:4; 22:14; 23:4; 86:2
**history** 53:15; 65:12
**hold** 14:23; 15:13; 19:18; 28:3, 14; 62:18
**hostile** 47:6
**hour** 52:20; 29:8; 57:21
**house** 50:24; 96:22; 97:4, 9
**Huff** 63:10, 18; 67:20; 68:6, 8, 10, 13
**hurt** 58:10

**I**

**idea** 45:5; 47:16
**identification** 37:21; 42:11; 64:12; 69:25; 83:22
**immediately** 50:13; 65:11
**impair** 5:10
**implication** 9:3
**impression** 52:17
**improper** 13:17
**incidence** 48:7
**incident** 50:9, 10, 22; 51:2, 7, 10, 11; 76:17, 19, 20, 23; 95:11; 96:8
**include** 20:4, 9; 25:13; 78:22; 81:21; 63:2
**including** 83:21
**inclusive** 72:17
**indicate** 20:8; 42:13; 71:13; 88:7, 10, 12; 90:2; 95:23; 21:19; 88:21, 24; 89:6; 70:10, 22; 71:2; 84:4
**individual** 34:21; 49:6, 7; 51:22; 71:4, 6; 72:5; 73:14; 74:7; 75:5, 21; 76:5, 25; 77:2; 78:18; 80:5; 83:23; 84:6; 87:9; 88:13; 89:3, 7, 19, 20; 93:4, 5; 97:20; 24:18; 83:18
**Individually** 40:24; 47:14
**influence** 12:13, 18
**inform** 33:18, 21, 24
**infringement** 13:17, 23; 40:8
**inherent** 92:23
**initial** 49:5
**initially** 22:16
**input** 63:19
**inside** 62:16; 66:25

**instructed** 50:7
**intend** 49:19, 23; 50:6; 93:10; 47:4, 12
**interest** 86:18
**interpret** 51:19; 74:5; 72:7
**interpretation** 75:3
**intervene** 56:5; 11:9, 24
**intervention** 13:16, 22; 30:6, 6
**into** 8:15; 30:6, 10; 44:15; 54:8, 9; 58:17; 59:22; 60:23; 64:23; 66:14; 74:13; 96:22
**invested** 73:20
**involve** 25:4; 18:10, 16; 24:19; 25:3, 6; 27:9; 50:21; 51:25; 85:3
**irrelevant** 77:22
**Island** 46:6, 6
**Israel** 55:17
**issue** 44:24; 66:3; 84:24, 25; 96:19; 64:14; 67:9; 47:23
**items** 28:11
**Izzy** 55:17, 17, 17

**J**

**jacket** 53:23
**Jackson** 16:9; 27:18; 28:24
**James** 21:17; 43:19; 44:8, 18; 65:14
**January** 5:21
**Jennings** 76:17, 19, 20, 23; 77:7, 15; 78:15, 25; 79:6; 95:10; 96:8, 16; 97:17
**job** 6:11; 48:20; 83:21
**Joel** 96:9
**join** 66:9
**Jolson** 11:7
**July** 69:25
**June** 63:13; 67:13; 84:10, 10; 88:16, 20, 24; 91:8, 11, 12
**justification** 93:3

**K**

**keep** 35:25; 36:8; 57:16
**kept** 54:11
**kind** 97:10, 11
**knew** 8:22; 14:11; 29:13, 17, 22, 24, 25, 25; 32:6; 34:3; 43:18; 44:2, 23; 45:12, 13; 62:19; 95:9
**Knock** 4:17
**knowing** 14:17
**knowledge** 7:17
**known** 45:7, 10
**knows** 53:8; 93:16

Koppell 35:4

# L

lack 66:12
laid 81:7
language 75:3
large 48:18; 97:4
last 7:24; 33:16; 79:24;
91:11
late 65:13
later 27:8; 28:21; 49:5;
52:4
Latino 19:2; 20:15; 21:7;
23:20; 24:3; 28:19; 33:19
laugh 55:6; 53:24; 54:14,
20, 23; 55:8, 10
laundromat 48:24
law 73:23; 81:24, 25;
82:4; 90:23
lawsuit 78:14
layman's 50:4
layperson's 50:5
leaders 81:25
leadership 92:2
least 21:3, 4; 31:2; 56:9
ledge 73:20
left 26:10; 27:6; 52:16
legal 89:17; 90:3, 5
legislation 74:24
legislative 73:21, 24;
74:2; 83:9
LEMENEDES 42:12;
59:21, 25; 60:3, 6
LEROY 4:2; 26:13; 53:22;
54:10; 98:12
letter 89:13; 91:5, 7;
51:15
level 27:9; 37:3
lieu 83:25
Lieutenant 94:2, 2, 5
limit 74:2; 81:21
line 16:25; 35:6; 44:11,
11; 65:7; 42:19; 71:17, 19
listening 55:25; 85:24
little 17:23
lives 52:6
Liz 90:20, 21
local 50:23; 82:4
locked 91:9
long 19; 45:7; 57:16
longer 40:16
look 37:22, 24; 42:16;
70:2; 81:10; 82:13; 54:10;
78:6; 90:11; 84:4
lose 8:14; 29:13, 18, 20
lot 33:12, 13; 48:14
loud 64:24
lounge 46:20

# M

machine 6:14
Mailing 71:15, 17
maintain 35:12
majority 23:20; 24:4, 6,
24; 82:2
makes 95:4
making 46:20; 51:9
management 74:21, 25
Managing 6:6
manner 47:7
manual 59:16, 18; 60:13,
25; 61:17
many 7:7; 9:14; 10:10;
33:7; 57:24; 71:17; 87:20;
97:6
Maria 16:8; 86:4 .
Mark 37:19; 42:4; 64:8;
37:21; 42:11; 64:12;
69:25; 9:19; 10:18; 11:12,
17; 12:4, 15, 19; 13:9, 13,
20; 14:2; 15:10; 16:19, 21,
23, 25; 17:5, 22; 19:11;
20:2; 21:10; 23:25; 24:25;
25:25; 30:8, 25; 32:21;
34:10; 35:16; 38:4, 25;
40:5, 10; 41:6, 13, 17;
42:7; 43:8, 11, 16, 21, 23;
44:12; 45:4, 22; 50:19;
52:12, 19; 57:19; 58:8, 21,
25; 59:4, 12; 61:2, 12, 18;
62:12; 63:25; 64:15;
65:20; 68:19, 25; 70:12,
17; 72:19; 75:23; 76:15;
80:6; 81:8; 82:18; 84:20;
85:4, 10; 86:14; 91:18, 21;
92:8, 11, 16, 21; 93:7, 16;
94:17; 95:18; 96:17; 97:5,
7, 24
Martinez 55:18; 85:24;
90:25
matter 97:17
May 10:15, 18, 18, 21, 25;
15:2, 8, 13; 20:7, 15, 20,
22, 23, 24; 21:2; 22:24;
26:22, 22; 28:15; 29:23;
32:9, 12; 34:8; 38:7; 41:20;
51:23; 53:9; 61:19; 83:8;
85:7, 14, 16; 86:23; 87:21;
97:15
Maybe 20:25
Mayor 10:8
Mayoral 74:20
mean 11:16; 44:12;
46:17; 48:17; 51:20; 74:6;
78:9; 90:14; 93:19; 11:17,
17; 26:17; 72:23; 79:12
meant 47:12
Meara 85:23; 90:24
medication 5:12, 5
meet 85:6; 10:16, 20, 24;
17:17; 20:7, 14, 16; 21:6,
19; 22:6, 10, 13, 15, 17;
26:4, 10; 27:4, 6; 30:23;
31:4, 5, 13; 32:8, 11, 12,

