UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
VIOLA PLUMMER,                                    :

                    Plaintiff,           :        07 Civ. 6154 (WHP)

          -against-                                :        MEMORANDUM AND ORDER

CHRISTINE QUINN, Speaker of the City   :
Council, and the CITY OF NEW YORK,
                                          :

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

WILLIAM H. PAULEY III, District Judge:

        Plaintiff Viola Plummer brings this federal civil rights action against Defendants Christine Quinn ("Quinn") and the City of New York alleging that Defendants suspended her and then terminated her employment in violation of the First and Fourteenth Amendments, as well as the New York State Constitution. Defendants move for summary judgment dismissing all of Plaintiff's claims. Quinn also moves for summary judgment based on the doctrine of qualified immunity. For the following reasons, Defendants' motions are granted in part and denied in part.

## BACKGROUND

        In September 2005, Plaintiff, who identifies herself as a "U.S. born female of African decent," became Chief of Staff to New York City Council Member Charles Barron ("Barron"). (Defendants' Statement Pursuant to Rule 56.1, dated October 30, 2007 ("Def. 56.1 Stmt.") ¶ 2.) Throughout 2007, Quinn was Speaker of the New York City Council (the "Council"). (Def. 56.1 Stmt. ¶ 5.)

Several months prior to May 30, 2007, Plaintiff attended a joint hearing of the Public Safety and Civil Rights Committee (the "Joint Hearing"). (Def. 56.1 Stmt. ¶ 6; Transcript of the Proceedings, dated January 3, 2008 ("Tr.") at 6.) During the Joint Hearing, Plaintiff said "wow" and made an audible "gasp" while Police Commissioner Raymond Kelly was speaking. (Def. 56.1 Stmt. ¶ 7.) Council Member Peter Vallone ("Vallone"), who co-chaired the Joint Hearing with Council Member Larry Seabrook ("Seabrook"), looked at Plaintiff and appeared to mouth the word "out", but whatever he said was inaudible. (Def. 56.1 Stmt. ¶ 8.) Plaintiff did not leave the Joint Hearing. Vallone took no further action either at the Joint Hearing or afterward. At some unspecified time, long after the Joint Hearing, Vallone, Seabrook and Quinn discussed Plaintiff's conduct during the Joint Hearing. (Def. 56.1 Stmt. ¶¶ 9-11; Tr. at 8.)

On May 30, 2007, the Council held a stated meeting (the "May 30 Meeting"), during which the Council discussed a bill to rename certain streets in honor of various individuals (the "Bill"). (Def. 56.1 Stmt. ¶¶ 12, 14.) The Council also discussed a proposed amendment to the Bill to co-name Gates Avenue in Brooklyn after Sonny Abubadika Carson ("Carson") (the "Amendment"), who was a close friend of Plaintiff. (Def. 56.1 Stmt. ¶¶ 15-16.) The Committee on Parks and Recreation had removed the Amendment from the Bill. (Def. 56.1 Stmt. ¶ 15.)

During the Council's debate, Plaintiff yelled "liar" while both Quinn and Council Member Michael Nelson ("Nelson") were commenting on the Amendment. (Def. 56.1 Stmt. ¶¶ 27,-28.) In response, Public Advocate Betsy Gotbaum ("Gotbaum") said "quiet please" and banged her gavel several times. (Def. 56.1 Stmt. ¶ 35.) A number of unidentified individuals also yelled during the meeting, causing Gotbaum to ask for quiet and repeatedly bang her gavel. (Declaration of Eric Eichenholtz, dated October 30, 2007 ("Eichenholtz Decl.") Ex. P: Video

2

recording of the May 30 Meeting.) It is atypical for someone to yell from the floor of the Council, where Plaintiff and other staff were seated. (Def. 56.1 Stmt. ¶¶ 38-39.) The Council did not pass the Amendment. Councilman Leroy Comrie ("Comrie") abstained from the vote. (Def. 56.1 Stmt. ¶ 41.)