15, 18, 24; 33:3, 4, 7, 10,
13, 14, 18; 34:4, 8, 20;
36:14; 38:7, 11; 39:18;
41:5, 21; 42:6; 46:20; 66:3;
81:19; 85:16, 17, 22; 86:9,
11, 12, 23; 87:18, 21, 24;
88:16; 91:11, 11; 97:15
meetings 6:8; 28:9;
39:17, 21; 45:15, 15; 82:6;
84:10, 13, 16, 19; 87:13
Member 5:17, 20, 23; 8:8,
18; 14:5; 15:24; 21:16;
23:10, 11; 28:24; 29:9;
35:19; 43:19, 25; 44:2, 25;
45:20; 47:9; 48:9; 65:6;
71:22; 72:8, 9, 9, 12, 12,
18, 22; 73:3, 14, 14; 74:8,
23; 75:5, 16; 76:3; 77:7,
10, 11; 83:8, 17; 88:11, 13,
14; 89:2, 3; 90:17; 95:20;
97:20, 20; 25:4, 5; 27:12,
18, 23; 28:18; 29:22, 22;
30:3; 34:21; 35:4; 44:6;
48:8; 60:20; 65:25; 66:2, 9;
71:5, 5, 6, 21, 21, 24; 72:2,
3, 5, 6, 7, 14, 23, 24; 73:5,
9; 75:21; 76:6; 77:2, 9, 13,
14; 78:19, 24; 79:7, 19;
80:5, 5, 12; 82:2; 83:6, 19;
84:6, 6; 87:8, 9; 89:7, 19,
20; 91:16, 20, 24, 25; 92:3;
93:5, 6; 95:15; 96:2, 7
memories 65:13
memory 36:9; 66:22;
69:8, 12; 81:2
mention 44:6, 21, 18
mentor 50:14; 33:11;
46:19; 48:2
met 23:4; 90:18
microphone 39:8
might 5:10; 80:18; 87:14
Miller 40:18; 76:15, 16
mind 22:7, 11, 20; 23:2;
26:23; 33:17; 43:7
minute 94:19
modifications 74:20
month 29:25; 32:6;
88:20, 24
more 18:5; 19:17; 32:22;
49:6; 65:24; 72:17; 81:6
morning 4:10, 11; 33:11
most 58:13; 91:24; 92:3
mother 52:4, 6, 16, 24;
53:12
move 19:14; 27:24; 96:22
Mrs 84:12; 85:8
much 30:10, 17
murdered 48:9
must 66:3
Myself 63:18; 85:23

# N

name 10:25; 11:10, 24;
12:13; 13:12, 24; 20:5, 10;
25:13; 44:21, 23; 48:16;

58:13, 14; 7:14; 11:7;
81:23; 9:11; 11:4, 25;
20:12; 41:7, 16; 44:6;
83:17; 96:6
naming 10:11, 22; 12:9;
18:16
nature 34:13; 49:22;
50:5; 56:17
near 55:7; 56:7
necessarily 45:15; 58:19
necessary 38:15
need 62:18; 94:18; 19:17
negotiate 15:4; 21; 16:3,
16, 17; 17:25; 18:9, 19, 25;
19:2, 3, 5, 5, 23; 23:21;
24:17, 21
negotiating 14:7, 15, 21,
22; 31:21
negotiation 15:5; 16:4;
18:8, 23; 23:24; 28:5, 20;
29:5, 7, 12; 15:18, 25;
16:10, 18; 18:3, 7; 19:5,
13; 24:7, 10, 25; 20:20
New 4:4; 5:17; 23:15;
59:7; 65:9; 69:20, 24;
74:19; 81:7; 90:8; 96:22
newspaper 51:17; 52:25
next 53:16; 54:4; 64:18;
87:18; 91:10
nobody 57:9
none 17:13; 30:11
norm 84:19
Notary 4:6
noted 60:9, 11; 94:20, 22;
97:25
notice 50:22; 82:6
notification 46:22
notified 50:20
number 10:12; 9:15;
42:10; 64:11

# O

oath 4:7, 22
objecting 11:18, 19
Objection 9:19; 11:12,
16; 12:4, 15, 19; 13:9, 13,
20; 14:2; 15:10; 16:19;
19:11; 20:2; 23:25; 24:25;
30:8; 32:21; 34:10; 35:16,
18; 38:4, 25; 40:5, 10;
41:6, 13, 17; 43:8, 11, 16,
21, 23; 45:4, 22; 50:19;
52:12, 19; 57:19; 58:8, 21,
25; 59:12; 61:2, 12, 18;
62:12; 63:25; 65:20;
68:19, 25; 70:12; 72:19;
75:23; 80:6; 81:8; 84:20,
21; 92:8, 11, 16; 93:7;
94:17; 95:18, 18; 96:17;
97:5
obligation 28:3
occur 88:16
off 16:18; 18:3; 19:5;

46:23; 53:9; 68:15 
office 5:25; 6:5, 21, 23;
16:13; 28:13; 54:7; 57:15;
60:16, 23; 63:20; 64:14;
67:14; 79:9
officer 38:5, 6, 10; 40:3,
13; 93:25; 83:6
official 35:22
old 5:14; 53:13
once 19:13, 14; 33:6
one 7:10; 13:7; 18:7; 19:8;
23:24; 24:10; 25:24;
33:16; 45:16; 46:3; 48:8;
52:6; 56:3, 8; 60:15; 69:5;
84:23; 96:5, 24
one-page 64:16
ones 9:17; 62:14
only 8:13; 9:17; 23:24;
24:9; 36:21; 54:17; 55:2
onto 62:19
opened 95:17
opinion 50:10; 65:10
opportunity 18:11
option 61:5, 7
order 23:18; 27:14; 38:3,
10; 39:3, 6, 24; 40:4, 23
organization 8:19
originally 12:2; 46:2
ourselves 25:4
out 7:9; 14:7, 16; 23:9;
31:23; 33:10, 13; 35:6;
40:15; 41:3; 53:23; 57:12;
64:24; 67:17; 81:7
outbursts 85:8, 9
outside 61:23; 62:9; 63:3;
66:16
over 8:25; 39:8, 18;
40:17; 46:21; 48:23;
54:11; 69:11, 15; 70:11;
71:3; 75:21; 78:18; 79:6;
80:11; 84:24; 87:8; 88:13,
25; 91:19; 92:9, 9
overall 85:20
overheard 57:13
overrode 19:22
own 14:9; 31:24; 55:10;
81:18

# P


p.m 94:20, 22; 97:25
package 10:17; 11:4, 11,
25; 12:14, 22; 19:20;
20:10; 41:15
packed 33:9, 10
packets 10:11
page 42:19, 23; 48:6;
51:13; 64:17; 98:6
painful 65:13
panic 52:8
paper 46:6; 48:7; 51:23,
24; 53:8; 94:15; 51:13, 15
paragraph 5:24; 64:21,
25; 65:2, 4, 21, 22, 23, 24;



66:4; 73:15; 81:11, 16;
83:15

**part** 33:7; 48:20; 53:14;
69:18; 71:10; 74:14;
76:10; 80:17, 19

**participate** 16:4; 18:12;
75:15

**particular** 13:18, 23;
28:12; 36:7; 42:18; 44:7;
70:3

**party** 6:17, 24; 7:11

**pass** 14:18; 33:6; 48:10,
11; 10:8

**past** 48:2

**people** 9:9, 9, 14; 19:19;
25:2; 26:5, 10; 27:9; 33:7;
44:18; 45:3; 46:22; 48:15,
19, 21; 54:25; 55:3; 57:24;
58:12, 13; 86:6; 92:17;
95:23, 25; 58:17

**per** 10:13; 48:14; 60:25;
61:16; 84:19

**percentage** 7:20

**perform** 83:8, 19

**performance** 74:24

**period** 51:14

**permit** 17:6

**person** 11:3; 13:18;
25:10, 16, 19; 35:11, 19;
39:24; 46:7, 10; 48:15, 16,
17, 18, 20; 49:7; 53:9

**personal** 45:12; 87:3

**personnel** 38:14; 68:21,
24; 69:11, 15; 70:11;
78:18; 79:9, 13, 16; 83:13;
89:21; 92:9, 10

**Peter** 96:9

**phone** 33:12; 46:20

**physical** 37:11; 53:4, 6

**physically** 47:21; 48:4, 5;
49:2

**place** 84:3

**plaintiff** 30:17; 31:2;
37:20; 42:5, 9, 13; 64:9,
10; 67:13; 69:23; 81:10;
82:13, 14, 19; 77:3, 5

**plan** 8:3, 20, 22

**platform** 30:16; 76:10

**play** 46:12

**please** 35:8; 65:3; 70:19;
71:10, 13; 74:13

**pleasure** 40:12

**Plummer** 7:18; 9:4;
17:11, 19; 30:12, 19; 34:7;
38:19, 24; 41:4; 45:8, 18;
47:18; 48:4; 49:3; 50:18;
53:4, 7, 13, 17, 21; 54:5;
57:7; 60:25; 61:22; 62:3;
63:24; 65:6, 8; 66:7; 67:22,
24; 68:3, 18; 73:7; 84:12;
85:3; 86:19, 23; 87:17;
88:8; 89:2, 6; 91:8; 93:11;
95:12, 25; 17:9; 31:4;
36:20; 37:8; 41:9, 14;
47:11; 48:3; 61:8; 62:25;
65:17; 66:17; 87:9; 97:14,