After the May 30 Meeting, in the courtyard outside of City Hall, Plaintiff stated to a group of people, including the media, that Comrie's "aspiration to be Queens Borough President was over even if it meant assassinating his ass." (Def. 56.1 Stmt. ¶¶ 41-42.) Plaintiff also stated that "to assassinate Leroy Comrie's ass, that's what I said, means his whole stuff, his whole run for Queens Borough President, his whole get the people to support him." (Def. 56.1 Stmt. ¶ 45.) In 2003, Council Member James Davis ("Davis") was shot and killed in the balcony of the Council. (Def. 56.1 Stmt. ¶ 49.) While Comrie testified that he felt "physically threatened" as a result of Plaintiff's statements, he made no complaint and filed no police report at the time. (Def. 56.1 Stmt. ¶ 47; Eichenholtz Decl. Ex. J: Transcript of Deposition of Leroy Comrie ("Comrie Tr.") at 47-49.) Nevertheless, in the wake of Plaintiff's statements, Defendants provided Comrie with security. (Eichenholtz Decl. Ex. H: Transcript of Deposition of Carl D'Alba at 27-28; Comrie Tr. at 49.)

The New York City Council Policy on Harassment and Discrimination (the "Policy") sets forth the "process for addressing allegations of employment discrimination or unlawful harassment" once a "Member or employee of the City Council who believes he or she has been subjected to discrimination or harassment" files a report with the Fair Intervention Committee. (Declaration of Roger S. Wareham, dated November 13, 2008 [sic] ("Wareham Decl.") Ex. 2: New York City Council Policy Against Employment Discrimination and Unlawful Harassment, dated June 13, 2006 at 1, 3.)

Following the May 30 Meeting, Quinn held meetings to address Plaintiff's statements and asked the Office of the Council's General Counsel to research whether she had the authority to discipline a Council Member's staff. (Def. 56.1 Stmt. ¶¶ 52, 54.) Barron stated that he was "so proud of [Plaintiff] that [he] might give her a raise." (Def. 56.1 Stmt. ¶ 51.) On June 28, 2007, Quinn's Chief of Staff notified Plaintiff that she was suspended without pay until August 10, 2007. (Def. 56.1 Stmt. ¶¶ 56-57.) Plaintiff filed this action. On July 5, 2007 Plaintiff received another letter stating:

> As a staff member and employee of the Council, you may not engage in disorderly or disruptive conduct at Council Stated and Committee meetings and you must abide by any and all directions of the Presiding Officer of such meetings either to the audience or to you yourself. You must also follow the sergeant-at-arms' instructions to maintain order and decorum. Further, you must refrain from using language towards any Council Member or Council Staff that threatens bodily harm.

(Def. 56.1 Stmt. ¶¶ 59-60.) The letter required Plaintiff to agree to abide by its terms in order to return to her position. (Def. 56.1 Stmt. ¶ 61.) Plaintiff declined to do so. (Def. 56.1 Stmt. ¶ 63.)

## DISCUSSION

I. Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Grady v. Affiliated Cent., Inc., 130 F.3d 553, 559 (2d Cir. 1997). In determining

whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." Liberty Lobby, 477 U.S. at 255.

II. First Amendment Claim

    A. Legal Standard

A plaintiff alleging retaliation for the exercise of her First Amendment rights must show that: (1) the speech was "made as a citizen on matters of public concern rather than as an employee on matters of personal interest"; (2) she suffered an adverse employment action; and (3) the speech was a motivating or substantial factor in that action. Johnson v. Ganim, 342 F.3d 105, 112 (2d Cir. 2003) (some internal quotations and citations omitted). Defendants do not dispute that Plaintiff can make this showing.

However, even if a plaintiff can make this showing, a government employer may fire an employee for speaking on a matter of public concern if the speech disrupts governmental operations such that it "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin v. McPherson, 483 U.S. 378, 388 (1987). "Any actual disruption that has already occurred is of course a persuasive argument for the government that it has met its burden, but even a showing of probable future disruption may satisfy the balancing test, so long as such a prediction is reasonable." Melzer v. Bd. of Educ. of the City Sch. Dist. of New York, 336 F.3d 185, 197 (2d Cir. 2003). The government, however, must present evidence that the prediction of probable future disruption was reasonable. See, e.g., Lewis v. Cowen, 165

5

F.3d 154, 164 (2d. Cir. 1999). Thus, a government employer may fire an employee if: (1) the employer's prediction of disruption is reasonable or if plaintiff's speech was actually disruptive; (2) the potential disruptiveness is enough to outweigh the value of speech; and (3) the employer took action against the employee based on this disruption and not in retaliation for the speech. See Jeffries v. Harleston, 52 F.3d 9, 13 (2d Cir. 1995); Johnson, 342 F.3d at 114.