18

**point** 8:3; 9:8; 17:20;
22:19; 26:8, 12; 28:2;
32:19, 24; 47:2, 16, 25;
54:17; 57:6; 65:3; 69:5;
85:7; 88:6, 19, 23; 89:5,
18; 91:24

**police** 49:17, 20, 24;
50:6, 7, 21, 21, 23, 24;
93:11, 23, 24

**political** 30:16; 45:20

**politics** 6:20

**polled** 29:21

**position** 5:16; 15:6, 12,
16; 16:14; 19:3; 24:13;
26:16; 27:6; 28:24; 29:4,
10; 32:7; 62:24; 63:5, 23;
65:16; 95:21

**possibility** 61:16

**possible** 59:8, 9

**postpone** 15:17

**power** 12:25; 13:4, 7, 8;
73:24; 74:2; 75:13; 91:17;
92:14, 19; 95:7; 73:22, 25;
92:6, 23

**precedent** 30:4; 96:15,
19

**predecessor** 5:24; 6:2

**preliminary** 4:13

**preparation** 36:10, 18

**prepared** 6:10

**prerogative** 13:17

**presence** 54:16; 57:12

**present** 6:11; 32:11;
42:2; 59:5; 90:19; 70:6

**president** 40:14

**presiding** 38:5, 6, 10;
39:18; 40:3, 13, 17

**press** 63:12, 15; 67:12

**pretty** 48:16; 97:13

**prevent** 41:10, 12, 15

**primary** 24:18; 25:2, 10,
16

**printed** 51:17

**prior** 5:22; 6:19; 10:15,
20, 24; 20:7, 15; 31:12;
33:18; 39:20

**priority** 50:12

**privilege** 40:17; 94:25;
95:3

**pro** 40:14

**problem** 60:5; 62:25

**procedural** 28:7

**procedure** 10:3; 60:18

**proceedings** 81:18

**process** 14:6, 20, 22;
17:13; 30:7, 22; 41:18;
96:25

**produced** 33:15

**professional** 74:17

**promise** 28:4

**proper** 11:11; 12:3, 12,
18; 34:18

**proposed** 74:17, 23;

81:24, 25; 82:4

**provide** 82:5; 83:16;
49:11; 57:14; 74:3

**pubic** 40:8

**Public** 4:6; 35:20; 38:16;
39:14, 17, 25; 40:3, 11, 11,
16, 19, 22; 48:15, 20; 70:8;
82:7, 8; 87:2

**publically** 8:16; 66:10

**publisher** 51:16

**pull** 48:23; 53:23; 30:13,
19

**punish** 71:21

**pushed** 53:23

**pushing** 25:10

**put** 12:21; 17:16, 17, 19;
20:9; 32:17, 19, 25; 50:4;
68:12

**putting** 20:4

## Q

**Queens** 5:18; 6:14, 17,
23; 7:10; 8:18

**quick** 85:20

**Quinn** 9:22; 11:9, 23;
15:25; 17:10; 18:25;
38:22; 39:4, 13; 40:21;
41:3; 57:25; 76:3, 14;
79:19, 20; 80:10; 88:11

**quote** 41:9; 53:2

**quote/unquote** 45:19;
85:9

## R

**race** 8:25; 17:12

**racial** 66:14

**racist** 8:18

**raise** 61:15

**Ramon** 85:24; 90:25

**ran** 5:24

**Rance** 63:10, 18; 68:6, 8,
10, 12

**re-ask** 92:25

**re-establishment** 39:10,
13

**re-naming** 10:17, 4;
14:24

**reaction** 46:15; 47:5;
37:5

**read** 44:10, 12, 15, 17;
51:23; 52:7; 64:23, 24;
65:3; 69:4, 13; 71:10;
73:18; 74:13; 80:25;
81:15; 82:24, 25; 83:14;
98:2; 52:23; 71:14

**reader** 51:21, 22

**reaffirm** 95:21

**real** 4:19; 45:12

**realize** 61:5

**really** 30:9; 31:7; 46:23;
47:4; 58:9; 97:13

**rear** 53:24

**reason** 19:18; 45:2;
59:19; 80:8; 12:6; 13:11

**reasonable** 82:5

**recall** 24:2; 41:2, 7

**received** 83:25

**receiving** 60:15; 83:18

**recent** 65:11

**recess** 60:10; 94:21

**reckless** 65:8, 17

**recognition** 48:16

**recollection** 21:22;
80:25

**record** 42:13; 44:15, 16;
46:10; 64:15, 24; 73:17;
74:13; 81:15; 82:25;
93:13, 20; 94:7, 13; 82:7;
46:12

**redress** 95:17

**reestablishment** 39:3

**refer** 72:4; 82:14

**reference** 30:13

**referring** 72:2, 17

**reflect** 63:22

**reflection** 63:23

**refused** 15:4

**rehired** 79:3

**related** 6:13

**relationship** 6:23

**release** 63:12, 22; 64:7,
14; 67:13

**relevant** 97:7, 8

**remark** 61:23; 44:5; 62:4,
5, 5, 6, 9, 14, 16, 25; 63:2;
65:8, 18, 25; 66:8, 16, 17,
21, 24; 67:7

**remember** 7:20, 23; 9:7,
12; 10:21, 23, 25; 21:16,
21, 24; 35:9; 36:6; 38:17;
46:4; 55:15, 23; 60:15;
62:17, 21; 64:6; 66:20;
84:13, 15, 17, 18, 24, 25;
85:5; 87:19; 88:17, 18;
89:12; 96:10

**remove** 12:23; 11:3, 10,
24; 12:13; 38:19

**removing** 13:12

**rephrase** 13:5

**report** 49:16, 19, 22;
50:6, 9; 83:13, 17, 24;
74:21

**reporter** 46:4, 5; 47:9;
85:18, 25; 47:5; 46:3

**represented** 6:9

**representing** 6:7, 13

**repugnant** 65:25

**request** 38:13; 39:3, 6;
40:4; 74:18; 85:19; 87:2, 3;
25:22; 39:10, 12, 24

**require** 64:2; 81:25

**research** 89:11, 16

**resolution** 19:25; 81:24;
82:2, 4

**resolved** 28:20

**respect** 66:12

**respond** 55:9; 87:7

**response** 87:4

**responsibility** 78:20, 21,
22; 79:5, 12

**responsible** 77:8, 21;
79:9

**rest** 51:23, 24

**restore** 38:3, 10

**restoring** 40:22

**retain** 74:16

**revealed** 9:2, 11

**review** 36:11, 16; 74:17,
24; 60:22

**right** 13:24; 14:9; 18:2;
19:6; 22:5, 15; 23:12;
24:14; 25:18, 18; 26:19,
21; 35:15; 36:5; 44:4, 19;
47:10, 20; 57:8; 60:14;
67:4, 21; 69:16; 71:15, 25;
74:12; 78:6, 16, 22; 79:12,
15, 17; 82:21; 90:11, 14;
91:2, 3; 92:20; 93:3; 94:14,
16; 95:6; 96:14; 17:10