While the Jeffries factors are generally questions of law, "the question of the degree to which the employee's speech could reasonably have been deemed to impede the employer's efficient operation [is properly] regarded as a question of fact, to be answered by the jury." Johnson, 342 F.3d at 114. For example, where an employee was suspended and then fired after he sent a letter to the Mayor's office which defendants claimed threatened other employees, the Second Circuit found "reasonable minds could differ as to whether [the employee's letter] had the potential to cause disruption." Johnson, 342 F.3d at 115. Similarly, in Gorman-Bakos v. Cornell Cooperative Extension of Schenectady County, 252 F.3d 545, 549-50 (2d Cir. 2001), plaintiffs lost their membership in a 4-H program run by defendants after complaining about the program both to the defendants and to political leaders during "heated conversations and correspondence." Gorman-Bakos, 252 F.3d at 549-50. The Second Circuit held that the question of whether the manner in which plaintiffs conveyed their opinion was disruptive, as defendants argued, was a matter for a jury. Gorman-Bakos, 252 F.3d at 557-58.

B. The Disruptiveness of Plaintiff's Speech

The record reflects that as a result of Plaintiff's speech: (1) at the Joint Hearing, Vallone looked at Plaintiff and appeared to mouth the word "out"; (2) at the May 30 Meeting Gotbaum asked for quiet and banged her gavel several times; (3) Quinn held meetings with staff

and Council Members and had her staff perform research on her authority to discipline Plaintiff; and (4) Comrie may have felt "physically threatened." (Def. 56.1 Stmt. ¶¶ 8, 35, 52, 55.)

First, with respect to the Joint Hearing, Defendants concede that this event played a "very small part" in Quinn's decision to discipline Plaintiff. (Tr. at 8.) Moreover, Plaintiff's speech and Vallone's minimal reaction during the Joint Hearing are insufficient to show actual disruption of the Council's operations or that any prediction of future disruption was reasonable.

Second, with respect to Gotbaum's response to Plaintiff's speech at the May 30 Meeting, the record does not reflect whether it was unusual for Gotbaum to call for quiet or bang her gavel during a stated meeting. Moreover, although it was unusual for yelling to come from the floor of the Council, the May 30 Meeting was a raucous session; there was other yelling coming from the gallery, which also caused Gotbaum to call for quiet and bang her gavel. (Eichenholtz Decl. Ex. P: Video recording of the May 30 Meeting.) Thus, based on the evidence before it, this Court cannot conclude that Plaintiff's speech was actually disruptive of the Council's efficient operations, particularly given that the vote on the Amendment actually went forward. Cf. Washington v. Nat'l Ry. Passenger Corp., 01 Civ. 4201 (BSJ), 2003 WL 22126544, *5-*6 (S.D.N.Y. Sept. 12, 2003) (granting summary judgment on First Amendment retaliation claim where plaintiff's speech had prevented another employee from performing his duties). "[R]easonable minds could differ" as to whether Plaintiff's speech was actually disruptive or had the potential to cause future disruption. Johnson, 342 F.3d at 115. Accordingly, whether Plaintiff yelling "liar," from the floor of the Council, "could reasonably have been deemed to impede the employer's efficient operation . . . [is] a question of fact, to be answered by the jury." Johnson, 342 F.3d at 114; see also Gorman-Bakos, 252 F.3d at 557.

Third, that Quinn held meetings to address Plaintiff's speech could indicate that Plaintiff's speech was actually disruptive to the Council's operations. However, the reasonableness of such a conclusion depends on the circumstances of the meetings, such as their number, duration, and attendance, none of which is reflected in the record.

Fourth, although Comrie testified that he felt "physically threatened" as a result of Plaintiff's speech— evidence that the speech was actually disruptive or potentially disruptive — he also testified that it was Defendants who initiated security for him and that he did not file a police report or make a complaint at the time. (Def. 56.1 Stmt. ¶ 47; Eichenholtz Decl. Ex. J: Comrie Tr. at 47-49; Eichenholtz Decl. Ex. H: D'Alba Tr. at 27-28.) Consequently, the effect Plaintiff's statement had on Comrie is a disputed issue of fact for a jury to decide. See Gorman-Bakos, 252 F.3d at 557-58.