**Rivera** 96:9

**Robert** 16:8

**role** 30:21; 47:19

**roof** 97:11

**room** 40:23; 46:3; 97:6

**rules** 4:13; 37:16, 20, 25;
38:9; 40:13; 80:15, 20;
81:3, 14, 18, 20, 21; 82:10,
15, 16; 84:3; 90:15; 94:25;
95:3, 5, 13, 16; 96:9

**run** 8:4

**running** 6:4, 18, 22; 7:4,
15; 96:6

## S

**Saint** 4:4

**Same** 12:19; 26:16

**saw** 53:17; 54:5; 55:11;
57:10; 69:5

**saying** 9:12, 13; 13:6;
15:20; 19:13; 24:23;
35:24; 44:23; 56:5; 59:8;
66:15; 67:12; 69:13;
72:16; 75:2; 77:17; 92:17

**scale** 66:24

**scenario** 14:8

**scheduled** 41:20

**Sears** 96:9

**second** 23:4; 26:4; 64:25;
65:21, 24; 93:9

**section** 69:6; 70:3, 19;
71:8, 13, 15; 72:16, 23;
73:2, 12, 16, 18; 74:5, 12,
14; 75:8, 11; 82:23, 25;
83:3, 11; 90:10, 13; 69:21,
22; 70:3, 6, 7, 9; 74:10;
78:6

**security** 49:8, 11; 51:2, 4;
57:14; 94:4

**seeing** 52:2

Leroy Comrie  Case 1:07-cv-06154-WHP    Document 24-9    Filed 10/30/2007    Page 33 of 45    Viola Plummer  v.

Vol. 1, August 13, 2007    Christine Quinn, Speaker of the City Council



**seek** 61:14

**seems** 17:2

**sees** 51:22

**select** 76:3; 75:20; 76:2; 79:19, 20, 24; 80:10

**selection** 76:13

**self-designate** 14:9, 17

**sends** 52:22

**sense** 46:23

**sent** 91:7

**separate** 6:21

**September** 19:19

**Sergeant** 55:13, 15; 56:4, 15; 57:7

**serve** 40:20; 96:8, 11; 10:12

**services** 6:7

**session** 15:18

**set** 28:21; 30:5; 46:21; 56:8, 9; 82:10; 83:24

**sets** 28:8, 10; 62:5

**Shall** 71:12, 20; 73:19, 20, 20, 23, 25; 74:15, 21; 81:17, 19, 21; 82:5; 83:5, 16, 24

**shield** 45:2

**shock** 47:22

**short-circuiting** 30:22

**shown** 70:9; 80:18; 98:5

**sick** 48:14; 53:8

**sides** 64:16

**sign** 68:15; 10:8

**significance** 91:16

**simply** 13:8

**single** 41:3

**sit** 33:14, 14

**six** 7:8, 9; 66:5

**slowed** 41:18

**smooth** 84:22

**smoothly** 84:19

**solicited** 6:25; 32:3

**somebody** 35:23, 24; 52:21, 22; 93:24

**someone** 31:24; 43:6; 52:5

**Sometime** 26:22

**Sonny** 11:10, 24; 13:12; 14:19; 20:4, 10; 25:13

**sorry** 21:12; 26:3; 42:8; 69:9; 70:16, 24; 72:11; 76:11, 16; 78:10, 11; 86:20; 93:5

**sought** 66:13

**speak** 31:9; 33:25; 41:23; 48:21; 54:15; 58:2; 86:16; 95:12, 15; 77:14; 43:6

**Speaker** 8:4; 9:10, 24; 11:9, 23; 12:13, 18; 13:7; 14:13, 22; 15:17, 24; 17:10; 18:25; 28:10, 18, 13, 25; 40:4, 13, 18, 21; 41:3; 57:25; 58:6, 10, 18; 61:9, 13, 15, 21;

62:2; 63:6; 66:6, 8; 67:25; 68:2, 5, 8, 15, 17, 24; 69:7, 10, 14; 70:4, 10, 23; 71:3; 73:13; 74:6, 11; 75:4, 16, 17, 20; 76:3, 14, 14, 21, 24; 77:4, 8, 19, 20, 24; 78:17, 25; 79:3, 6, 20, 24; 80:10; 82:24; 83:2, 6, 7, 9, 16; 84:5; 85:6, 19, 23; 87:3, 14; 88:7, 10, 11, 12, 21, 24, 25; 89:6, 8, 22, 23; 90:24; 91:2, 17; 92:7, 13, 18, 23; 93:3; 95:8, 24; 96:12; 97:19; 8:25; 16:13; 28:13, 15; 30:5; 40:12; 49:15; 57:15; 58:14; 63:19; 67:14; 79:9; 87:4

**specific** 32:22; 35:3; 41:7; 51:12; 81:6; 90:6; 62:19

**specifically** 62:22; 74:3; 75:7, 9, 12; 84:7

**spending** 29:8

**Spigner** 6:3

**spirit** 31:21

**spoke** 27:20, 21, 22, 23; 28:23; 30:4; 40:22; 42:2; 57:22, 24; 65:23; 67:10; 92:18; 95:20; 96:2, 3

**sponsor** 81:24; 25:12

**staff** 6:6; 35:11; 36:2; 63:8; 65:6; 66:2; 71:5; 72:4, 8, 9, 12; 74:8, 17, 21; 75:21; 76:6, 25; 77:9, 11, 13, 14; 78:24; 79:6; 80:4, 11; 84:6; 87:8; 88:13; 89:2, 7, 17, 19, 19; 91:19; 92:10, 19; 93:4, 6; 97:20

**staffers** 65:25

**stamped** 42:14; 64:17

**standing** 81:22

**starting** 44:11

**state** 28:8; 47:22; 10:15, 20, 24; 20:7, 16; 30:23; 31:4, 5, 13; 32:8, 12; 34:8; 36:13; 39:20; 41:20; 42:6; 64:2, 3; 66:3; 68:23; 81:18; 84:9; 86:12, 24; 87:20; 91:11, 11

**statement** 44:10; 49:6; 53:10; 63:13, 15; 93:13, 20; 94:7, 12; 31:5; 34:19, 20, 25; 37:5, 6, 6; 53:15

**Staten** 46:5, 6

**stating** 4:2

**stayed** 46:19; 57:20

**step** 33:13; 38:9; 54:19; 92:9; 86:18; 87:14

**still** 26:8, 16, 17; 27:7; 48:11; 53:11; 93:14; 95:12

**stood** 26:5

**stop** 48:23; 71:25; 18:7, 22

**store** 48:24

**stories** 52:25

**strangers** 48:21

**street** 10:3, 10, 17, 22;

11:4, 6; 12:9; 14:6, 24; 18:16; 30:7; 41:15; 48:23; 13:24

**strings** 30:13, 20

**structure** 74:16

**stuff** 12:23; 95:10

**subject** 98:5

**submitted** 11:2; 12:2

**Subscribed** 98:15

**Subsequent** 22:6, 10, 13, 17; 87:13

**success** 58:7

**successful** 58:4

**sued** 77:3

**suggested** 94:6

**support** 6:25; 7:2; 8:7, 7, 12, 16, 17, 19; 9:10, 17, 21; 11:6; 12:10; 20:5; 21:8, 15; 22:3, 11, 16; 26:6, 9, 13; 31:15; 32:3; 58:6, 10; 7:10, 18; 8:13; 26:17; 27:7; 29:11; 59:10; 22:20; 26:23; 43:19; 44:3, 7; 45:3