Finally, Defendants could reasonably have believed Plaintiff's statement that Comrie's "aspiration to be Queens Borough President was over even if it meant assassinating his ass," was potentially disruptive if the statement could: (1) impair discipline by superiors; (2) impair harmony among co-workers; (3) have a detrimental impact on close working relationships for which personal loyalty and confidence are necessary; (4) impede the performance of the speaker's duties; or (5) interfere with the regular operation of the enterprise. Rankin, 483 U.S. at 388. First, there is no evidence that Plaintiff's statement would impair discipline by superiors. Second, whether her statement itself could affect harmony among co-workers at the Council or interfere with the Council's regular operations, particularly in light of the 2003 shooting of Davis, is a question of fact for a jury. See Johnson, 342 F.3d at 115 (whether employee's letter, which defendants claimed threatened other employees, was potentially disruptive was a question of fact). Third, Plaintiff's statement could have a detrimental impact on close working

relationships or impede the performance of her duties if people Plaintiff needed to work closely with to accomplish her duties were unwilling to work with her as a result of her statement. However, it was clear that Barron was still supportive of Plaintiff, and there is no evidence in the record regarding who else, if anyone, Plaintiff needed to work closely with to accomplish her duties. There is also no evidence that Defendants believed Plaintiff was violent or posed a threat to safety. See Blackman v. New York City Transit Auth., 491 F.3d 95, 98-100 (2d. Cir. 2007) (government employer reasonably believed plaintiff's statements that two supervisors who were shot by a former employee "deserved what they got" were potentially disruptive where he had made other statements demonstrating him to be violent).

In addition, because there are issues of fact with regard to the actual or potential disruptiveness of each of Plaintiff's statements, this Court cannot conclude that cumulatively Plaintiff's statements were actually disruptive or had the potential to cause future disruption. Accordingly, there are factual disputes as to whether Plaintiff's speech was disruptive or whether Defendants' prediction of disruption was reasonable, which preclude summary judgment. Because the Court finds there are disputed issues of fact with respect to the first Jeffries step, it need not reach the remaining two steps in the inquiry.

III. Fourteenth Amendment

Plaintiff brings equal protection and substantive due process claims under both the Fourteenth Amendment and the corresponding sections of the New York State Constitution. This Court's Fourteenth Amendment analysis also applies to the Plaintiff's New York state constitutional claims. See e.g., Williams v. City of Mount Vernon, 428 F. Supp. 2d 146, 160

(S.D.N.Y. 2006) (applying the same standard to dismiss plaintiff's Fourteenth Amendment and corresponding New York State constitutional claims).

A. Equal Protection Claim

To establish a prima facie case of race discrimination, a plaintiff must show that: (1) she belongs to a protected class; (2) she was performing her duties satisfactorily; (3) she suffered an adverse employment decision; and (4) the circumstances surrounding the action give rise to an inference of discrimination. Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d. Cir. 1999). A plaintiff may satisfy the fourth prong by demonstrating that similarly situated employees of a different race were treated more favorably than she was. See Norville, 196 F.3d at 95.

With regard to the fourth prong, Plaintiff points to three circumstances she asserts give rise to an inference of discrimination: (1) Defendants' failure to follow the Policy in responding to Plaintiff's statements; (2) the racially charged nature of the Amendment; and (3) that Plaintiff is the only employee of a Council Member ever to have been fired by a Speaker. The Court addresses each in turn.

An employer's failure to adhere to its employment policies can provide evidence of an improper motive. See Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039-40 (2d Cir. 1993). Here, the Policy sets forth the "process for addressing allegations of employment discrimination or unlawful harassment" once a "Member or employee of the City Council who believes he or she has been subjected to discrimination or harassment" files a report with the Fair Intervention Committee. (Wareham Decl. Ex. 2 at 1, 3.) Plaintiff concedes that no report of harassment was filed. (Tr. at 36.) Consequently, there was no reason for Defendants to follow

the procedures outlined in the Policy, and their failure to do so does not support an inference of discrimination.

Second, Plaintiff contends that the racially charged circumstances surrounding the Bill and the Amendment give rise to an inference of discrimination. Plaintiff argues that Carson, who she describes as "an African-American political activist and Black Nationalist" (Second Amended Complaint, dated Oct. 3, 2007 ("Comp.") ¶ 21), was the first name the Parks and Recreation Department had ever removed from a re-naming bill and the first name Quinn had ever reviewed in a renaming bill. Plaintiff supported the co-naming of Gates Avenue in Brooklyn after Carson, while Quinn opposed it. However, these facts show only that Plaintiff and Quinn had a disagreement on a contentious issue related to race and do not support an inference of discrimination with respect to her termination. See, e.g., Bickerstaff v. Vassar Coll., 196 F.3d 435, 450-51 (2d Cir. 1999) (disagreement regarding the importance of racial diversity was insufficient to give rise to inference of discrimination).