**supportive** 29:2

**supposedly** 34:14

**sure** 22:18; 37:23; 59:24; 60:2; 81:9

**surprised** 46:16; 66:6

**suspend** 73:13; 76:5; 79:12; 80:2

**suspension** 17:10; 71:4; 91:5

**sworn** 4:5; 98:15

**T**

**talk** 46:22; 27:9; 31:20, 25; 32:2, 3; 31:12; 39:4

**tape** 36:16; 85:18, 25; 86:10; 36:14, 15

**taxes** 74:19, 19

**team** 92:2

**technical** 33:4, 5, 6; 50:2

**telling** 8:16; 55:2

**tells** 9:5

**tem** 40:14

**tenure** 9:25; 85:20

**term** 50:2; 92:22; 93:2; 17:16; 26:6; 30:21; 31:21; 41:4; 50:5; 58:7; 95:7, 16

**terminate** 61:14; 80:4; 95:25; 61:22; 62:3; 88:8; 95:22; 97:19

**termination** 17:11; 64:5; 66:11, 17; 97:19

**testified** 4:7; 42:25

**testimony** 4:21; 98:3

**thesis** 30:18

**thinking** 43:10

**third** 64:21; 65:2, 4, 22

**thought** 27:5; 39:9; 47:3; 48:3, 10, 13; 49:4, 5; 64:3, 4; 95:22

**threatened** 47:21; 48:4, 5; 49:2, 6; 50:18

**Threats** 65:5; 85:9

**three** 9:9, 14; 14:11; 21:4; 22:24; 26:20; 27:3; 29:15; 30:2; 33:17; 52:2; 57:18, 21

**timing** 22:18

**tipped** 66:24

**title** 83:21; 90:23

**today** 5:6; 78:6

**told** 8:17, 23; 43:2; 61:11; 89:25; 93:19, 22

**tolerated** 65:10

**tongue** 43:9

**took** 18:8; 60:16

**total** 67:2

**totally** 35:6; 67:17

**trail** 94:15

**transcript** 42:7, 8, 19; 98:4

**trauma** 48:2

**true** 9:20; 16:15; 98:4

**try** 14:7, 16; 23:8; 27:11, 12, 19, 24

**trying** 27:22; 46:21; 52:5; 53:9; 93:14

**turn** 5:15; 23:9; 53:22; 54:10; 40:2

**twist** 58:16

**two** 9:9; 10:13; 53:19; 56:5; 64:16; 69:21; 82:17; 84:9

**two-minute** 59:23

**two-thirds** 71:24; 73:5, 9

**type** 86:22

**U**

**umbrella** 79:10

**Umm-hmm** 4:25; 5:4; 44:20; 81:12; 86:7; 91:13, 13; 94:6

**unacceptable** 62:20

**under** 4:7, 22; 37:25; 38:9; 40:18; 79:10; 87:6; 89:20

**undermines** 27:16

**underneath** 48:14

**understood** 79:21; 88:20

**undue** 17:12

**unlimited** 50:8, 11, 15

**unprecedented** 30:6

**up** 97:2

**updated** 60:23

**upon** 66:5; 90:2, 3

**upper** 37:3

**upset** 56:19

**upstairs** 33:9

**urgently** 50:18

**use** 35:11

**used** 35:3; 36:7; 41:8

**usually** 43:6, 14

**V**

**Vallone** 96:9

**Vann** 14:5, 20; 15:24; 16:13; 18:6, 18, 24; 19:22; 20:3, 8; 21:15; 22:16, 20; 24:20; 25:7, 22; 26:6, 9, 13, 18, 24; 27:7, 22; 28:15, 25; 29:2, 10; 31:10, 19; 32:17, 19, 25; 33:2, 14, 22; 41:11, 23; 43:22; 44:3; 45:3; 18:17; 21;8

**venue** 35:20

**Verbal** 37:5, 6, 9

**verbatim** 80:23

**verse** 77:25; 90:7

**vested** 73:22, 23

**view** 13:16, 22; 17:24; 39:16; 67:23; 40:7

**Vile** 34:18, 25; 62:20

**Viola** 7:18; 8:17; 9:4; 30:12, 19; 38:19, 24; 45:7; 47:11, 18; 48:4; 49:3; 50:18; 53:4, 6, 13; 65:6; 68:18; 73:6; 86:18, 23; 87:17; 88:8; 89:2, 6

**violation** 17:9

**vote** 10:16, 22; 11:6; 12:24; 14:11, 12, 13, 14; 15:2, 7, 13, 18; 16:5; 19:8, 14; 21:5, 9, 13, 14, 14, 24; 22:2, 18, 24; 23:5, 7; 24:4, 24; 26:5, 15; 28:14; 29:14, 16, 18, 20, 22; 32:2, 2; 33:17; 34:2, 4; 41:10, 11, 15, 43:3; 75:15; 81:25; 10:11; 21:15, 17, 17; 22:16; 76:2; 7:21; 10:6, 7; 19:18; 29:24; 32:5; 82:7

**W**

**walked** 56:20; 57:12

**walking** 48:25; 54:11

**walkway** 54:8

**wants** 97:12

**WAREHAM** 4:9; 10:2, 19; 13:3; 16:22; 17:15; 22:9; 30:18; 37:19; 39:19; 42:4, 8; 43:12; 44:14; 53:20; 59:24; 60:2, 5, 8; 62:15; 64:8; 69:17; 79:22; 80:3; 82:21; 88:22; 93:18; 94:18; 97:22

**warrant** 64:4

**way** 11:19; 14:16; 23:9; 27:19; 28:6; 31:23

**week** 23:7; 50:25; 87:22; 89:13; 91:4, 10; 14:11; 21:4; 22:17; 29:14

**well-known** 48:17

**weren't** 56:7

**wherever** 48:24

**white** 8:20

**whole** 52:7; 81:23

**whose** 14:5; 25:6, 16; 49:14

**wide** 56:10

**wife** 33:11; 46:19; 48:2

**willing** 15:25

**win** 27:25; 28:6; 29:25

**win-win** 14:7, 16; 23:9; 27:20; 31:22, 23

**wishes** 19:22

**Withdrawn** 10:2; 13:3; 22:9; 39:19; 43:12; 53:20; 62:15; 79:22; 88:22

**withdrew** 8:15

**within** 74:16; 87:22

**WITNESS** 11:15; 16:24; 17:4; 21:12; 26:3; 70:16; 98:2

**woman** 86:2, 2

**women** 77:6

**won** 24:13

**wood** 4:17, 19

**word** 30:11; 34:18; 53:10; 56:3; 64:6; 65:12; 21:21; 35:3, 7, 10, 10; 36:7; 37:6; 52:2; 54:12; 55:24, 25; 56:2; 67:9, 9

**work** 19:15; 23:16; 27:11; 83:18; 5:24; 6:21; 27:10, 19; 50:14, 14

**world** 48:15; 59:7

**worth** 30:10

**writing** 83:8

**written** 68:23; 80:15, 16; 84:8

**wrote** 63:15; 64:6

# Y

**year** 10:13; 53:13; 81:19; 45:9; 47:19

**yesterday** 5:8

**York** 4:4; 5:17; 23:15; 65:9; 69:20, 24; 81:7; 90:8

**Lawyer's Notes**

Exhibit K

**Page 1**

[1]
[2] UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
[3]
[4] VIOLA PLUMMER,
[5]        Plaintiff,    Civil Action No.
[6]   -against-           07 CV 6154(WHP)
[7] CHRISTINE QUINN,
Speaker of the City Council,
[8]        Defendant.
[9]
[10]        August 20, 2007
12:15 p.m.
[11]
[12]
[13]
[14]        DEPOSITION of ISRAEL MARTINEZ, taken
[15] by the Plaintiff, pursuant to Notice, at the law
[16] offices of The Corporation Counsel, 100 Church
[17] Street, New York, New York before Karen Perlman,
[18] a Shorthand Reporter and Notary Public within and
[19] for the State of New York.
[20]
[21]
[22]
[23]
[24]   GREENHOUSE REPORTING, INC.
[24]   363 Seventh Avenue - 20th Floor
New York, New York  10001
[25]   (212) 279-5108

**Page 2**

[1]
[2] APPEARANCES:
[3] LAW OFFICES OF ROGER S. WAREHAM, ESQ.
[4] Attorneys for the Plaintiff
[5]   394 Putnam Avenue
[6]   Brooklyn, New York  11216
[7]
[8] NEW YORK CITY LAW DEPARTMENT
[9] OFFICE OF THE CORPORATION COUNSEL
[10] Attorneys for Defendant
[11]   100 Church Street
[12]   New York, New York  10007
[13] BY:  ERIC J. EICHENHOLTZ, ESQ.
[14]        -and-
[15]   PAUL MARKS, ESQ.
[16]        -and-
[17] NEW YORK CITY COUNCIL
[18] OFFICE OF THE GENERAL COUNSEL
[19] Attorneys for Defendant
[20]   250 Broadway
[21]   New York, New York  10007
[22] BY:  ALVIN L. BRAGG, JR., ESQ.
[23]
[24] ALSO PRESENT:
[25] Viola Plummer