Finally, Plaintiff points to the fact that a Speaker has never before fired a Council Member's employee and that Quinn did not consult with Barron before suspending and then terminating Plaintiff. However, these facts are insufficient to create an inference that Plaintiff was fired because of race discrimination because Plaintiff has not shown that Defendants treated any similarly situated employee differently than Plaintiff. See Norville, 196 F.3d at 95.

Accordingly, Plaintiff cannot show that the circumstances surrounding her termination give rise to an inference of racial discriminations and her federal and state equal protection claims are dismissed.

11

B. <u>Substantive Due Process Claim</u>

"[A] Substantive Due Process claim . . . must allege governmental conduct that 'is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" <u>Velez v. Levy</u>, 401 F.3d 75, 93 (2d Cir. 2005) (quoting <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 847 n.8 (1998)). The Second Circuit has explained that although "[t]he measure of what is conscience-shocking is no calibrated yard stick, . . . malicious and sadistic abuses of power by government officials, intended to oppress or to cause injury and designed for no legitimate government purpose, unquestionably shock the conscience." <u>Velez</u>, 401 F.3d at 94 (internal quotations omitted). In addition, where government conduct is prohibited by a specific constitutional provision, a plaintiff cannot bring a claim referring to the "broad notion of substantive due process." <u>Velez</u>, 401 F.3d at 94.

Plaintiff's claim that her substantive due process rights were violated because she was suspended and terminated in retaliation for her speech is the same as her First Amendment claim and cannot be brought as a claim referring to the "broad notion of substantive due process." See <u>Velez</u>, 401 F.3d at 94. Plaintiff's claim that her suspension and termination were arbitrary and capricious, and undertaken without authority also fail because there is no evidence of "malicious or sadistic abuses of power" or that Defendants acted with the intention to "oppress or cause injury" or with no legitimate governmental purpose. <u>Velez</u>, 401 F.3d at 94. Accordingly, Plaintiff's federal and state substantive due process claims are dismissed.

IV. <u>Qualified Immunity</u>

The qualified immunity doctrine protects government officials from liability where their conduct does not violate "clearly established statutory or constitutional rights of

12

which a reasonable person would have known." Lewis, 165 F.3d at 166. "Qualified immunity is an immunity from suit that should be decided as early as can be" because denial of qualified immunity "may work a substantial injustice unless it is premised on a thorough review of the record." Kinzer v. Jackson, 316 F.3d 139, 145 (2d Cir. 2003) (Jacobs, J., concurring). In determining whether a defendant is entitled to qualified immunity, the threshold question is whether the defendant's conduct violated a statutory or constitutional right. See Scott v. Harris, -- U.S. --, 127 S. Ct. 1769, 1774 (2007). As discussed previously in detail, further development of the record and resolution of factual disputes are required before this Court can determine whether Plaintiff's constitutional rights were violated. Accordingly, although the Court is cognizant of the need to decide whether Quinn is entitled to qualified immunity as early as possible, the disputed factual issues make it premature to reach that issue. Therefore, Quinn's motion for summary judgment based on qualified immunity is denied.[1]

---

[1] To the extent a defendant acts outside of the scope of her official duties, she is not entitled to qualified immunity. See Shechter v. Comptroller of New York, 79 F.3d 265, 268-69 (2d Cir. 1996). If Plaintiff's constitutional rights were violated, and if the Court found that in suspending and terminating Plaintiff, Quinn was acting outside the scope of her authority as Speaker of the Council, then she would not be entitled to qualified immunity. See Shechter, 79 F.3d at 270. However, because it is not necessary to do so at this junction, this Court will not reach this question.

CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part.

Dated: January 24, 2008
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record:*

Roger S. Wareham, Esq.
394 Putnam Avenue
Brooklyn, NY 11216
*Counsel for Plaintiff*

James M. Lemonedes, Esq.
Assistant Corporation Counsel
City of New York Law Department
100 Church Street
Room 2-172
New York, NY 10007
*Counsel for Defendants*