**Page 3**

[1]
[2]        STIPULATIONS
[3]        IT IS HEREBY STIPULATED AND AGREED
[4] by and between the attorneys for the respective
[5] parties hereto, that all objections, except as to
[6] form, shall be reserved to the time of trial.
[7]        IT IS FURTHER STIPULATED AND AGREED
[8] that the sealing and filing of the within
[9] deposition are hereby waived.
[10]        IT IS FURTHER STIPULATED AND AGREED
[11] that the within deposition may be subscribed and
[12] sworn to by the witness being examined before a
[13] Notary Public other than the Notary Public before
[14] whom this deposition was begun.
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

**Page 4**

[1]        *I. Martinez*
[2] I S R A E L  M A R T I N E Z, stating a business
[3] address of 250 Broadway, New York,
[4] New York, having been first duly
[5] sworn by the Notary Public, was
[6] examined and testified under oath as
[7] follows:
[8]        EXAMINATION
[9]        BY MR. WAREHAM:
[10]   **Q:** Good afternoon, Mr. Martinez.
[11]   **A:** Good afternoon, sir.
[12]   **Q:** My name is Roger Wareham, I
[13] represent Ms. Plummer in this action. Let me
[14] just ask you some preliminary questions.
[15]        Have you ever been deposed before?
[16]   **A:** No, never.
[17]   **Q:** As you know, your testimony is under
[18] oath, so this is the same as being in a trial,
[19] except there is no judge, this is sworn
[20] testimony.
[21]        Have you taken any medication or
[22] drugs that would impair your ability to speak
[23] truthfully and accurately to the questions?
[24]   **A:** No.
[25]   **Q:** If I ask a question and you don't

---

**Page 5**

**I. Martinez**

[1]
[2] understand it, either because I'm not stating it
[3] clearly, or whatever, you can ask me and I will
[4] try to rephrase it so that you'll be able to
[5] understand it, okay?
[6]    **A:** Okay.
[7]    **Q:** You have to answer orally, you can't
[8] restrict yourself to shaking your head or
[9] nodding —
[10]    **A:** Okay.
[11]    **Q:** — because the reporter has to be
[12] able to record what you actually answer.
[13]    If you need to take a break, which
[14] is probably unlikely because this will be real
[15] short, just let us know, let me know, if I've
[16] asked a question I prefer that you finish the
[17] question before requesting the break?
[18]    **A:** That makes sense.
[19]    **Q:** Have you reviewed any documents in
[20] preparation for this hearing?
[21]    **A:** None that I can think of, no
[22] documents.
[23]    **Q:** What is your title at the City
[24] Council?
[25]    **A:** I am an Assistant Sergeant At Arms.

---

**Page 6**

**I. Martinez**

[1]
[2]    **Q:** And how long have you been Assistant
[3] Sergeant At Arms?
[4]    **A:** Be 20 years in April.
[5]    **Q:** And what are your responsibilities
[6] as an Assistant Sergeant At Arms?
[7]    **A:** My primary responsibility is to
[8] provide order and decorum in the chambers when
[9] Council is in session, I also provide security at
[10] 250 Broadway at the floors where Council — where
[11] the Council actually have staff and the Council
[12] Members' offices, and from time to time doing
[13] historical tours of City Hall.
[14]    **Q:** What is the highest level of
[15] education you attained?
[16]    **A:** I would say a little over two years
[17] of college.
[18]    **Q:** Do you have an immediate supervisor?
[19]    **A:** Yes, that would be the Chief
[20] Sergeant At Arms Elias Cabrera, and over him
[21] would be now our new director of security, Carl
[22] D'Alba.
[23]    **Q:** Let me draw your attention to I
[24] think it's approximately June 1, 2007. Where
[25] were you on duty that day?

---

**Page 7**

**I. Martinez**

[1]
[2]    **A:** June 1, 2007, that would be the day
[3] that we're talking about in question?
[4]    **Q:** Yes.
[5]    **A:** I was at my — at my desk, which is
[6] in the reception area right off the elevators on
[7] the 18th floor.
[8]    **Q:** So it's in the area right in front
[9] of the elevator?
[10]    **A:** Right in front of the elevators, the
[11] four elevators, there is one glass double door on
[12] one side, one glass double door on the other
[13] side.
[14]    **MR. MARKS:** I JUST want to make sure
[15] we're clear, you're talking about 18th
[16] floor of 250 Broadway?
[17]    **THE WITNESS:** Right, the 18th floor
[18] of 250 Broadway.
[19]    **Q:** And can you describe what if
[20] anything happened that you observed happening
[21] between Viola Plummer and Council Member Leroy
[22] Comrie?
[23]    **A:** Well, what I noticed was — this was
[24] again shortly after the stated meeting, so I
[25] was — and this is the first time I actually saw

---

**Page 8**

**I. Martinez**

[1]
[2] them together in one place, actually I haven't
[3] seen them together in one place since then, and
[4] Ms. Plummer was coming out.
[5]    **Q:** Coming out of?
[6]    **A:** Coming out of the glass door on this
[7] side —
[8]    **Q:** From the office area?
[9]    **A:** From my right where I'm sitting, she
[10] was coming out, Council Member Comrie had come
[11] off the elevators and he was going in.
[12]    **Q:** The same door she was coming out?
[13]    **A:** On the opposite, on the opposite
[14] side. And Ms. Plummer called out to Mr. Comrie,
[15] I don't remember all of her words, I do remember
[16] her opening line, which was something to the
[17] effect You need to cut it out, and it was said
[18] quite loud, and it was, you know, very vocal and
[19] she said some other things.
[20]    **Q:** You don't remember what those other
[21] things were?
[22]    **A:** I think she restated that again, and
[23] then as Council Member Comrie was walking down,
[24] he the left to walk down the hall she did call
[25] him a chump at least twice.

---

Page 9

### I. Martinez

[2] **Q:** And what, if anything, was Council
[3] Member Comrie's response?
[4] **A:** Council Member Comrie I think paused
[5] when he realized that she was addressed him, and
[6] then he went on.
[7] **Q:** He just stopped and then went on?
[8] **A:** More or less, yes.
[9] **Q:** He didn't do anything? He did
[10] nothing else?
[11] **A:** He kind of fumbled with the door,
[12] you know, he's a big guy trying to get through
[13] the door.
[14] **Q:** You have to buzz him through the
[15] door?
[16] **A:** I opened the door and then he has
[17] to — he opens the door and goes through, and he
[18] usually has bags, I think he had at least one
[19] that day, so he was getting through the door and
[20] then at no point did he turn to face her, at no
[21] point did he — that I could see make eye
[22] contact, and he certainly did not speak.
[23] **Q:** And the only words you remember Ms.
[24] Plummer saying was you need to cut it out?
[25] **A:** You need to cut it out, she said —

Page 10

### I. Martinez

[2] there was some other words in there which I guess
[3] weren't a big — you know, didn't stand out to
[4] me, I figured everything was — that was the
[5] extent of the matter, and I remember her calling
[6] "You're a chump", she said that more than once.
[7] **Q:** And he didn't respond?
[8] **A:** He didn't respond, he just kept
[9] walking down the hallway.
[10] **Q:** And did you intervene in this
[11] incident at all?
[12] **A:** Well, there was nothing to intervene
[13] in, there was nothing to — it was done.
[14] **Q:** And when Ms. Plummer called Council
[15] Member Comrie a chump, where was he exactly? Was
[16] he still inside the elevator area, was he —
[17] **A:** He was not far. I mean, you know,
[18] he doesn't — I mean he wasn't very far, maybe he
[19] had just gone passed the door, but she did call
[20] it out quite loudly, so he would have — unless
[21] he would have had a serious hearing impediment he
[22] would have heard it.
[23] **Q:** And after he went through the door,
[24] did Ms. Plummer follow him through the door?
[25] **A:** No, no, she did not.

Page 11

### I. Martinez

[2] **Q:** What did she do?
[3] **A:** She got into the elevator and she
[4] left.
[5] **MR. WAREHAM:** Give me two minutes.
[6] (Time noted: 12:22 p.m.)
[7] (A brief recess is taken.)
[8] (Time noted: 12:25 p.m.)
[9] **Q:** After Councilman Comrie walked down
[10] the hall and Ms. Plummer got on the elevator, did
[11] you report this incident?
[12] **A:** I did report it a little later, I
[13] mentioned it to my assistant supervisor and also
[14] eventually relayed it to Carl D'Alba.
[15] **Q:** You didn't see it as anything really
[16] urgent?
[17] **MR. EICHENHOLTZ:** Objection.
[18] **A:** I reported it that day, I mean I
[19] didn't leave it sit for days.
[20] **Q:** I'm saying it wasn't —
[21] **A:** I didn't —
[22] **Q:** You didn't view it as something I
[23] need to call right away and tell —
[24] **MR. EICHENHOLTZ:** Objection, but you
[25] can answer the question.

Page 12

### I. Martinez

[2] **A:** I mean it was over, I didn't have to
[3] call 9-1-1.
[4] **Q:** And do you remember what you
[5] reported to them?
[6] **A:** Precisely what I just have spoken
[7] right now.
[8] **Q:** And that is that Ms. Plummer called
[9] Council Member Comrie —
[10] **A:** That is —
[11] **Q:** Said that —
[12] **A:** Would you like me to —
[13] **MR. MARKS:** Let him, so the record
[14] is clear you have to let Mr. Wareham finish
[15] the question before you start speaking.
[16] **THE WITNESS:** Sorry.
[17] **Q:** You need to cut it out and you're a
[18] chump, basically?
[19] **MR. EICHENHOLTZ:** Objection. You
[20] can answer.
[21] **A:** Those were — those were — when
[22] this occurred, I'm not in the habit of doing so,
[23] I didn't write down the date, the time, I didn't
[24] write down specifically which — what her words
[25] were word for word, I didn't — it was just

Page 13

**I. Martinez**

[1]

[2] something that happened — that happened to have
[3] happened in front of me, which I was a little
[4] surprised by being so close to the stated meeting
[5] and, you know, with all the publicity, I figured
[6] this will be something that they would just avoid
[7] each other and keep quiet, and so I was surprised
[8] at the outburst, and I reported it, naturally, as
[9] one would.
[10]   **Q:** And did it seem antagonistic or was
[11] it just a statement?
[12]   **A:** There was hostility, I would say it
[13] was.
[14]   **Q:** Why do you characterize it as
[15] hostility?
[16]   **A:** The word chump is not a neutral
[17] word.
[18]   **Q:** You're saying because of the use of
[19] the word chump, you would characterize it as
[20] hostile?
[21]   **MR. EICHENHOLTZ:** Objection.
[22] You can answer. Go ahead.
[23]   **A:** I was — I would say that the word
[24] chump is not a nicety.
[25]   **Q:** So it's really —

Page 14

**I. Martinez**

[1]
[2]   **A:** If anything —
[3]   **Q:** It's really the choice of word that
[4] you would then characterize?
[5]   **A:** The loudness.
[6]   **MR. EICHENHOLTZ:** Objection.
[7] You can answer.
[8]   **THE WITNESS:** Sorry.
[9]   **MR. EICHENHOLTZ:** It's okay.
[10]   **A:** The loudness, the tone, and —
[11]   **Q:** And how —
[12]   **A:** — the use of the word.
[13]   **Q:** How would you describe the tone?
[14]   **A:** There was a certain amount of
[15] belligerence in the tone.
[16]   **Q:** And you equate belligerence with the
[17] fact that it was loud?
[18]   **A:** No, it was loud, and, you know, I
[19] mean these are all subjective questions, I'm
[20] giving you my opinion.
[21]   **Q:** Right, it's an opinion, right.
[22]   **A:** Right.
[23]   **Q:** But what you recall is that Council
[24] Member Comrie did not react at all, he just
[25] walked away?

Page 15

**I. Martinez**

[1]
[2]   **MR. EICHENHOLTZ:** Objection.
[3] You can answer.
[4]   **A:** Essentially.
[5]   **Q:** And you were looking at him when Ms.
[6] Plummer said these things?
[7]   **A:** As much as I can look at two people
[8] in opposite ends, yes, I was looking at them,
[9] back and forth.
[10]   **MR. WAREHAM:** I have no further
[11] questions.
[12]   **MR. EICHENHOLTZ:** Nothing from us so
[13] I guess we're done.
[14]     (Time noted: 12:29 p.m.)
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 16

**I. Martinez**

[1]
[2]     I, the witness herein, having read
[3] the foregoing testimony, do hereby certify
[4] it to be a true and correct transcript,
[5] subject to the corrections, if any, shown
[6] on the attached page.
[7]
[8]
[9]
[10]
[11]
[12]          **ISRAEL MARTINEZ**
[13]
[14]
[15] Subscribed and sworn to
[16] before me this _____ day
[17] of _____ 2007.
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 17

[1]            I. Martinez
[2]            CERTIFICATE
[3] STATE OF NEW YORK )
[4]
[5] COUNTY OF NEW YORK)
[6]      I, KAREN PERLMAN, a Shorthand Reporter and
[7] Notary Public within and for the State of New
[8] York, do hereby certify:
[9]      That ISRAEL MARTINEZ, the witness whose
[10] deposition is hereinbefore set forth, was duly
[11] sworn by me and that such deposition is a true
[12] record of the testimony given by such witness.
[13]      I further certify that I am not related to
[14] any of the parties to this action by blood or
[15] marriage, and that I am in no way interested in
[16] the outcome of this matter.
[17]      IN WITNESS WHEREOF, I have hereunto set my
[18] hand this 27th day of August, 2007.
[19]
[20]
[21]
[22]
[23]
[24]           KAREN PERLMAN
[25]

**Lawyer's Notes**

## 1

**12:22** 11:6
**12:25** 11:8
**12:29** 15:14
**18th** 7:7, 15, 17

## 2

**2007** 6:24; 7:2; 16:17
**250** 4:3; 6:10; 7:16, 18

## 9

**9-1-1** 12:3

## A

**ability** 4:22
**able** 5:4, 12
**accurately** 4:23
**action** 4:13
**actually** 5:12; 6:11; 7:25; 8:2
**address** 4:3; 9:5
**afternoon** 4:10, 11
**again** 7:24; 8:22
**ahead** 13:22
**amount** 14:14
**antagonistic** 13:10
**approximately** 6:24
**April** 6:4
**area** 7:6, 8; 8:8; 10:16
**Arms** 5:25; 6:3, 6, 20
**Assistant** 5:25; 6:2, 6; 11:13
**attached** 16:6
**attained** 6:15
**attention** 6:23
**avoid** 13:6
**away** 11:23; 14:25

## B

**back** 15:9
**bags** 9:18
**basically** 12:18
**belligerence** 14:15, 16
**big** 9:12; 10:3
**break** 5:13, 17
**brief** 11:7
**Broadway** 4:3; 6:10; 7:16, 18
**business** 4:2
**buzz** 9:14

## C

**Cabrera** 6:20
**call** 8:24; 10:19; 11:23; 12:3; 8:14; 10:14; 12:8; 10:5
**can** 5:3, 21; 7:19; 11:25; 12:20; 13:22; 14:7; 15:3, 7
**Carl** 6:21; 11:14
**certain** 14:14
**certainly** 9:22
**certify** 16:3
**chambers** 6:8
**characterize** 13:14, 19; 14:4
**Chief** 6:19
**choice** 14:3
**chump** 8:25; 10:6, 15; 12:18; 13:16, 19, 24
**City** 5:23; 6:13
**clear** 7:15; 12:14
**clearly** 5:3
**close** 13:4
**college** 6:17
**coming** 8:4, 5, 6, 10, 12
**Comrie** 7:22; 8:10, 14, 23; 9:4; 10:15; 11:9; 12:9; 14:24; 9:3
**contact** 9:22
**corrections** 16:5
**Council** 5:24; 6:9, 10, 11, 11; 7:21; 8:10, 23; 9:2, 4; 10:14; 12:9; 14:23
**Councilman** 11:9
**cut** 8:17; 9:24, 25; 12:17

## D

**D'Alba** 6:22; 11:14
**date** 12:23
**day** 6:25; 7:2; 9:19; 11:18; 16:16
**days** 11:19
**decorum** 6:8
**deposed** 4:15
**describe** 7:19; 14:13
**desk** 7:5
**director** 6:21
**documents** 5:19, 22
**done** 10:13; 15:13
**door** 7:11, 12; 8:6, 12; 9:11, 13, 15, 16, 17, 19; 10:19, 23, 24
**double** 7:11, 12
**down** 8:23, 24; 10:9; 11:9; 12:23, 24
**draw** 6:23
**drugs** 4:22
**duly** 4:4
**duty** 6:25

## E

**education** 6:15
**effect** 8:17
**EICHENHOLTZ** 11:17, 24; 12:19; 13:21; 14:6, 9; 15:2, 12
**either** 5:2
**elevator** 7:9; 10:16; 11:3, 10; 7:6, 10, 11; 8:11
**Elias** 6:20
**else** 9:10
**ends** 15:8
**equate** 14:16
**Essentially** 15:4
**eventually** 11:14
**exactly** 10:15
**EXAMINATION** 4:8
**examined** 4:6
**except** 4:19
**extent** 10:5
**eye** 9:21

## F

**face** 9:20
**fact** 14:17
**far** 10:17, 18
**figured** 10:4; 13:5
**finish** 5:16; 12:14
**first** 4:4; 7:25
**floor** 7:7, 16, 17; 6:10
**follow** 10:24; 4:7
**foregoing** 16:3
**forth** 15:9
**four** 7:11
**front** 7:8, 10; 13:3
**fumbled** 9:11
**further** 15:10

## G

**giving** 14:20
**glass** 7:11, 12; 8:6
**goes** 9:17
**Good** 4:10, 11
**guess** 10:2; 15:13
**guy** 9:12

## H

**habit** 12:22
**Hall** 6:13; 8:24; 11:10
**hallway** 10:9
**happened** 7:20; 13:2, 2, 3
**happening** 7:20
**head** 5:8
**heard** 10:22

**hearing** 5:20; 10:21
**hereby** 16:3
**herein** 16:2
**highest** 6:14
**historical** 6:13
**hostile** 13:20
**hostility** 13:12, 15

## I

**immediate** 6:18
**impair** 4:22
**impediment** 10:21
**incident** 10:11; 11:11
**inside** 10:16
**intervene** 10:10, 12
**into** 11:3
**ISRAEL** 16:12

## J

**judge** 4:19
**June** 6:24; 7:2

## K

**keep** 13:7
**kept** 10:8
**kind** 9:11

## L

**later** 11:12
**least** 8:25; 9:18
**leave** 11:19
**left** 8:24; 11:4
**Leroy** 7:21
**less** 9:8
**level** 6:14
**line** 8:16
**little** 6:16; 11:12; 13:3
**long** 6:2
**look** 15:7, 5, 8
**loud** 8:18; 14:17, 18
**loudly** 10:20
**loudness** 14:5, 10

## M

**makes** 5:18
**MARKS** 7:14; 12:13
**Martinez** 4:10; 16:12
**matter** 10:5
**maybe** 10:18
**mean** 10:17, 18; 11:18; 12:2; 14:19
**medication** 4:21
**meeting** 7:24; 13:4
**Member** 7:21; 8:10, 23;

**hearing** 9:3, 4; 10:15; 12:9; 14:24; 6:12
**mentioned** 11:13
**minutes** 11:5
**More** 9:8; 10:6
**much** 15:7

## N

**name** 4:12
**naturally** 13:8
**need** 5:13; 8:17; 9:24, 25; 11:23; 12:17
**neutral** 13:16
**New** 4:3, 4; 6:21
**nicety** 13:24
**nodding** 5:9
**None** 5:21
**Notary** 4:5
**noted** 11:6, 8; 15:14
**noticed** 7:23

## O

**oath** 4:6, 18
**Objection** 11:17, 24; 12:19; 13:21; 14:6; 15:2
**observed** 7:20
**occurred** 12:22
**off** 7:6; 8:11
**office** 8:8; 6:12
**once** 10:6
**one** 7:11, 12, 12; 8:2, 3; 9:18; 13:9
**only** 9:23
**opened** 9:16
**opening** 8:16
**opens** 9:17
**opinion** 14:20, 21
**opposite** 8:13, 13; 15:8
**orally** 5:7
**order** 6:8
**out** 8:4, 5, 6, 10, 12, 14, 17; 9:24, 25; 10:3, 20; 12:17
**outburst** 13:8
**over** 6:16, 20; 12:2

## P

**p.m** 11:6, 8; 15:14
**page** 16:6
**passed** 10:19
**paused** 9:4
**people** 15:7
**place** 8:2, 3
**Plummer** 4:13; 7:21; 8:4, 14; 9:24; 10:14, 24; 11:10; 12:8; 15:6
**point** 9:20, 21
**Precisely** 12:6

**srael Martinez**   Case 1:07-cv-06154-WHP   Document 24-9   Filed 10/30/2007   Page 44 of 45
**Viola Plummer v.**
**Christine Quinn, Speaker of the City Council**
**/ol. 1, August 20, 2007**

prefer 5:16
preliminary 4:14
preparation 5:20
primary 6:7
probably 5:14
provide 6:8, 9
Public 4:5
publicity 13:5

## Q

quiet 13:7
quite 8:18; 10:20

## R

react 14:24
read 16:2
real 5:14
realized 9:5
really 11:15; 13:25; 14:3
recall 14:23
reception 7:6
recess 11:7
record 5:12; 12:13
relayed 11:14
remember 8:15, 15, 20;
9:23; 10:5; 12:4
rephrase 5:4
report 11:11, 12, 18;
12:5; 13:8
reporter 5:11
represent 4:13
requesting 5:17
respond 10:7, 8
response 9:3
responsibilities 6:5
responsibility 6:7
restated 8:22
restrict 5:8
reviewed 5:19
right 7:6, 8, 10, 17; 8:9;
11:23; 12:7; 14:21, 21, 22
Roger 4:12

## S

same 4:18; 8:12
saw 7:25
saying 9:24; 11:20; 13:18
security 6:9, 21
seem 13:10
sense 5:18
Sergeant 5:25; 6:3, 6, 20
serious 10:21
session 6:9
shaking 5:8
short 5:15
shortly 7:24
shown 16:5

side 7:12, 13; 8:7, 14
sit 11:19
sitting 8:9
Sorry 12:16; 14:8
speak 4:22; 9:22; 12:15
specifically 12:24
spoken 12:6
staff 6:11
stand 10:3
start 12:15
stated 7:24; 13:4
statement 13:11
stating 4:2; 5:2
still 10:16
stopped 9:7
subject 16:5
subjective 14:19
Subscribed 16:15
supervisor 6:18; 11:13
sure 7:14
surprised 13:4, 7
sworn 4:5, 19; 16:15

## T

talking 7:3, 15
testified 4:6
testimony 4:17, 20; 16:3
title 5:23
together 8:2, 3
tone 14:10, 13, 15
tours 6:13
transcript 16:4
trial 4:18
true 16:4
truthfully 4:23
try 5:4
trying 9:12
turn 9:20
twice 8:25
two 6:16; 11:5; 15:7

## U

under 4:6, 17
unless 10:20
unlikely 5:14
urgent 11:16
use 13:18; 14:12
usually 9:18

## V

view 11:22
Viola 7:21
vocal 8:18

## W

walk 8:24; 11:9; 14:25;
8:23; 10:9
WAREHAM 4:9, 12; 11:5;
12:14; 15:10
weren't 10:3
WITNESS 7:17; 12:16;
14:8; 16:2
word 12:25, 25; 13:16,
17, 19, 23; 14:3, 12; 8:15;
9:23; 10:2; 12:24
write 12:23, 24

## Y

years 6:4, 16
York 4:3, 4

**Lawyer's Notes**